JOHN C. CRUDEN
Acting Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
PATRICIA L. HURST
District of Columbia Bar No. 438882
Trial Attorney
ESPERANZA ANDERSON
Pennsylvania Bar No. 62582
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C.   20044
Telephone: (202) 307-1242
Fax: (202) 514-2583
Email: patricia.hurst@usdoj.gov
       esperanza.anderson@usdoj.gov

(Additional Counsel are listed on the next page)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, and ) | No. 2:08-CV-02556-MCE-JFM |
| CALIFORNIA DEPARTMENT OF TOXIC ) SUBSTANCES CONTROL, ) | |
| Plaintiffs, ) | **MEMORANDUM IN IN SUPPORT OF PLAINTIFFS' MOTION FOR LETTER OF REQUEST SEEKING INTERNATIONAL JUDICIAL ASSISTANCE** |
| v. ) | |
| STERLING CENTRECORP INC., ) STEPHEN P. ELDER, and ) ELDER DEVELOPMENT, INC., ) | Date: December 3, 2009 Time: 2:00pm Courtroom: 7 Trial Date: None set |
| Defendants. ) | Judge: Morrison C. England, Jr. [Complaint filed Oct. 27, 2008] |

Paul Cirino
Environmental Defense Section
United States Department of Justice
P.O. Box 23986
Washington, DC 20026-3986
(202) 514-1542 (Tel.)

MCGREGOR W. SCOTT
United States District Attorney
SYLVIA QUAST, State Bar No. 159011
Chief, Defense Litigation Unit
United States Attorney's Office
Eastern District of California
501 I Street, Suite 10-100
Sacramento, CA 95814
(916) 554-2740 (Tel.)
(916) 554-2900 (Fax)
Sylvia.Quast@usdoj.gov

Attorneys for Plaintiff United States of America


EDMUND G. BROWN JR.
Attorney General of the State of California
J. MATTHEW RODRIGUEZ
Chief Assistant Attorney General
KEN ALEX
Senior Assistant Attorney General
MARGARITA PADILLA
Supervising Deputy Attorney General
KIRK MCINNIS
California Bar No. 130952
Deputy Attorney General
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
(510) 622-2191 (Tel.)
(510) 622-2270 (Fax)
Kirk.McInnis@doj.ca.gov

Attorneys for Plaintiff California Department of Toxic Substances Control

2

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A LETTER OF REQUEST SEEKING INTERNATIONAL JUDICIAL ASSISTANCE

Pursuant to Federal Civil Procedure Rule 28(b), Plaintiffs, the United States of America and the California Department of Toxic Substances Control, respectfully move for this Court to send a letter of request ("letter rogatory") to the Ontario Superior Court of Justice seeking judicial assistance so that evidence, to be used in this case, may be obtained from a Canadian national, Jack Gilbert, in Toronto, Ontario. The grounds for this request are as follows:

**Background**

Plaintiffs have filed claims against Canadian company Sterling Centrecorp Inc. ("Sterling"), among others, pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-9675. Plaintiffs seek the reimbursement of costs incurred in performing remedial actions to clean up releases or threatened releases of hazardous substances from a former mining operation, the Lava Cap Mine, which is located in Nevada County, California ("Site"). Plaintiffs also seek a declaratory judgment that Plaintiffs are entitled to recover future response costs from the defendants.

Plaintiffs allege that Sterling, through its corporate predecessors and subsidiary,[1] owned and operated the Lava Cap Mine at the time of disposal of hazardous substances at the Site and, therefore, is a potentially responsible party that may be held liable pursuant to Section 107(a) of CERCLA, 42 U.S.C. §§ 9607(a).

---

[1] Sterling, as a corporate entity, has undergone several name changes, including New Goldvue Mines Ltd to Lava Cap Resources Ltd to Lava Capital Corporation to Samoth Capital Corporation to Sterling Centrecorp Inc. In addition, for several relevant years, Sterling maintained a wholly-owned corporate subsidiary named Keystone Copper Corporation.

3

**Applicable Law**

Federal Rule of Civil Procedure 28 allows a deposition to be taken in a foreign country, pursuant to a letter of request granted by the host country. It provides that a deposition may be taken in a foreign country (A) pursuant to any applicable treaty of convention, or (B) pursuant to a letter of request (whether or not captioned a letter rogatory),[2] or (C) on notice before a person authorized to administer oaths in the place where the examination is held, either by the law thereof or by the law of the United States, or (D) before a person commissioned by the court, and a person so commissioned shall have the power by virtue of the commission to administer any necessary oath and take testimony. Id. Further, "[i]t is not requisite to the issuance of a commission or a letter of request that the taking of the deposition in any other manner is impracticable or inconvenient; and both a commission and a letter of request may be issued in proper cases." See Evanston Insurance Company v. OEA, Inc., S-02-1505, 2006 WL 1652315, slip op. at 2 (E.D. Cal. June 13, 2006).

Additionally, the Canada Evidence Act also provides that a court outside of Canada may serve letters rogatory upon a Canadian court. R.S.C. 1985, c. C-5, s. 46. Further, Section 60 of the Evidence Act of Ontario states:

Evidence for foreign tribunals

**60.** (1) Where it is made to appear to the Superior Court of Justice or a judge thereof, that a court or tribunal of competent jurisdiction in a foreign country has duly authorized, by commission, order or other process, for a purpose for which a letter of request could be issued under the rules of court, the obtaining of the

[2]In 1993, the term "letter of request" was substituted for the term "letter rogatory" "because it is the primary method provided by the Hague Convention." Evanston Insurance Company v. OEA, Inc., S-02-1505, 2006 WL 1652315, slip op. at 2 (E.D. Cal.) (citing Federal Rules of Civil Procedure, Rule 28(b), Advisory Committee Notes re 1993 Amendment).

4

testimony in or in relation to an action, suit or proceeding pending in or before such foreign court or tribunal, or a witness out of the jurisdiction thereof and within the jurisdiction of the court or judge so applied to, such court or judge may order the examination of such witness before the person appointed, and in the manner and form directed by the commission, order or other process, and may, by the same or by a subsequent order, command the attendance of a person named therein for the purpose of being examined, or the production of a writing or other document or thing mentioned in the order, and may give all such directions as to the time and place of the examination, and all other matters connected therewith as seem proper, and the order may be enforced, and any disobedience thereto punished, in like manner as in the case of an order made by the court or judge in an action pending in the court or before a judge of the court.

Ontario Evidence Act, R.S.O. 1990, c. E.23, s 60(1).

Whether to issue a letter rogatory in this case is a matter of this Court's discretion since "a court is inherently vested with the authority to issue letters rogatory." See Asis Internet Services v. Optin Global, Inc. , C-05-05124, 2007 WL 1880369, slip op. at 3 (N.D. Cal. June 29, 2007) (citing cases). "When determining whether to exercise its discretion, a court will generally not weigh the evidence sought from the discovery request nor will it attempt to predict whether that evidence will actually be obtained." Id. "Ultimately, a court's decision whether to issue a letter rogatory requires an application of Rule 28(b) in light of the scope of discovery provided for by the Federal Rules of Civil Procedure. Id. [3]

**Argument**

Plaintiffs seek to take an oral examination of Canadian national Jack Gilbert ("Gilbert") for several reasons. First, Plaintiffs refer the Court to Sterling's Initial Disclosures served in this case, which are attached to this Memorandum as Appendix 1. In its Initial Disclosures, Sterling

---

[3]"When carrying out the request, the law of the judicial authority requested to execute the request governs and its own methods and procedures are to be followed." See Progressive Minerals, LLC v. Rashid , 5:07-108, 2009 WL 1789083, slip op. at 3 (N.D. W.Va. June 23, 2009).

identified Gilbert as having discoverable information regarding this litigation. Noteworthy, Sterling did not identify any other person in its Initial Disclosures as a potential witness that would have discoverable information.

Additionally, one of the Plaintiffs' theories of liability against Sterling is that through its corporate predecessors and its wholly-owned subsidiary, Sterling owned and operated the Lava Cap Mine when hazardous substances were released at the Site.[4] Plaintiffs also seek to take an oral examination of Gilbert because Gilbert held several corporate positions for Sterling's corporate predecessors and its subsidiary when these companies held business interests in the Lava Cap Mine, and Gilbert played key roles in transacting these companies business interests relating to the mine. See Appendix 2, Affidavit of John Moore ("Moore Affidavit"), which includes, as Exhibits "A" through "F," copies of some of the business records of Sterling's corporate predecessors and subsidiary submitted to the United States by Sterling. See Moore Affidavit, at 1.

Specifically, Moore Affidavit Exhibit A is a letter, dated December 4, 1972, which appears to be authored by Gilbert, albeit unsigned, in which he identifies himself as both "a director and general counsel of New Goldvue Mines Limited," which is one of Sterling's corporate predecessors. In the letter, Gilbert writes of New Goldvue Mines control of the Lava Cap Mine and of his own negotiations regarding tailings from the Lava Cap Mine. Additionally,

---

[4] Plaintiffs reserve their rights to argue at the appropriate time, either through a dispositive summary judgment motion or at trial, that Sterling's wholly-owned subsidiary, Keystone Copper Corporation ("Keystone"), was merely an instrumentality of Sterling's corporate predecessors serving as these companies' "alter ego" or simply as a "dummy corporation." At this junction, Plaintiffs seek only the opportunity to take the deposition of Gilbert and to have Gilbert produce all documents in his possession relating to the Lava Cap Mine.

he directs the addressee, Arnold Kunody of SELA Electronics, to contact New Goldvue's Mine Manager, Charles Hall, for a sample of the Lava Cap tailings.  Moore Affidavit Exhibit A, which is Bates Stamped "EPA004390" and "SCC 928."

Moore Affidavit Exhibit B is a letter, dated March 16, 1973, authored by Charles Hall ("C. Hall"), addressed to Jack Gilbert.  In the letter, among other matters, C. Hall informs Gilbert of sending Lava Cap tailings to Mr. Hart of SELA Electronics.[5]  Moore Affidavit Exhibit B, which is Bates Stamped "EPA004392" and "SCC931."

Moore Affidavit Exhibit C is a letter, dated July 9, 1981, authored by Ms. Janet C. Hendry ("Hendry"), as Administrative Assistant of Lava Cap Resources Ltd (one of Sterling's corporate predecessors).  In this letter, Hendry addresses Ms. Anne Hall ("A. Hall") with regards to a State of California Domestic Stock Corporation filing done on behalf of Keystone Copper Corporation (Sterling's subsidiary).[6]  There are two additional documents attached to the July 9, 1981 letter: a) a handwritten note authored and executed by "Anne" and b) Keystone Copper Corporation's State of California corporate filing, which is executed by Jack Gilbert and which identifies Gilbert as "Chief Executive Officer" of the company.  Moore Affidavit Exhibit C, which is Bates Stamped "EPA004278-EPA004280" and "SSC 815-SSC 817."

Moore Affidavit Exhibit D is letter, dated August 30, 1982, that is authored by Leonard Carey ("Carey"), who represents himself in the letter as a "realtor."  Carey's letter is addressed to the California Regional Water Quality Control Board and Gilbert is copied.  In this letter, Carey

---

[5] Plaintiffs have confirmed that C. Hall is now deceased.

[6] Plaintiffs have confirmed that A. Hall, wife of C. Hall, is now deceased.

7

makes clear that he is responding to the State of California's concerns regarding the Lava Cap Mine that were originally addressed to "Mr. Jack Gilbert at Toronto, Canada [of] Lava Cap Resources, Ltd.." Lava Cap Resources, Ltd. is one of Sterling's corporate predecessors. Moore Affidavit Exhibit D, which is Bates Stamped "EPA004558" and "SCC 379."

Moore Affidavit Exhibit E is a contractual agreement, dated July 11, 1983, that was entered into by Keystone Copper Corporation (Sterling's subsidiary), Lava Cap Resources Ltd (Sterling's corporate predecessor) and Franco-Nevada Mining Corporation regarding the Lava Cap Mine. Jack Gilbert executed this agreement as President of both Keystone Copper Corporation and Lava Cap Resources Ltd. Moore Affidavit Exhibit E at 12 ("EPA003248"), which is Bates Stamped "EPA003237-EPA003258."

Moore Affidavit Exhibit F is a memorandum, with attachments, dated February 18, 1987, which is authored and signed by Gilbert and is addressed to Eugene Kaulius. In this letter, Gilbert writes of how he has "been spending some time trying to generate some interest in the Grass Valley properties." The Lava Cap Mine is in Grass Valley, Nevada County, California. Moore Affidavit Exhibit F, which has been Bates Stamped "EPA004537-EPA004543."

Given the foregoing, Plaintiffs respectfully move this Court to request by letter ("letter rogatory") that the appropriate judicial authority of Toronto Ontario, Canada compel the appearance of Jack Gilbert, 123 Edward Street, Suite 703, Toronto, Ontario, M5G1E2, Canada, for an oral examination (deposition) in Toronto, Canada. Plaintiffs also ask that the Court request the Canadian court's assistance in compelling Gilbert to produce, at his oral examination (deposition), documents in his possession that relate to the Lava Cap Mine property in Nevada County California. See Fed. R. Civ. P. 28(b); R.S.C. 1985, c. C-5, s. 46.; and Ontario Evidence

8

Act, R.S.O. 1990, c. E.23, s 60(1). Plaintiffs have attached a proposed letter of request, which would be executed by this Court and filed with the Canadian Court by the United States' hired Canadian counsel, if Plaintiffs motion is granted. See Appendix 3.


Dated: October 28, 2009              /s Esperanza Anderson
                                     ESPERANZA ANDERSON
                                     Pennsylvania Bar No. 62582
                                     Trial Attorney
                                     PATRICIA L. HURST
                                     District of Columbia Bar No. 438882
                                     Trial Attorney
                                     Environmental Enforcement Section
                                     Environment & Natural Resources Division
                                     United States Department of Justice
                                     P.O. Box 7611
                                     Washington, D.C.  20044
                                     Telephone: (202) 307-1242
                                     Fax: (202) 514-2583
                                     Email: esperanza.anderson@usdoj.gov
                                            patricia.hurst@usdoj.gov


                                     Attorneys for Plaintiff United States of America




                                     /s Kirk McInnis
                                     KIRK MCINNIS
                                     California Bar No. 130952
                                     Deputy Attorney General
                                     Telephone: (510) 622-2191
                                     Fax: (510) 622-2270
                                     Email: Kirk.McInnis@doj.ca.gov

                                     Attorneys for Plaintiff California Department of Toxic
                                     Substances Control

9

APPENDIX 1

Gary J. Smith, (State Bar No. 141393)
(gsmith@bdlaw.com)
BEVERIDGE & DIAMOND, P.C.
456 Montgomery Street, Suite 1800
San Francisco, CA 94104-1251
Telephone No.: (415) 262-4000
Facsimile No.: (415) 262-4040

Attorney for Defendant
Sterling Centrecorp Inc.

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA
## SACRAMENTO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, and CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL,<br><br>Plaintiffs,<br><br>vs.<br><br>STERLING CENTRECORP INC., STEPHEN P. ELDER, and ELDER DEVELOPMENT, INC.,<br><br>Defendants. | No.: 2:08-cv-02556-MCE-JFM<br><br>DEFENDANT STERLING CENTRECORP'S RULE 26(A)(1) INITIAL DISCLOSURES<br><br>Trial Date: None Set<br>Judge: Judge Morrison C. England<br><br>[Complaint Filed: October 27, 2008] |

Pursuant to Federal Rule of Civil Procedure 26(a)(1), and according to the terms of the January 12, 2009 Joint Rule 26(f) Conference Report and Discovery Plan, Sterling Centrecorp Inc. ("Sterling") makes its initial disclosures as follows:

Sterling's investigation is ongoing, and Sterling responds based on its diligent investigation and the information that it has obtained to date. Sterling makes these disclosures without waiving, and subject to, the protections accorded by the attorney-client privilege and the attorney work product doctrine.

Sterling identifies Jack A. Gilbert as an individual likely to have discoverable information concerning the history of Sterling and its subsidiary Keystone Copper Corp. Mr. Gilbert's office address and telephone number are: 123 Edward Street, Suite 703, Toronto,

1

Ontario, M5G1E2, Canada, 416-593-4093.

Sterling has already provided many, if not all, of the documents that it may use to support its defenses in response to information requests propounded by the United States Environmental Protection Agency pursuant to Section 104(e) of CERCLA, 42 U.S.C. § 9604(e). Plaintiffs may use the documents provided pursuant to Section 104(e) as if they had been produced under Rule 26(a)(1).

As permitted in the Federal Rules of Civil Procedure, Sterling reserves the right to supplement these initial disclosures.

Dated: January 23, 2009.                              BEVERIDGE & DIAMOND, PC

                                                       By:    /s/ Gary J. Smith
                                                              Gary J. Smith


                                                       Attorneys for Defendant
                                                       Sterling Centrecorp Inc.

JOHN C. CRUDEN
Acting Assistant Attorney General
Environment & Natural Resources Division
United States Department of Justice
PATRICIA L. HURST
District of Columbia Bar No. 438882
Trial Attorney
ESPERANZA ANDERSON
Pennsylvania Bar No. 62582
Trial Attorney
Environmental Enforcement Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, DC  20044
Telephone: (202) 307-1242
Fax: (202) 514-2583
Email: patricia.hurst@usdoj.gov
        esperanza.anderson@usdoj.gov

(Additional Counsel are listed on the next page)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNITED STATES OF AMERICA, and**<br><br>**CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL,**<br><br>Plaintiffs,<br><br>v.<br><br>**STERLING CENTRECORP INC., STEPHEN P. ELDER, and ELDER DEVELOPMENT, INC.,**<br><br>Defendants. | No. 2:08-cv-02556-MCE-JFM<br><br>**DECLARATION OF JOHN MOORE IN SUPPORT OF MOTION FOR LETTER OF REQUEST SEEKING INTERNATIONAL JUDICIAL ASSISTANCE**<br><br>Date: December 3, 2009<br>Time: 2:00pm<br>Courtroom: 7<br>Trial Date:  None Set<br>Judge Morrison C. England, Jr.<br><br>[Complaint filed Oct. 27, 2008] |

DECLARATION OF JOHN MOORE

1

Paul Cirino
Environmental Defense Section
United States Department of Justice
P.O. Box 23986
Washington, DC 20026-3986
(202) 514-1542 (Tel.)

MCGREGOR W. SCOTT
United States District Attorney
SYLVIA QUAST, State Bar No. 159011
Chief, Defense Litigation Unit
United States Attorney's Office
Eastern District of California
501 I Street, Suite 10-100
Sacramento, CA 95814
(916) 554-2740 (Tel.)
(916) 554-2900 (Fax)
Sylvia.Quast@usdoj.gov

Attorneys for Plaintiff United States of America

CITY OF WASHINGTON           §
                             §
                             §
DISTRICT OF COLUMBIA         §

Before me, the undersigned notary, on this day, personally appeared JOHN MOORE.

After I administered an oath to him, upon his oath, he said:

In accordance with the provisions of 28 U.S.C. § 1746(2), I, John Moore, hereby declare the following:

1.      I am a paralegal working in the Enforcement Section of the Environment Division of the United States Department of Justice.

2.      Through discovery, and through U.S. EPA's authority, pursuant to Section 104(e) of CERCLA, 42 U.S.C § 9604(e), the United States obtained many business records from Sterling of its corporate predecessors and subsidiary relating to the Lava Cap Mine.

3.      Through the obtained documents, and by information and belief, I learned that Jack Gilbert, a Canadian national, held various key corporate positions for Sterling's corporate predecessors and its wholly-owned subsidiary while these companies held business interests in Lava Cap Mine.  True and accurate copies of

DECLARATION OF JOHN MOORE

2

some of these documents are attached to my declaration as Exhibits "A" through "F."

4. The United States has maintained these documents with a Bates Stamped numbering system that appears in the lower right-hand corner of each page as "EPA ######."  A second Bates Stamped number may appear on some of these documents as "SCC###."

Dated: October 28, 2009

*/s John Moore*
John Moore
*(original signature maintained by*
*Attorney Esperanza Anderson)*

DECLARATION OF JOHN MOORE

3

EXHIBIT A

L-43

December 4th, 1972

Mr. Arnold Kunody,
611 Leisure Way,
Palm Springs, California, 92262.

Dear Arnold,

I am a director and general counsel of New Goldvue Mines
Limited, which company controls the Lava Cap mine near Nevada City,
California. I have been negotiating with a California firm who claim
they can extract $30 to $40 per ton in gold from our tailings. I
estimate our tailings at approximately 150,000 tons.

I enclose a copy of a letter dated March 5th, 1969 from
Stanford University on their analysis of the Lava Cap tailings. This
may be of some assistance to Sela Electronics.

New Goldvue has a Mine Manager who lives at the Lava Cap
property. His address is P. O. Box 7, Nevada City, Cal., 95959,
and his telephone number is. Area Code 916, 273-4238.
If you feel it would be useful to have a sample of the material sent
to you so that the Sela resin process could be tried, I would be
happy to arrange it. Alternatively, you might telephone Mr. Charles
Hall directly and arrange this as I am sending a copy of this letter
to him.

Sincerely,

JAG/jch
Encl.

JACK A. GILBERT.

c.c. Mr. Charles R. Hall,

SCC    928

EPA004390

P.O. Box 7,
Nevada City, Calif. 95959

March 16, 1973.

Jack A. Gilbert, Q.C.,
Suite 4701, P.O. Box 135,
Toronto-Dominion Centre,
Toronto 1, Ontario.

Dear Jack:

We have shipped a 2# sample of Lava Cap tailings to Mr. Hart of SELA Electronics in New York.

The Mr. Myers of Grass Valley you mentioned is the one described in the enclosed clipping.

Fircap Enterprises has been advised that Lava Cap tailings are not available at this time, due to the five-year renewable lease they requested and also to Mr. Weiler's letter.

Mr. Weiler has asked for the County parcelling maps so he can figure out the taxes they would have to pay on the property leased from Keystone.

Re the Ivey 36½ acres. I think the 26½ acres adjacent to United Duvex should be purchased by Duvex but the separate and more remote 10 acres should be purchased by Keystone as a possible opening on the East Banner crosscut as the law now requires an escape opening at the end of any long tunnel.

Apparently the bonds have not been released yet, however I think we can expect another plaster by State Compensation Insurance on the Kostenko case, so maybe the Duvex deed should be recorded in this County.

Kindest personal regards.

Yours truly,

Charles R. Hall

SCC    931

EPA004392

EXHIBIT C

 *Lava Cap Resources Ltd.*

TELEPHONE: (416) 593-4093
TELECOPIER (416) 593-4094

HEAD OFFICE
122 ST. PATRICK STREET
SUITE 405
TORONTO, ONTARIO
M5T 2X8

L- 16

July 9, 1981

Mrs. Anne Hall
12194 Madrone Way
P. O. Box 7
Nevada City, California
95959

Dear Anne:

#### Re: Keystone Copper Corporation

I enclose herewith State of California Statement by Domestic Stock Corporation duly completed and trust you will attend to filing same.

Sincerely,

LAVA CAP RESOURCES LTD.

/jch
Encl.

Per:   Janet C. Hendry
       Administrative Assistant

OKLAHOMA OFFICE.
300A HIGHTOWER BLDG . 105 NO. HUDSON. OKLAHOMA CITY, OKLAHOMA 73102
(405) 235-4500

CALGARY OFFICE
P.O. BOX 6, 10333 SOUTHPORT RD. S.W., CALGARY. ALBERTA T2J 2V4
(403) 259-5333

SCC    815

EPA004278

May 14'81

Jack —

Please show my
address as —
12194 Madron Way
P.O. Box 7,
Nevada City, Ca.
95759

+ return to me for
filing.

Chuck

SCC      816

EPA004279

:amento, CA 95812
ne: (916) 445-2020

**STATE OF CALIFORNIA**

Secretary of State

# STATEMENT BY DOMESTIC STOCK CORPORATION

THIS STATEMENT MUST BE FILED WITH CALIFORNIA SECRETARY OF STATE (SEC. 1502, CORPORATIONS CODE).

## PLEASE READ INSTRUCTIONS ON BACK OF FORM

PLEASE TYPE OR USE BLACK INK WHICH WOULD BE SUITABLE
FOR MICROFILMING.

### FEE FOR FILING THIS STATEMENT — $5.00

1928160   DUE DATE 07/31/81 28860S

KEYSTONE COPPER CORPORATION
BOX 7
NEVADA CITY, CA  95959

DO NOT ALTER PREPRINTED NAME  IF ITEM 1 IS BLANK PLEASE ENTER CORPORATE NAME

THE CORPORATION NAMED HEREIN, ORGANIZED UNDER THE LAWS OF THE STATE OF CALIFORNIA, MAKES THE FOLLOWING STATEMENT:

| 2  STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE | SUITE OR ROOM | 2A. | 2B. |
|---|---|---|---|
| Lava Cap Mine Road (DO NOT USE P O BOX NO.) | | Nevada City, Ca. CITY | 95959 ZIP CODE |
| 3  STREET ADDRESS OF PRINCIPAL BUSINESS OFFICE IN CALIF IF ANY | SUITE OR ROOM | 3A. | 3B. |
| 12194 Madrone Way, P.O.Box 7 (DO NOT USE P O BOX NO.) | | Nevada City, Ca. CALIF. | 95959 ZIP CODE |
| 4  MAIL ADDRESS (OPTIONAL) | SUITE OR ROOM | 4A. | 4B. |
| 12194 Madrone Way, P.O.Box 7 | | Nevada City, Ca. CITY & STATE | 95959 ZIP CODE |

NAMES OF THE FOLLOWING OFFICERS ARE:

| 5 | 5A. | 5B. | 5C. |
|---|---|---|---|
| Jack A. Gilbert CHIEF EXECUTIVE OFFICER | 405-122 St.Patrick Street BUSINESS OR RESIDENCE ADDRESS (DO NOT USE P.O. BOX) | Toronto, Ontario CITY & STATE | M5T2X8 ZIP CODE |
| 6 John A. Murphy SECRETARY | 405-67 Yonge Street BUSINESS OR RESIDENCE ADDRESS (DO NOT USE P O BOX) | Toronto, Ontario CITY & STATE | M5E1J8 ZIP CODE |
| 7 Jack A. Murphy CHIEF FINANCIAL OFFICER | 405-122 St.Patrick Street BUSINESS OR RESIDENCE ADDRESS (DO NOT USE P.O. BOX) | Toronto, Ontario CITY & STATE | M5T2X8 ZIP CODE |

8.  NAMES AND COMPLETE BUSINESS OR RESIDENCE ADDRESS OF INCUMBENT DIRECTORS INCLUDING THOSE DIRECTORS WHO ARE ALSO OFFICERS. (Attach a supplemental list of directors if needed).

| NAME | BUSINESS OR RESIDENCE ADDRESS (DO NOT USE P.O. BOX) | CITY & STATE | ZIP CODE |
|---|---|---|---|
| A Jack A. Gilbert | as above | | |
| B John A. Murphy | as above | | |
| C | | | |
| D | | | |
| E | | | |

9  THE NUMBER OF VACANCIES ON THE BOARD, IF ANY  [      ]

10  AGENT FOR SERVICE OF PROCESS  Mrs. Anne Hall

12194 Madrone Way, Nevada City, Ca. 95959

CALIFORNIA BUSINESS OR RESIDENCE ADDRESS IF AN INDIVIDUAL. ONLY ONE AGENT CAN BE NAMED. DO NOT INCLUDE ADDRESS IF AGENT IS A CORPORATION  (DO NOT USE P.O. BOX)

| 11  INFORMATION MUST BE BRIEF | | |
|---|---|---|
| TYPE OF BUSINESS  Mining – inactive | SCC | 817 |

12  I DECLARE THAT I HAVE EXAMINED THIS STATEMENT AND TO THE BEST OF MY KNOWLEDGE AND BELIEF, IT IS TRUE, CORRECT AND COMPLETE

July 8, 1981                    SIGNATURE OF CORPORATE OFFICER    J.A. Gilbert

EPA004280

EXHIBIT D

 **LEONARD F. CAREY** Realtor · investment properties

August 30, 1982

L-60

Thomas A. Vandenberg, Area Engineer
California Regional Water Quality Control
Board — Central Valley Region
3201 S Street
Sacramento, CA   95816

RE:   Lava Cap Mine, Nevada County, CA

Dear Mr. Vandenberg:

Responding to your letter of June 24 and your last letter
of August 26, 1982 addressed to Mr. Jack A. Gilbert at
Toronto, Canada regarding Lava Cap Resources, Ltd. subject
property, be advised that for and on behalf of Keystone
Copper Corp., the Cranmer Engineering Inc. has been authorized
to carry out the testing and reporting procedure requested in
your June 24, 1982 letter.

In personal discussion with Mr. Cranmer today, August 27, 1982,
he informs me they have been doing the monitoring and sampling
requested and that you will be getting a current report in
this coming week.

Sorry for the delay — please let me know if I can be of further
help.

Yours very truly,

Leonard F. Carey, REALTOR

LFC:pf
cc:   Jim Cranmer
      Jack Gilbert
      Dr. Greg Carmichael

SCC      379

EPA004558

EXHIBIT E

E-3

THIS AGREEMENT made as of the 11th day of July, 1983,

AMONGST:

> KEYSTONE COPPER CORPORATION, a corporation incorporated under the laws of California ("Keystone")
>
> - and -
>
> LAVA CAP RESOURCES LTD., a corporation incorporated under the laws of Ontario ("Lava Cap")
>
> - and -
>
> FRANCO-NEVADA MINING CORPORATION LIMITED, a corporation incorporated under the laws of Canada ("FNMC")

WITNESSES THAT:

WHEREAS Keystone is the registered and beneficial owner in fee simple of and, subject to applicable laws, has exclusive right to deal with, and dispose of, the mineral properties described in Schedule "A" attached hereto together with all buildings and fixtures thereon (the "Property");

AND WHEREAS Keystone is a wholly-owned subsidiary of Lava Cap;

AND WHEREAS Keystone is desirous of selling the Property to FNMC and FNMC is desirous of purchasing the Property;

AND WHEREAS Keystone and Lava Cap have determined that it is in their best interests to enter into this Agreement;

NOW THEREFORE in consideration of the covenants and agreements herein contained to be performed, the parties hereto agree as follows:

EPA003237

2.

## ARTICLE ONE

## DEFINITIONS

Section 1.01   The terms defined in this section for the purposes of this Agreement shall have the following meanings unless the context expressly or by necessary implication otherwise requires:

(a) "Closing Date" means a day to be fixed upon consent of the parties hereto but not later than July 15, 1983.

(b) "Force Majeure" means any cause beyond the control of FNMC which prevents the performance by FNMC of any obligations hereunder and not caused by its default or act of commission or omission and not avoidable by the exercise of reasonable effort or foresight by FNMC including, without limitation, strikes or other labour or industrial disturbances, civil disturbance, acts, orders, legislation, regulations or directives of any governmental or other public authorities, act of public enemy, war, riot, sabotage, blockade, embargo, shortage of materials and supplies, financial inability, shortage of labour, lightning, earthquake, fire, storm, hurricane, flood, washout, explosion, acts of God, weather and delays caused by Keystone.

(c) "Net Smelter Return" means the value of marketable minerals produced or extracted from the Property and received by FNMC from a purchaser thereof, less the following deductions:

(i) all charges made by a smelter, mill or other purchaser, including without limiting the generality of the foregoing, treatment, sampling and other charges, penalties and other deductions;

(ii) all costs of transportation and insurance of ore from the Property to the purchaser or otherwise as directed; and

(iii) all ad valorum, excise, severance, sales and/or production taxes, but not income taxes.

(d) "Property" means the mineral properties known as the Central and Banner Mines with certain surround- ing subsurface rights, all as more particularly described in Schedule "A" to this Agreement, together with all buildings and fixtures thereon.

EPA003238

3.

## ARTICLE TWO

### SALE

Section 2.01   FNMC agrees to purchase and Keystone agrees to sell, convey, transfer and assign to FNMC, or as it may direct, all of its right, title and interest in and to the Property.  The purchase price for the Property shall be Cdn $10.00 and the royalties provided for in Article Seven of this Agreement.

Section 2.02   The obligation of Keystone to sell, convey, transfer and assign the Property to FNMC shall be conditional upon the subscription by FNMC for 50,000 common shares without par value in the capital of Lava Cap at a price of Cdn. $4.00 per share for an aggregate consideration of Cdn. $200,000.

Section 2.03   The closing of the transaction contemplated by Section 2.02 shall occur on the Closing Date in the offices of Lava Cap at Suite 405, 122 St. Patrick Street, Toronto, Ontario. All title deeds and related conveyancing documents required to effect the transfer of the Property to FNMC shall thereafter be prepared and held in escrow by Messrs. Berliner & Spiller, of 224 Main Street, Nevada City, California, counsel to Lava Cap and Keystone, for the benefit of FNMC to be released for registration upon FNMC delivering to Lava Cap a notarial copy of a receipt for final prospectus from the Ontario Securities Commission in respect of an equity financing by FNMC which will raise not less than Cdn. $2,000,000.  Upon such delivery all such deeds and documents shall be released to FNMC or as it may direct for immediate registration in the appropriate governmental offices.  In the event that such receipt is not available by December 31, 1983, all such deeds and documents shall be returned to Lava Cap and Keystone and they shall have no further obligations pursuant to this Agreement.

## ARTICLE THREE

### REPRESENTATIONS AND WARRANTIES

Section 3.01   Keystone hereby represents and warrants as follows:

(a)   that it is a valid and subsisting corporation and is in good standing under the laws of California and has full power in law and in equity to deal in and with the Property in accordance with the terms of this Agreement;

EPA003239

.4.

(b)   that no person owns or has any rights in respect of the Property which would materially adversely affect the carrying out of this Agreement;

(c)   that it is the owner of the entire, undivided fee simple title to the Property and that all applicable carrying charges have been satisfied, save and except for U.S. $11,478.57 in taxes levied by and owing to Nevada County, California with accrued interest thereon;

(d)   that the Property is all of the property of such nature and character as is owned beneficially by Keystone within Nevada County, California;

(e)   that except as herein provided or contemplated, no person has or will have any agreement or option, or any right capable of becoming an agreement or option, for the lease, purchase or acquisition of the Property (or any part thereof) or for any interest therein;

(f)   that Keystone is not a party to any litigious proceedings save and except for <u>Scott et al.</u> v. <u>Keystone Copper Corporation</u> commenced at the instance of an owner of property adjacent to the Property and in respect of access thereto; and

(g)   that no third party or other regulatory approvals are required for the sale, conveyance, transfer or assignment of the Property as contemplated by this agreement.

Section 3.02   Lava Cap represents and warrants as follows:

(a)   that it is a valid and subsisting corporation and is in good standing under the laws of Ontario;

(b)   that the head office of Lava Cap is located at Suite 405, 122 St. Patrick Street, Toronto, Ontario;

(c)   that the authorized and issued capital of Lava Cap is as set forth in the audited financial statements as of December 31, 1982;

(d)   that it is the registered and beneficial holder of all of the issued and outstanding shares of Keystone;

(e)   that there has been no material adverse change in its affairs, financial or otherwise, from the position shown in its unaudited financial statements for the period ending March 31, 1983;

EPA003240

5.

(f)  that it is a "reporting issuer" (as defined in the Securities Act (Ontario)) and is not in default of any requirement of such Act or the Regulations made under such Act; and

(g)  that the common shares without par value of Lava Cap are listed on The Toronto Stock Exchange and posted for trading thereon.

## ARTICLE FOUR

## CONDITIONS OF CLOSING; TITLE DEFECTS

Section 4.01   By the Closing Date Lava Cap shall have obtained all necessary regulatory approvals for the issue of shares contemplated by Section 2.02 and shall provide to FNMC on the Closing Date the opinion of its counsel to the effect that it is duly incorporated and organized and validly subsisting under the laws of Ontario and that, when issued, the shares of Lava Cap referred to in Section 2.02 shall be duly issued as fully-paid and non-assessable and are listed and posted for trading on The Toronto Stock Exchange, and as to such other matters as FNMC's counsel may reasonably require.

Section 4.02   Keystone shall provide FNMC with any shareholder or director approvals required to effect the transfer of the Property.

Section 4.03   Notwithstanding the provisions of Section 4.02 of this Agreement, FNMC shall have the right to notify Keystone in writing before the first anniversary of the Closing Date that there has been disclosed a material defect in Keystone's title to the Property as represented in Section 3.01(c) of this Agreement, or Keystone's title is contested or questioned by any person, entity or governmental agency, whereupon Keystone shall promptly commence action reasonably designed to correct the defects or alleged defects in title.  If Keystone is unable or unwilling to promptly commence such action, and to thereafter diligently pursue such action to completion, FNMC may, but shall not be obligated to, attempt to perfect, defend or initiate litigation to protect its title to the Property.  In such event, Keystone shall execute all documents and shall take all such other actions as are reasonably necessary to assist FNMC in its efforts to perfect, defend or protect its title.

Section 4.04   If, as a consequence of any material title defect, lien, claim, encumbrance or adverse interest, title to the Property is otherwise than as represented in

EPA003241

6.

Section 3.01(c), then the costs and expenses of perfecting, defending or correcting title (including reasonable attorneys fees and court costs) shall be

(a)  paid by Keystone if Keystone is notified by FNMC of such defect, lien, claim, encumbrance or adverse interest within one year from the Closing Date, unless the encumbrance or dispute arises from FNMC's failure to perform obligations hereunder, in which case such costs shall be borne by FNMC; or

(b)  paid by FNMC if notice of such defect, lien, claim, encumbrance or adverse interest is not provided to Keystone within said one year period.

If Keystone does not pay the costs and expenses which it is obligated to pay pursuant to the provisions of this Section 4.04, and FNMC pays such expenses, FNMC may take a credit against 50% of advance royalty payments and for Net Smelter Return royalties to be paid thereafter to Keystone in accordance with Article Seven for the amount of costs and expenses so paid by FNMC.

Section 4.05  If title to the Property (or any portion thereof) is materially otherwise than as represented in Section 3.01(c) hereof, FNMC shall have the right to elect to accept such title as Keystone may have by giving notice of such election to Keystone.  In such event, and provided that FNMC has, within one year from the Closing Date, notified Keystone in writing of the title defects, liens, claims, encumbrances or other adverse interests affecting title to the Property and such title defects, liens, claims, encumbrances or other adverse interest affecting title to the property is established by a court of competent jurisdiction, the advance royalty payments and the Net Smelter Return royalty payments set forth in Article Seven hereof shall be reduced to the same proportion thereof as the undivided title and interest actually owned by Keystone and not owned by a third party bears to the title of Keystone as represented in Section 3.01(c) hereof.


ARTICLE FIVE

EXPLORATION AND DEVELOPMENT

Section 5.01   Subject to Force Majeure and unless the conditions contained in Section 2.03 of this Agreement are not satisfied by FNMC, FNMC shall spend a total of Cdn. $500,000 on the exploration and development of the Property over the four year period commencing from the date

7.

upon which FNMC, acting in good faith, has satisfied itself that title to the Property is free and clear of all liens and encumbrances as might render the further development of the Property commercially unreasonable. If such determination is made then the provisions of Article Six shall apply. Cdn. $300,000 shall be spent within the first three years of the aforementioned period. FNMC covenants to undertake all work herein in a professional and workmanlike manner and in compliance with all federal and state laws of general application.

Section 5.02  FNMC shall have the discretion whether to place the Property into commercial production and the scale of such production and shall be responsible to raise all funds required to place the Property into commercial production or to proceed with its obligations under Article Six of this Agreement.

Section 5.03  If an event of Force Majeure shall prevent or delay performance of any obligation under this Agreement the time for such performance shall be extended by a period equal to the period of delay.

ARTICLE SIX

SALVATION MODE

Section 6.01  If FNMC has determined in its reasonable opinion that the Property is not commercially viable as an operating mine, it may at its option discontinue all exploration and development work on the Property and thereupon salvage and thereafter sell the Property on an arm's length basis and all rights appurtenant thereto.

Section 6.02  Subject to the provisions of Section 5.01 of this Agreement respecting title to the Property, FNMC shall not so salvage and sell the Property before it has expended Cdn. $300,000 on exploration and development work thereon.

Section 6.03  If a determination is made that the Property be so sold, FNMC and Keystone shall share equally in the proceeds from such salvage or sale, including the real estate value of the Property, after FNMC has recovered all its costs incurred in connection with the Property and Keystone has been credited with the shortfall between Cdn. $500,000 and the amount expended on the Property by FNMC. For the purpose of determining such costs, FNMC shall be credited with the market value of the shares of Lava Cap referred to in Section 2.02 at the time that the determination to salvage and sell the Property is made. The proceeds of salvage and sale to be

EPA003243

8.

so divided shall include any amount realized upon the recovery of the 149,500 tons of ore identified on the Siegfried Report (1952). If in the course of such salvage and sale proceedings there can be no profitable disposition of the mineral rights comprising the Property, such rights shall be conveyed to Keystone for Cdn. $1.00.

Section 6.04    In the event that the Property is so salvaged and sold, the right of Keystone to receive any royalty payments either by way of advance royalty or Net Smelter Return royalties pursuant to Article Seven of this Agreement shall cease at the time such determination to salvage and sell the property is made.

## ARTICLE SEVEN

## ROYALTIES

Section 7.01    Commencing on the first anniversary date of the Closing Date FNMC shall pay to Keystone, annually for a period of three years, advance royalty payments of Cdn. $50,000, and thereafter Cdn. $100,000 annually until commercial production at the rate of not less than 100 tons of ore per day is achieved on the Property. The advance royalty payments shall be credited against any Net Smelter Return royalties payable after commencement of commercial production.

Section 7.02    On achieving commercial production of 100 tons of ore per day FNMC shall pay Keystone a royalty being a percentage of Net Smelter Return as follows:

| Percent Net Smelter Return | Average Monthly Recovered Gold Grade per Ton of Ore Milled |
|---|---|
| 5% | up to 0.39 oz/t |
| 6% | 0.40 - 0.49 oz/t |
| 8% | 0.50 - 0.59 oz/t |
| 10% | 0.60 and greater |

Section 7.03    Payment of the Net Smelter Return royalties due to Keystone shall be made within 30 days after FNMC receives the Net Smelter Return. Within 120 days after the end of each fiscal year in which Net Smelter Return royalties are payable to Keystone, the records relating to the calculation of the Net Smelter Return shall be audited and any resulting adjustments in the payment of the Net Smelter Return royalties due to Keystone shall be made forthwith

EPA003244

9.

after completion of the audit. All payments of royalties for a fiscal year shall be deemed final and in full satisfaction of all obligations of FNMC in respect thereof if such payments or calculations thereof are not disputed by Keystone within 60 days after receipt by Keystone of the said audited statement.

Section 7.04   The Net Smelter Return royalty rights contained herein are convertible, at the option of Keystone, into a 25% non-assessable net profits interest in the operation of the Property, but such conversion shall only take place if the price of gold as defined by the P.M. London fixing averages over U.S. $750 an ounce (and as reported in "Metals Week") over a 180 day period. Any losses incurred in the operation of the Property can be carried forward on a cummulative basis for the purposes of calculating net profits payable to Keystone from time to time. The advance royalty rights provided in Section 7.01 shall be credited against any payments to be made in accordance with the net profits interest created hereby.

## ARTICLE EIGHT

### ACCESS

Section 8.01   Keystone shall be entitled at all reasonable times upon prior arrangement acceptable to FNMC to reasonable access during normal business hours to all data, reports and logs in FNMC's possession relating to the Property and to receive copies thereof. Neither Keystone nor Lava Cap shall make public disclosure of any such material without the consent of FNMC, such consent not to be unreasonably withheld and subject always to applicable disclosure laws (in which latter case Keystone and Lava Cap shall give notice to FNMC of any such public disclosure).

## ARTICLE NINE

### MISCELLANEOUS

Section 9.01   Unless otherwise provided herein, any disclosure, notice, direction or other communication required or permitted to be given under this Agreement shall be in writing and may be given by delivering same, or by mailing same by prepaid registered post or sending same by telegram, telex, telecopier or other similar form of telecommunication, in each case addressed as follows:

10.

if to Keystone or                Suite 405
Lava Cap:                        122 St. Patrick Street
                                 Toronto, Ontario

if to FNMC:                      Suite 1201
                                 2300 Yonge Street
                                 Toronto, Ontario

Any disclosure, notice, direction or other communication aforesaid, if delivered, shall be deemed to have been given and received on the day on which it was delivered, and if mailed shall be deemed to have been given and received on the fifth business day following the day on which it was mailed and if sent by telegram, telex, telecopier or other similar form of telecommunications, shall be deemed to have been given and received on the second business day following the day on which it was so sent. Any party from time to time may give written notice of change of address in the same manner in which event any disclosure, notice, direction or other communication shall thereafter be given to it as above provided at such changed address.

Section 9.02    This Agreement shall enure to the benefit of and be binding upon the parties hereto and their respective successors and assigns. Keystone, Lava Cap or FNMC may assign to any other persons or corporations any portion of the powers, rights, titles or interests obtained by or conferred upon the respective parties hereto and Keystone, Lava Cap and FNMC may enter into all agreements, contracts and writings and do all acts and things necessary to give effect to the provisions of this Section 9.02; provided, however, that the rights of assignment in favour of Keystone and Lava Cap herein contained shall only be exercisable by Keystone and Lava Cap following notice to FNMC and an offer by FNMC to meet or better any offer to acquire such powers, rights, titles or interests made bona fide by a third party (such right in favour of FNMC not to in any way be construed to preclude Keystone from undertaking a public offering of its securities).

Section 9.03   Keystone and Lava Cap, on the one hand, and FNMC on the other, hereby indemnify and agree to hold each other harmless from all material costs, losses, damages, liability and expenses which may have been incurred by all or any previous operators on the Property including Keystone and Lava Cap prior to the Closing Date. From the Closing Date FNMC will maintain comprehensive insurance coverage on the Property, with an endorsement in favour of Lava Cap and Keystone to indemnify them from any losses or lawsuits arising from past ownership or continuing interest in the Property.

EPA003246

11.

Section 9.04   Except as specifically set forth in this Agreement, there are no representations, warranties, covenants or agreements made by either of the parties hereto with respect to the matters herein provided or contemplated and not contained herein, and this Agreement supersedes any other prior agreement, whether written or oral, between the parties hereto relative to the matters herein provided or contemplated and constitutes the entire agreement of the parties hereto relative to the matters herein provided or contemplated.   Nothing herein contained shall be construed as creating a partnership or similar association amongst the parties hereto or as imposing upon any of them any partnership duties, obligations or liabilities and it being the intention that, unless then so expressly stated, the rights, privileges, duties, obligations and liabilities of the parties hereto shall be several and not joint or collective.

Section 9.05   Lava Cap and Keystone covenant to pay the taxes referred to in Section 3.01(c) of this Agreement on the dates they fall due, failing which payment FNMC shall be entitled to withhold the necessary amount for payment from the advance royalty contemplated by Section 7.01 of this Agreement.

Section 9.06   Any dispute or difference between any of the parties hereto concerning the reduction of royalty interest provided for in Section 4.05 or the calculation of Net Smelter Return royalties provided for in Section 7.03 of this Agreement which cannot be resolved or settled by the parties may be settled by arbitration in accordance with the Arbitrations Act (Ontario) with procedure satisfactory to the parties.

Section 9.07   Time shall be of the essence for the purposes of this Agreement.

Section 9.08   This Agreement shall be subject to and governed by the laws of the Province of Ontario, save in relation to all questions respecting the title to the Property which shall be governed by the law of California.

Section 9.09   Keystone, Lava Cap and FNMC agree that no finder's fee or agent's commission will be payable in connection with the transactions contemplated by this Agreement and further agree that Keystone and Lava Cap, on the one hand, and FNMC on the other will indemnify each other for any amounts that may be claimed by and owing to a third party as such.

Section 9.10   FNMC covenants that it won't interfere with development by Keystone of the adjoining surface acreage of approximately 400 acres currently recorded in Keystone's name which it holds for the beneficial owners.   FNMC further

EPA003247

12.

covenants that it shall maintain the Property in good standing for the purposes of the development thereof.

Section 9.11    Lava Cap shall be jointly responsible with Keystone for the performance of all obligations pursuant to this Agreement.    Lava Cap and Keystone shall and will, from time to time and at all times hereafter upon every reasonable request so to do, do, execute and deliver, or cause to be done, executed and delivered all such further acts and assurances as may be necessary for carrying out the true intent and meaning of this Agreement.

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be executed.

KEYSTONE COPPER CORPORATION

Per:_____ c/s

LAVA CAP RESOURCES LTD.

Per:_____ c/s

FRANCO-NEVADA MINING
    CORPORATION LIMITED

Per:_____ c/s

## SCHEDULE "A"

### Surface Acreage

All that real property situate in the unincorporated area of the County of Nevada, State of California, described as follows:

### Parcel No. 1

All that portion of the South half (S½) of Section 21, in Township 16 North, Range 9 East, M.D.B. & M.

COMMENCING at Stake No. 1 on the Section line between Sections 21 and 28, 531 feet Westerly from the quarter section corner between said Sections; thence Easterly along said section line 667 feet to a stake marked Corner No. 2; thence North 26°35' 1645 feet to a staked marked corner No. 3; West 600 feet to a stake marked Corner No. 4; thence South 26°35' East 1,355 feet to place of beginning; magnetic variation 18°30' East.

EXCEPTING THEREFROM all that portion located within the boundary lines of Banner Mountain Development, as described in Parcel 7 of the Quit Claim Deed recorded June 2, 1964, in Book 359, Official Records, at page 638, Nevada County Records, executed by Keystone Copper Corporation to Nevada Irrigation District.

ALSO EXCEPTING THEREFROM the South one-half of Southwest one-fourth of Southeast one-fourth of Section 21, Township 16 North, Range 9 East, M.D.M., as conveyed to William F. Blackledge by the deed recorded March 13, 1964, in Book 353, at page 235, Nevada County Records, executed by Keystone Copper Corporation.

ALSO EXCEPTING THEREFROM all that portion of land lying West or Westerly of the West line of the East one-half of the East one-half of the Southwest one-quarter of Section 21, Township 16 North, Range 9 East, M.D.M.

### Parcel No. 2

Lot No. 56, in Section 16, Township 16 North, Range 9 East, Mount Diablo Meridian, according to the official plat thereof.

EXCEPTING THEREFROM that portion thereof conveyed by deed dated April 24, 1964, recorded July 2, 1964, in Book 359 of Official Records, at page 638, executed by Keystone Copper Corporation, to Nevada Irrigation District, the West half of Southwest quarter of Southeast quarter of Section 16, Township 16 North, Range 9 East, M.D.M.

EPA003249

2.

## Parcel No. 3

The East one-half of the Northeast one-quarter of the North-west one-quarter of Section 28, Township 16 North, Range 9 East, M.D.M.

## Parcel No. 4

Lots 1, 2, 3, 88 and 89 of Section 28, Township 16 North, Range 9 East, M.D.M., according to the official plat thereof.

EXCEPTING FROM said Lot 88 that portion thereof, located in the Northwest quarter of said Section 28.

## Subsurface Rights

The mineral rights underlying the following described property, except as reserved herein, from a point 100 feet from the surface, and below, without the right of surface entry:

## Parcel No. 1:

Lots One (1) to Ten (10) inclusive, Lots Thirteen (13) to Twenty-Four (24) inclusive and Lots Twenty-Seven (27) to Thirty-Eight (38) inclusive of Banner Hill Ranch Subdivision Number One according to the Official Map or Plats of said Subdivision filed for record in the County Recorder's Office of Nevada County, January 9th, 1915.

## Parcel No. 2:

The Northeast quarter of the Southeast quarter (NE¼ of SE¼) and the Southeast quarter of the Southeast quarter (SE¼ of SE¼) of Section Twenty-One (21), in Township Sixteen (16) North, Range Nine (9) East, Mount Diablo Base and Meridian; the Northwest quarter of the Southwest quarter (NW¼ of SW¼) and the Southwest quarter of the Northwest quarter (SW¼ of NW¼) of Section Twenty-Two (22), in Township Sixteen (16) North, Range Nine (9) East, Mount Diablo Base and Meridian.

## Parcel No. 3:

(a)  The Northwest quarter (NW¼) of Section Twenty-Eight (28) in Township Sixteen (16) North, Range Nine (9) East, Mount Diablo Base and Meridian.

EXCEPTING THEREFROM that portion of the location or claims of the Greenhorn Quartz Mining Company located on the Monroe

3.

Ledge upon Independence Hill, West of Greenhorn Creek in the County of Nevada, State of California, and on the East half of the Northwest quarter of Section 28, Township 16 North, Range 9 East, Mount Diablo Base and Meridian; ALSO Two Hundred Feet on the East side of said ledge for mills, dumps and other mining purposes, as conveyed by that deed dated August 14, 1869, recorded February 8, 1870, in Book "35" of Deeds, at page 239, executed by J. H. Nichols, to Thomas Findley, et al;

ALSO EXCEPTING that portion of the Northwest quarter of Section 28, Township 16 North, Range 9 East, M.D.B. & M., described as follows, to wit:

COMMENCING at the Northeast corner of said quarter section, thence running Southerly along the East line thereof to stake "C.A.", of the survey of the Central Con. Quartz Mine, as shown on the Official plats of the United States and Mineral Application No. 1841, filed in the U.S. Land Office at Sacramento, California; thence North 26° 35' West to the North line of said quarter section, and thence Easterly along the latter line to beginning.

Being all that portion of said quarter section lying Northeasterly of a line drawn through stakes of said mining survey marked "C.S.W. Cor.", and "C.A.", and thence on same line and course to the North line of said quarter section, containing 13.11 acres, more or less.

(b)  The East half of the Northeast quarter (E½ of NE½) of Section Twenty-Nine (29), in Township Sixteen (16) North, Range Nine (9) East, Mount Diablo Base and Meridian.


Parcel No. 4:

The Southeast quarter (SE½) of Section Thirty-Three (33), Township Sixteen (16) North, Range Nine (9) East, Mount Diablo Base and Meridian.


Parcel No. 5:

All minerals, ores, mineral bearing gravel, rock and earth lying and being within:

(a)  All that portion of the Southwest quarter (SW½) of Section Fifteen (15) in Township Sixteen (16) North, Range Nine (9) East, M.D.B. & M. lying Westerly and Northerly of the Banner Hill Road.

EPA003251

4.

(b)  The North half (N½) of Section Twenty-One (21) in Township Sixteen (16) North, Range Nine (9) East, M.D.B. & M.,

EXCEPT that portion thereof located within the boundaries of the South Banner Quartz Mine as said mine is described in a Mining Location recorded in Book "10" of Mining Claims, at page 751.

(c)  The East half (E½) of the Southwest quarter (SW¼) and the West half of the Southeast quarter (SE¼) of Section Twenty-One (21), in Township Sixteen (16) North, Range Nine (9) East, M.D.B. & M.

EXCEPTING that portion thereof described as parcel No. 6 below.

(d)  The Southeast quarter (SE¼) of Section Sixteen (16), in Township Sixteen (16) North, Range Nine (9) East, M.D.B. & M.

EXCEPTING THEREFROM that portion located within Lot 56 (described as Parcel No. 7 below), and North Banner Mine, known as Lot 77;

ALSO EXCEPTING THEREFROM all that portion conveyed by the Deed dated January 6, 1881, recorded March 29, 1881, in Book "60" of Deeds, at pages 62 et seq., executed by W.H. Jennings to J.B. Hosford and M.G. Foot, described as follows:

"ALL AND SINGULAR those certin pieces of parcels of land containing gold bearing quartz rock, situate on Banner Hill, in Township and County of Nevada, State of California, to wit:

Fifteen Hundred (1,500) feet in length along the line of the East Banner Quartz Lode situate in Nevada Mining District, commencing three hundred (300) feet Northeast from the cabin standing near the mouth of the tunnel on said ledge, and running thence twelve hundred (1,200) feet Southwest from said cabin, with sufficient land on each side of said lode for the purpose of working and mining said quartz lode and for no other purpose whatever.  Also that certain other quartz lode, known as the East Banner Lode situate in said mining district in Township and County aforesaid and being an extension of the first named claim.  Commencing at the Southwesterly line of the above-described claim and running thence in a Southwesterly direction along the line of said lode Fifteen Hundred (1,500) feet to a stake standing about four hundred (400) feet Northeast from the dwelling house of the party of the first part, with sufficient surface ground on each side of said lode for working purposes and for no other purpose whatever.  Together with all the dips, spurs, angles, and variations to said quartz ledges belonging and

EPA003252

5.

all tunnels, cuts, shafts, thereunto belonging. The claims above described are situated on the Southeast quarter of Section Sixteen (16), in Township 16 North, Range 9 East, Mount Diablo Base and Meridian."

ALSO EXCEPTING THEREFROM a portion of said Southeast quarter of Section 16 conveyed by the deed dated June 2, 1936, recorded July 6, 1936, in Book "31" of Official Records, page 366, executed by Lava Cap Gold Mining Corporation, a corporation to Empire Star Mines Company, Limited, a corporation, describing the following:

All that portion of Lot 77 situate in Section 16, Township 16 North, Range 9 East, which Lot No. 77 is commonly known as and called North Banner Quartz Mine (and other property) EXCEPTING from this conveyance any and all extralateral mining rights of the said party of the first part in and to the above described property.

Parcel No. 6:

Twenty and 66/100 (20.66) acres in the South half (S½) of Section 21, in Township 16 North, Range 9 East, Mount Diablo Base and Meridian described as follows:

COMMENCING at Stake No. 1 on the section line between Sections 21 and 28, 531 feet Westerly from the quarter section corner between said Sections; thence Easterly along said section line 667 feet to a stake marked Corner No. 2; thence North 26° 35' West 1,645 feet to a stake marked Corner No. 3; thence South 63° 25' West 600 feet to a stake marked Corner No. 4; thence South 26° 35' East 1,355 feet to place of beginning; magnetic variation 18° 30' East and containing 20.66 acres, more or less.

Parcel No. 7:

Lot No. Fifty-Six (56), in Section Sixteen (16), Township Sixteen (16) North, Range Nine (9) East, Mount Diablo Base and Meridian.

Parcel No. 8:

That portion of the Northwest quarter (NW¼) of Section Twenty-Eight (28), in Township Sixteen (16) North, Range Nine (9) East, M.D.B. & M., described as follows:

COMMENCING at the Northeast corner of said quarter section, thence running Southerly along the East line thereof to Stake "C.A." of the survey of the Central Con. Quartz Mine, as

EPA003253

6.

shown on the official plats of the United States, and Mineral Application No. 1841, filed in the U.S. Land Office at Sacramento, California, thence North 26° 35' West to the North line of said quarter section and thence Easterly along the latter line to beginning, being all that portion of said quarter section lying Northeasterly of a line drawn through stakes of said mining survey marked "C.S.W. Cor." and "C.A." and thence on same line and course to the North line of said quarter section, containing 13.11 acres, more or less.

Parcel No. 9:

Lots One (1), Two (2), Three (3), Four (4) and the Northeast quarter of the Northeast quarter (NE¼ of NE¼) of Section Twenty-Eight (28), in Township Sixteen (16) North, Range Nine (9) East, Mount Diablo Base and Meridian.

Parcel No. 10:

Lot Eighty-Eight (88), in Section Twenty-Eight (28), in Township Sixteen (16) North, Range Nine (9) East, Mount Diablo Base and Meridian.

EXCEPTING THEREFROM that portion thereof located in the Northwest quarter (NW¼) of said Section 28.

Parcel No. 11:

Lot Eighty-Nine (89), in Section Twenty-Eight (28), in Township Sixteen (16) North, Range Nine (9) East, Mount Diablo Base and Meridian.

Parcel No. 12:

Lots Numbered One (1), Two (2), Three (3), Four (4), Five (5), Seven (7) and Eight (8) of Tract "A" of the Subdivision of the Manion Ranch, according to the Map thereof filed in the office of the County Recorder of the County of Nevada, State of California, on the 6th day of April, 1917, and situated in Section 33, Township 16 North, Range 9 East, Mount Diablo Base and Meridian.

Parcel No. 13:

The Southeast quarter of the Northwest quarter of Section Thirty-Three (33), Township Sixteen (16) North, Range Nine (9) East, M.D.B. & M., containing 40 acres, more or less.

EPA003254

7.

EXCEPTING AND RESERVING THEREFROM all the mineral, metal matter and rock below One Hundred (100) feet of the surface with the right to extract and remove the said mineral, metal matter and rock from any depth up to One Hundred (100) feet of the surface of said premises without disturbing the surface thereof.

Parcel No. 14:

The East half of the Southwest quarter of the Southeast quarter (E½ of the SW¼ of SE¼) and West half of Southeast quarter of Southeast quarter (W½ of SE¼ of SE¼) of Section Sixteen (16), Township Sixteen (16) North, Range Nine (9) East M.D.B. & M.

EXCEPTING THEREFROM all the minerals, ores, mineral bearing gravel, rock and earth as contained in the deed dated March 3, 1906, recorded September 28, 1906, in Book "104" of Deeds, at pages 447, et seq., executed by Worthington M. Jennings to the Central Consolidated Mining Company.

Parcel No. 15:

(a)  Lot Four (4) of Southeast quarter of the Southwest quarter of Section Sixteen (16), Township Sixteen (16) North, Range Nine (9) East, M.D.B. & M., containing 23.60 acres, more or less.

(b)  Lot Eleven (11) of the East half of the Southwest quarter of the Southwest quarter of Section 16, Township 16 North, Range 9 East, M.D.B. & M. containing 19.51 acres, more or less.

Parcel No. 16:

HARMONY QUARTZ LODE MINING CLAIM, designated by the Surveyor General as Lot 83, Survey No. 2780, embracing a portion of Section 16, Township 16 North, Range 9 East, Mount Diablo Base and Meridian, being more particularly described in the Patent from the United States of America to George Fletcher, recorded in Book 4 of Patents, Page 7, Nevada County Records.

Parcel No. 17:

The South half of the Southeast quarter of the Southeast quarter (S½ of SE¼ of SE¼) of Section Twenty (20), Township Sixteen (16) North, Range Nine (9) East, Mount Diablo Base and Meridian.

EPA003255

8.

Parcel No. 18:

All quartz, mineral, metals and ores of every description within that portion of the South Banner Quartz Mine (as said Mine is described in a Mining Location, recorded August 11, 1887, in Book "10" of Mining Claims, page 751, Nevada County Records) included in the Northwest quarter (NW¼) of Section Twenty-One (21), in Township Sixteen (16) North, Range Nine (9) East, Mount Diablo Base and Meridian, being that portion of said quartz mine extending from the North boundary line of said Northwest quarter (NW¼) 1,200 feet in a Southerly direction.

Parcel No. 19:

The right, title and interest of the grantor in and to that certain real property described in the deed dated November 25, 1983, recorded December 2, 1938, in Book "46" of Official Records, page 486, executed by Nevada Irrigation District to Lava Cap Gold Mining Corp., as follows:

The Southeast quarter of the Southeast quarter of the Northwest quarter; The Northeast quarter of the Southeast quarter of the Northwest quarter; The Southwest quarter of the Southwest quarter of the Northwest quarter; and that portion of the Northwest quarter of the Southwest quarter of the Northeast quarter lying South of the road in Section 21, Township 16 North, Range 9 East, containing 33 acres, more or less. The mineral rights in and to said realty being conveyed herein above under Parcel No. 5(b).

Parcel No. 20:

All that portion of land lying South of the Southern boundary lines of the Woodville Quartz Mine (known as Lot No. 78) and the North Banner Quartz Mine (known as Lot No. 77) and between the Eastern Boundaryline of the Harmony Quartz Mine (known as Lot No. 83) and the Western Boundary line of the Banner Quartz Mine (known as Lot No. 56) situate in the East half of the Southwest quarter of Section 16, Township 16 North, Range 9 East, M.D.B.&.M., containing 4.21 acres, more or less.

Parcel No. 21:

The right, title, and interest of the grantor, in and to that certain real property described in the deed dated December 16, 1938, recorded June 27, 1939, in Book "54" of

EPA003256

9.

Official Records, page 64, executed by John J. Looser and Katherine M. Looser, his wife, to Lava Cap Gold Mining Corporation, as follows:

The North half of the Southwest quarter of the Northwest quarter of the Northeast quarter of Section 21, Township 16 North, Range 9 East, M.D.B.& M., containing 5 acres, more or less.

The mineral rights in and to said realty being conveyed hereinabove under Parcel No. 5(b).

Parcel No. 22:

The right, title and interest of the grantor, in and to that certain real property described in the deed dated August 4, 1939, recorded September 27, 1939 in Book "56" of Official Records, page 206, executed by John J. Looser and Katherine M. Looser, his wife, to Lava Cap Gold Mining Corporation, as follows:

The Northeast quarter of the Northwest quarter of Section 21, Township 16 North, Range 9 East, M.D.B. & M.; containing 50 acres, more or less.

The minerals rights in and to said realty being conveyed hereinabove under parcel No. 5(b).

Parcel No. 23:

COMMANDER PLACER MINING CLAIM described as the Southeast quarter of the Southeast quarter of Section 17, Township 16 North, Range 9 East, M.D.B. & M., containing 40 acres, more or less.

ALSO QUITCLAIMED hereby is all of the estate, right, title, interest, possession, claim and demand whatsoever, in law as well as in equity, of said grantor corporation, of, in, or to any and all mineral property, with all of the appurtenances attached thereto, of said grantor corporation situate in said County of Nevada, in said State of California, whether hereinbefore specifically described or not; it being the intent and purpose of this conveyance to convey, assign, transfer and set over to the grantee all of the mineral property and any mineral interest therein of the grantor corporation in the County of Nevada.

EXCEPTING from all of the above-described parcels, No. 1 through No. 23, the following conveyances of surface acreage and minerals within 100 feet from the surface as described by the following documents recorded in the Official Records of

EPA003257

10.

Nevada County, on the date book and page number set forth
below:

| Recording Date | Book & Page No. |
|---|---|
| 1-18-56 | 216 - 543 |
| 1-22-57 | 228 - 546 |
| 7-24-57 | 234 - 582 |
| 3-3-58 | 243 - 178 |
| 11-10-58 | 252 - 467 |
| 2-9-59 | 257 - 107 |
| 5-27-59 | 262 - 50 |
| 1-4-62 | 309 - 192 |
| 10-31-62 | 325 - 504 |
| 4-11-63 | 334 - 28 |
| 6-18-63 | 337 - 393 |
| 7-16-63 | 339 - 68 |
| 9-17-63 | 343 - 225 |
| 3-13-64 | 353 - 235 |
| 3-20-64 | 353 - 551 |
| 3-25-64 | 353 - 666 |
| 7-2-64 | 359 - 638 |
| 10-19-64 | 367 - 277 |
| 1-19-65 | 372 - 523 |
| 3-3-66 | 398 - 348 |
| 3-19-69 | 469 - 497 |
| 6-16-72 | 604 - 19 |
| 11-20-72 | 624 - 323 |
| 12-2-74 | 718 - 487 |
| 2-10-76 | 778 - 68 |
| 6-2-76 | 795 - 26 |

EPA003258

# Lava Capital Corporation

TELEPHONE: (416) 593-4093
TELECOPIER (416) 593-4094

HEAD OFFICE
122 ST. PATRICK STREET
SUITE 400
TORONTO, ONTARIO
M5T 2X8

L-57

MEMO TO:   EUGENE KAULIUS

FROM:      JACK GILBERT                          February 18, 1987

---

I have been spending some time trying to generate some interest in the Grass Valley properties.  I enclose three matters for your consideration and approval:

1.   Letter from Leonard Carey re Jennings Mineral Right - 100 ft. Release Requests Policy

I recommend that you approve this proposal so that I can communicate with Carey to have him proceed.

2.   Copy of Letter from Carey to Orson Hansen re Waste Rock

I have agreed to the sale on the basis of the proposal outlined in the letter for 5,000 tons.  There is considerable more available rock.  In this instance, this first sale would be a test.  I trust you will agree with my arrangement.

3.   Letter from Carey re Proposed Sale of the 146 Surface Acres Plus Mineral Rights at $2,000 per Surface Acre

Carey is intimately familiar with our property, having been associated with it for probably 20 years or more, and I consider his recommendation of $2,000 per acre a reasonable price.  You are free to speak to Carey directly in this regard if you wish, or please confirm my authority to sign the Exclusive Authorization to sell.

bc Len Carey

Confirmed at mtg of Directors held March 5/87 in Vancouver

SCC 680

EXECUTIVE OFFICE: 100-10751 SHELLBRIDGE WAY, RICHMOND, B.C. V6X 2E8 (604) 278-2934

EPA004537

 LEONARD F. CAREY   Realtor · investment properties

February 12, 1987

Mr. Jack A. Gilbert, LLM-Q.C.
122 St. Patrick Street
Suite 400
Toronto, Ontario, Canada M5T 2X8

RE:   Jennings Mineral Right - 100 ft. Release Requests
      Policy.

Dear Jack;

As has often happened before and is now occuring on an in-
creased basis especially since Franco-Nevada's advertising
of "mineral rights for sale" took place - We are getting
more requests from individuals and Title Companies to sell
mineral right titles to a depth of 100 ft. with no right
to enter or disturb said 100 ft.

Reason is; increased refinancing of homes on new lower in-
terest rates and tighter policies by banks on loan terms.

I'd suggest we have a basic policy of $500.00 minimum charge
plus title and transfer costs, plus $200.00 per acre add-
itional for every acre over 3 acres.

With a basic policy approval, then we here can advise real
estate brokers and title companies so they each can proceed
to handle this question as it arises.

Do let me have your thoughts on this.

Regards.

Yours truly,

LEONARD F. CAREY, REALTOR

LFC:ps

SCC    681

POSTOFFICE BOX 944 · GRASS VALLEY, CALIFORNIA · TELEPHONE 273-4300 AREA CODE 916

EPA004538

 LEONARD F. CAREY   Realtor · investment  properties

February 13, 1987

Mr. Orson Hansen, President
Hansen Enterprises Inc.
P.O. Box 1599
Grass Valley, Calif. 95945

RE:   Your bid on 5000 Cu. Yards Waste Dump Run
      Rock from Lava Cap Mine.

Dear Orson;

Your subject purchase request has been approved by Mr. Jack
A. Gilbert of Lava Capital Corporation in Toronto, Ontario.

When you have firmed up your clients contract please advise
and we will get together and formalize your purchase agree-
ment for this rock at 50¢ per ton ($11.00 per truck and
trailer load) in place on the dump at Lava Cap Mine.

Yours truly,

LEONARD F. CAREY, REALTOR

LFC:ps

cc: Mr. Jack A. Gilbert

SC?   682

POSTOFFICE BOX 944 · GRASS VALLEY, CALIFORNIA · TELEPHONE 273-4300, AREA CODE 916

EPA004539

 LEONARD F. CAREY   Realtor · investment properties

February 12, 1987

Mr. Jack A. Gilbert, LLM - Q.C.
122 St. Patrick Street
Suite 400
Toronto, Ontario, Canada M5T 2X8

RE:  Proposed Sale Offering - Nevada County California
     Properties of Lava Capital Corporation 146.35
     Surface Acres Plus Mineral below 100 ft. down from
     Surface as per Schedule "A".

Dear Jack;

As was discussed in our phone conversation of 2/9/87, enclosed
for your approval is sales listing agreement on those properties
retrieved from Franco Nevada by Quit claim deed on January 15,
1987. Description used are those in said deed. I've checked
them with assessors current plat maps and all appears in order.

I've used a sales figure of $2,000.00 per surface acre on a
one cash sale basis to get things started.

Any suggestions you may have will be gratefully received.

If this agreement is approved please return the signed "Brokers
Copy" so we can start pushing.

Kind regards.

Yours truly,

LEONARD F. CAREY, REALTOR

LFC:ps

SCC   683

POSTOFFICE BOX 944 · GRASS VALLEY, CALIFORNIA · TELEPHONE 273-4300 AREA CODE 916

EPA004540



.SCC    684

EPA004541

Case 2:08-cv-02556-MCE-DB   Document 43-2   Filed 10/28/09   Page 48 of 52

EPA004542

POR. S ½ SEC. 16, T. 16 N., R. 9 E., M.D.B. & M.

SCC 685

Tax Area Code
68-011

39-02

Assessor's Map Bk. 39 - Pg. 02
County of Nevada, Calif.
1968



EPA004543

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, and ) <br><br> CALIFORNIA DEPARTMENT OF TOXIC ) <br> SUBSTANCES CONTROL, ) <br><br> ) <br> Plaintiffs, ) <br><br> ) <br><br> v. ) <br><br> ) <br> STERLING CENTRECORP INC., ) <br> STEPHEN P. ELDER, and ) <br> ELDER DEVELOPMENT, INC., ) <br><br> ) <br> Defendants. ) | No. 2:08-CV-02556-MCE-JFM <br><br><br> REQUEST SEEKING <br> INTERNATIONAL <br> JUDICIAL ASSISTANCE |

## LETTER OF REQUEST (ROGATORY) FOR JUDICIAL ASSISTANCE

This Court respectfully requests notice as to the date, time and place where in Toronto, Ontario the oral examination (deposition) of Mr. Jack Gilbert may be taken by the parties in the above-captioned civil action. This Court has fully considered this matter, including the submitted memorandum of law and affidavit of counsel for the United States, which are attached hereto as Exhibit "A," and has found good cause for this request. Mr. Gilbert held various corporate positions for Defendant Sterling Centrecorp Inc.'s corporate predecessors and its wholly-owned subsidiary when these companies held business interests in the Lava Cap Mine, and he personally transacted these companies business interests relating to the mine. See the attached memorandum of law, and its exhibits, filed by Plaintiffs in this case.

At the proposed deposition, Mr. Gilbert would be examined under oath, which will be administered by a Canadian court reporter who will be charged with making a verbatim transcript

of the oral examination proceeding. The United States District Court for the Eastern District of California also asks that the Canadian Court compel Mr. Gilbert to bring to the oral examination (deposition) documents in his possession that relate to the former business interests of Sterling Centrecorp Inc.'s predecessors and subsidiary that relate to the Lava Cap Mine property in Nevada County California.

This Court affirms that it will reciprocate the requested assistance if in the future it is needed by the Ontario Superior Court of Justice. Additionally, this Court will see that all costs required by the Canadian judicial authorities, or other government officials, to execute this Court's letter of request will be fully paid. If such costs are to be paid prior to this request being approved, please advise what are such costs and to whom they should be paid.

_____          _____
DATE                          MORRISON C. ENGLAND, JR.
                              UNITED STATES DISTRICT JUDGE
                              United States District Court
                              Eastern District of California
                              (Sacramento Division)
                              501 I Street, Suite 4-200
                              Sacramento, CA 95814
                              Phone: (916) 930-4000

2