IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, and CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL, | |
| Plaintiffs, | No. 2:08-cv-02556 MCE JFM |
| vs. | |
| STERLING CENTRECORP, INC. STEPHEN P. ELDER, and ELDER DEVELOPMENT, INC., | ORDER AND |
| Defendants. | FINDINGS & RECOMMENDATIONS |
| _____/ | |

On May 26, 2011, the undersigned held a hearing on plaintiffs' joint motion for default judgment against defendant Elder Development, Inc. ("Elder Development"). Patricia Hurst and Karl Fingerhood appeared for plaintiff United States of America. Kirk McInnis appeared for plaintiff California Department of Toxic Substances Control ("CDTSC"). Defendant Stephen Elder appeared in pro per. At the hearing, defendant Stephen Elder submitted a motion for order vacating default judgment. Upon review of the docket, the motion for default judgment and all attached exhibits, discussion of the appearing parties and good cause appearing therefor, THE COURT FINDS AS FOLLOWS:

/////

FACTUAL ALLEGATIONS

Plaintiffs the United States and CDTSC (collectively, "plaintiffs") initiated this action on October 27, 2008 against defendants Sterling Centrecorp, Inc. ("Sterling"), Stephen Elder and Elder Development, pursuant to Section 107(a) of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9607(a) for recovery costs related to the release and threatened release of hazardous substances from the Lava Cap Mine Superfund Site in Nevada County, California ("the Site"); and pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), for declaratory judgment that plaintiffs are entitled to recover for future response costs.

The Site is comprised of two mines: the Lava Cap Mine and the Banner Mine. Compl. at 5.  In 1932, the Lava Cap Gold Mining Corporation ("LCGMC") acquired both the Lava Cap and Banner Mines and, in 1934, began gold mining operations at both mines. Id.  In 1952, defendant Sterling's predecessor, New Goldvue Mines Limited ("NGV"), acquired both mines from LCGMC and continued to operate both as gold mines. Id. at 5, 7.

In 1989, Banner Mountain Properties Limited ("Banner Mountain"), of which Stephen Elder was the general partner, acquired the Lava Cap Mine property. Compl. at 7.  In 1992, Banner Mountain deeded the property to another California corporation, Lava Cap Gold Mining Corporation ("LCGMC2"); Stephen Elder was also the general partner of this second corporation. Id.  In 1994, LGCMC2 deeded parcels of Lava Cap Mine to Stephen Elder in his individual capacity. Id.  In 2003, Stephen Elder transferred title of three of these parcels to Elder Development. Id.  In 2005, LCGMC2 dissolved, reverting ownership of the remaining Lava Cap Mine parcels back to Elder in his individual capacity.

Plaintiffs contend that during the ownership of the Site by defendants, and through a series of incidents, contaminants have been released into nearby soil and water. Compl. at 5-7.

In 1979, plaintiffs assert that a log dam built to hold mill tailings,[1] a mining waste, in place partially collapsed, resulting in a discharge of contaminants into a nearby creek called Little Cripper Creek. Id. at 6. This discharge was investigated by the Central Valley Regional Water Quality Control Board ("the Board") and the California Department of Fish and Game, finding that the discharge resulted in arsenic-contaminated tailings entering the creek and flowing downstream. Id. at 7. The Board issued a Complaint of Discharge letter, followed by a Cleanup and Abatement Order, to Sterling's predecessor. Id.

On or about January 1, 1997, the log dam completely collapsed, discharging over 10,000 cubic yards of additional tailings into Little Clipper Creek. Compl. at 8. As a result of this collapse, CDTSC and other local agencies inspected and tested soil and water at the Lava Cap Mine and down-gradient areas. Id. In June 1997, CDTSC issued an information sheet warning of potential hazards from contact with sediment at the site. Id. In October 1997, the EPA Region IX Emergency Response Section determined that the Lava Cap Mine conditions associated with the tailings release met the criteria for a removal action. Id. Thus, during 1997 and 1998, the EPA conducted a removal action at the Site to address the tailings release. Id.

Also in 1998, the EPA evaluated the Site and determined that the potential risks to human health and the environment warranted placement on the National Priorities List ("NPL"), pursuant to 42 U.S.C. § 9605(a)(8)(B). Compl. at 8. The Site was added to the NPL in 1999. Id. Through April 30, 2008, plaintiffs estimate that the EPA has incurred $21,365,002.14 in response costs, and through March 31, 2008, estimate that CDTSC has incurred $717,143.16 in response costs. Id. Plaintiffs contend that defendants are jointly and severally liable for the costs incurred. Id. at 10.

/////

---

[1] According to plaintiffs, mill tailings, also known as rock flour, are extremely fine-grained materials with high concentrations of arsenic that are easily suspended in water and are susceptible to being carried offsite. See Compl. at 6, ¶ 21.

RELEVANT PROCEDURAL BACKGROUND

Stephen Elder and Elder Development (collectively, "the Elder defendants") were served on November 11, 2008 by personal service. Doc. No. 9. On March 9, 2009, plaintiffs and the Elder defendants filed a joint motion for an extension of time to file an answer. Therein, the parties represented that the Elder defendants had limited resources, had not yet obtained counsel and that settlement negotiations were in progress. See Doc. No. 21. District Judge Morrison C. England granted the request and ordered that an answer be filed by May 29, 2009. On May 20, 2009, plaintiffs and the Elder defendants filed a second motion for extension of time based upon the same assertions as in the initial motion. See Doc. No. 29. Again, Judge England granted the motion and gave the Elder defendants until September 30, 2009 to file an answer. Doc. No. 31.

On September 29, 2009, Stephen Elder, appearing in propria persona and on behalf of the Elder defendants, filed an answer and asserted counter- and cross-claims. Because Elder Development, a corporation, cannot appear in federal court without a licensed attorney, see Rowland v. Cal. Men's Colony, 506 U.S. 194, 202 (1993) ("It has been the law for the better part of two centuries . . . that a corporation may appear in the federal courts only through licensed counsel . . . . [T]hat rule applies equally to all artificial entities."), plaintiff United States filed a motion to strike the answer to the extent it purported to answer on behalf of Elder Development. See Doc. No. 56. On February 23, 2010, the motion to strike was granted.

On January 13, 2011, plaintiffs requested entry of default as to Elder Development, which was entered by the Clerk of Court on January 21, 2011. On April 19, 2011, plaintiffs filed a joint motion for default judgment against Elder Development. The United States seeks entry of default judgment in the amount of $20,640,245.70, and CDTSC seeks entry of default judgment in the amount of $1,193,368.54. Neither plaintiff seeks pre-judgment interest or attorneys' fees.

On March 25, 2009, discovery and trial in this matter were bifurcated on questions of liability and damages. See Doc. No. 26.

## DISCUSSION

Plaintiffs seek default judgment pursuant to either Federal Rule of Civil Procedure 55(b)(1) or 55(b)(2).

Federal Rule of Civil Procedure 55(b)(1) provides

> If the plaintiff's claim is for a sum certain or a sum that can be made certain by computation, the clerk – on the plaintiff's request, with an affidavit showing the amount due – must enter judgment for that amount and costs against a defendant who has been defaulted for not appearing and who is neither a minor nor an incompetent person.

Fed. R. Civ. P. 55(b)(1). However, a sum is not certain "unless no doubt remains as to the amount to which a plaintiff is entitled as a result of the defendant's default." Franchise Holding II, LLC v. Huntington Restaurants Group, Inc., 375 F.3d 922, 929 (9th Cir. 2004). In this case, plaintiffs' claim for damages in excess of $20,000,000.00 is not a sum certain where no doubt remains as to the amount of damages owed as a result of the default. Accordingly, entry of default judgment under Rule 55(b)(1) is not proper.

Federal Rule of Civil Procedure 55(b)(2) provides that "[i]n all other cases [other than those in which the clerk of the court may enter default judgment], the party must apply to the court for a default judgment." Fed. R. Civ. P. 55(b)(2). It is within the sound discretion of the district court to grant or deny an application for default judgment pursuant to Rule 55(b)(2). Aldabe v. Aldabe, 616 F.2d 1089, 1092 (9th Cir. 1980). In making this determination, the court considers the following factors:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action, (5) the possibility of a dispute concerning the material facts, (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

Eitel v. McCool, 782 F.2d 1470, 1471-72 (9th Cir. 1986). "In applying this discretionary standard, default judgments are more often granted than denied." Philip Morris USA, Inc. v. Castworld Products, Inc., 219 F.R.D. 494, 498 (C.D. Cal. 2003) (quoting PepsiCo, Inc. v.

/////

Triunfo-Mex, Inc., 189 F.R.D. 431, 432 (C.D. Cal. 1999)).  Nonetheless, "default judgments are ordinarily disfavored."  Eitel, 782 F.2d at 1471.

As a general rule, once default is entered, the factual allegations of the complaint are taken as true, except for those allegations relating to damages.  Tele Video Systems, Inc. v. Heidenthal, 826 F.2d 915, 917-18 (9th Cir. 1987) (citations omitted).  However, although well-pleaded allegations in the complaint are admitted by defendant's failure to respond, "necessary facts not contained in the pleadings, and claims which are legally insufficient, are not established by default."  Cripps v. Life Ins. Co. of N. Am., 980 F.2d 1261, 1267 (9th Cir. 1992).

1.      Possibility of Prejudice to Plaintiffs

The first factor set forth by the Ninth Circuit in Eitel considers whether the plaintiff would suffer prejudice if default judgment is not entered, and whether such potential prejudice to the plaintiff militates in favor of granting a default judgment.  See PepsiCo, Inc., 238 F. Supp. 2d at 1177.  Here, if plaintiffs' motion was denied, plaintiffs may be unable to recover the remediation costs they incurred at the Site from defendant Elder Development.  Plaintiffs, however, are not prevented from recovering remediation costs from the other co-defendants who have joint and several liability.  See B.F. Goodrich Co. v. Murtha, 958 F.2d 1192, 1198 (2d Cir. 1992) (citing O'Neil v. Picillo, 883 F.2d 176, 178-79 (1st Cir. 1989)).  Elder Development's principal, Stephen Elder, is named in this action and has appeared, as has co-defendant Sterling.  Plaintiffs merely asserts that default judgment should be entered because there is a clerk's entry of default.

Additionally, while Elder Development is in default by failing to participate in this litigation, the court's power to enter judgment against Elder Development is limited by Federal Rule of Civil Procedure 54.  Under Rule 54(b), "when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay."  Fed. R. Civ. P. 54(b).  "[W]here a complaint alleges that defendants are jointly liable and one of them defaults,

1  judgment should not be entered against the defaulting defendant until the matter has been
2  adjudicated with regard to all defendants." In re First T.D. & Investment, Inc., 253 F.3d 520, 532
3  (9th Cir. 2001) (citing Frow v. De La Vega, 15 Wall. 552, 55 (1872)).  "[I]f an action against the
4  answering defendants is decided in their favor, then the action should be dismissed against both
5  answering and defaulting defendants." Id. (citing Frow, 15 Wall. at 554 ).  The Ninth Circuit has
6  extended the applicability of this rule and held that default judgments should not be entered
7  against a defaulting defendant if there are non-defaulting defendants "who are similarly situated,
8  even if not jointly and severally liable." Id.

9  While it has been acknowledged that Frow does not preclude entry of default
10 judgment against some defendants where other defendants remain in the litigation, even where
11 liability is joint and several, see In re Uranium Antitrust Litigation, 617 F.2d 1248, 1258 (7th Cir.
12 1980), there is still the possibility of inconsistent determinations as to damages, as well as the
13 lack of judicial economy, in that "there could be two distinct damages awards on a single claim
14 involving joint and several liability." Id. at 1262.  If plaintiffs later prevail against the answering
15 defendants, the damage award could be different; however, the joint nature of the claim precludes
16 different findings as to damages against all defendants. Id.  Furthermore, where defendants are
17 jointly liable for the entire award, plaintiff could look to any one defendant for full satisfaction of
18 the damage award. Id.

19 Thus, the first Eitel factor does not favor the entry of default judgment as to
20 damages.

21 2-3.    Merits of Plaintiffs' Substantive Claims & "Sufficiency of the Complaint"

22 The undersigned considers the merits of plaintiffs' substantive claims and the
23 sufficiency of the complaint together below because of the relatedness of the two inquiries.  The
24 undersigned must consider whether the allegations in the complaint are sufficient to state a claim
25 that supports the relief sought.  See Danning v. Lavine, 572 F.2d 1386, 1388 (9th Cir. 1978);
26 PepsiCo, Inc., 238 F. Supp. 2d at 1175.

1    CERCLA imposes liability for the cleanup of sites where there is a release or
2 threatened release of hazardous substances into the environment. See Carson Harbor Vill., Ltd.
3 v. Unocal Corp., 270 F.3d 863, 881 (9th Cir. 2001) (en banc) ("CERCLA holds a PRP liable for
4 a disposal that 'releases or threatens to release' hazardous substances into the environment.").
5 CERCLA liability attaches when three conditions are satisfied: (1) the site at which there is an
6 actual or threatened release of hazardous substances is a "facility" under § 9601(9); (2) a
7 "release" or "threatened release" of a hazardous substance from the facility has occurred,
8 § 9607(a)(4); and (3) the party is within one of the four classes of persons subject to liability
9 under § 9607(a).

10   a.   "Facility"

11    CERCLA defines the term "facility" as, in relevant part, "any site or area where a
12 hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be
13 located." § 9601(9). In this case, the "facility" is defined as the Lava Cap Mine Superfund Site
14 consisting of approximately thirty (30) acres in a rural residential area and situated approximately
15 five miles southeast of Nevada City, California. Compl. at 5. Plaintiffs contend hazardous
16 substances have been released at the Site. Id. at 6. Accordingly, the Site is a facility under
17 § 9601(a). See 3550 Stevens Creek Assocs. v. Barclays Bank of California, 915 F.2d 1355, 1360
18 n.10 (9th Cir. 1990) ("[T]he term facility has been broadly construed by the courts, such that in
19 order to show that an area is a facility, the plaintiff need only show that a hazardous substance
20 under CERCLA is placed there or has otherwise come to be located there." )

21   b.   "Release" or "Threatened Release"

22    The second element of liability under CERCLA is that there must be a "release"
23 or "threatened release" of a hazardous substance from the facility into the environment. See
24 § 9607(a)(4). To determine if there is an actual or threatened release here, we consider the
25 statutory definition of release. CERCLA defines a "release," with certain exceptions not relevant
26 here, as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting,

escaping, leaching, dumping, or disposing into the environment." § 9601(22). Here, the discharge of the tailings into the soil and water may properly be characterized as releases.

### c. "Covered Person"

The third element of liability under CERCLA is that the party must be a "covered person" under § 9607(a). Per Section 9607(a), a "covered person" is defined as:

> (1) the owner and operator of a vessel or a facility,
>
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
>
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
>
> (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance . . .

Here, the complaint alleges that Elder Development was an owner of the Lava Cap Mine, which was the site where tailings were released. As such, Elder Development is a "covered person" pursuant to Section 9607(a)(1) or (a)(2). Based on the foregoing, the court finds that plaintiffs' claims are meritorious. Thus, Eitel's second and third factors favor entry of default judgment.

### 4. Sum of Money at Stake

Under the fourth factor cited in Eitel, "the court must consider the amount of money at stake in relation to the seriousness of Defendant's conduct." PepsiCo, Inc., 238 F. Supp. 2d at 1177. The United States seeks entry of default judgment in the amount of $20,640,245.70, and CDTSC seeks entry of default judgment in the amount of $1,193,368.54. This is not an insignificant sum of money. See Eitel, 782 F.2d at 1472 ("[B]ecause Eitel was seeking almost $3 million in damages from McCool and because the parties disputed material facts in the pleadings, we cannot say that the district court abused its discretion in denying the default judgment.").

5.     Possibility of a Dispute Concerning Material Facts

"The fifth Eitel factor examines the likelihood of dispute between the parties regarding the material facts surrounding the case." Craigslist, Inc. v. Naturemarket, Inc., 694 F. Supp. 2d 1039, 1060 (N.D. Cal. 2010).  It is evident, based on the pleadings of the co-defendants in this action, whose liability is joint and several with that of Elder Development, that the material facts set forth in plaintiffs' complaint are disputed.  Accordingly, this Eitel factor weighs against granting plaintiffs' motion.

6.     Excusable Neglect

Upon review of the record before the court, the undersigned finds that the default was not the result of excusable neglect.  See PepsiCo, Inc., 238 F. Supp. 2d at 1177.  Rather, based on representations made to the court, it appears Elder Development was simply unable to afford to hire an attorney to represent it in this action.

7.     Policy Favoring Decisions on the Merits

"Cases should be decided upon their merits whenever reasonably possible." Eitel, 782 F.2d at 1472. Although this factor, standing alone, is not dispositive, see PepsiCo, Inc., 238 F. Supp. 2d at 1177, it advises against granting plaintiffs' motion in combination with the other factors previously discussed.

In sum, the court finds that consideration of the Eitel factors favors granting the motion for default judgment as to the question of liability.  However, the court finds that the motion for default judgment should be denied without prejudice as to the question of damages so as to prevent an inconsistent determination.

Accordingly, IT IS HEREBY ORDERED that, pursuant to Rowland v. Cal. Men's Colony, 506 U.S. 194, 202 (1993), Stephen Elder's motion for order vacating default judgment is denied; and

IT IS HEREBY RECOMMENDED that plaintiffs' joint motion for default judgment be partially granted as follows:

1. Default judgment be entered against Elder Development on the question of its liability; and

2. Default judgment be denied without prejudice as to the question of damages.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Failure to file objections within the specified time may waive the right to appeal the District Court's order. Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: June 6, 2011.

UNITED STATES MAGISTRATE JUDGE

/014;sterling.mdj