UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,
and CALIFORNIA DEPARTMENT
OF TOXIC SUBSTANCES CONTROL,        No. 2:08-cv-02556-MCE-JFM

      Plaintiffs,

  v.                                  MEMORANDUM AND ORDER

STERLING CENTRECORP INC.,
STEPHEN P. ELDER and ELDER
DEVELOPMENT, INC.,

      Defendants.

----oo0oo----

Both the United States and the California Department of Toxic Substances (hereinafter collectively referred to as "Plaintiffs" or "government" unless otherwise specified) have designated the former Lava Cap Mine, located in Nevada County, California, as a superfund site polluted by elevated levels of arsenic that were disseminated through tailings and waste materials generated by mine operations. Plaintiffs have undertaken cleanup efforts designed to remediate that arsenic contamination.

1

The present action seeks contribution for the costs of those activities both from former owners of the site and operators responsible for its mining.  Presently before the Court is the motion of Defendant Sterling Centrecorp, Inc. ("Sterling") for summary judgment on grounds that this Court lacks personal jurisdiction over Sterling, and that Sterling is accordingly entitled to judgment as a matter of law.  As set forth below, that motion will be denied.[1]

## BACKGROUND

Mining operations at the Lava Cap Mine commenced in 1861. Between 1933 and 1943, mining was conducted at the site by the Lava Cap Gold Mining Corporation ("LCGMC").  Sterling's Statement of Undisputed Fact ("SUF") No. 17.  Mining and milling operations conducted prior to 1943 created two piles of mine waste at the site, a waste rock pile and a mill tailings pile.  In 1938, LCGMC built a tailings dam on Greenhorn Creek (now known as Lost Lake Dam) "to stop tailings from polluting the waters of the Bear River."  Pls.' Supp. SUF No. 138.  Waste products included within the mine-generated tailings contained elevated concentrations of naturally occurring arsenic, a hazardous substance pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601, et seq. ("CERCLA"). SUF No. 24.

---

[1] Because oral argument was not of material assistance, the Court ordered this matter submitted on the briefs.  E.D. Cal. Local Rule 230(h).

2

No active mining occurred at Lava Cap after 1943, when its operations were shut down by the United States government during the Second World War. SUF No. 18. In June of 1950, LCGMC decided to "sell, lease, or exchange all the property and assets of the company," preferably to another mining company that could employ LGCMC's existing plant, machinery and equipment. In 1952, LCGMC's directors recommended a sales transaction between LCGMC and New Goldvue, Mines, Ltd, a Canadian company developing a gold mine in Quebec and looking to upgrade its equipment. A purchase and sale agreement was subsequently executed between the two companies. Pursuant to that agreement, New Goldvue, having "been advised as to the . . . assets and liabilities of [LCGMC]," agreed to purchase "all the assets of [LCGMC], subject to the liabilities of [LCGMC], which liabilities [New Goldvue] agreed to assume and cause to be paid promptly." SUF No. 43. The sales agreement further specified that LCGMC's assets would be transferred to Keystone Copper Corporation ("Keystone"), a wholly owned subsidiary of LCGMC, before Keystone was itself conveyed to New Goldvue. SUF Nos. 27-29 Keystone, which had previously operated a copper mine while a LCGMC subsidiary, thus became a wholly-owned subsidiary of New Goldvue.[2] Id.

The sales transaction between New Goldvue and LCGMC was financed by transfer of Sterling stock valued at $245,175.60. This represented a 10.2 percent interest in New Goldvue. SUF No. 44.

---

[2] Keystone was a California corporation and remained a Sterling subsidiary until it became inactive after selling the Lava Cap Mine in 1989 (Keystone was ultimately suspended by the California Secretary of State in 1991).

3

After the LCGMC purchase was consummated, New Goldvue expanded its board from five to seven and appointed two individuals previously associated with LCGMC to the New Goldvue Board of Directors. SUF No. 47.

New Goldvue, which was originally incorporated in Ontario, Canada, as Goldvue Mines Ltd in 1944, changed its name several times over the years before becoming Sterling in 2001.[3] Until 1985, the company now known as Sterling was primarily a natural resources company with investments in mining and oil and gas production. Sterling, through its subsidiary Keystone, owned the Lava Cap Mine for some 37 years (aside from a brief, ultimately unsuccessful attempt to transfer ownership to another company). No mining occurred during that period.

In 1979, however, a partial log dam collapse led to a release of mine tailings which, in turn, caused downstream neighbors to complain about pollution from the resulting silt. In response to those complaints, the California Regional Water Quality Control Board issued a Cleanup and Abatement Order to Keystone On October 25, 1979. See SUF Nos. 32-33.

Following an ultimately unsuccessful attempt to sell the Lava Cap Mine to another company, Keystone sold, in 1989, the property to Banner Mountain Properties, Ltd., an entity controlled by Defendant Stephen Elder, who currently owns four of the seven parcels comprising the former mine site. SUF No. 23.

---

[3] New Goldvue changed its names several times over the years before becoming Sterling Centrecorp Inc. in 2001. New Goldvue and the subsequent names by which the corporation was known will be simply referred to as "Sterling" throughout the remainder of this Memorandum and Order unless otherwise noted.

1  The remaining three parcels are owned by another Elder business
2  interest, Defendant Elder Development, Inc.
3       Heavy rainstorms occurring in 1997, after Banner Mountain's
4  purchase on the mine site, washed mine wastes downstream into
5  Little Clipper Creek and a former mine tailings pond now known as
6  Lost Lake.  SUF No. 25.  EPA began cleanup operations in late
7  1997 and the site was officially designed a Superfund site in
8  January of 1999.  SUF No. 26.
9       Through the present motion, Sterling asks this Court to
10 determine as a matter of law that because it never directly
11 conducted business in the United States, was never directly
12 authorized to do business in any State, and has never directly
13 owned property in the United States, there are insufficient
14 contacts on Sterling's part upon which the jurisdiction of this
15 Court may be premised.[4]

### STANDARD

As Defendant Sterling correctly points out, Plaintiffs bear the burden of establishing this Court's personal jurisdiction over Sterling.  <u>Am. Tel. & Telegraph Co. v. Compagnie Bruxelles Lambert,</u> 94 F.3d 586, 588 (9th Cir. 1996).

///
///

---

[4] Until 2007, when Sterling underwent privatization, it had another U.S. based subsidiary, SCH Corp. ("SCH").  SCH owned other U.S. based assets and conducted operations in the United States through a variety of subsidiary and partnership interests.  <u>See</u> SUF No. 7.

1  Sterling is consequently entitled to dismissal as a matter of law
2  unless Plaintiffs present sufficient evidence to make out a prima
3  facie case for personal jurisdiction.  <u>Fields v. Sedgwick</u>
4  <u>Associated Risks, Ltd.</u>, 796 F.2d 299, 301 (9th Cir. 1986);
5  <u>Congoleum Corp. v. DLW Aktiengesellschaft,</u> 729 F.2d 1240, 1241
6  (9th Cir. 1984).  If Plaintiffs do successfully establish a prima
7  facie case in that regard, then the burden shifts to Sterling to
8  show that evidence to support jurisdiction is in fact absent.
9  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986); <u>In re Oracle</u>
10 <u>Corp. Securities Litigation</u>, 627 F.3d 376, 387 (9th Cir. 2010).
11 Finally, the burden shifts once more to Plaintiffs, if Sterling
12 is able to rebut Plaintiffs' prima facie showing, to demonstrate
13 specific facts which point to the existence of genuine issues for
14 trial.  <u>Id.</u>  A mere scintilla of evidence to support Plaintiffs'
15 position is insufficient in that regard; there must be some
16 evidence upon which a jury could reasonably find in favor of
17 Plaintiffs.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252
18 (1986).  Only if Plaintiffs fail to make that final showing would
19 Sterling then be entitled to summary judgment.
20      Stated another way, "before the evidence is left to the
21 jury, there is a preliminary question for the judge, not whether
22 there is literally no evidence, but whether there is any upon
23 which a jury could properly proceed to find a verdict for the
24 party producing it, upon whom the onus of proof is imposed."
25 ///
26 ///
27 ///
28 ///

6

Anderson, 477 U.S. at 251 (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)).  As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 586-87.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  Anderson, 477 U.S. at 255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

## ANALYSIS

As Plaintiffs correctly point out, the Court may exercise in personam jurisdiction over Sterling due to either 1) Sterling's own contacts in California; 2) the contacts of Sterling's wholly owned subsidiary, Keystone, insofar as those contacts can be attributed to Sterling; or 3) an attribution of LCGMC's contacts to Sterling under a theory of successor liability.  Sterling's motion for summary judgment on jurisdictional grounds necessarily fails unless it rules out all three bases for jurisdiction.

7

Consequently, if Plaintiffs establish a viable prima facie basis for Sterling's successor liability as to LCGMC's activities at the Lava Cap site, and even if Sterling successfully rebuts that showing, Sterling is still not entitled to summary judgment if Plaintiffs identify facts pointing to the existence of genuine issues for trial as to such liability.  The Court concludes that Plaintiffs have indeed identified enough triable issues of fact to preclude summary judgment on a successor liability basis.

Under both Ninth Circuit precedent and California law, successor liability does not arise from an asset purchase like that between Sterling and LCGMC "unless (1) the purchasing corporation expressly or impliedly agrees to assume the liability; (2) the transaction amounts to a 'de-facto' consolidation or merger; (3) the purchasing corporation is merely a continuation of the selling corporation; or (4) the transaction was fraudulently entered into in order to escape liability." Atchison, Topeka and Santa Fe Railway Co. v. Brown & Bryant, Inc., 159 F.3d 358, 361 (9th Cir. 1997); Ray v. Alad Corp., 19 Cal. 3d 22, 28 (1977).  As the quoted language makes clear, successor liability can rest on any one of those four variants.

Sterling's quest for summary judgment as to successor liability fails because there are triable issues as to whether Sterling either expressly or impliedly agreed to assume all of LCGMC's liabilities, whether financial, environmental, or otherwise, in the course of the purchase transaction.

///

///

///

1    Although the Ninth Circuit has not squarely addressed
2 whether state law governs in determining successor liability
3 under CERCLA, examination of cases in the CERCLA arena leave
4 little doubt as to that conclusion.  See, e.g., Atchison,
5 159 F.3d at 362-64 (stepping back from a prior unequivocal
6 announcement as to the applicability of state law, but only on
7 grounds that the court "need not determine" whether state law is
8 dispositive since both state law and federal common law yield the
9 same result); Mardan Corp. v. C.G.C. Music Ltd., 804 F.2d 1454,
10 1457-1460 (9th Cir. 1986) (noting that a federal rule for CERCLA
11 liability based on contractual assumption of liability would
12 disrupt and undermine commercial contractual relationships
13 premised on state law).
14    Here, of course, any liability based on CERCLA and premised
15 on the purchase agreement between Sterling and LCGMC is
16 intrinsically problematic since that 1952 agreement was entered
17 some 28 years before CERCLA was enacted into law in 1980.
18 Nonetheless, under California law, laws enacted after a contract
19 was formed can still become part of an assumption of liabilities
20 if there is "clear and distinct" evidence that a broad assumption
21 was in fact contemplated by the parties.  Swenson v. File,
22 3 Cal. 3d 389, 394-95 (1970).  As long as the agreement is
23 sufficiently clear, that general proposition has been held to
24 apply to CERCLA liability on the basis of a pre-CERCLA agreement.
25 See, e.g., Cal. Dep't of Toxic Substances Control v. Cal-Fresno
26 Inv. Co., 2007 U.S. Dist. LEXIS 37314 at *13 (E.D. Cal. 2007)).
27 ///
28 ///

9

In arguing that no such "clear and distinct" evidence is present, Sterling points to the language of the purchase agreement whereby Sterling, having "been advised as to the... assets and liabilities of [LCGMC], agreed to purchase "all the assets of [LCGMC], subject to the liabilities of [LCGMC], which liabilities [New Goldvue] agreed to assume and cause to be paid promptly." SUF 43. According to Sterling, while "assets" is modified by the qualifier "all", no similar use of "all" with respect to liabilities is employed. Sterling further maintains that by explaining that "liabilities" will be "paid promptly", the purchase agreement necessarily refers to liabilities in a limited financial sense, rather than encompassing any expansive definition extending to contingent and as-yet-unknown environmental liability. Sterling consequently contends that the requisite clear intent to assume all liabilities is simply not present.

According to Sterling, all cases where assumption of unknown liabilities have been recognized entail an agreement to assume "all liabilities," a contingency absent from the instant purchase agreement according to Sterling. See, e.g., Olin Corp. v. Consolidated Aluminum Corp., 5 F.3d 10, 15-16 (2nd Cir. 1993) (language stating that purchase agreed to be responsible for "all liabilities . . . as they exist on the Closing Date or arise thereafter" evidenced the parties' "clear and unmistakable intent" to encompass future unknown CERCLA liability).

///
///
///

1  Plaintiffs point to evidence demonstrating that, in their
2 view, the sales transaction between Sterling and LCGMC does
3 supply the requisite intent that all future liabilities
4 attributable to LCGMC's mine activities were in fact assumed by
5 Sterling. Consequently, although Plaintiffs cite case law
6 suggesting that the general rule of Swenson v. File,
7 supra,(limiting assumption of later-created liability unless
8 "clear and distinct" evidence of an intent to do so) may not
9 apply to CERCLA cases (see, e.g., United States v. Iron Mountain
10 Mines, Inc., 987 F. Supp. 1233, 1240 (E.D. Cal. 1997) (refusing
11 to extend the rule articulated by Swenson to CERCLA cases),
12 Plaintiffs maintain that the requirements of Swenson are
13 satisfied in any event.

14  In arguing that Sterling's intent to assume all future
15 liabilities was in fact unmistakable, Plaintiffs point to parole
16 evidence that, in their view, removes any lingering uncertainty
17 about whether Sterling in fact intended to assume "all"
18 liability. Parole evidence is admissible to show all
19 circumstances surrounding a transaction in order to determine the
20 meaning intended and understood by the parties. See Brookes v.
21 Adolph's Ltd., 170 Cal. App. 2d 740, 746 (Cal. App. 1959); see
22 also Cal. Civ. Code § 1647 ("a contact may be explained by
23 reference to the circumstances under which it was made, and the
24 matter to which it relates").

25  First, Plaintiffs point to a letter from Sterling's
26 President to the company's shareholders dated September 22, 1952,
27 which described the sales agreement entered into some seventeen
28 days previously as follows:

11

> By agreement dated September 5, 1952, the Company has agreed to acquire all the assets of Lava Cap Gold Mines Limited [sic], a Delaware corporation, subject to its liabilities, in consideration of the issue of one share of the capital stock of our Company for every 6 issued shares of Lava Cap.

See Undisputed Fact No. 44 in support of Plaintiffs' own concurrently filed Motions for Summary Judgment (ECF No. 116, hereinafter "Pls.' SUF"), emphasis added.

Second, an October 24, 1952, letter from LCGMC's President to LCGMC shareholders appears to express a corresponding understanding of the sales transaction as entailing an assumption of all LCGMC liabilities by Sterling:

> Your Board of Directors on September 5, 1952, sold all the properties and assets of Lava Cap, subject to its liabilities, for sufficient fully paid and non-assessable shares of the capital stock of [Sterling].... [Sterling] assumes all liabilities and expenses of Lava Cap.

Pls.' SUF No. 41.

Third, correspondence from Sterling in 1956 to Chase Manhattan Bank describing the 1952 sales transaction reiterates Sterling's apparent assumption of liabilities:

> In 1952, [Sterling] purchased all of the assets and liabilities of Lava Cap gold Mining Corporation and the latter corporation has surrendered its charter.

Pls.' SUF No. 45.

///
///
///
///
///
///

12

1       It should also be noted that aside from the issue of whether
2  Sterling assumed the liabilities of LCGMC, and hence qualified
3  for successor liability on that basis, Plaintiffs also point to
4  both pre and post-acquisition correspondence suggesting that the
5  1952 sales transaction amounted to a merger between the two
6  companies.  See Pls.' SUF Nos. 46, 47.  As indicated above, if
7  the transaction amounts to a merger successor liability may also
8  apply.

9       The Court concludes that the above-enumerated evidence, at
10 the very least, creates triable issues of fact as to whether the
11 parties did agree that Sterling would assume all liabilities of
12 LCGMC, as well as questions about whether the transaction
13 amounted to a merger that would also trigger successor liability
14 shifting the responsibility for all LCGMC liability to Sterling.
15 Either scenario would support the exercise of this Court's
16 jurisdiction over Sterling and the presence of triable issues of
17 fact as to Sterling's successor liability dooms its motion for
18 summary judgment.
19 ///
20 ///
21 ///
22 ///
23 ///
24 ///
25 ///
26 ///
27 ///
28 ///

**CONCLUSION**

Given the foregoing, Defendant Sterling's Motion for Summary Judgment (ECF No. 119), made on grounds that this Court lacks personal jurisdiction over Sterling, is hereby DENIED.[5]

IT IS SO ORDERED.

Dated: December 8, 2011

_____
MORRISON C. ENGLAND, JR.
UNITED STATES DISTRICT JUDGE

---

[5] The Court recognizes that Sterling also argues 1) that its own direct contacts with the United States and this District are insufficient to support jurisdiction; and 2) that Keystone's own California contacts cannot be attributable to Sterling, as Keystone's alter ego or agent, for jurisdictional purposes. Because the Court concludes that summary judgment cannot be granted because Sterling's potential successor liability alone, it is not necessary to reach those additional arguments to adjudicate the present motion and the Court declines to do so.