UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA, and CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL,

Plaintiffs,

v.

STERLING CENTRECORP INC., STEPHEN P. ELDER and ELDER DEVELOPMENT, INC.,

Defendants.

No. 2:08-cv-02556-MCE-JFM

MEMORANDUM AND ORDER

----oo0oo----

Both the United States and the California Department of Toxic Substances (hereinafter collectively referred to as "Plaintiffs" or "government" unless otherwise specified) have designated the former Lava Cap Mine, located in Nevada County, California, as a Superfund site polluted by elevated levels of arsenic that were disseminated through tailings and waste materials generated by mine operations. Plaintiffs have undertaken cleanup efforts designed to remediate that arsenic contamination.

The present action seeks contribution for the costs of those activities both from former owners of the site and operators responsible for its mining. Presently before the Court is Plaintiffs' Motion for partial summary judgment, which seeks a determination that certain prerequisites for the recovery of response costs from Defendants under CERCLA have been established as a matter of law. As set forth below, that motion will be granted.[1]

**BACKGROUND**

Mining operations at the Lava Cap Mine commenced in 1861. Between 1934 and 1943, mining was conducted at the site by the Lava Cap Gold Mining Corporation ("LCGMC"). During that time period, the Lava Cap Mine was one of the leading gold and silver producers in California, and among the top twenty-five gold producers in the nation. Plaintiffs' Statement of Undisputed Fact ("SUF") No. 4. In 1938, LCGMC built a tailings dam on Greenhorn Creek (now known as Lost Lake Dam) to stop mine tailings from polluting the waters of the Bear River. SUF Nos. 9, 10. Waste products included within the mine-generated tailings contained elevated concentrations of naturally occurring arsenic, a hazardous substance pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601, et seq. ("CERCLA"). SUF No. 80-81.

[1] Because oral argument was not of material assistance, the Court ordered this matter submitted on the briefs. E.D. Cal. Local Rule 230(h).

No active mining occurred at Lava Cap after 1943, when its operations were shut down by the United States government during the Second World War. SUF No. 12. In 1950, LCGMC decided to sell, lease, or exchange all the property and assets of the company. In 1952, LCGMC's directors recommended a sales transaction between LCGMC and New Goldvue, Mines, Ltd, a Canadian company developing a gold mine in Quebec and looking to upgrade its equipment. A purchase and sale agreement was subsequently executed between the two companies. Pursuant to that agreement, New Goldvue, having "been advised as to the . . . assets and liabilities of [LCGMC]," agreed to purchase "all the assets of [LCGMC], subject to the liabilities of [LCGMC], which liabilities [New Goldvue] agreed to assume and cause to be paid promptly." SUF No. 19. The sales agreement further specified that LCGMC's assets would be transferred to Keystone Copper Corporation ("Keystone"), a wholly-owned subsidiary of LCGMC, before Keystone was itself conveyed to New Goldvue. Keystone, which had previously operated a copper mine while a LCGMC subsidiary, thus became a wholly-owned subsidiary of New Goldvue.[2] SUF No. 33.

The sales transaction between New Goldvue and LCGMC was financed by a transfer of New Goldvue stock. SUF No. 19. After the LCGMC purchase was consummated, New Goldvue expanded its board from five to seven and appointed two individuals previously associated with LCGMC to the New Goldvue Board of Directors. See SUF No. 20. LCGMC was subsequently dissolved. SUF No. 35.

---

[2] Keystone was a California corporation and remained a Sterling subsidiary until it became inactive after selling the Lava Cap Mine in 1989 (Keystone was ultimately suspended by the California Secretary of State in 1991).

New Goldvue, which was originally incorporated in Ontario, Canada, as Goldvue Mines Ltd in 1944, changed its name several times over the years before becoming Sterling in 2001.[3] Until 1985, the company now known as Sterling was primarily a natural resources company with investments in mining and oil and gas production. Sterling, through its subsidiary Keystone, owned the Lava Cap Mine for some 37 years (aside from a brief, ultimately unsuccessful attempt to transfer ownership to another company). No mining occurred during that period.

In 1979, a partial log dam collapse led to a release of mine tailings which, in turn, caused downstream neighbors to complain about pollution from the resulting silt. In response to those complaints, the California Regional Water Quality Control Board issued a Cleanup and Abatement Order to Keystone on October 25, 1979. See SUF No. 82.

Following an ultimately unsuccessful attempt to sell the Lava Cap Mine to another company, Keystone sold, in 1989, the property to Banner Mountain Properties, Ltd., an entity controlled by Defendant Stephen Elder, who currently owns four of the seven parcels comprising the former mine site. SUF Nos. 77, 120-23. The remaining three parcels are owned by another Elder business interest, Defendant Elder Development, Inc.

///

///

---

[3] New Goldvue changed its names several times over the years before becoming Sterling Centrecorp Inc. in 2001. New Goldvue and the subsequent names by which the corporation was known will be simply referred to as "Sterling" throughout the remainder of this Memorandum and Order unless otherwise noted.

Elder had an engineering firm prepare a Preacquisition Site Assessment before his purchase of the mine site that revealed hazardous substance contamination, primarily arsenic. SUF No. 127.

The United States Environmental Protection Agency ("EPA") completed a Preliminary Assessment on the mine site in April of 1993, after Banner Mountain's purchase of the mine site. See SUF 86. Sediment and soil samples revealed elevated concentrations of both arsenic and lead.

Heavy rainstorms in 1993 washed mine wastes downstream into Little Clipper Creek and a former mine tailings pond now known as Lost Lake. SUF No. 88. The EPA began cleanup operations in late 1997 and the site was officially designed a Superfund site in January of 1999. SUF Nos. 89-90. Those operations included the removal and relocation of tailings, reinforcement of the log dam, and diversion of Little Clipper Creek around the tailings pile. Id. Future remedial work contemplated by the EPA for the site will include actions to address the polluted groundwater. The EPA estimates that it spent at least $20 million in response costs at the site as of April 30, 2008. SUF No. 100. The State of California Department of Toxic Substances alleges that its own response costs as of December 2010 are another $1,000,000. There is no dispute that the release of hazardous substances at the mine site is responsible for the response costs that have been incurred by Plaintiffs. See SUF No. 102.

///

///

///

As indicated above, Plaintiffs now seek partial summary judgment to establish, as a matter of law, that certain prerequisites for the recovery of response costs against all Defendants in this matter have been satisfied. No opposition to Plaintiffs' Motion has been made.

**STANDARD**

The Federal Rules of Civil Procedure provide for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. Celotex Corp. v. Catrett, 477 U.S. at 325.

Rule 56 also allows a court to grant summary adjudication on part of a claim or defense. See Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying . . . the part of each claim or defense . . . on which summary judgment is sought."); see, also, Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995); France Stone Co., Inc. v. Charter Twp. of Monroe, 790 F. Supp. 707, 710 (E.D. Mich. 1992).

The standard that applies to a motion for summary adjudication is the same as that which applies to a motion for summary judgment. See Fed. R. Civ. P. 56(a), 56(c); Mora v. ChemTronics, 16 F. Supp. 2d. 1192, 1200 (S.D. Cal. 1998).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp., 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968).

In attempting to establish the existence of this factual dispute, the opposing party must tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(e). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251-52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1987).

///

///

///

///

Stated another way, "before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 251 (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)). As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 586-87.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. Anderson, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

**ANALYSIS**

In order to establish Defendants' liability for response costs under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), Plaintiffs must make a four-part showing.

First, Plaintiffs must prove that the Lava Cap Mine Superfund Site is a "facility" as defined by CERCLA. Second, they must show that a "release" or "threatened release" of a hazardous substance from the facility has occurred. Third, Plaintiffs are required to establish that the release or threatened release caused Plaintiffs to incur response costs. Fourth and finally, in order to incur liability Defendants must fall within one of the four classes of covered persons described in Section 9607(a). Cose v. Getty Oil, 4 F.3d 700, 703-04 (9th Cir. 1993); 3550 Stevens Creek Assocs. v. Barclays Bank of California, 915 F.2d 1355, 1358 (9th Cir. 1990). If Plaintiffs are successful in establishing these four elements of liability, they are entitled to summary judgment unless Defendants are able to invoke one of the limited statutorily-permitted defenses to CERCLA liability. Courts to routinely grant summary judgment as to CERCLA liability provided the requisite showing has been made. See, e.g., United States v. Shell Oil Co., 841 F. Supp. 962, 968 (C.D. Cal. 1993).

The present motion seeks to summarily adjudicate three out of the four requirements to establishing CERCLA liability. In response to Plaintiffs' Motion, Defendant Sterling states plainly that it "does not dispute that Plaintiffs have established that the Lava Cap Mine Site is a facility; that arsenic, a CERCLA hazardous substance, was released into the environment at the Site; and that Plaintiffs have incurred certain costs responding to the release of arsenic from the facility." Defendant Sterling's Response, 1:22-25. Defendant Stephen P. Elder has filed no opposition to Plaintiffs' Motion.

///

Default judgment as to the liability of the remaining Defendant, Elder Development, Inc., has already been granted by Order filed September 20, 2011. Consequently, for all intents and purposes, the instant motion is unopposed.

That lack of opposition is not surprising given the straightforward nature of the three liability elements as to which Plaintiffs request summary adjudication. With respect to the first question of whether the Lava Cap Mine Superfund Site is a "facility" for purposes of CERCLA, the statute defines "facility" as including "any building, structure, installation, equipment . . . well, pit pond, lagoon, impoundment, ditch landfill, storage container, . . . . or any site or area where a hazardous substance has been deposited, stored, disposed of, or place, or otherwise come to be located." 42 U.S.C. § 9601(9). Given this expansive definition, a "facility" includes virtually every conceivable place where hazardous substances can be found, criteria which certainly would encompass the Lava Cap site. Moreover, it is undisputed that arsenic was found at the site, and arsenic qualifies as a "hazardous substance" as a matter of law because it is listed in 40 C.F.R. § 302.4, which delineates a consolidated list of hazardous substances under CERCLA. Consequently Plaintiffs are entitled to summary adjudication as to the "facility" component for CERCLA liability.

The second element required to establish liability, the requirement that there have been releases or threatened releases of a hazardous substance from the Lava Cap facility, is equally plain.

///

CERCLA Section 101(22), 46 U.S.C. § 9601(22), defines "release" broad as including "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment." The term "release" is liberally construed, any the amount of a hazardous substance released into the environment is irrelevant to liability. See, e.g., Stewman v. Mid-South Wood Products of Mena, Inc., 993 F.2d 646, 649 (8th Cir. 1993). Here, while the ultimate responsibility for such releases may well be at issue, it is clear that mine tailings placed directly onto the soil at the Lava Cap site contained arsenic and that surface water drainage at the site has also produced arsenic contamination. The fact that a "release" has occurred for purposes of CERCLA liability cannot be reasonably controverted, and Plaintiffs are entitled to summary adjudication as to that liability prerequisite as well.

Finally, with respect to the third and last liability component Plaintiffs seek to establish through this motion, it has been unequivocally established that both the EPA and the California Department of Toxic Substances Control has incurred response costs in remediating pollutants present at the Lava Cap site.

///

///

///

///

///

///

///

**CONCLUSION**

As demonstrated above, Plaintiffs are entitled to summary adjudication as to the first three components of CERCLA liability; namely, that the Lava Cap mine site is a "facility" for purposes of the statute, that releases of a hazardous substance have occurred from that facility, and finally that Plaintiffs have incurred response costs as a result of said release. Plaintiffs' Motion for Partial Summary Judgment of Elements of CERCLA liability common to all Defendants (ECF No. 108) is accordingly GRANTED. Whether Plaintiffs can establish the fourth and final element that would establish Defendants' liability as a matter of law (to wit, whether either Defendant Sterling or Defendant Stephen Elder qualifies as a "covered person" for purposes of the statute), as well as whether either remaining Defendant may properly assert any affirmative defenses to CERCLA liability, will be assessed by three other motions concurrently filed by Plaintiffs as to those issues.

IT IS SO ORDERED.

Dated: December 8, 2011

MORRISON C. ENGLAND, JR.
UNITED STATES DISTRICT JUDGE