UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,
and CALIFORNIA DEPARTMENT
OF TOXIC SUBSTANCES CONTROL,

        Plaintiffs,

    v.

STERLING CENTRECORP INC.,
STEPHEN P. ELDER and ELDER
DEVELOPMENT, INC.,

        Defendants.

No. 2:08-cv-02556-MCE-JFM

MEMORANDUM AND ORDER

----oo0oo----

Both the United States and the California Department of Toxic Substances (hereinafter collectively referred to as "Plaintiffs" or "government" unless otherwise specified) have designated the former Lava Cap Mine, located in Nevada County, California, as a Superfund site polluted by elevated levels of arsenic that were disseminated through tailings and waste materials generated by mine operations.  Plaintiffs have undertaken cleanup efforts designed to remediate that arsenic contamination.

1

The present action seeks contribution for the costs of those activities both from former owners of the site and operators responsible for its mining.  Presently before the Court is Plaintiffs' Motion for partial summary judgment as to the CERCLA liability of Defendant Stephen P. Elder.  Plaintiffs argue that the prerequisites for the recovery of response costs under CERCLA as against Defendant Elder, and in particular Elder's status as a "covered person" under the terms of the statute, have been established as a matter of law.  Plaintiffs further seek a determination rejecting any affirmative defenses asserted on Elder's behalf, as well as a declaratory judgment from the Court with respect to Elder's liability for future cleanup costs.  As set forth below, that motion will be granted.[1]

**BACKGROUND**

Mining operations at the Lava Cap Mine commenced in 1861. Between 1934 and 1943, mining was conducted at the site by the Lava Cap Gold Mining Corporation ("LCGMC").  During that time period, the Lava Cap Mine was one of the leading gold and silver producers in California, and among the top twenty-five gold producers in the nation.  Plaintiffs' Statement of Undisputed Fact ("SUF") No. 4.

///

///

---

[1] Because oral argument was not of material assistance, the Court ordered this matter submitted on the briefs.  E.D. Cal. Local Rule 230(h).

In 1938, LCGMC built a tailings dam on Greenhorn Creek (now known as Lost Lake Dam) to stop mine tailings from polluting the waters of the Bear River.  SUF Nos. 9, 10.  Waste products included within the mine-generated tailings contained elevated concentrations of naturally occurring arsenic, a hazardous substance pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601, et seq. ("CERCLA").  SUF No. 80-81.

No active mining occurred at Lava Cap after 1943, when its operations were shut down by the United States government during the Second World War.  SUF No. 12.  In 1950, LCGMC decided to sell, lease, or exchange all the property and assets of the company.  In 1952, LCGMC's directors recommended a sales transaction between LCGMC and New Goldvue, Mines, Ltd, a Canadian company developing a gold mine in Quebec and looking to upgrade its equipment.  A purchase and sale agreement was subsequently executed between the two companies.  Pursuant to that agreement, New Goldvue, having "been advised as to the . . . assets and liabilities of [LCGMC], agreed to purchase "all the assets of [LCGMC], subject to the liabilities of [LCGMC], which liabilities [New Goldvue] agreed to assume and cause to be paid promptly." SUF No. 19.  The sales agreement further specified that LCGMC's assets would be transferred to Keystone Copper Corporation ("Keystone"), a wholly-owned subsidiary of LCGMC, before Keystone was itself conveyed to New Goldvue.

///

///

///

3

1  Keystone, which had previously operated a copper mine while a
2  LCGMC subsidiary, thus became a wholly-owned subsidiary of New
3  Goldvue.[2]  See SUF No. 33.

4      The sales transaction between New Goldvue and LCGMC was
5  financed by a transfer of New Goldvue stock.  SUF No. 19. After
6  the LCGMC purchase was consummated, New Goldvue expanded its
7  board from five to seven and appointed two individuals previously
8  associated with LCGMC to the New Goldvue Board of Directors.  <u>See</u>
9  SUF No. 20.  LCGMC was subsequently dissolved.  SUF No. 35.

10     New Goldvue, which was originally incorporated in Ontario,
11 Canada as Goldvue Mines Ltd in 1944, changed its name several
12 times over the years before becoming Sterling in 2001.[3]  Until
13 1985, the company now known as Sterling was primarily a natural
14 resources company with investments in mining and oil and gas
15 production.  Sterling, through its subsidiary Keystone, owned the
16 Lava Cap Mine for some 37 years (aside from a brief, ultimately
17 unsuccessful attempt to transfer ownership to another company).
18 No mining occurred during that period.
19 ///
20 ///
21 ///
22 ///

23 ────────────────

24     [2] Keystone was a California corporation and remained a
    Sterling subsidiary until it became inactive after selling the
25 Lava Cap Mine in 1989 (Keystone was ultimately suspended by the
    California Secretary of State in 1991).

26     [3] New Goldvue changed its names several times over the years
    before becoming Sterling Centrecorp Inc. in 2001.  New Goldvue
27 and the subsequent names by which the corporation was known will
    be simply referred to as "Sterling" throughout the remainder of
28 this Memorandum and Order unless otherwise noted.

In 1979, a partial log dam collapse led to a release of mine tailings which, in turn, caused downstream neighbors to complain about pollution from the resulting silt.  In response to those complaints, the California Regional Water Quality Control Board issued a Cleanup and Abatement Order to Keystone on October 25, 1979.  See SUF No. 82.

Following an ultimately unsuccessful attempt to sell the Lava Cap Mine to another company, Keystone sold, in 1989, the property to Banner Mountain Properties, Ltd., an entity controlled by Defendant Stephen Elder, who currently owns four of the seven parcels comprising the former mine site.  SUF Nos. 77, 120-23.  The remaining three parcels are owned by another Elder business interest, Defendant Elder Development, Inc.  Elder had an engineering firm prepare a Preacquisition Site Assessment before his purchase of the mine site that revealed hazardous substance contamination, primarily arsenic.  SUF No. 127.

The United States Environmental Protection Agency ("EPA") completed a Preliminary Assessment on the mine site in April of 1993, after Banner Mountain's purchase of the mine site.  See SUF 86.  Sediment and soil samples revealed elevated concentrations of both arsenic and lead.

Heavy rainstorms in 1993 washed mine wastes downstream into Little Clipper Creek and a former mine tailings pond now known as Lost Lake.  SUF No. 88.  The EPA began cleanup operations in late 1997 and the site was officially designed a Superfund site in January of 1999.  SUF Nos. 89-90.  Those operations included the removal and relocation of tailings, reinforcement of the log dam, and diversion of Little Clipper Creek around the tailings pile.

1  <u>Id.</u>  Future remedial work contemplated by the EPA for the site

2  will include actions to address the polluted groundwater.  The

3  EPA estimates that it spent at least $20 million in response

4  costs at the site as of April 30, 2008.  SUF No. 100.  The State

5  of California Department of Toxic Substances alleges that its own

6  response costs as of December 2010 are another $1,000,000.  There

7  is no dispute that the release of hazardous substances at the

8  mine site is responsible for the response costs that have been

9  incurred by Plaintiffs.  <u>See</u> SUF No. 102.

10  As indicated above, Plaintiffs now seek partial summary

11  judgment with respect to Defendant Stephen P. Elder's liability.[4]

12  Aside from responding to the Statement of Undisputed Facts filed

13  by Plaintiffs with respect to all four of their concurrently

14  filed summary judgment requests, Defendant Elder has otherwise

15  filed no opposition to the instant motion.

16

17  **STANDARD**

18

19  The Federal Rules of Civil Procedure provide for summary

20  judgment when "the pleadings, depositions, answers to

21  interrogatories, and admissions on file, together with

22  affidavits, if any, show that there is no genuine issue as to any

23  material fact and that the moving party is entitled to a judgment

24  as a matter of law."  Fed. R. Civ. P. 56(c); <u>Celotex Corp. v.</u>

25  <u>Catrett</u>, 477 U.S. 317, 322 (1986).

26

27      [4] A default judgment against Defendant Elder's company,
Defendant Elder Development, Inc., has already been granted by
28  Order filed September 20, 2011 (ECF No. 149).

One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses.  Celotex Corp. v. Catrett, 477 U.S. at 325.

Rule 56 also allows a court to grant summary adjudication on part of a claim or defense.  See Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying . . . the part of each claim or defense . . . on which summary judgment is sought."); see, also, Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995); France Stone Co., Inc. v. Charter Twp. of Monroe, 790 F. Supp. 707, 710 (E.D. Mich. 1992).

The standard that applies to a motion for summary adjudication is the same as that which applies to a motion for summary judgment.  See Fed. R. Civ. P. 56(a), 56(c); Mora v. ChemTronics, 16 F. Supp. 2d. 1192, 1200 (S.D. Cal. 1998).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp., 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968).

///

///

1    In attempting to establish the existence of this factual

2    dispute, the opposing party must tender evidence of specific

3    facts in the form of affidavits, and/or admissible discovery

4    material, in support of its contention that the dispute exists.

5    Fed. R. Civ. P. 56(e).  The opposing party must demonstrate that

6    the fact in contention is material, i.e., a fact that might

7    affect the outcome of the suit under the governing law, and that

8    the dispute is genuine, i.e., the evidence is such that a

9    reasonable jury could return a verdict for the nonmoving party.

10   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251-52

11   (1986); Owens v. Local No. 169, Assoc. of W. Pulp and Paper

12   Workers, 971 F.2d 347, 355 (9th Cir. 1987).  Stated another way,

13   "before the evidence is left to the jury, there is a preliminary

14   question for the judge, not whether there is literally no

15   evidence, but whether there is any upon which a jury could

16   properly proceed to find a verdict for the party producing it,

17   upon whom the onus of proof is imposed."  Anderson, 477 U.S. at

18   251 (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)).

19   As the Supreme Court explained, "[w]hen the moving party has

20   carried its burden under Rule 56(c), its opponent must do more

21   than simply show that there is some metaphysical doubt as to the

22   material facts . . . . Where the record taken as a whole could

23   not lead a rational trier of fact to find for the nonmoving

24   party, there is no 'genuine issue for trial.'"  Matsushita,

25   475 U.S. at 586-87.

26   ///

27   ///

28   ///

8

1   In resolving a summary judgment motion, the evidence of the
2  opposing party is to be believed, and all reasonable inferences
3  that may be drawn from the facts placed before the court must be
4  drawn in favor of the opposing party.  Anderson, 477 U.S. at 255.
5  Nevertheless, inferences are not drawn out of the air, and it is
6  the opposing party's obligation to produce a factual predicate
7  from which the inference may be drawn.  Richards v. Nielsen
8  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),
9  aff'd, 810 F.2d 898 (9th Cir. 1987).

10

11                              **ANALYSIS**

12

13   In order to establish Defendants' liability for response
14  costs under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a),
15  Plaintiffs must make a four-part showing.  First, Plaintiffs must
16  prove that the Lava Cap Mine Superfund Site is a "facility" as
17  defined by CERCLA.  Second, they must show that a "release" or
18  "threatened release" of a hazardous substance from the facility
19  has occurred.  Third, Plaintiffs are required to establish that
20  the release or threatened release caused Plaintiffs to incur
21  response costs.  Fourth and finally, in order to incur liability
22  Defendants must fall within one of the four classes of covered
23  persons described in Section 9607(a).  Cose v. Getty Oil, 4 F.3d
24  700, 703-04 (9th Cir. 1993); 3550 Stevens Creek Assocs. v.
25  Barclays Bank of California, 915 F.2d 1355, 1358 (9th Cir. 1990).
26  ///
27  ///
28  ///

1  If Plaintiffs are successful in establishing these four elements

2  of liability, they are entitled to summary judgment unless

3  Defendants are able to invoke one of the limited statutorily-

4  permitted defenses to CERCLA liability.  Courts readily grant

5  summary judgment as to CERCLA liability provided the requisite

6  showing has been made.  <u>See</u>, <u>e.g.</u>, <u>United States v. Shell Oil</u>

7  <u>Co.</u>, 841 F. Supp. 962, 968 (C.D. Cal. 1993).

8      In granting Plaintiffs' concurrently filed Motion for

9  Partial Summary Judgment as to the first three of the above-

10 enumerated four requirements for imposition of CERCLA liability,

11 this Court has already found that Plaintiffs have established

12 that a "release" or "threatened release" of a "hazardous

13 substance" occurred from a "facility" as that term is defined

14 under CERCLA, and that Plaintiffs incurred response costs as a

15 result thereof.

16     Plaintiffs now seek to establish by way of this motion that

17 Defendant Elder qualifies as a "covered person" as that term is

18 defined in the statute.  Plaintiffs also ask this Court to find

19 that none of the statutorily-prescribed defenses to CERCLA

20 liability are available to Defendant Elder, and that he is

21 consequently liable for both present and future response costs.

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

1 It is undisputed that Elder is a current owner of four of
2 the seven parcels that incorporate the former Lava Cap mine site.
3 As such a current owner, Elder qualifies as a "covered person"
4 for purposes of CERCLA liability under Section 107(a), 42 U.S.C.
5 § 9607(a)(1) ("covered person" includes the owner and operator of
6 a "facility"); see also California Dept. Of Toxic Substances
7 Control v. Hearthside Residential Corp., 613 F.3d 910, 912-13
8 (9th Cir. 2010) ("covered person" refers "to 'current' owners or
9 operators").  Consequently, because Plaintiffs have established
10 that all four prerequisites of CERCLA liability apply to
11 Defendant Elder, he is liable for all costs of removal or
12 remediation incurred by the Plaintiffs.  Hearthside Residential,
13 613 F.3d at 912-916.

14 Importantly, recoverable expenses include both existing
15 costs and costs to be borne in the future.  In any action under
16 section 107 of CERCLA, in addition to entering judgment on
17 liability for costs already incurred, "the court shall enter a
18 declaratory judgment on liability for response costs or damages
19 that will be binding on any subsequent action or actions to
20 recover further response costs or damages.  42 U.S.C.
21 § 9613(g)(2).

22 ///
23 ///
24 ///
25 ///
26 ///
27 ///
28 ///

11

1   Consequently, Plaintiffs have not only established all four

2   prerequisites for Elder's liability under CERCLA, but further

3   have shown their entitlement to declaratory judgment for

4   liability purposes with respect to both present and prospective

5   cleanup costs.[5]

6        Given Plaintiffs' showing, Defendant Elder can avoid

7   liability only if he can establish that one or more of the four

8   affirmative defenses to liability recognized under CERCLA

9   Section 107(g) existed.  Those defenses include 1) an act of God;

10  2) an act of war; 3) acts or omissions of certain third parties

11  not in privity with the defendant; or 4) any combination of the

12  above three defenses.  42 U.S.C. § 9607(b)(1)-(4).  These are the

13  only cognizable defenses to liability under Section 107(g).  See

14  California ex rel. Calif. Dept. Of Toxic Substances Control v.

15  Neville Chem. Co., 358 F.3d 661, 672 (9th Cir. 2004).  Moreover,

16  even these four available defenses should be narrowly construed

17  since CERCLA must be read "consistent with [its] broad remedial

18  purpose.  See, e.g., Wickland Oil Terminals v. ASARCO, Inc.,

19  792 F.2d 887, 892 (9th Cir. 1986).

20  ///

21  ///

22  ///

23  ///

24  ///

25

26       [5] That showing is for liability purposes only.  Having
    established liability, Plaintiffs must show their entitlement to
27  actual damages in the second stage of these proceedings, as set
    forth in the Court's Bifurcation Order of March 25, 2009. (ECF
28  No. 26).

1    Examination of Elder's Answer (ECF No. 38) indicates that

2  Elder pled four affirmative defenses.  Because the first two

3  defenses asserted, which allege issues of estoppel and offset,

4  respectively, are not included within the available list of

5  CERCLA defenses outlined above, they need not be considered in

6  assessing Elder's liability.  As a Third Affirmative Defense,

7  however, Elder does allege that "the harm alleged was caused by

8  an act of God."  Def. Elder's Answer, ECF No. 38, 9:1-2.

9    CERCLA defines an act of God to mean "an unanticipated grave

10 natural disaster or other natural phenomena of an exceptional,

11 inevitable, and irresistible character, the effects of which

12 could not have been prevented or avoided by the exercise of due

13 care or foresight."  42 U.S.C. § 9601(1).  The only event that

14 even arguably may fall within this definition is the partial

15 collapse of the original log dam at the site in January of 1997,

16 during a winter storm.  SUF No. 87.  That collapse released over

17 10,000 cubic yards of tailings into Little Clipper Creek.  Id.

18 Elder does not dispute this characterization of what happened,

19 but indicates only in his response to Plaintiffs' Statement of

20 Undisputed Facts that the storm was a severe one, and one of the

21 worst to affect the region in recent times.  Def. Elder's

22 Response to Pls.' SUF No. 87.

23    That distinction has already been rejected.  In United

24 States v. Stringfellow, 661 F. Supp. 1053, 1059 (C.D. Cal. 1987),

25 the Defendants in a CERCLA suit involving toxic waste raised a

26 similar act of God defense based on heavy rainfall.  Id. at 1061.

27 ///

28 ///

13

1  The Central District repudiated that defense, stating that "rains

2  were not the kind of 'exceptional natural phenomena' to which the

3  narrow act of God defense of section 107(b)(1) applies." <u>Id.</u>  As

4  the court explained, "rains were foreseeable based on normal

5  climatic conditions and any harm caused by the rain could have

6  been prevented through design of proper drainage channels." <u>Id.</u>

7  Even excessive rainfall has been deemed insufficient to establish

8  the "exceptional, inevitable, and irresistible" nature of a

9  viable act of God defense. <u>United States v. Atlantic Richfield,</u>

10 <u>Co.,</u> 1996 U.S. Dist. LEXIS 22885 at *15 (D. Mont. 1986).

11      Moreover, even Elder concedes in the counterclaim appended

12 to his answer that the "log dam . . . was in a precarious

13 condition and likely to fail."  Elder's Answer, ECF No. 38,

14 11:7-8.  Elder is therefore hard pressed to argue that the

15 collapse was so utterly unforeseeable to qualify for treatment as

16 an act of God.  That CERCLA defense is unavailable as a matter of

17 law to Elder under the circumstances of this case.

18     Elder's fourth and final affirmative defense alleges the

19 statutorily-available CERCLA defense absolving a defendant of

20 liability if the release in question was caused by "an act or

21 omission of a third party" not in privity with the defendant.

22 42 U.S.C. § 9607(b)(3).  To prevail in asserting this defense,

23 however, Elder must demonstrate that a "totally unrelated third

24 party is the sole cause of the release. <u>Stringfellow</u>,

25 661 F. Supp. at 1061.  He must also show that he exercised due

26 care with respect to the hazardous substance, and that he took

27 precautions against foreseeable acts or omissions of the third

28 party.

1    The third party defense is unavailable because, as set forth

2 above, Elder had a Preacquisition Site Assessment prepared before

3 his purchase of the mine site that revealed hazardous substance

4 contamination, primarily arsenic.  SUF No. 127.  A landowner with

5 actual knowledge of contamination at the time of purchase, like

6 Elder, cannot assert the defense.  United States v. Honeywell

7 Int'l, Inc., 542 F. Supp. 2d 1188, 1201 (E.D. Cal. 2008).  It is

8 further undisputed that releases continued after Elder assumed

9 ownership of the Lava Cap site, including the aforementioned

10 partial dam collapse in 1997.  Under those circumstances Elder

11 simply cannot allege that a third party was the sole cause of

12 arsenic releases at the site, which he must do in order to avail

13 himself of the third party affirmative defense.

14

15                              **CONCLUSION**

16

17    Plaintiffs' Motion for Partial Summary Judgment as to the

18 CERCLA liability of Defendant Stephen P. Elder (ECF No. 114) is

19 GRANTED.  Plaintiffs have demonstrated their entitlement to

20 summary adjudication as to all four components of CERCLA

21 liability, including the particular focus of this summary

22 adjudication request -- Elder's status as a "covered person"

23 under the statute.

24 ///

25 ///

26 ///

27 ///

28 ///

1  Because Plaintiffs have also established that no statutorily
2  authorized affirmative defenses to CERCLA liability are available
3  under the circumstances of this case, Plaintiffs are entitled to
4  a declaratory judgment holding Defendant Elder liable under
5  Section 107(a) for all costs of removal or remediation incurred
6  by Plaintiffs, including all appropriate further response costs
7  under Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2).  The
8  amount to be recovered will be determined in the damages phase of
9  this litigation now that Defendant Elder's liability for cleanup
10 costs has been established.

11      IT IS SO ORDERED.

12 Dated: December 8, 2011

15      MORRISON C. ENGLAND, JR.
        UNITED STATES DISTRICT JUDGE

16