UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,                    No. 2:08-cv-02556-MCE-JFM
and CALIFORNIA DEPARTMENT
OF TOXIC SUBSTANCES CONTROL,

        Plaintiffs,

    v.                                       MEMORANDUM AND ORDER

STERLING CENTRECORP INC.,
STEPHEN P. ELDER and ELDER
DEVELOPMENT, INC.,

        Defendants.

                        ----oo0oo----


    Both the United States and the California Department of

Toxic Substances (hereinafter collectively referred to as

"Plaintiffs" or "government" unless otherwise specified) have

designated the former Lava Cap Mine, located in Nevada County,

California, as a Superfund site polluted by elevated levels of

arsenic that were disseminated through tailings and waste

materials generated by mine operations.  Plaintiffs have

undertaken cleanup efforts designed to remediate that arsenic

contamination.

1

The present action seeks contribution for the costs of those activities both from former owners of the site and operators responsible for its mining.  Presently before the Court are two Motions for Partial Summary Judgment as to the CERCLA liability of Defendant Sterling Centrecorp, Inc. ("Sterling").  Plaintiffs' first motion (as to Sterling's liability) argues that the prerequisites for the recovery of response costs under CERCLA as against Defendant Sterling, and in particular Elder's status as a "covered person" under the terms of the statute, have been established as a matter of law.  Plaintiffs' second motion seek a determination rejecting, as a matter of law, any affirmative defenses asserted on Sterling's behalf.  As set forth below, Plaintiffs' liability motion will be denied; the motion as to availability of affirmative defenses will be granted in part and denied in part.[1]

**BACKGROUND**

Mining operations at the Lava Cap Mine commenced in 1861. Between 1934 and 1943, mining was conducted at the site by the Lava Cap Gold Mining Corporation ("LCGMC").  During that time period, the Lava Cap Mine was one of the leading gold and silver producers in California, and among the top twenty-five gold producers in the nation.  Plaintiffs' Statement of Undisputed Fact ("SUF") No. 4.

---

[1] Because oral argument was not of material assistance, the Court ordered this matter submitted on the briefs.  E.D. Cal. Local Rule 230(h).

1   In 1938, LCGMC built a tailings dam on Greenhorn Creek (now known
2   as Lost Lake Dam) to stop mine tailings from polluting the waters
3   of the Bear River.  SUF Nos. 9, 10.  Waste products included
4   within the mine-generated tailings contained elevated
5   concentrations of naturally occurring arsenic, a hazardous
6   substance pursuant to the Comprehensive Environmental Response,
7   Compensation and Liability Act of 1980, 42 U.S.C. § 9601, et seq.
8   ("CERCLA").  SUF No. 80-81.

9        No active mining occurred at Lava Cap after 1943, when its
10  operations were shut down by the United States government during
11  the Second World War.  SUF No. 12.  In 1950, LCGMC decided to
12  sell, lease, or exchange all the property and assets of the
13  company.  In 1952, LCGMC's directors recommended a sales
14  transaction between LCGMC and New Goldvue Mines Limited, a
15  Canadian company developing a gold mine in Quebec and looking to
16  upgrade its equipment.  A purchase and sale agreement was
17  subsequently executed between the two companies.  Pursuant to
18  that agreement, New Goldvue, having "been advised as to
19  the...assets and liabilities of [LCGMC], agreed to purchase "all
20  the assets of [LCGMC], subject to the liabilities of [LCGMC],
21  which liabilities [New Goldvue] agreed to assume and cause to be
22  paid promptly."  SUF No. 19.  The sales agreement further
23  specified that LCGMC's assets would be transferred to Keystone
24  Copper Corporation ("Keystone"), a wholly-owned subsidiary of
25  LCGMC, before Keystone was itself conveyed to New Goldvue.
26  ///
27  ///
28  ///

3

Keystone, which had previously operated a copper mine while a LCGMC subsidiary, thus became a wholly-owned subsidiary of New Goldvue.[2]  See SUF No. 33.

The sales transaction between New Goldvue and LCGMC was financed by a transfer of New Goldvue stock.  SUF No. 19.  After the LCGMC purchase was consummated, New Goldvue expanded its board from five to seven and appointed two individuals previously associated with LCGMC to the New Goldvue Board of Directors.  See SUF No. 20.  LCGMC was subsequently dissolved.  SUF No. 35.

New Goldvue, which was originally incorporated in Ontario, Canada as Goldvue Mines Limited in 1944, changed its name several times over the years before becoming Sterling in 2001.[3]  Until 1985, the company now known as Sterling was primarily a natural resources company with investments in mining and oil and gas production.  Sterling, through its subsidiary Keystone, owned the Lava Cap Mine for some 37 years (aside from a brief, ultimately unsuccessful attempt to transfer ownership to another company).  No mining occurred during that period.

///

///

///

///

---

[2] Keystone was a California corporation and remained a Sterling subsidiary until it became inactive after selling the Lava Cap Mine in 1989 (Keystone was ultimately suspended by the California Secretary of State in 1991).

[3] New Goldvue changed its name several times over the years before becoming Sterling Centrecorp Inc. in 2001.  New Goldvue and the subsequent names by which the corporation was known will be simply referred to as "Sterling" throughout the remainder of this Memorandum and Order unless otherwise noted.

4

In 1979, a partial log dam collapse led to a release of mine tailings which, in turn, caused downstream neighbors to complain about pollution from the resulting silt.  In response to those complaints, the California Regional Water Quality Control Board issued a Cleanup and Abatement Order to Keystone on October 25, 1979.  See SUF No. 82.

Following an ultimately unsuccessful attempt to sell the Lava Cap Mine to another company, Keystone sold, in 1989, the property to Banner Mountain Properties, Ltd., an entity controlled by Defendant Stephen Elder, who currently owns four of the seven parcels comprising the former mine site.  SUF Nos. 77, 120-23.  The remaining three parcels are owned by another Elder business interest, Defendant Elder Development, Inc.  Elder had an engineering firm prepare a Preacquisition Site Assessment before his purchase of the mine site that revealed hazardous substance contamination, primarily arsenic.  SUF No. 127.

The United States Environmental Protection Agency ("EPA") completed a Preliminary Assessment on the mine site in April of 1993, after Banner Mountain's purchase of the mine site.  See SUF No. 86.  Sediment and soil samples revealed elevated concentrations of both arsenic and lead.

Heavy rainstorms in 1993 washed mine wastes downstream into Little Clipper Creek and a former mine tailings pond now known as Lost Lake.  SUF No. 88.  The EPA began cleanup operations in late 1997 and the site was officially designed a Superfund site in January of 1999.  SUF Nos. 89-90.  Those operations included the removal and relocation of tailings, reinforcement of the log dam, and diversion of Little Clipper Creek around the tailings pile.

1   Id.  Future remedial work contemplated by the EPA for the site
2   will include actions to address the polluted groundwater.   The
3   EPA estimates that it spent at least $20 million in response
4   costs at the site as of April 30, 2008.  SUF No. 100.  The State
5   of California Department of Toxic Substances alleges that its own
6   response costs as of December 2010 are another $1,0000,000.
7   There is no dispute that the release of hazardous substances at
8   the mine site is responsible for the response costs that have
9   been incurred by Plaintiffs.  See SUF No. 102.

10      As indicated above, Plaintiffs now seek partial summary
11  judgment with respect to Defendant Stephen P. Elder's liability.[4]
12  Aside from responding to the Statement of Undisputed Facts filed
13  by Plaintiffs with respect to all four of their concurrently
14  filed summary judgment requests, Defendant Elder has otherwise
15  filed no opposition to the instant motion.

16
17                          **STANDARD**
18
19      The Federal Rules of Civil Procedure provide for summary
20  judgment when "the pleadings, depositions, answers to
21  interrogatories, and admissions on file, together with
22  affidavits, if any, show that there is no genuine issue as to any
23  material fact and that the moving party is entitled to a judgment
24  as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v.
25  Catrett, 477 U.S. 317, 322 (1986).

26
27      [4] A default judgment against Defendant Elder's company,
28  Defendant Elder Development, Inc., has already been granted by
    Order filed September 20,2011 (ECF No. 149).

6

One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. at 325.

Rule 56 also allows a court to grant summary adjudication on part of a claim or defense.  <u>See</u> Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying...the part of each claim or defense...on which summary judgment is sought."); <u>see also</u> <u>Allstate Ins. Co. v. Madan</u>, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995); <u>France Stone Co., Inc. v. Charter Twp. of Monroe</u>, 790 F. Supp. 707, 710 (E.D. Mich. 1992).

The standard that applies to a motion for summary adjudication is the same as that which applies to a motion for summary judgment.  <u>See</u> Fed. R. Civ. P. 56(a), 56(c); <u>Mora v. ChemTronics</u>, 16 F. Supp. 2d. 1192, 1200 (S.D. Cal. 1998).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.

<u>Celotex Corp.</u>, 477 U.S. at 323 (<u>quoting</u> Fed. R. Civ. P. 56(c)).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 585-87 (1986); <u>First Nat'l Bank v. Cities Serv. Co.</u>, 391 U.S. 253, 288-89 (1968).

///

///

In attempting to establish the existence of this factual dispute, the opposing party must tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(e). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251-52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1987). Stated another way, "before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 251 (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)). As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 586-87.

///

///

///

8

1    In resolving a summary judgment motion, the evidence of the
2    opposing party is to be believed, and all reasonable inferences
3    that may be drawn from the facts placed before the court must be
4    drawn in favor of the opposing party.  Anderson, 477 U.S. at 255.
5    Nevertheless, inferences are not drawn out of the air, and it is
6    the opposing party's obligation to produce a factual predicate
7    from which the inference may be drawn.  Richards v. Nielsen
8    Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),
9    aff'd, 810 F.2d 898 (9th Cir. 1987).

10
11                              **ANALYSIS**
12   **A.   Plaintiffs' Liability Motion as to Sterling**
13
14       In order to establish Sterling's liability for response
15   costs under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a),
16   Plaintiffs must make a four-part showing.  First, Plaintiffs must
17   prove that the Lava Cap Mine Superfund Site is a "facility" as
18   defined by CERCLA.  Second, they must show that a "release" or
19   "threatened release" of a hazardous substance from the facility
20   has occurred.  Third, Plaintiffs are required to establish that
21   the release or threatened release caused Plaintiffs to incur
22   response costs.  Fourth and finally, in order to incur liability
23   Sterling must fall within one of the four classes of covered
24   persons described in § 9607(a).  Cose v. Getty Oil, 4 F.3d 700,
25   703-04 (9th Cir. 1993); 3550 Stevens Creek Assocs. v. Barclays
26   Bank of California, 915 F.2d 1355, 1358 (9th Cir. 1990).
27   ///
28   ///

9

1 If Plaintiffs are successful in establishing these four elements

2 of liability, they are entitled to summary judgment unless, as

3 discussed in more detail in the following section, Sterling is

4 able to invoke one of the limited statutorily-permitted defenses

5 to CERCLA liability.  Courts readily grant summary judgment as to

6 CERCLA liability provided the requisite showing has been made.

7 See, e.g., United States v. Shell Oil Co., 841 F. Supp. 962, 968

8 (C.D. Cal. 1993).

9      In granting Plaintiffs' concurrently filed Motion for

10 Partial Summary Judgment as to the first three of the above-

11 enumerated four requirements for imposition of CERCLA liability,

12 this Court has already found that Plaintiffs have established

13 that a "release" or "threatened release" of a "hazardous

14 substance" occurred from a "facility" as that term is defined

15 under CERCLA, and that Plaintiffs incurred response costs as a

16 result thereof.

17      Plaintiffs now seek to establish by way of this motion that

18 Defendant Sterling qualifies as a "covered person" as that term

19 is defined in the statute.  The Ninth Circuit recognizes that

20 corporate successors should answer for the liabilities of their

21 predecessor corporations under CERCLA.  See Louisiana-Pacific

22 Corp. v. ASARCO, Inc., 909 F.2d 1260, 1262 (9th Cir. 1990)

23 ("Congress did intended successor liability" under CERCLA),

24 overruled on other grounds, Atchison, Topeka & Santa Fe Ry. Co.

25 v. Brown & Bryant, Inc., 132 F.3d 1295, 1301), amended and

26 superseded by 159 F.3d 358, 364 (9th Cir. 1997).

27 ///

28 ///

10

1    In addition, other courts have uniformly concluded that successor

2    corporations are within the meaning of "persons" for purposes of

3    CERCLA liability.  See United States v. Mexico Feed and Seed Co.,

4    Inc., 980 F.2d 478, 486-87 (8th Cir. 1992); United States v.

5    Carolina Transformer Co., 978 F.2d 832, 837 (4th Cir. 1992);

6    Anspec Co., Inc. v. Johnson Controls, Inc., 922 F.2d 1240, 1245-

7    48 (6th Cir. 1991); Smith Land & Improvement Corp. v. Celotex

8    Corp., 851 F.2d 86, 91-92 (3d Cir. 1988), cert. denied, 488 U.S.

9    1029 (1989).

10       Under both Ninth Circuit precedent and California law,

11   successor liability does not arise from an asset purchase like

12   that between Sterling and LCGMC "unless (1) the purchasing

13   corporation expressly or impliedly agrees to assume the

14   liability; (2) the transaction amounts to a 'de-facto'

15   consolidation or merger; (3) the purchasing corporation is merely

16   a continuation of the selling corporation; or (4) the transaction

17   was fraudulently entered into in order to escape liability."

18   Atchison, Topeka and Santa Fe Railway Co. v. Brown & Bryant,

19   Inc., 159 F.3d 358, 361 (9th Cir. 1997); Ray v. Alad Corp.,

20   19 Cal. 3d 22, 28 (1977).  As the quoted language makes clear,

21   successor liability can rest on any one of those four variants.

22   Here, Plaintiffs argue that Sterling qualifies as the successor

23   to LCGMC either because Sterling assumed the liabilities of LCGMC

24   when it acquired the company, or because a de facto merger or

25   consolidation between the two companies incurred upon which

26   successor liability may also be premised.  Both those bases for

27   successor liability will now be addressed.

28   ///

1      **1.  Assumption of Liability.**

2

3          Plaintiffs' quest for summary judgment as to successor

4   liability fails because there are triable issues as to whether

5   Sterling either expressly or impliedly agreed to assume all of

6   LCGMC's liabilities, whether financial, environmental, or

7   otherwise, in the course of the purchase transaction.

8          Although the Ninth Circuit has not squarely addressed

9   whether state law governs in determining successor liability

10  under CERCLA, examination of cases in the CERCLA arena leave

11  little doubt as to that conclusion.  See, e.g., Atchison,

12  159 F.3d at 362-64 (stepping back from a prior unequivocal

13  announcement as to the applicability of state law, but only on

14  grounds that the court "need not determine" whether state law is

15  dispositive since both state law and federal common law yield the

16  same result); Mardan Corp. v. C.G.C. Music Ltd., 804 F.2d 1454,

17  1457-1460 (9th Cir. 1986) (noting that a federal rule for CERCLA

18  liability based on contractual assumption of liability would

19  disrupt and undermine commercial contractual relationships

20  premised on state law).

21         Here, of course, any liability based on CERCLA and premised

22  on the purchase agreement between Sterling and LCGMC is

23  intrinsically problematic since that 1952 agreement was entered

24  some 28 years before CERCLA was enacted into law in 1980.

25  Nonetheless, under California law, laws enacted after a contract

26  was formed can still become part of an assumption of liabilities

27  if there is "clear and distinct" evidence that a broad assumption

28  was in fact contemplated by the parties.

12

1   <u>Swenson v. File</u>, 3 Cal. 3d 389, 394-95 (1970).  As long as the
2   agreement is sufficiently clear, that general proposition has
3   been held to apply to CERCLA liability on the basis of a pre-
4   CERCLA agreement.  <u>See, e.g.</u>, <u>Cal. Dep't of Toxic Substances</u>
5   <u>Control v. Cal-Fresno Inv. Co.,</u> 2007 U.S. Dist. LEXIS 37314 at
6   *13 (E.D. Cal. 2007)).

7       Sterling opposes Plaintiffs' argument that any such "clear
8   and distinct" evidence to assume liability was contemplated in
9   the LCGMC purchase.  Sterling points to the language of the
10  purchase agreement itself, which indicates that Sterling, having
11  "been advised as to the... assets and liabilities of [LCGMC],
12  agreed to purchase "all the assets of [LCGMC], subject to the
13  liabilities of [LCGMC], which liabilities [New Goldvue] agreed to
14  assume and cause to be paid promptly."  SUF No. 43.  According to
15  Sterling, while "assets" is modified by the qualifier "all", no
16  similar use of "all" with respect to liabilities is employed.
17  Sterling further maintains that by explaining that "liabilities"
18  will be "paid promptly", the purchase agreement necessarily
19  refers to liabilities in a limited financial sense, rather than
20  encompassing any expansive definition extending to contingent and
21  as-yet-unknown environmental liability.  Sterling consequently
22  contends that the requisite clear intent to assume all
23  liabilities is simply not present.

24      According to Sterling, all cases where assumption of unknown
25  liabilities have been recognized entail an agreement to assume
26  "all liabilities", a contingency absent from the instant purchase
27  agreement according to Sterling.
28  ///

1    See, e.g., Olin Corp. v. Consolidated Aluminum Corp., 5 F.3d 10,
2    15-16 (2nd Cir. 1993) (language stating that purchase agreed to
3    be responsible for "all liabilities... as they exist on the
4    Closing Date or arise thereafter" evidenced the parties' "clear
5    and unmistakable intent" to encompass future unknown CERCLA
6    liability).

7         Plaintiffs, on the other hand, in moving for summary
8    judgment on this issue, point to evidence demonstrating that, in
9    their view, the sales transaction between Sterling and LCGMC does
10   supply the requisite intent to assume all future liabilities
11   attributable to LCGMC's mine activities.  Consequently, although
12   Plaintiffs cite case law suggesting that the general rule of
13   Swenson v. File, supra, (limiting assumption of later-created
14   liability unless "clear and distinct" evidence of an intent to do
15   so) may not apply to CERCLA cases (see, e.g., United States v.
16   Iron Mountain Mines, Inc., 987 F. Supp. 1233, 1240 (E.D. Cal.
17   1997) (refusing to extend the rule articulated by Swenson to
18   CERCLA cases), Plaintiffs maintain that the requirements of
19   Swenson are satisfied in any event.

20        In arguing that Sterling's intent to assume all future
21   liabilities was in fact unmistakable, Plaintiffs point to parole
22   evidence that, in their view, removes any lingering uncertainty
23   about whether Sterling in fact intended to assume "all"
24   liability.  Parole evidence is admissible to show all
25   circumstances surrounding a transaction in order to determine the
26   meaning intended and understood by the parties.

27   ///

28   ///

14

See <u>Brookes v. Adolph's Ltd.</u>, 170 Cal. App. 2d 740, 746 (Cal. App. 1959); <u>see also</u> Cal. Civ. Code § 1647 ("a contact may be explained by reference to the circumstances under which it was made, and the matter to which it relates").

First, Plaintiffs point to a letter from Sterling's President to the company's shareholders dated September 22, 1952 which described the sales agreement entered into some seventeen days previously as follows:

> By agreement dated September 5, 1952, the Company has agreed to acquire all the assets of Lava Cap Gold Mines Limited [sic], a Delaware corporation, subject to its liabilities, in consideration of the issue of one share of the capital stock of our Company for every 6 issued shares of Lava Cap.

SUF No. 44.

Second, an October 24, 1952 letter from LCGMC's President to LCGMC shareholders appears to express a corresponding understanding of the sales transaction as entailing an assumption of all LCGMC liabilities by Sterling:

> Your Board of Directors on September 5, 1952, sold all the properties and assets of Lava Cap, subject to its liabilities, for sufficient fully paid and non-assessable shares of the capital stock of [Sterling].... [Sterling] assumes all liabilities and expenses of Lava Cap.

SUF No. 41.

Third, correspondence from Sterling in 1956 to Chase Manhattan Bank describing the 1952 sales transaction reiterates Sterling's apparent assumption of liabilties:

> In 1952, [Sterling] purchased all of the assets and liabilities of Lava Cap gold Mining Corporation and the latter corporation has surrendered its charter.

SUF No. 45.

15

1    The Court concludes that the above-enumerated evidence, at

2  the very least, creates triable issues of fact as to whether the

3  parties did agree that Sterling would assume all liabilities of

4  LCGMC.  Given those triable issues of fact, Plaintiffs' motion

5  for partial summary judgment, made on grounds that Sterling

6  qualifies as a "covered person" under CERCLA by virtue on

7  successor liability grounds, fails.

8

9              **2.   De Facto Merger or Consolidation.**

10

11    Even aside from the issue of whether Sterling assumed the

12  liabilities of LCGMC, and hence qualified for successor liability

13  on that basis, Plaintiffs also point to both pre and post-

14  acquisition correspondence suggesting that the 1952 sales

15  transaction amounted to a merger between the two companies.  <u>See</u>

16  Pls.' SUF Nos. 46, 47.  As indicated above, if the transaction

17  amounts to a merger, successor liability may also apply.

18    The correspondence at issue, which intimates that a

19  reorganization of the two companies occurred at least for

20  purposes of tax law, is not determinative.  Instead, under both

21  state and federal authority governing whether a corporate merger

22  will be deemed to have occurred, a continuity of enterprise is

23  required.  <u>See</u> <u>Marks v. Minnesota Mining and Mfg. Co.</u>, 187 Cal.

24  App. 3d 1429, 1436 (Cal. App. 1986); <u>Cal. Dept. of Toxic</u>

25  <u>Substances Control v. California-Fresno Inv. Co.</u>, 2007 WL 1345580

26  at *6 (E.D. Cal. 2007).

27  ///

28  ///

1  While other factors must also be considered in assessing a
2  merger, in this particular matter the continuity requirement is
3  the prerequisite disputed by the parties, and if continuity is
4  not present here as a matter of law summary judgment cannot be
5  granted as to whether Sterling has assumed successor liability by
6  virtue of a de facto merger.

7       Determining whether there is a continuity of enterprise is a
8  fact intensive inquiry necessary to ensure that "solvent
9  corporations, going concerns, should not be permitted to
10 discharge their liabilities to injured persons simply by
11 shuffling paper and manipulating corporate entities." Marks,
12 187 Cal. App. 3d at 1437 (internal citation omitted). The Court
13 believes that the evidence, viewed in the manner most favorable
14 to the non-moving party (Sterling), is at best conflicting as to
15 whether a continuity of operation occurred after the LCGMC
16 purchase by Sterling. As Sterling points out, the acquisition
17 did not alter its corporate structure and management team, and
18 aside from two new board members, one of which had been a
19 director of Lava Cap Mining, there was no difference in
20 Sterling's operation after it purchased Lava Cap. There is no
21 evidence that Sterling ever used the name Lava Cap Mining or held
22 itself out as a continuation of Lava Cap Mining. To the
23 contrary, the evidence suggests that Sterling bought LCGMC not to
24 continue its operation but instead to utilize its equipment and
25 movable assets for its Canadian operations.
26 ///
27 ///
28 ///

17

Although the Lava Cap mine had been inactive since being closed by the government during World War II, LCGMC was a mining company and the undisputed evidence simply does not show that Sterling intended to operate the mine as a going concern as LCMGC had beforehand.  It follows that Plaintiffs' reliance on a de facto merger or consolidation as the basis for imposing successor liability on Sterling is no more persuasive, for purposes of granting summary judgment, than its assumption of liabilities argument enumerated above.  Either way, summary judgment in Plaintiffs' favor is not indicated, and the requested declaratory judgment as to Sterling's liability for future costs cannot be had.

### B.    Viability of Sterling's Affirmative Defenses to Liability

Plaintiffs also request, by way of their second motion for summary judgment pending before this Court, a finding that none of the affirmative defenses to CERCLA liability pled by Sterling are available given the facts of this case.  In addition to disputing Sterling's claim (by way of its First Affirmative Defense) that this court lacks personal jurisdiction over it, Plaintiffs also contest the viability of the three enumerated defenses specifically recognized by CERCLA, and pled by Sterling in its Fourth Affirmative Defense.

///

///

///

1    With respect to the fourteen other affirmative defenses included

2    within Sterling's answer, Plaintiffs claim either that they

3    cannot be supported by any set of facts, or that they are

4    appropriate only in the damages portion of this trial as relating

5    to the amount of response costs owed by Sterling.

6         With respect to personal jurisdiction, as already set forth

7    in its Memorandum and Order denying Sterling's corresponding

8    Motion seeking summary judgment on grounds of no personal

9    jurisdiction (ECF No. 151), this Court finds that triable issues

10   of fact preclude any finding as a matter of law with respect to

11   personal jurisdiction under the facts of this case.

12   Consequently, as the Court denied Sterling summary judgment on

13   that issue, the Court will also deny Plaintiffs' attempt to

14   foreclose through summary judgment the use of an affirmative

15   defense to that effect.  Moreover, because the Court finds

16   triable issues as to personal jurisdiction on a successor

17   liability theory alone, it need not otherwise assess whether

18   jurisdiction is absent by virtue of Sterling's own lack of

19   contact with California (pursuant to a specific jurisdiction

20   analysis).

21        With respect to the affirmative defenses specifically

22   available in a CERCLA action, the statute recognizes three

23   separate defenses, plus any combination of the three as a fourth.

24   Those defenses are as follows:  1) an act of God; 2) an act of

25   war; 3) acts or omissions of certain third parties not in privity

26   with the defendant; or 4) any combination of the above three

27   defenses.  42 U.S.C. § 9607(b)(1)-(4).  These are the only

28   cognizable defenses to liability under § 107(g).

1  See California ex rel. Calif. Dept. Of Toxic Substances Control
2  v. Neville Chem. Co., 358 F.3d 661, 672 (9th Cir. 2004).
3  Moreover, even these four available defenses should be narrowly
4  construed since CERCLA must be read "consistent with [its] broad
5  remedial purpose.  See, e.g.,  Wickland Oil Terminals v. ASARCO,
6  Inc., 792 F.2d 887, 892 (9th Cir. 1986).

7       Sterling admits that none of the affirmative defenses
8  available under CERCLA are applicable (See Opp'n, 9:4-5).
9  Consequently, summary judgment is granted in Plaintiffs' favor as
10 to the Sterling's Fourth Affirmative Defense.  Sterling also does
11 not oppose summary judgment as to its Thirteenth and Fourteenth
12 Affirmative Defenses.  In addition, since none of the other
13 liability defenses are recognized as cognizable affirmative
14 defenses in a CERCLA action like the present one, summary
15 judgment is also granted as to the Second, Third, Fifth, Sixth
16 and Eleventh Affirmative Defenses.[5]  Both parties recognize that
17 the remaining affirmative defenses (the Seventh, Eighth, Ninth,
18 Tenth, Twelfth, Fifteenth and Sixteenth Defenses) are pertinent
19 only to the damages phase of this trial and consequently, their
20 validity as such is not contested.

21 ///
22 ///
23 ///
24 ///

25

26      [5] These defenses relate to elements of the claim, or the
   applicable burden of proof, and, as so-called "negative"
27 defenses, are properly raised by way of denial as opposed to an
   affirmative defense per se.  See, e.g., Sanwa Bus. Credit Corp.
28 v. Harris, 1991 WL 156116 at *1-2 (N.D. Ill. 1991).

                              20

**CONCLUSION**

For the reasons set forth above, Plaintiffs' Motion for Partial Summary Judgment as to the CERCLA liability of Defendant Sterling Centrecorp, Inc. (ECF No. 110) is DENIED.  Plaintiffs' additional Motion for Partial Summary Judgment on Defendant Sterling's Affirmative Defenses to CERCLA liability (ECF No. 112) is DENIED in part and GRANTED in part.  It is denied with respect to the First Affirmative Defense, but granted as to the Second, Third, Fourth, Fifth, Sixth, Eleventh, Thirteenth and Fourteenth Defenses.

IT IS SO ORDERED.

Dated: December 21, 2011

_____
MORRISON C. ENGLAND, JR.
UNITED STATES DISTRICT JUDGE