1
2
3
4
5
6
7

8              UNITED STATES DISTRICT COURT

9              EASTERN DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA and          No.  2:08-cv-02556-MCE-JFM
     CALIFORNIA DEPARTMENT OF
12   TOXIC SUBSTANCES CONTROL,

13              Plaintiffs,                 **FINDINGS OF FACT**[1]

14        v.

15   STERLING CENTRECORP, INC.
     STEPHEN P. ELDER and ELDER
16   DEVELOPMENT, INC.,

17              Defendants.

18

19        **I.      BACKGROUND**

20

21        1.      The Plaintiffs in this action are the United States of America, on behalf of

22   the United States Environmental Protection Agency ("EPA"), and the California

23   Department of Toxic Substances Control ("DTSC").  Docket Entry ("DE") 1 (Complaint).

24   ///

25   _____

26        [1] "To the extent that any of the Findings of Facts may be deemed Conclusions of Law, they also
     shall be considered conclusions.  Likewise, to the extent that any of the Conclusions of Law may be
27   deemed Findings of Fact, they shall be considered findings."  United States v. Newmont USA Limited and
     Dawn Mining Co., No. CV-05-020-JLQ, 2008 WL 4621566 at *2  n.1 (E.D. Wash. Oct. 17, 2008), citing
28   Miller v. Fenton, 474 U.S. 104, 113-14, 106 S. Ct. 445, 451-52 (1985) (noting the difficulty, at times, of
     distinguishing findings of facts from conclusions of law).

1

1       2.      Plaintiffs brought this action on October 27, 2008, against Defendants

2    Sterling Centrecorp, Inc ("Sterling"), Stephen P. Elder, and Elder Development, Inc.,

3    under Section 107(a) of the Comprehensive Environmental Response, Compensation

4    and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a).  Plaintiffs seek to recover response

5    costs incurred and to be incurred at the Lava Cap Mine Superfund Site, located in

6    Nevada County, California ("Site").  DE 1 (Complaint); DE 163-1 (Joint Statement of

7    Undisputed Facts, 8/9/2012 ("SUF") ¶ 8)).

8       3.      By Order dated March 25, 2009, the Court bifurcated these proceedings

9    into two phases.  Phase 1 consists of discovery and trial on the Court's jurisdiction over

10    Sterling, and Defendants' liability under Section 107(a) of CERCLA for past and future

11    response costs.  All other issues are reserved for Phase 2.  DE 26.

12       4.      By Orders dated February 23, 2010 (DE 78), September 20, 2011 (DE

13    149), and December 8, 2011 (DE 153), the Court adjudicated the liability of Defendants

14    Stephen P. Elder and Elder Development, Inc.

15       5.      This Court has already found that the Defendant Sterling changed its name

16    several times before settling on its current name of Sterling Centrecorp, Inc. in 2001.  DE

17    152 4:1-3. (Memorandum and Order, 12/8/2011).  Sterling was incorporated in Ontario,

18    Canada, on September 7, 1944 under the name Goldvue Mines Limited.  Sterling

19    changed its name from Goldvue Mines Limited to New Goldvue Mines Limited in 1949.

20    New Goldvue changed its name to Lava Cap Resources Ltd. on February 23, 1979.

21    Lava Cap Resources became Lava Capital Corporation in 1985.  In 1988, the company

22    renamed itself Samoth Capital Corporation.  Samoth became Sterling Financial

23    Corporation in May 2000.  Sterling Financial Corporation adopted the name Sterling

24    Centrecorp, Inc, in January 2001.  SUF ¶ 2.[2]

25    ///

26

27        [2] Notwithstanding Sterling's many name changes over time, the Court will simply refer to the
28    Defendant as "Sterling" unless otherwise noted.

1      6.     This case was tried before the Court over four days starting on October 31,

2    2012 and continuing from November 5-7, 2012.  The remaining issues for trial were

3    Sterling's status as a "covered person" under Section 107(a) of CERCLA and the Court's

4    jurisdiction over Sterling.  The Court heard live testimony from four expert witnesses;

5    viewed videotaped deposition testimony from two unavailable witnesses, Jack Gilbert

6    and Janet Hendry; heard designated deposition testimony from Robert Green, Sterling's

7    Federal Rule of Civil Procedure 30(b)(6) witness; accepted additional designated

8    deposition testimony from these witnesses as provided by Plaintiffs and Defendant;[3] and

9    admitted 239 exhibits.  See DE 197 (Minutes Day 1, 10/31/2012), DE 199 (Minutes Day

10    2, 11/5/2012); DE 200 (Minutes Day 3, 11/6/2012); DE 201 (Minutes Days 4, 11/7/2012);

11    and DE 201-1 (Exhibit List, 11/7/2012).

12      7.     Sterling is responsible for response costs incurred by Plaintiffs in

13    accordance with Section 107(a) of CERCLA if Sterling qualifies as a "covered person"

14    under any one of the following three alternatives:  (1) Sterling expressly and impliedly

15    assumed the liabilities of former Site owner/operator Lava Cap Gold Mining Corporation

16    ("LCGMC"), and is therefore the successor to LCGMC; (2) Sterling is LCGMC's

17    successor by de facto merger; and (3) Sterling operated the Lava Cap Mine.  The

18    Defendant contends that it is not LCGMC's successor, that it did not operate the Lava

19    Cap Mine, and that the Court lacks in personam jurisdiction to adjudicate its CERCLA

20    liability.  The Court will analyze the facts pertaining to each of those three liability

21    theories below.

22    ///

23    ///

24    ///

25    ///

26

27       [3] See DE 193 (Plaintiffs' Notice of Deposition Designations Intended to be Offered Into Evidence Pursuant to Section VII(B) of the Final Pretrial Order, 10/17/2012) and DE 163-4 (Defendant's Trial Witness List, and Video Deposition Designations of Absent Witnesses, 8/9/2012); Trial Tr. 316:22-25,

28    417:11-18.

## II.      THE SITE CONTAMINATION

8.      The Site is comprised of the Mine Area, where hardrock gold and silver mining operations took place, downstream areas where waste materials generated at the Lava Cap Mine have come to be located, and the groundwater underlying the Site. SUF ¶ 9; Exhibit ("Ex.") 196 (Site Map (EPA006715)).

9.      The downstream areas of the Site include Little Clipper Creek and Clipper Creek drainage, and Lost Lake, located approximately 1¼ miles downstream of the Mine Area of the Site.  The groundwater portion of the Site includes drinking water wells with elevated levels of arsenic and other areas of groundwater impacted by arsenic.   SUF ¶¶ 10-11; Ex. 196 (Site Map (EPA006715)).

10.      Mining operations began at the Site in 1861.  Between 1934 and 1943, mining was conducted at the Site by LCGMC.  During that period the Lava Cap Mine was one of the largest gold mines in California.  SUF ¶¶ 12, 14-15; DE 152 at 2:12-17 (Memorandum and Order, 12/8/2011).

11.      Dr. Frederic Quivik testified at trial as part of Plaintiffs' case-in-chief. Dr. Quivik is a professor of history at the Michigan Technological University and is an expert in the history of mining technology, including the organization of mining enterprises and the operation of mines from an organizational standpoint.   Testimony of Dr. Frederic Quivik, Trial Transcript ("Trial Tr.") at 66:1-7.  He has studied dozens of mineral mining operations, and his testimony has been credited by other federal courts faced with CERCLA liability determinations like this one.[4]

---

[4] Among other credentials, Dr. Quivik holds a Ph.D. in history and sociology of science from the University of Pennsylvania and a Master's degree in historic preservation from Columbia University.  As a historian of technology, he studies the tools, equipment, and skills people employ, and how people organize themselves to use technology. This includes examination of interactions between corporations and other organizations such as governmental and voluntary entities.  Dr. Quivik uses the historical method, which involves creating hypotheses about the past, testing them against available data, and then as appropriate modifying or converting them into conclusions which are presented in narrative form. Quivik, Trial Tr. at 54:2-57:8.  His academic background includes research in the organization of large-scale technological systems post World War II as well as how the Butte, Montana, copper mining industry, as a set of organizations, interacted with other organizations resolving social conflict over the impact the mining industry was having on the environment.  Quivik, Trial Tr. at 57:9-58:24.  Quivik has been qualified

1   Dr. Quivik explained that LCGMC conducted two basic kinds of mining activity: extracting

2   ore and developing new workings.  Ore extraction generated the revenue and the

3   development work was necessary for ongoing mining operations.   The development

4   work included excavating the underground workings in order to get to the ore body.  This

5   excavated material is called waste rock and it was hoisted to the surface and dumped

6   next to the mine opening. Quivik, Trial Tr. at 77:9-16, 79:2-9.

7        12.     Dr. Quivik further explained that milling operations involved a floatation

8   process that separated the valuable minerals from other non-valuable substances in the

9   ore.  Quivik, Trial Tr. at 77:20-78:10.  The latter were discharged from the mill in a

10   wastewater slurry.  Id. at 78:9-17, 79:17-80:1.  In California during the time of LCGMC's

11   mining operations, the State's regulatory structure prevented mining companies from

12   discharging their tailings directly into streams and letting the streams carry the material

13   away.  Id. at 78:18-22.  Accordingly, mill tailings were impounded behind a timber dam at

14   the Mine on Little Clipper Creek just below the mill.  Id. at 78:18-22; 79:10-21; SUF ¶ 16.

15        13.     This Court has previously found that, in 1938, LCGMC built a second

16   tailings dam on Greenhorn Creek (now known as Lost Lake dam) to stop mill tailings

17   from polluting the waters of the Bear River.  DE 152 at 2:18-20 (Memorandum and

18   Order, 12/8/2011); SUF ¶ 17.

19        14.     In December 1952, J.F. Siegfried, a mining engineer formerly employed by

20   LCGMC and hired by Sterling to investigate the feasibility of reopening the Lava Cap

21   Mine, reported that:

22   _____

23   as an expert historian in other federal cases in the area of parent-subsidiary relationships in mining
     enterprises, including United States v Newmont USA Limited, et al., 2008 WL 4621566 (E.D. Wash.,
     Oct. 17, 2008), which involved questions similar to the ones before this Court today (i.e., whether the

24   parent was managing operations of the mine owned by its subsidiary). Quivik, Trial Tr. at 60:20-64:8.

25        This Court agrees with the Newmont court that the present case "demands the evaluation of
     events which occurred decades ago.  The fact-finder must necessarily rely on the testimonial narratives of

26   other people. . . . Historians are trained to recover 'facts' and, through selecting certain facts from the
     universe of available facts, construct narratives that explain a historical issue. Through the application of

27   his expertise as a historian, Dr. Quivik may be able to assist the court as a 'summary' or 'aggregating'
     witness 1) by testifying as to what evidence, in his opinion, exists in the record showing the relative roles
     of the parties; and 2) by providing historical context to the evidence." 2007 WL 4856859 at *3 (E.D. Wash.,

28   Nov.16, 2007) (denying Newmont's Motion In Limine to Exclude the Testimony of Dr. Quivik).

> Tailings are dumped into Clipper Creek and allowed to flow along the creek to a restraining dam located about 1-1/4 miles south of the plant.  This dam is a rock-core, earth-filled dam, meeting the requirements of the California Debris Commission. . . .  The overflow water from this dam is used by the Pacific Gas & Electric Company for hydro-electric power generation, which makes it necessary for practically complete sedimentation of the tailings.

Ex. 13 (J.F. Siegfried, Report of the Lava Cap Gold Mining Corp., December 1952 ("Siegfried Report") (RRFP003373-003404 at RRFP003383)).

15.     This Court finds that, when the Mine was in operation, mill tailings were dumped into Clipper Creek and allowed to flow downstream to the two tailings ponds. SUF ¶ 18.

16.     The overflow water from the Lost Lake dam was used by the Pacific Gas & Electric Company for hydro-electric power generation, which made it necessary for practically complete sedimentation of the mill tailings.  LCGMC added settling agents to its process water discharges from the cyanide plant for that reason.  SUF ¶ 18.

17.     Both the waste rock and mill tailings contain arsenic. SUF ¶¶ 12-15; DE 152 at 2:21-25 (Memorandum and Order, 12/8/2011).

18.     This Court has previously found that the mill tailings placed directly onto the soil at the Site and surface water drainage at the Site have resulted in arsenic contamination.  DE 152 at 11:9-12 (Memorandum and Order, 12/8/2011).

19.     No active mining occurred at the Lava Cap Mine after 1943, when the United States War Production Board ordered the Mine shut down.  DE 151 at 3:1-3 (Memorandum and Order, 12/8/2011); SUF ¶ 13.

20.     This Court has previously found that, in 1979, a partial log dam collapse led to a release of tailings which, in turn, caused downstream neighbors to complain about pollution from the resulting silt.  In response to these complaints, the California Regional Water Quality Control Board (the "Regional Water Board") issued a Cleanup and Abatement Order ("CAO") on October 25, 1979 to Keystone Copper Corporation ("Keystone"), a now-suspended California corporation that is a wholly-owned Sterling subsidiary.

1  DE 151 at 4:14-19 (Memorandum and Order, 12/8/2011); DE 152 at 4:10-15

2  (Memorandum and Order, 12/8/2011); DE 154 at 5:1-6 (Memorandum and Order,

3  12/22/2011); SUFs ¶¶ 48, 49.

4      21.   This Court has previously found that heavy rainstorms occurring in 1997

5  washed mine wastes downstream into Little Clipper Creek and the tailings pond now

6  known as Lost Lake.  DE 151 at 5:3-6 (Memorandum and Order, 12/8/2011).  Sterling

7  concedes that, during a strong storm on or around January 1, 1997, the upper half of the

8  timber dam collapsed and washed what EPA estimates to have been 10,000 cubic yards

9  of tailings into Little Clipper Creek and downstream to Lost Lake.  SUF ¶ 22.

10     22.   EPA added the Site to the National Priorities List of Superfund sites in

11 January 1999.  SUF ¶ 23.

12

13 **III.   STERLING'S EXPRESS AND IMPLIED ASSUMPTION OF LCGMC'S
      LIABILITIES**

14

15     23.   Based on the evidence presented at trial, and summarized below, the

16 Court finds that Sterling assumed, expressly and impliedly, the CERCLA liabilities of

17 LCGMC when it acquired all of LCGMC's assets in 1952.

18

19     **A.   Sterling Acquired LCGMC's Assets Subject to Its Liabilities**

20

21     24.   This Court has previously found that, in September 1952, Sterling signed

22 an agreement to acquire the assets of LCGMC.  DE 152 at 3:5-13 (Memorandum and

23 Order, 12/8/2011); DE 154 at 3:13-17; (Memorandum and Order, 12/22/2011); Ex. 2

24 (Agreement between LCGMC and Sterling, 9/5/1952 ("the 1952 Agreement")

25 (EPA002980-2986)).

26     25.   Under the 1952 Agreement, Sterling acquired all of LCGMC's assets,

27 including all personal property located at the Lava Cap Mine, such as mining equipment

28 and supplies.

7

1  Ex. 2 (1952 Agreement, 9/4/1952 (EPA002980-002986 at 2983-2984)); Ex. 9a

2  (Assignment from LCGMC to Sterling of Personal Property, 10/24/1952 (EPA000532-

3  533)).

4        26.     Prior to the closing, LCGMC quitclaimed its real property to its subsidiary

5  Keystone Copper Corporation, which consisted of surface rights to 1886.87 acres and

6  mineral rights to 2465.32 acres.  SUF ¶ 47.  This real property was the only asset

7  LCGMC transferred to Keystone prior to the closing.  Ex. 6 (Letter, Moot, Sprague,

8  Marcy & Gulick to Leslie Jockmus, 10/17/1952 (EPA001437-001438)).

9        27.     This Court has previously found that the shares of Keystone were among

10  the assets acquired by Sterling.  Keystone, which had previously operated a copper

11  mine while a LCGMC subsidiary, thus became a wholly-owned subsidiary of Sterling.[5]

12  DE 154 at 3:25-4:3 (Memorandum and Order, 12/22/2011); DE 152 at 3:17-19

13  (Memorandum and Order, 12/8/2011).

14        28.     This Court has previously found that, pursuant to the 1952 Agreement,

15  Sterling, having "been advised as to the . . . assets and liabilities of [LCGMC]," agreed to

16  purchase "all the assets of [LCGMC], subject to the liabilities of [LCGMC], which

17  liabilities [Sterling] agreed to assume and cause to be paid promptly."  DE154, at

18  3:17-22.  The transaction closed on October 24, 1952.  SUF ¶ 52.

19        29.     The assumption of liabilities under the 1952 Agreement is broad and

20  unfettered.  It does not exclude unknown liabilities, as Sterling contends.  In fact, the

21  1952 Agreement does not exclude any liabilities from those assumed by Sterling; nor

22  does it expressly reserve any liability for LCGMC.  Ex. 2 (1952 Agreement, 9/5/1952

23  (EPA002980-002986)).

24  ///

25  ///

26  _____

[5] Keystone remained a Sterling subsidiary until it was suspended by the California Secretary of
27  State in 1991.  DE 154 at 4:23-25 (Memorandum and Order, 12/22/2011).

28

30.     The Court observes that, where specific liabilities are enumerated, the language of the 1952 Agreement is inclusive, not exclusive.  For example, the fifth paragraph of the 1952 Agreement provides that:

> [Sterling] agrees to assume forthwith all expenses of [LCGMC], including the obligation to cause the dissolution of [LCGMC] and the distribution to its stockholders of the shares of stock of [Sterling] to be paid to [LCGMC]. . . . The parties agree and warrant that upon the dissolution of [LCGMC], at the expense of [Sterling] as hereinbefore provided, [LCGMC] shall own free and clear and shall distribute to its stockholders pro rata and in accordance with the applicable laws the shares of stock of [Sterling] to be paid to [LCGMC] as aforesaid and the cash to be paid in lieu of fractional shares as aforesaid."

Ex. 2 (1952 Agreement, 9/5/1952 (EPA002980-002986 at 2984)) (emphasis added).

31.     In arguing  that its assumption of liabilities was limited, Sterling points out that although the contracting parties used the word "all" to describe the "assets" acquired,  in other places in the 1952 Agreement  they did not use the word "all" to describe the liabilities assumed. The Court is not persuaded that the absence of the word "all" before the word "liabilities" is definitive of the parties' intentions.  The 1952 Agreement must be construed in its entirety, in the context of all of the evidence, including extrinsic evidence of the parties' intentions.

32.     While Sterling also argues that it assumed only those liabilities of which it was advised,  and  could not have been advised of LCGMC's CERCLA liability because CERCLA was not yet enacted, the Court finds that interpretation of the 1952 Agreement to be unnecessarily restrictive.  In the Agreement, the parties represented that Sterling "has made an inspection by its representatives of the physical assets of [LCGMC] and has been duly advised as to the other assets and liabilities of [LCGMC]."  Ex. 2 (Agreement between LCGMC and Sterling, 9/5/1952 ("the 1952 Agreement") (EPA002980-2986, at EPA2982)).  As detailed below, Sterling was constructively advised and was on notice of both the mine waste and the environmental liability it posed prior to the closing of the 1952 Agreement.

33.     Prior to that closing, Sterling sent a consulting engineer, Julius M. Cohen, to inspect the Lava Cap Mine.

9

1   Ex. 4 (Letter, S. Ciglen to Sterling Shareholders, 9/22/1952 (EPA000546-548 at 547));

2   Sterling Rule 30(b)(6) Deposition Testimony ("Sterling Rule 30(b)(6) Deposition") at

3   85:11-20.

4        34.    The Plaintiffs introduced footage taken of Mine operations in 1937, and the

5   Defendant does not contest the authenticity of the footage.  The footage depicts, among

6   other things, the large, dark grey pile of waste rock.  The footage also depicts the

7   location of the waste rock pile as immediately adjacent to the mine and mill building.  It

8   further depicts its scale.  The waste rock pile was several stories high.  Quivik, Trial Tr.

9   at 77:9-16, 79:2-9; Ex. 189 (historic video footage) at 14:18-14:27 (showing waste rock

10   pile as it existed in 1937).  The Court finds, based on this evidence that the waste rock

11   pile was massive in scale, and in plain view immediately adjacent to the mine and mill

12   building.

13        35.    This same footage of Mine operations in 1937 shows that the tailings

14   impounded behind the timber dam below the mill were also readily apparent to anyone

15   visiting the Mine.  State inspectors estimated in 1979 that the dammed tailings were

16   approximately 60 feet high and occupied an area approximately 300 feet by 300 feet in

17   size.  Quivik, Trial Tr. at 80:3-15; Ex. 61 (Letter from Robert Lassen to James Robertson,

18   10/9/1979 (EPA000481-482) (California State Biologist's 1979 observation "that the silt

19   discharge consisted of rock flour mill wastes that were being eroded from a huge old mill

20   waste fill (approximately 60 feet thick, 300 feet wide and 300 feet long) placed in the

21   creek canyon by early day miners."); Ex. 189 (historic video footage), at 00:17-00:26

22   (showing impoundment as it existed in 1937).  Based on this evidence, the Court

23   concludes that the tailings impoundment below the mill was massive in scale and in plain

24   view.

25        36.    Given the size and location of the waste rock pile and tailings

26   impoundment, it would be unreasonable to conclude that Mr. Cohen inspected the Mine

27   yet somehow failed to see the substantial waste rock pile and tailings impoundment in

28   plain view.

1   Accordingly, through Mr. Cohen's inspection, Sterling was aware of the waste rock and

2   impoundment located on the Mine property.

3       37.     The Court also finds that Sterling was on notice of potential environmental

4   liability associated with the waste rock and the tailings impounded at the Mine.  There

5   was an extensive body of state law regulating the Mine's pollution disposal practices at

6   the time of the acquisition.  By 1952, California had enacted environmental protection

7   statutes, including the Dickey Act, enacted in 1949, Cal. Water Code § 13000 (1949);

8   and the Public Health Act, established in 1907, Public Health Code, 1906 Cal. Stat.

9   893-94.  Both addressed water pollution.

10      38.     The Court further notes that California nuisance law was also well-

11  settled in 1952, and imposed strict liability for failure to prevent nuisances

12  resulting in contaminated surface and ground water.  In Kall v. Carruthers, 59 Cal.

13  App. 555, 559 (Cal. App. 3 Dist. 1922), the California Court of Appeals held that

14  an "artificial receptacle for holding the liquid, be it of whatever form or nature,

15  must be made and maintained as nearly waterproof as human agency can

16  reasonably and prudently make it.  Otherwise, if the escaping water results

17  injuriously by reason of the receptacle failing to properly hold the water, it then

18  falls within the category of nuisances . . ."  And in 1930 the California Supreme

19  Court proclaimed, "[t]here is no doubt that pollution of water constitutes a

20  nuisance."  Carter v. Chotiner, 210 Cal. 288, 291 (1930).

21      39.     It had long been established as a matter of California law that the

22  creation of the original condition leading to the nuisance is not necessary for

23  liability.  "Every successive owner of property who neglects to abate a continuing

24  nuisance upon, or in the use of such property created by the former owner, is

25  liable therefor in the same manner as the one who first created it."  City of

26  Turlock v. Bristow, 103 Cal. App. 750, 755 (Cal. App. 3 Dist. 1930).  See also Cal.

27  Civ. Code § 3483.

28  ///

1    40.    The Court further notes that, by 1952, numerous federal cases had already

2    upheld retroactive liability, including the 1938 and 1947 Supreme Court cases of Welch

3    v. Henry, 305 U.S. 134, 59 S. Ct. 121 (1938) and Fleming v. Rhodes, 331 U.S. 100, 67

4    S. Ct. 1140 (1947).

5    41.    Accordingly, even if this Court credited Sterling's argument that the 1952

6    Agreement transferred only those liabilities of which Sterling was duly advised during its

7    pre-acquisition inspection, considering the facts before the Court, it is simply

8    disingenuous to argue that Sterling – a mining company that had an engineer inspect the

9    Mine property it was contracting to acquire – did not know the legal landscape regulating

10   mining companies, and was not well-aware of the existence of an enormous waste rock

11   pile located immediately next to the mine and mill building and an enormous tailings pile

12   located beneath the mill.  This Court refuses to credit this argument and make such a

13   finding.

14   42.    Although Sterling argues that it only agreed to assume those liabilities that

15   were "to be paid promptly",  the Court finds that construction of the 1952 Agreement to

16   be unnecessarily restrictive.  The language of the Agreement suggests only that when

17   liabilities arise they should be paid promptly when they arise, not that all liabilities under

18   the Agreement had already accrued.

19   43.    Finally, while Sterling contends that it assumed only those liabilities that

20   were enumerated in a statement of accounts provided to Sterling by LCGMC as a

21   condition of the 1952 Agreement, and while the ninth paragraph of the Agreement calls

22   for a "Balance Sheet and Financial Statements including a complete list of all accounts

23   payable and accrued or accruing charges as at September 30, 1952."  (Ex. 2 (1952

24   Agreement, 9/5/1952 (EPA002980-002986 at 2985)), that language does not require a

25   complete statement of all liabilities transferred to Sterling.

26   44.    In addition, there is no document in the record entitled "Balance Sheet and

27   Financial Statements."

28   ///

1    The Nevada City Accounts document that Sterling  points to (Ex. 12) does not purport to

2    be a complete list of liabilities transferred under the Agreement, and on its face is

3    preliminary and incomplete.   For example, the expenses of Lava Cap's dissolution and

4    the cost of distribution of Sterling shares to Lava Cap are not mentioned in the

5    document, even though they are listed in the 1952 Agreement.

6        45.    Under these facts, the Court refuses to find that Sterling assumed only

7    those liabilities enumerated in a statement of accounts or that the Balance

8    Sheet/Nevada City accounts document establishes the scope of the liabilities assumed.

9        46.    To the contrary, the language of the 1952 Agreement and the extrinsic

10   evidence discussed below suggest a broad transfer of all liabilities.

11

12   **B.     The Words and Actions of the Parties Signify Their Intent to Transfer
          LCGMC's Liabilities to Sterling**

13

14       **1.     Sterling and LCGMC's Representations about the 1952
              Acquisition**

15

16       47.    This Court has previously found that an October 24, 1952 letter from

17   LCGMC's President to LCGMC shareholders appears to express a corresponding

18   understanding of the sales transaction as entailing an assumption of all LCGMC

19   liabilities by Sterling: "Your Board of Directors on September 5, 1952, sold all the

20   properties and assets of Lava Cap, subject to its liabilities, for sufficient fully paid and

21   non-assessable shares of the capital stock of [Sterling].... [Sterling] assumes all liabilities

22   and expenses of Lava Cap."  DE 154 at 15:14-22 (Memorandum and Order,

23   12/22/2011); see Ex. 10 (Letter, L. Jockmus to LCGMC Stockholders, 10/24/1952

24   (EPA000550-552 at 551)); Sterling Admissions (DE 180-1), Nos. 5 and 7.

25       48.    The Court finds that Exhibit 10 accurately reflects the parties' intentions

26   with respect to Sterling's broad assumption of liabilities.

27   ///

28   ///

1    David L. Landy drafted the October 24, 1952 letter to LCGMC's shareholders, [Ex. 10

2    (EPA000550)], and he permitted Sterling's President, Samuel Ciglen, an opportunity to

3    review the letter before it was sent.  Ex. 5 (Letter, David L. Landy to Harry C. Powley,

4    10/6/1952 (EPA000569-570 at 570) ("Mr. Ciglen has reviewed my first draft of the

5    proposed letter to the Lava Cap stockholders . . . .")).

6          49.     David L. Landy was a lawyer with the firm of Moot, Sprague, Marcy &

7    Gulick in Buffalo, New York.   He was counsel to LCGMC and participated in the

8    negotiation of the 1952 Agreement on behalf of LCGMC.  He was therefore well advised

9    of the terms of the 1952 Agreement and was fully capable of describing them precisely

10   in the letter to LCGMC's shareholders.  Ex. 5 (Letter, David L. Landy to Harry C. Powley,

11   10/6/1952, (EPA000569-570)); Ex. 10 (Letter, L. Jockmus to LCGMC Stockholders,

12   10/24/1952, (EPA000550-552 at 550)).

13         50.     This Court has previously found that a letter from Ciglin as Sterling's

14   President to the company's shareholders, dated September 22, 1952, describes the

15   sales agreement entered into some seventeen days previously as follows: "By

16   agreement dated September 5, 1952, the Company has agreed to acquire all the assets

17   of Lava Cap Gold Mines Limited [sic], a Delaware corporation, subject to its liabilities, in

18   consideration of the issue of one share of the capital stock of our Company for every 6

19   issued shares of Lava Cap."  DE 154 at 15:5-13 (Memorandum and Order, 12/22/2011);

20   see Ex. 4 (Letter, S. Ciglan to Sterling Stockholders, 9/22/1952 (EPA000546-548 at

21   546)); Sterling's Response to United States' First Request for Admissions ("Sterling

22   Admissions") (DE 180-1), Nos. 10 and 11.  The letter did not identify a single LCGMC

23   liability that Sterling had not assumed. Ex. 4 (Letter, S. Ciglan to Sterling Stockholders,

24   9/22/1952 (EPA000546-548)).

25         51.     Like Landy, Ciglen was also well advised of the terms of the 1952

26   Agreement and fully capable of accurately describing the deal terms in his letter to

27   Sterling's shareholders.  In 1952, Ciglen was a partner in the law firm Levinter, Ciglen,

28   Grossberg & Shapiro in Toronto.  SUF ¶ 50.

52.     Correspondence from Sterling in 1956 to Chase Manhattan Bank describing the 1952 sales transaction reiterates Sterling's broad assumption of liabilities: "In 1952, [Sterling] purchased all of the assets and liabilities of Lava Cap Gold Mining Corporation and the latter corporation has surrendered its charter." DE 154 at 15:23-28 (Memorandum and Order, 12/22/2011); see Ex. 19 (Letter, J.T. Symons to Chase Manhattan Bank, 4/13/1956 (EPA000554)); Sterling's Admissions (DE 180-1), Nos. 24 and 25.

53.     This letter too was written by someone very familiar with the terms of the 1952 Agreement.  J.T. Symons, the author of the 1956 letter to Chase, signed the 1952 Agreement as Secretary of Sterling.  See Ex. 2 (1952 Agreement, 9/5/1952 (EPA002980-002986 at 2986)).

54.     This Court finds that these three letters demonstrate the parties' mutual intention to transfer all of LCGMC's liabilities to Sterling under the 1952 Agreement.

**2.      LCGMC Assigned All of Its Insurance to Sterling**

55.     Other evidence also indicates the parties' mutual intention to transfer all LCGMC liabilities to Sterling.  At the closing, LCGMC assigned to Sterling all of its insurance policies. Like the language of the 1952 Agreement itself, the Assignment language is broad and inclusive. It states:

> LCGMC] . . . does hereby assign, transfer and set over to [Sterling] . . ., all its right, title and interest in and to any and all insurance policies owned or in which said [LCGMC] shall have any interest whatsoever, including but not limited to the insurance policies set forth in the annexed list . . . and said [LCGMC] does herby authorize and empower said [Sterling] to assign any or all of said insurance policies, to notify the respective issuing insurance companies of this assignment or any subsequent assignment . . . , or to cancel any or all of said insurance policies and to receive for its own use and as its own property any return premiums received by said [Sterling] from any of said issuing insurance companies.

Ex. 8 (Assignment from LCGMC to Sterling [for insurance policies], 10/24/1952 (EPA000525-528 at 526)); Sterling Admissions (DE 180-1), No. 17.

56.     Sterling assumed responsibility for payment of the premiums on insurance policies LCGMC assigned to Sterling.  Ex. 8 (Assignment from LCGMC to Sterling, 10/24/1952 (EPA000525-000528 at 526); Ex. 81 (Letter from Anne Hall[6] to Lava Cap Resources enclosing Keystone Report, 4/22/1982 (EPA004303)).

57.     This Court finds that LCGMC's transfer of all of its interest "whatsoever in any and all" insurance policies to Sterling demonstrates the parties' mutual understanding that LCGMC had transferred all of its liabilities to Sterling.  If LCGMC believed it had retained its environmental liabilities, it would not have assigned all of its insurance policies to Sterling.

### 3.     LCGMC Directors and Shareholders Approved Dissolution

58.     The dissolution of LCGMC itself offers proof that the contracting parties believed all of LCGMC's liability had been transferred to Sterling.  LCGMC was a Delaware corporation.  In 1952, the extent of personal liability of Delaware directors and shareholders of dissolved corporations was unresolved.  One Delaware court commenting on the relevant statutory scheme noted that it "still leaves open the question, what, if any, rights are afforded to persons who have no claim against a corporation at the time of its dissolution, or during the statutory wind-up period, but who do thereafter acquire such a claim."  In re RegO Co., 623 A.2d 92, 96 (Del. Ch. 1992).

59.     The 1952 Agreement provided that LCGMC would dissolve after the closing.  Specifically, the seventh paragraph of the 1952 Agreement states:

///

///

///

_____

[6]Anne Hall was the wife of Charles Hall, the Mine's resident manager, and they resided on the Lava Cap Mine property.  Mrs. Hall was Keystone's bookkeeper and responsible for maintaining Keystone's financial records, writing checks, paying taxes, and conducting other like clerical services.  She continued in this role after Mr. Hall died in 1973.  Mrs. Hall died in 1998.  Quivik, Trial Tr. 115:24-116:4, 117:2-9, 118:18-119:4, 165:20-166:8; SUF ¶¶ 19, 20.

> Forthwith after the closing of the sale and purchase as aforesaid [LCGMC] shall take all such steps as shall be necessary, with the advice and supervision of counsel to cause the dissolution of [LCGMC] and the distribution to its stockholders of the shares of stock of [Sterling] to be paid to [LCGMC] as aforesaid . . . , with all reasonable despatch.

SUF ¶ 27; Ex. 2 (1952 Agreement, 9/5/1952 (EPA002980-002986 at 2985)).

60.     The October 24, 1952, letter sent by LCGMC's president, Leslie Jockmus, to LCGMC's shareholders stated:

> Enclosed herewith is a notice of special meeting of stockholders to be held on November 24, 1952, for the purpose of authorizing the dissolution of Lava Cap, which will result in the distribution to the stockholders of its sole remaining asset, namely the New Goldvue stock. There will be no other business conducted at the meeting except to consider, and if approved adopt the resolution authorizing dissolution.

Ex. 10 (Letter, L. Jockmus to LCGMC Stockholders, 10/ 24/1952, (EPA000550-552 at 552)).

61.     LCGMC's board of directors met on October 22, 1952, and resolved to dissolve the company.  Ex. 16 (Certificate of Dissolution of LCGMC, 4/6/1953 (EPA000559-562 at 559)).

62.     LCGMC's stockholders met on December 1, 1952, and voted unanimously in favor of the dissolution. Ex. 16 (Certificate of Dissolution of LCGMC, 4/6/1953 (EPA000559-562 at 559-560)).

63.     LCGMC dissolved in April 1953.  SUF ¶ 28.

64.     In light of the uncertain state of Delaware law on the issue of whether directors and shareholders could be held personally liable for claims brought against a dissolved corporation, this Court finds that the approval of LCGMC's dissolution demonstrates the parties' intent to transfer all LCGMC liabilities to Sterling.  If the directors and shareholders of LCGMC had believed Sterling had not assumed LCGMC's environmental liabilities, they would not have approved the dissolution of their corporation.

///

///

17

**4.      Sterling Continued to Pay Workers Compensation Claims More Than 30 Years After the Acquisition**

65.      After the closing, Sterling continued to behave exactly as this Court would expect if Sterling understood that it had assumed all of LCGMC's liabilities, including unknown liabilities.  Sterling stepped into LCGMC's shoes before the Industrial Welfare Commission, where workers' compensation claims were pending against LCGMC.  At the closing, LCGMC assigned to Sterling $37,500 in United States bonds on deposit with the Industrial Welfare Commission, authorizing Sterling to take any action with respect to the bonds "with the same force and effect as if done by [LCGMC], and in the name, place and stead of [LCGMC]. . . ."  Ex. 11 (Assignment from LCGMC to Sterling [for $37,500 in United States bonds], 10/24/1952 (EPA003007-3010 at 3009)); Sterling Admissions (DE 180-1), No. 16.

66.      Thereafter, Sterling worked to resolve these claims, and others brought after the closing, using the bond money assigned to it by LCGMC, and other funds.  Ex. 46 (Notes to Consolidated Financial Statements for the year ended December 31, 1972, n.3 (RRFP003937-003968 at 3951)) ("On April 17, 1973 the Department of Industrial Relations of The State of California issued an order approving and authorizing the sale of the bonds.  The proceeds of $18,750 together with the $6,118 cash deposit, were used to pay certain Workmen's Compensation claims.").

67.      The amount of the workers compensation claims exceeded the value of the bonds LCGMC assigned to Sterling.  Yet Sterling continued to resolve the claims using its own funds.  From 1963 to 1978 alone, Sterling paid out more than $100,000 in worker's compensation claims.  See DE 177-1 (Summary of Workman's Comp Financial Data and Disclosures, Exhibit A to Plaintiff's Trial Brief, 8/23/2012).

68.      There is no evidence that Sterling ever refused to pay a workers compensation claim on the ground that it had not assumed liability for the claim.  Likewise, there is no evidence that Sterling ever referred a claim to the former shareholders of LCGMC for payment.

1    To the contrary, Sterling continued to pay workers compensation claims brought by

2    former LCGMC employees, including those unknown to the contracting parties at the

3    time of the 1952 Agreement, until at least 1985.  Ex. 80 (Keystone Copper Corporation

4    Weekly Financial Report, 4/22/1982 (EPA004295); Ex. 97 (Letter from State

5    Compensation Insurance Fund to Anne Hall, 11/23/1982 (RRFP004153)); and Ex.

6    141(Keystone Copper Corporation Weekly Financial Report, 4/30/1985 (EPA004319)).

7           69.     Sterling admitted in its Rule 30(b)(6) deposition that it was responsible,

8    jointly and severally, for workers compensation claims brought against LCGMC totaling

9    at least $60,400 as of December 31, 1965.  Sterling Rule 30(b)(6) Deposition at

10   62:22-63:6.

11          70.     Jack Gilbert is one of the two unavailable witnesses whose designated

12   video deposition testimony was admitted at trial.  He is a Canadian barrister who began

13   his association with Sterling as early as 1963.  Over the years he has served as

14   Sterling's general counsel, as a director of Sterling and as an officer of Sterling.  He has

15   also served from time to time as a director and officer of Keystone.  Gilbert Deposition at

16   13:20-15:5, 127:16-128-8; Ex. 195 (Fed. R. Evid. 1006 Chart).  Gilbert testified in

17   deposition that Sterling made the final decisions about when and under what

18   circumstances Sterling should settle worker's compensation claims filed against

19   LCGMC.  Gilbert Deposition at 69:14-23.

20          71.     The Court concludes that Sterling understood when it acquired all the

21   assets of LCGMC that it had also acquired all the liabilities of LCGMC, including liability

22   for workers compensation claims brought against LCGMC after 1952, and for claims

23   exceeding the amount of the $37,500 bond acquired from LCGMC in 1952.

24          72.     Sterling's payment of workers compensation claims through at least 1985

25   further demonstrates the parties' mutual understanding that Sterling assumed all of

26   LCGMC's liabilities, whether known or unknown. This Court finds that Sterling assumed

27   liability for claims unknown to LCGMC and Sterling in 1952.

28   ///

73.     When viewed as a whole, the evidence strongly supports the Court's finding that Sterling assumed all the liabilities of LCGMC in 1952, including its environmental liability.  The language of the 1952 Agreement itself suggests a transfer of broad liabilities, and the parties' actions both before and after consummation of the transaction indicate a mutual understanding of such a broad transfer.  The Court concludes that, because the parties intended to transfer all LCGMC liabilities to Sterling, the transfer of liability is broad enough to encompass LCGMC's CERCLA liability.

## IV.     STERLING'S <u>DE FACTO</u> MERGER WITH LCGMC

74.     The Plaintiffs' second theory of CERCLA liability is that the Defendant is the successor to LCGMC by <u>de facto</u> merger.  As discussed below, this Court finds that three of the four factors typically considered in a <u>de facto</u> merger analysis are met here, and the weight of the evidence supports a finding that the fourth factor is also met.

### A.     There was a Continuity of Shareholders, LCGMC Dissolved, and Sterling Assumed Obligations Necessary to Continue Uninterrupted Operations at the Mine

75.     It is uncontested that Sterling paid LCGMC with shares of its stock and this Court has already found that the 1952 sales transaction between Sterling and LCGMC was financed by a transfer of Sterling stock valued at $245,175.60.  DE 151 at 3:22-25 (Memorandum and Order, 12/8/2011) and SUF ¶ 29.

76.     Sterling's shares were, in fact, distributed to LCGMC's shareholders.  Ex. 18 (Letter, Fisher, Gordon & Company to LeRoy Harris, CPA, April 4, 1956 (EPA000564-567)).  Thus, there was a complete continuity of shareholders.

77.     Likewise, it is uncontested that the 1952 Agreement provided that LCGMC would dissolve after closing, and LCGMC dissolved in April 1953.  SUF ¶ 27-28.

///

///

20

78.     The 1952 Agreement also clearly states that Sterling agreed to assume all of LCGMC's expenses, including the costs incurred to dissolve LCGMC as a corporate entity.  Ex. 2 (1952 Agreement, 9/5/1952 (EPA002980-002986 at 2983-2985)).

79.     The LCGMC obligations assumed by Sterling under the 1952 Agreement included payroll, unclaimed wages, accounts payable, property taxes, withheld income taxes, federal insurance contribution taxes, and state unemployment taxes.  Ex. 12 (LCGMC Statement of Nevada City Accounts, 9/30/1952, (EPA000494-495 at 494)).  As already discussed, Sterling also assumed liability for workers compensation claims under the 1952 Agreement.  See Findings 65-73 above.  The Court finds that Sterling assumed all LCGMC obligations needed to continue operations at the Mine.

### B.     Sterling Continued LCGMC's Enterprise

80.     With respect to the remaining fourth factor - a continuation of the enterprise of the seller in terms of continuity of management, personnel, physical location, assets and operations -- this Court finds that Sterling maintained continuity of management, personnel, physical location and assets.   The only issue under this factor requiring the Court's close examination is whether Sterling continued LCGMC's business operations.  As detailed below, this Court finds that it did.   LCGMC's business operations were simple.  Prior to the 1952 Agreement, LCGMC held on to the Lava Cap Mine as a going prospect with hopes of reopening it.  As the evidence shows, Sterling continued to hold the Mine and endeavored over the years to bring the Lava Cap Mine back into production.

///

///

///

///

///

1     **1.     Sterling Maintained Continuity of Management, Personnel, Physical Location and Assets**

2

3        81.     This Court has previously found that, in 1952, Sterling expanded its board

4    from five to seven and appointed two individuals previously associated with LCGMC to

5    the Sterling Board of Directors.  DE 154 at 4:5-9 (Memorandum and Order, 12/22/2011);

6    SUF ¶ 31.

7        82.     The increase in the number of directors on Sterling's Board was "to provide

8    for 2 representatives of Lava Cap."  Ex. 2 (1952 Agreement, 9/5/1952 (EPA002980-

9    002986 at 2983)); Ex. 4 (Letter, S. Ciglan to Sterling's Stockholders, 9/22/1952

10   (EPA000546-548 at 546)).

11       83.     The LCGMC representatives appointed to Sterling's Board were Harry C.

12   Powley, secretary-treasurer and director of LCGMC, and David L. Landy, legal counsel

13   for LCGMC.  SUF ¶ 31.

14       84.     LCGMC agreed that, upon closing, all of its directors would resign and

15   Sterling would be entitled to designate replacements to act as LCGMC directors.  Ex. 2

16   (1952 Agreement, 9/5/1952 (EPA002980-002986 at 2984)).  Although Sterling points out

17   that Sterling apparently never appointed its own representatives to the LCGMC board,

18   this fact does not diminish the level of control Sterling assumed over LCGMC's

19   operations under the 1952 Agreement.  These features of the transaction demonstrate a

20   continuity of management and control over the operations of the Lava Cap Mine.

21       85.     It is also uncontested that Charles Hall, resident manager at the Lava Cap

22   Mine, hired two former employees of LCGMC to continue working at the Lava Cap Mine

23   after the 1952 transaction was consummated.  SUF ¶¶ 19 & 34.  This indicates a

24   continuity of personnel.

25   ///

26   ///

27   ///

28   ///

86.     Likewise, this Court finds there was a complete continuity of assets.  As discussed above, the 1952 Agreement was structured so that Sterling did not simply acquire the buildings and equipment at the Mine, but so that Sterling acquired control of all the assets of LCGMC, including surface and mineral rights, equipment, supplies, insurance policies, cash, and bonds.  DE 154 at 3:17-22 (Memorandum and Order, 12/22/2011); Ex. 8 (Assignment from LCGMC to Sterling [for insurance policies], 10/24/1952 (EPA000525-528)); Sterling Admissions (DE 180-1), No. 17; Ex. 9a (Assignment from LCGMC to Sterling [for all personal property], 10/24/1952 (EPA000532); Ex. 11 (Assignment from LCGMC to Sterling [for $37,500 in United States bonds], 10/24/1952 (EPA003007-3010 at 3009)); Sterling Admissions (DE 180-1), No. 16.; Quivik at Trial Tr. 73:18-23, 87:8-17.

87.     .  Although Sterling contends that at least initially  it  had plans to relocate some of the Mine assets to its Duvernay operation in Quebec, the evidence indicates  it ultimately abandoned that plan.  Instead, Sterling chose to leave all of its assets where they were situated, to preserve and maintain those assets it deemed essential for future production and to sell assets it deemed surplus. Ex. 17 (Letter, S. Ciglan to Sterling Shareholders, 12/8/1953 (EPA000556-000557 at 557)).   The Court finds that there was a complete continuity of assets as a result.

### 2.     Sterling Continued the General Business Operations of LCGMC

88.     This Court has previously found that Sterling, through its subsidiary Keystone, owned the Lava Cap Mine (aside from a brief, ultimately unsuccessful attempt to transfer ownership to another company) for 37 years, until the Mine was sold in 1989 to Banner Mountain Properties, Ltd.  DE 152 at 4:6-8, 4:17-18 (Memorandum and Order, 12/8/2011).  This Court now finds that during Sterling's long association with the Lava Cap Mine, it persistently tried to reopen it, just as LCGMC had do.

///

1   As described below, Sterling commissioned profitability studies, preserved the necessary

2   real and personal property needed to reopen the Mine, and actively courted other parties

3   to join it in reopening the Mine.  In the 1980s, Sterling entered into two agreements with

4   other mining enterprises to reopen the Mine.  Moreover, the Court finds that Sterling's

5   acquisition of the Lava Cap Mine materially changed Sterling's role in the mining industry

6   from an exploration and development enterprise to the owner of a proven producer.  As

7   such, the Court finds that Sterling continued the general business operations of LCGMC.

8

9           **a.**        **LCGMC Rejected Proposals to Liquidate and Accepted Sterling's Proposal Because Sterling Could Hold the Mine for Reopening**

10

11       89.    When mining operations ceased in 1943, the Lava Cap Mine had about

12   149,000 tons of proven reserves – developed ore that was ready for extraction -- and

13   development over the previous decade suggested that additional reserves could be

14   opened with further development.  Quivik, Trial Tr. at 77:9-19; 81:6-19; Ex. 13 (Siegfried

15   Rpt., 12/1/1952 (RRFP003373-003404 at 3373-376, 383, 385-392, 398-404)).  There

16   were enough proven reserves at the Mine when it shut down to guarantee another year

17   of ore extraction.  Quivik, Trial Tr. at 77:9-19; 81:6-19.

18       90.    However, the Lava Cap Mine was still dormant in the early 1950s.

19   LCGMC's shareholders and directors were trying to figure out how to stay afloat.  They

20   owed taxes and other debts.   They had received offers for buildings and equipment, but

21   they did not want to liquidate those assets because that would lead to the abandonment

22   of the Mine.  LCGMC hoped to find a company that its shareholders could become

23   invested in that would eventually have the means to reopen the Lava Cap Mine.  Quivik,

24   Trial Tr. at 85:14-23.

25       91.    Although Defendant claims that by 1952, LCGMC simply wanted to

26   liquidate its assets and dissolve, after assessing the evidence this Court finds that

27   LCGMC was not looking to liquidate its assets at the Lava Cap Mine.

28   ///

1   Specifically, LCGMC  had rejected offers that would have amounted to liquidation

2   because that would have led to the abandonment of the Mine.   Quivik, Trial Tr. at 85:24-

3   87:2. A letter sent by LCGMC President Leslie Jockmus to LCGMC stockholders in

4   October 1952 said:

5   > Your officers were of the opinion that the stockholders might derive a
    > greater advantage by acquiring an interest in another mining company that

6   > had reasonable prospects of developing a producing mine and that could
    > employ the Company's mining plant, machinery and equipment to this end,

7   > and could afford to pay the taxes on the Company's mining property, and
    > thereby hold the mine for possible future reopening instead of

8   > abandonment.

9   Ex. 10 (Letter, L. Jockmus to LCGMC Stockholders, October 24, 1952, (EPA000550-

10  000552 at 550)) (emphasis added); Sterling Admissions (DE 180-1), No. 5.  This Court

11  finds that LCGMC entered into the 1952 Agreement with Sterling precisely because it

12  was another mining company with the resources to "hold the mine for possible future

13  reopening instead of abandonment."  The Court therefore concludes that LCGMC's

14  general business operations at the time of the 1952 transaction consisted of holding the

15  Mine for future reopening and searching for parties with the interest and wherewithal to

16  return the Mine to production.

17
18              **b.     Sterling Intended to Hold the Mine for Future Reopening,
                         and Repeatedly Attempted to Reopen the Mine, Just as
19                       LCGMC Did**

20          92.     The evidence suggests that Sterling did in fact wish to reopen the Mine,

21  and that for decades it sought partnerships with other mining enterprises to reopen the

22  Mine.  Dr.  Quivik explained that, in the mining industry, there are generally two classes

23  of mining companies:  juniors and majors.   Junior mining companies buy prospects,

24  invest capital in the exploration and development of these prospects and hope to be able

25  to prove that the prospect has a substantial ore body that merits development into a

26  producing mine.  Major mining companies have access to capital and the expertise to

27  actually turn a prospect into a producing mine.  Quivik, Trial Tr. at 84:22-85:10.

28  ///

93.     Sterling began as a small mining company in 1944 incorporated in Canada. Four of its five founding directors identified themselves as members of the mining community or prospectors; the fifth was Sam Ciglen, an attorney.  In the early 1950s, Sterling owned mining property and it was focused on exploring and developing a mining property in Duvernay Township, Quebec.  Sterling was not a major mining company engaged in the actual extraction of ore, but was an exploration and development company, also known as a junior mining company.  Gilbert described Sterling as an exploration company that was always in need of funds, which it used for exploration, looking for the "one in a thousand" prospect that came in as a producer.  Quivik, Trial Tr. at 84:2-20; Gilbert Testimony at 102:7-14.

94.     Until 1985, Sterling had been primarily a natural resources company with investments in mining and oil and gas production.  DE 152 at 4:3-6 (Memorandum and Order, 12/8/2011); SUF ¶ 4.

95.     While Sterling asserts that its sole intention was to liquidate its assets at the Mine, and claims it never seriously considered returning the Mine to production, this Court finds the weight of evidence does not support Sterling's contention as discussed below.

### i.  Sterling Repeatedly Commissioned Profitability Studies

96.     After the acquisition, Sterling immediately began to explore the economic viability of resuming production.  Sterling retained LCGMC's chief geologist, J.F. Siegfried, to assess the Lava Cap Mine's potential.  Siegfried concluded that the Lava Cap operation could be profitable if economic conditions became more favorable. Ex. 13 (Siegfried Report, 12/1952 (RRFP003373-003404 at 3373-376, 383, 385-392, 398-404)).

97.     In 1971, the Sterling Board authorized Jack Gilbert to engage an outside consultant to provide a report on the feasibility of reopening the Lava Cap Mine.

1   Ex. 39 (Sterling Board of Directors Meeting Minutes, 6/15/1971 (RRFP002966-002973 at

2   2968-69); Quivik Trial Tr. 91:13-92:3.

3        98.    At Sterling's Annual Shareholder's Meeting in June 1972, Sterling's

4   President reported out that "the Corporation is compiling and assessing all the

5   information on the former gold producer," and provided an excerpt from the December

6   1952 report prepared for Sterling by Siegfried, including the observation that "[w]e know

7   of no mine in the State that has greater prospective value."   Ex. 45 (Letter, J.A. Murphy

8   to Sterling's Shareholders, 6/9/1972 (RRFP003038-003040 at 3038-3039)).

9        99.    During this time period the price of gold was going up and there were a

10   number of other new realities surrounding the mining industry.  Given that market

11   conditions had changed, Sterling commissioned another report about the Mine to update

12   the 1952 Siegfried Report.  In 1973, Sterling hired W.P. McGill to assess the Lava Cap

13   Mine and make recommendations about its future operation.  McGill visited the Mine,

14   met with former LCGMC geologist Siegfried and reviewed LCGMC's mining records.  He

15   concluded that there was developed ore to be extracted and that the history of

16   operations indicated a strong likelihood that more ore could be developed, but estimated

17   the expense of resuming production would be prohibitive until gold reached just over

18   $100 per ounce.  Ex. 47 (Letter, W.P. McGill to A.G. Andrews, 8/13/1973, enclosing

19   Report entitled "Central and Banner Mines, Grass Valley, Nevada City Mining District,

20   California," 8/14/1973 (RRFP006504-6512 at 6510-6512)); Quivik, Trial Tr. at

21   97:13-98:13.

22        100.    The historical record also contains fragments of other profitability studies

23   prepared in the early 1970s, which further indicate that Sterling was updating its

24   understanding of the Mine so that it could evaluate whether to reopen it.  Quivik, Trial Tr.

25   at 98:14-23; Ex. 42 (Profitability Report, 4/1/1972, (RRFP000151-000161 at 000152)).

26   ///

27   ///

28   ///

101.    When viewed in light of the facts presented below, the record demonstrates that Sterling continually monitored the possibility and profitability of reopening the Mine because it sought to reopen the Mine with assistance from another mining company.

ii.      **Sterling Preserved Equipment and Property Needed for Mining**

102.    The Siegfried Report recommended which equipment should be kept and which equipment would not be useful to future production, as well as which nearby property should be acquired to enhance future production.  Quivik, Trial Tr. at 94:12-95:25; Ex. 13 (Siegfried Report, 12/1/1952 (RRFP003373-003404 at 3403-04)).

103.    Based in part on the Siegfried Report, Sterling decided to hold on to sufficient existing infrastructure and equipment until "such time as conditions became more favourable for the gold mining industry in the area."  Sterling's decision also was based on the recommendation of its General Manager, who travelled to the Mine to evaluate its potential.  In a letter dated December 8, 1953, Sterling's President told Sterling's shareholders that:

> Our General Manager, L. Martial Dumulon, personally visited the [Lava Cap Mine] property and spent several days thoroughly examining the assets that were acquired, investigating and studying all available reports on the mining operations which had been profitably carried on for some years, interviewing engineers and workmen formerly employed in the operations, studying a model of the underground workings, and arranging for a comprehensive report by J.F. Siegfried, Consulting Mining Engineer, who was Chief Geologist at the time the mine was closed down and for several years prior thereto. As a result of the information so gathered, on the recommendation of our General Manager, the plan to dismantle the buildings, plant, machinery and equipment was deferred in the hope that a rise in the price of gold might take place during the year 1953 in which event his recommendation would be to re-open the mine and place the same on production.
>
> [. . .]

///

///

> The advisability of dismantling and transporting the plant and equipment to our mine in Duvernay Township, Quebec, was also given very careful consideration. [. . .] Taking everything into consideration, including costs of insurance, maintenance, care-taking, supervision, etc., it was decided to dismantle and sell the milling equipment, machine shop equipment, supplies and a large portion of the mining plant, <u>leaving intact on the property the headframe, compressors, hoists and other equipment for unwatering and re-opening the underground workings at such time as conditions became more favourable for the gold mining industry in the area</u>.

Ex. 17 (Letter, S. Ciglan to Sterling's Shareholders, 12/8/1953 (EPA000556-557)) (emphasis added).  This Court finds that Sterling's preservation of equipment demonstrates Sterling's eye toward reopening the Mine.

104.   While Martial Dumulon was also a Keystone official at the time, Dumulon conducted his inspection of the Mine as Sterling's General Manager, and not as a Keystone official, and made his recommendation to preserve the Mine's workings to Sterling's Board, not Keystone's board.   This finding is based on Sterling's own admission that Dumulon visited the Mine as Sterling's general manager.  Sterling Rule 30(b)(6) Deposition at 115:16-116:20.  Sterling further admitted that Dumulon recommended to Sterling's board that it defer its original plan to dismantle the plant in the hope that the price of gold might rise.   Id. at 116:21-117:9.

105.   To implement Dumulon's recommendations, workers at the Lava Cap Mine were tasked with maintaining the machinery and equipment owned by Sterling so that it would be usable when an opportunity to resume mining presented itself.  Ex. 15 (Letter, C. Hall to L. M. Dumulon, 12/9/1952 (EPA004569-4570) ("On good days outside maintenance is proceeding, on rainy days rust on shafts, etc., is being cleaned up, shafts oiled and machinery turned over.")).  The Court finds based on this evidence that Sterling's preservation of equipment and search for additional property signals an intention to reopen the Mine.

106.   Although Sterling contends that only minimal useful equipment remained at the mine by 1973 (some 20 years after Sterling's 1952 acquisition), and while Sterling appears to contend that this shows it was not really interested in reopening the mine

1    (Trial Tr. 217:23-218:21),  the Court finds this argument unpersuasive.  This Court does

2    not find it surprising that equipment remaining at the Mine in 1973, which was last used

3    by LCGMC in 1943, had outlived its usefulness after the passage of 40 years.

4           107.   Moreover, Sterling's management of property at the Mine indicates its

5    intention to reopen the Mine.  In 1952, Charles Hall, resident manager of the Lava Cap

6    Mine, began inquiring locally on Sterling's behalf about the possibility of acquiring

7    adjoining property to facilitate renewed mining at Lava Cap.  Ex. 14 (Letter, Charles R.

8    Hall to L.M. Dumulon, 12/8/1952 (RRFP003405-408)); Ex. 17 (Letter, S. Ciglan to

9    Sterling Shareholders, 12/8/1953 (EPA000556-000557)).  It appears that at least one

10   purchase of an additional nearby property occurred.  Quivik, Trial Tr. at 94:12-95:25.

11          108.   And, although Sterling authorized sales of surface rights owned by

12   Keystone starting in 1963, it consistently reserved the property needed to resume mining

13   at the Lava Cap Mine.  For example, in 1971 the Sterling Board authorized Gilbert "to

14   take whatever steps he deems advisable to seek out a sale of the Company's surface

15   rights at the Lava Cap property other than those surface rights and mineral rights which

16   should be retained for an eventualy (sic) possibility of re-opening the Lava Cap Mine. . .

17   ." About 140 acres of surface rights were identified as necessary for resumed production.

18   Ex. 39 (Sterling Board of Directors Meeting Minutes, 6/15/1971 (RRFP002966-002973 at

19   2968-2969)); Ex. 54 (Letter to Shareholders, 8/3/1978 (RRFP000605-000608, at

20   000605); Quivik Trial Tr. 91:13-92:3.

21          109.   Gilbert testified that he and other Sterling officials had "always" felt there

22   was a possibility of reopening the Mine one day:

23          [W]hen Lou Pancer was alive and Mr. Ciglen, there was always a feeling
            that there was a possibility one day of re-opening the mine.  And I was
24          under the same . . . I had the same feelings about it, and I was hoping that
            maybe we could turn the property to account.  And I gather that they
25          formally  . . . got the formal permission from the board to seek out interest.

26   Gilbert Deposition at 147:9-148:9.  He believed the Lava Cap Mine was potentially

27   profitable because "it had been a previous . . . the second largest gold and silver

28   producer in California before the advent of the Second World War.

1   It had known reserves.  And if you could just knock on the right door, maybe there was

2   somebody who would take up the cudgel and do something about it."  Id. at 148:10-19.

3   The Court considers such a statement significant due to Gilbert's position as President

4   for several years and Director for at least 17 years, and as the son-in-law of Ciglen, a

5   former Sterling President of Sterling's.  As such, he not only likely knew of the decisions

6   and direction of the corporation – he probably shaped them.  Ex. 195 (Fed. R. Evid.

7   1006 Chart); Gilbert Deposition at 14:17-22.

8           110.    Gilbert testified that although, as an exploration company, Sterling could

9   find the means to extract ore, it could not do it on its own because it did not have the

10  money.  Sterling needed to search for partners in investment to make the project

11  happen.   Gilbert recalled "the Siegfried report being my bible to try to sell this prospect."

12  Gilbert Deposition at 148:20-149:5, 150:24-151:1.

13          111.    Sterling informed its shareholders of its intent to resume production.  In a

14  July 5, 1974 letter to the shareholders signed by President Andrews on behalf of the

15  Sterling board, Andrews explained:

16          As your President, I have made several trips to Grass Valley, California to
        determine the policy to be followed for the Lava Cap Mine property.
17          Annexed is a summary of information on this former gold and silver
        producer for our Shareholders.  It is evident [. . .] this represents an asset
18          of considerable potential and enquiries are invited from interested parties.

19  Ex. 49 (Letter, A.G. Andrews to Sterling Shareholders, 7/5/1974) (RRFP002417-002431

20  at 2419)).

21          112.    While Sterling contends that Andrews was merely puffing in his July 5,

22  1974 letter to shareholders, and claims that Andrews' letter does not signify a continuing

23  interest on Sterling's part in trying to reopen the Mine,  Sterling admitted that Andrews'

24  shareholder letter does suggest that Sterling was continuing to examine the Mine's

25  potential as a producer.  Sterling Rule 30(b)(6) Deposition at 231:1-9; 234:1-18.

26          113.    Sterling's annual reports also demonstrate its desire to hold onto the Lava

27  Cap Mine until conditions became favorable to mining.

28  ///

1    Gilbert testified that Pancer, in Sterling's 1967 annual report, told Sterling's shareholders

2    "that because [the Lava Cap Mine] was the second largest gold producer in California

3    before the second world war, and the Siegfried Report . . . indicated that when the mine

4    was closed it had a certain tonnage of reserves . . . . there would be a potential of mining

5    those reserves together with the potential of the property, when the price of gold was

6    right, to make a profit."  Gilbert Deposition at 93:18-94:24; Ex. 35 (Minutes of Sterling's

7    Annual Shareholder's Meeting, 5/17/1968 (RRFP002884-002900 at 2863); (Ex. 123

8    (1982 Annual Report, 6/24/1983 (RRFP003346-003367 at 3347-3349)); Ex. 134 (1983

9    Annual Report, 6/20/1984 (EPA003638-003655 at 3640)).

10

11                          **iii.      Sterling's Efforts to Reopen the Mine Resulted in
                                    Agreements to Reopen the Mine.**

12

13           114.   The evidence suggests that Sterling's efforts to reopen the Mine continued

14   for decades.  In 1979, Sterling continued to regard the Mine as an asset of great

15   potential. However, litigation over disputed title to certain parcels of the Mine prevented

16   immediate resumption of gold and silver production. Once that litigation was resolved,

17   Sterling believed it would be able "to undertake exploration and possible development."

18   Ex. 69 (1979 Annual Report, p. 1 (RRFP001905-001953 at 1942)).

19           115.   In 1981, Sterling's subsidiary entered into an agreement, ultimately

20   terminated, with a mining enterprise called Mastermine Gold Corporation to reopen the

21   Lava Cap Mine.  Instead of simply selling the mine to Mastermine, this agreement was

22   structured so that Sterling, through Keystone, could profit from reopening the Mine.  The

23   more productive the property, the more return Sterling's subsidiary would realize under

24   the agreement with Mastermine.  Ex. 73 (Minutes of the Board of Directors of Lava Cap

25   Resources Ltd.,  December 11, 1980, p. 5 (RRFP001865-1872 at 1872));  Ex. 76

26   (Minutes of the Board of Directors of Lava Cap Resources Ltd., May 12, 1981, pp. 2-3

27   (RRFP001810-1812 at 001811-1812)); Ex. 77 (Agreement between Keystone Copper

28   Corporation and Mastermine Gold Corporation, May 20, 1981 (RRFP001826-834));

1 Ex. 87  (Letter, Gilbert to Wood, July 13, 1982 (RRFP001977)); Quivik, Trial Tr. at 102:4-

2 22, 138:18-139:23.

3       116.   In 1982, Sterling settled the quiet title litigation, and once again embarked

4 on a plan to resume exploration and development at the Lava Cap Mine with the goal of

5 eventual production.  In a 1982 Annual Report, Sterling's directors told shareholders

6 that: "renewed exploration and development with eventual production [is] very possible.

7 The mining property is attractive, particularly with a favourable long-term gold market."

8 Ex. 122 (1982 Annual Report (EPA003617-3637, at 3618)).

9       117.   During this period of time, Sterling was very actively trying to find someone

10 to partner with to reopen the Mine.  Quivik, Trial Tr. at 99:13-21. Sterling's President,

11 Jack Gilbert, contacted at least eight potential business partners in 1982 and separately

12 informed them that Sterling had re-established its subsidiary's title to the Lava Cap Mine

13 property.  He told each of these prospects that "I have been associated with this property

14 for over 25 years waiting for a chance to see it back into production."  Ex. 98

15 (Letter from Jack Gilbert to Paul Penna, 11/29/1982 (RRFP006612)); Ex. 100 (Letter

16 from Jack Gilbert to Brian Wadsworth, 12/3/1982 (RRFP000145)); Ex. 101 (Letter

17 from Jack Gilbert to Paul Mattinen, 12/7/1982 (RRFP000144)); Ex. 102 (Letter from Jack

18 Gilbert to Robert Smith, United Siscoe Mines, December 13, 1982 (RRFP0006613));

19 Ex. 103 (Letter from Jack Gilbert to Donald McLeod, 12/14/1982 (RRFP000125));

20 Ex. 105 (Letter from Jack Gilbert to Gordon Stollery, 12/16/1982 (RRFP000135)); Ex.

21 106 (Letter from Jack Gilbert to Stanley Holmes, 12/16/1982 (RRFP000136)); Ex. 107

22 (Letter from Jack Gilbert to John Kearney, 12/16/1982 (RRFP000166)).

23       118.   Likewise, Sterling's board member, Ralph Bachenheimer, courted

24 Newmont Mining Corporation by writing a letter explaining that "the reason why [Sterling

25 had] not opened up the Lava Cap Mine . . . is that we were in litigation on the title," but

26 that Sterling had "some reasonably definitive plans to open up this mine in a joint

27 venture."

28 ///

1   On behalf of Sterling, Mr. Bachenheimer proposed to explore reopening the Mine "on

2   some kind of a joint venture basis" with Newmont.  Ex. 78 (Letter from Ralph

3   Bachenheimer to Plato Malozemoff, Newmont Mining Corporation, 10/27/1981

4   (EPA0004589)).

5          119.   In 1983, Sterling entered into another agreement to reopen the Mine, this

6   time, with a major mining enterprise called Franco Nevada.  In Sterling's June 1983 letter

7   to shareholders, Gilbert, as Sterling's President and on behalf of the Sterling board,

8   reported that

9          with the favourable resolution late in 1982 of four years of litigation relating
       to the mining property, it became clear that renewed exploration and
10     development with eventual production was very possible.  The mining
       property is attractive, particularly with a favourable long-term gold market.
11     Accordingly . . . an agreement has been reached to develop the mining
       property to commercial production with Franco Nevada Mining Corporation.
12

13  Ex. 124 (Sterling Letter to the Shareholders, 6/24/1983 (RRFP004200-004203 at

14  4200).

15         120.   Describing the agreement with Franco Nevada, Gilbert testified that he

16  "always held the belief that the property was a potential producer.  The price of gold was

17  improving and [he] was forever on the look-out for somebody who might take on the

18  responsibility of bringing the property into production."  Gilbert Deposition at 156:11-13.

19  Franco Nevada brought the assets of money and mining expertise to the table and

20  Sterling brought the property to the table.  Id. at 158:20-159:5.

21         121.   The agreement required Franco Nevada to pay $200,000 (Cdn.) to Sterling

22  in exchange for 50,000 common shares of Sterling; to pay Keystone advanced royalties,

23  or upfront payments, of $50,000 (Cdn.) for three years and thereafter $100,000 (Cdn.)

24  annually until commercial production equaled at least 100 tons of ore per day; and to

25  spend at least $500,000 (Cdn.) on exploration and development over four years.  In

26  exchange, Keystone was to deed the Mine property to Franco Nevada   SUF ¶ 35;

27  Ex. 125 (Agreement Between Keystone, Sterling, and Franco Nevada, 7/11/1983

28  (EPA000572-000583)).

1  Gilbert explained that Sterling was "always desperate for money."  Sterling used the

2  $200,000 it received from Franco Nevada for its oil and gas exploration programs.

3  Gilbert Deposition at 159:22-160:6.

4        122.   Sterling publicly characterized this agreement as its effort "to re-open its

5  Lava Cap Mine," in a May 10, 1983 press release stating specifically that "[Sterling]

6  reached an agreement in principle with Franco Nevada Mining Corporation Limited . . .

7  to re-open its Lava Cap Mine in California."  Sterling Admissions (DE 180-1), No. 31;

8  Sterling Rule 30(b)(6) Deposition at 182:13-17, 183:11-19; Ex. 118 (Sterling Press

9  Release, 5/10/1983 (RRFP004189)).

10        123.   Despite this evidence, Sterling contends that it merely sold the Mine

11  property to Franco Nevada.  The Court finds this argument unconvincing.  The

12  agreement with Franco Nevada was not a simple sale; it provided that Keystone would

13  receive advanced royalties and then continue to receive royalties once Lava Cap

14  became a producing mine.  It also provided Keystone, under certain conditions, with an

15  option to convert its royalty rights into a 25% stake or interest in the property operations.

16  Quivik, Trial Tr. at 104:4-18; Ex. 125 (Agreement Between Keystone, Sterling, and

17  Franco Nevada, 7/11/1983 (EPA000572-000583 at 580)).

18        124.   Dr. Quivik testified that he has studied many similar agreements in his

19  research on partnerships among mining enterprises to return mines to production.  He

20  testified that 1981 and 1983 agreements are within the spectrum of agreements he has

21  studied whereby junior mining enterprises with a potentially productive mining property

22  will partner with major mining companies with capital and expertise to bring it to

23  production.  Quivik, Trial Tr. at 102:4-22, 104:19-105:7.  This Court finds that these two

24  agreements, with Mastermine and Franco Nevada, are not simply property dispositions,

25  as Sterling contends.  See Gilbert Deposition at 245:19-246:5.  They appear by their

26  very terms to be agreements with major mining enterprises to reopen the Lava Cap

27  Mine, under which Sterling would continue to profit if operations became successful.

28  ///

35

1   Quivik, Trial Tr. at 243:4-13 (confirming that Keystone would receive 25% share of profits

2   generated by the Mine under the Franco Nevada deal).

3
4                           **iv.     The Court Declines to Credit Ms. Hill's Testimony
                                    That Sterling's Financial Statements Indicate It
5                                   was Disposing of Mine Assets**

6           125.   In an effort to rebut Plaintiffs' evidence that Sterling attempted to reopen

7   the Mine, Sterling presented an expert accountant, Vanessa Hill, who opined that "the

8   financial statements indicate that Sterling and Keystone were disposing of the assets

9   that they had acquired."  Hill, Trial Tr. at 376:13-15.  Although there is some evidence

10  that Sterling charged Keystone expenses to its surplus rather than to a deferred account

11  which would be deducted from later mine revenue, this Court finds that the weight of the

12  evidence suggests that Sterling intended to reopen the Mine.

13          126.   This Court simply cannot credit any of Ms. Hill's testimony.  Sterling

14  retained Ms. Hill as a rebuttal expert to Dr. Quivik's testimony and the testimony of

15  Plaintiffs' expert accountant, Wiley Wright.  Ms. Hill spent only forty hours over the

16  course of two weeks – while working half-time on vacation on this case and others – to

17  review documents, prepare her opinions and write her report.  Hill, Trial Tr. at

18  398:11-399:11.  She testified that the focus of her analysis was Sterling and Keystone's

19  financial statements.  Trial Tr. at 397:3-9, 405:11-13.  However, she acknowledged at

20  least eighteen errors in her analysis of various financial statements, more than a dozen

21  of them attributable to her failure to closely and carefully examine the financial

22  statements upon which she purportedly relies, and the remaining errors due to her

23  incorrect addition and subtraction of six-figure numbers.  She also readily admitted her

24  review was not as expansive as Dr. Quivik's.  Hill, Trial Tr. at 396:7-397:23 (admitting

25  she did not review the same breadth of documentation as Quivik).

26  ///

27  ///

28  ///

1   Compare Hill, Trial Tr. at 398:11-399:11 (stating that she spent forty hours during two

2   weeks, while working half-time while on vacation, to review the documentation in this

3   case, prepare her opinions and write her report) with Quivik, Trial Tr. at

4   66:17-71:11(detailing Quivik's work to prepare his opinion, including research in trade

5   journals and primary source documents, reviewing "several thousand" historical

6   documents regarding the mine, Sterling, and Keystone, visiting the Mine itself and

7   uncovering documents there, and spending 200 hours to prepare his report and dozens

8   of hours more afterwards).  The Court is entitled to give whatever weight it deems

9   appropriate to witnesses, and under the circumstances present here, the Court cannot

10  credit Ms. Hill's testimony, especially over the opinions of Dr. Quivik and Wright.

11         127.   Even if Ms. Hill's testimony carried any probative weight, it in large part

12  fails to contradict Dr. Quivik's testimony, and the documentation supporting it, which

13  demonstrate that Sterling repeatedly chose to retain mineral rights and surface rights

14  sufficient to reopen the Mine.  See e.g., Ex. 39 (Sterling Board of Directors Meeting

15  Minutes, 6/15/1971 (RRFP002966-002973 at 2968-2969)) (authorizing Jack Gilbert to

16  take any steps advisable to sell the Mine's surface rights "other than those surface rights

17  and mineral rights which should be retained for an eventualy (sic) possibility of

18  re-opening the Lava Cap Mine. . . .").  For instance, during her direct examination,

19  Ms. Hill stated that the 1972 sale of 375 acres to United Duvex informed her opinion that

20  Sterling and Keystone were disposing of its property but, during her cross-examination,

21  she acknowledged that the sale was for surface rights only, not mineral rights.  Compare

22  Hill, Trial Tr. at 378:21-379:5 (acknowledging that the 1972 sale of 375 acres to United

23  Duvex informed her opinion that Sterling was disposing of assets) with Hill, Trial Tr. at

24  410:9-21 (acknowledging that the 1976 of 375 acres to United Duvex was for surface

25  rights only, not mineral rights).

26  ///

27  ///

28  ///

1
2

**C.    Sterling's Absorption of LCGMC Materially Changed Sterling's Mining Operations**

3       128.    Sterling argues that the acquisition of LCGMC's assets did not change its

4   business operations in any significant way.  Trial Tr. at 34:3-4.  This Court disagrees.  As

5   noted above, Sterling started out in 1944 as a small mining company focused on

6   exploration and development of its prospects.  Its function was to identify potential

7   prospects and then to explore and develop them in hopes of finding the "one in a

8   thousand that came in as a producer."   Gilbert Deposition at 102:5-12.

9       129.    With its acquisition of the Lava Cap Mine, Sterling, for the first time,

10  acquired a proven mine – "a producer" - that had about 149,000 tons of reserves ready

11  to be extracted.  Assessments of Lava Cap also indicated a strong likelihood that more

12  ore could be developed.  E.g., Ex. 15 (Siegfried Report, 12/1952 (RRFP003373-3404));

13  Ex. 47 (McGill Report, 8/14/1973 (RRFP006504-006512, 6510 ("There is no question in

14  my mind that further ore can be developed on the Central property and in particular on

15  the Banner property."), 6511 ("A reasonable tonnage of good grade gold and silver

16  material remains on the property and is available for mining.").  For the first time, Sterling

17  did not have to follow its standard practice of raising capital to explore and develop its

18  prospect, because the Lava Cap Mine was already a proven producer.  For the first time,

19  Sterling's business expanded to include attracting major mining companies to partner

20  with it to reopen the Lava Cap Mine when gold market conditions were ripe.

21      130.    This Court finds that Sterling's acquisition of the Lava Cap Mine expanded

22  its operations from solely exploration and development to bringing a proven mine into

23  production.  Sterling entered into a new segment of the mining industry when it acquired

24  the Lava Cap Mine.

25      131.    Sterling points to the fact that it did not raise money or invest its own

26  capital in the development of the Mine as evidence that it did not intend to reopen it.

27  Trial Tr. 39:19-40-9; 212:4-10.  The Court is not persuaded by this logic given the "apple

28  and orange" distinction between a mining prospect and a proven mine like Lava Cap.

1  The record is well documented that Sterling sought partnerships with other entities to

2  reopen the Lava Cap Mine; thus, it is insignificant that Sterling did not attempt to raise its

3  own money given the different class of investment Lava Cap represented in Sterling's

4  mining portfolio.

5       132.    Based on the evidence, the Court finds that Sterling deliberately positioned

6  itself to reopen the Mine when market conditions were favorable, and that it courted

7  major mining enterprises with the expertise and funding to partner with Sterling for

8  decades.  The Court therefore concludes that Sterling continued the business operations

9  of LCGMC.

10

11       **D.  Sterling's Evidence of Attempts to Sell the Mine Property Does Not**
          **Undermine Evidence That It Attempted for Decades to Reopen the Mine.**

12

13       133.    Although Defendant argues that the several instances where Sterling

14  contemplated selling the Mine negate the overwhelming evidence that Sterling also

15  persistently tried to reopen the Mine (see Trial Tr. 223:2-227:25, 234:1-236:9), the record

16  is clear that Sterling contemplated both options at different times.  The prominent factor

17  influencing Sterling's decision to reopen the Mine was the prevailing gold market, i.e.,

18  whether the price of gold would make renewed production profitable.  See Ex. 32

19  (Sterling Annual Shareholder Meeting, 6/23/1966 (RRFP002629-002635 at 2632), Ex.

20  33 (Sterling Report to Shareholders, 4/17/1967 (RRFP002863-002866 at 2863), Quivik,

21  Trial Tr. at 227:1:19 (explaining that in 1966 the price of gold had not changed in the 14

22  years since Sterling acquired the Mine, but if the prospect of some kind of subsidy in the

23  gold mining industry was realized Sterling would consider reopening the Mine); Ex. 39

24  (Sterling Board of Director Meeting Minutes, 6/15/1971 (RRFP002966-002973 at

25  2968-69); Quivik, Trial Tr. at 228:22-230:9 (explaining that Sterling's 1971 efforts to

26  reopen the Mine coincide with an improvement in the price of gold).

27       134.    Likewise, the decision to sell the Mine property depended on the right price

28  being offered, i.e., one that took into account the Mine's value as a producer.

1  See Ex. 24 (Sterling Annual Shareholder Meeting Minutes, 6/29/1962 (RRFP002780-

2  002793 at 2788)); Quivik, Trial Tr. at 225:20-226:3 (explaining that Sterling's directors

3  would have been interested in 1962 in selling the Mine, but only if the "right deal" came

4  along, i.e., a substantial dollar amount); Ex. 25 (Sterling Annual Report, 6/14/1963

5  (RRFP002767-002773 at 2768); Quivik, Trial Tr. at 226:4-25 (explaining that it is

6  uncertain whether the in  Sterling board minutes regarding negotiations for the

7  disposition of the Lava Cap property in 1963 was solely for surface rights or included

8  mineral rights, or, if it included mineral rights, whether it was "a potentially really good

9  deal for the mineral rights."); Ex 52 (Sterling Annual Shareholder Meeting Minutes,

10  6/27/1977 (RRFP003985-003997 at 3986)); Quivik, Trial Tr. at 235:9-236:9 (explaining

11  that the option to purchase the mine for the sum of $1 million in 1976 suggests "a very

12  potentially lucrative exchange."); Ex. 35 (Minutes of Sterling's Annual Shareholder's

13  Meeting, 5/17/1968 (RRFP002884-002900 at 2890) (President of Sterling reporting to

14  shareholders that  Sterling may be able to dispose of its remaining holdings at an

15  advantageous price).

16      135.   This same logic applies to the 1959 option to purchase the Mine property

17  granted by Sterling to local realtor Leonard Carey, which Sterling contends is further

18  evidence of its sole desire to dispose of the Mine.  Ex. 22 (Sterling Board of Directors

19  Minutes, 9/9/1959 (RRFP002809-002815 at 2813-2814) (indicating that under the terms

20  of the option Sterling would receive $250,000 in cash or $300,000 with $100,000 down

21  with remainder payable at rate of $40,000 a year plus 5% interest)).  The Sterling board

22  approved the option; from this fact, the Court infers that the offering price was right given

23  prevailing gold market in 1959.

24      136.   The Court concludes that the mere fact that Sterling considered a number

25  of offers to purchase the Mine over the 37 years it was associated with the Mine does

26  not discount its own repeated attempts over the years to reopen it.

27  ///

28  ///

1        **D.  Sterling and LCGMC Believed They Had Merged**

2

3        137.    The Court further finds that LCGMC believed it had merged with Sterling.

4   Prior to the closing, two LCGMC officials (who later became directors of Sterling) sought

5   and obtained an IRS ruling on whether the 1952 transaction amounted to a

6   reorganization under US tax laws.  On October 6, 1952, David L. Landy, Assistant

7   Secretary and counsel to LCGMC, wrote to Harry Powley, secretary-treasurer and

8   director of LCGMC:

9          I enclose to you herewith the original letter ruling dated October 2, 1952
           addressed to [LCGMC] . . . . from U.S. Treasury Department. . . . You will
10         note that the ruling confirms our opinion that the transaction with [Sterling]
           constitutes a reorganization[7] under the Internal Revenue Code, and that no
11         gain or loss to the stockholders will be recognized or result from the receipt
           of [Sterling] stock by Lava Cap stockholders; and that the basis to the Lava
12         Cap stockholders for the [Sterling] stock received will be the same as their
           respective bases for the Lava Cap surrendered.
13

14  SUF ¶ 33; Ex. 5 (Letter, David L. Landy to Harry C. Powley, 10/6/1952, (EPA000569-570

15  at 569)).

16        138.    Likewise, the Court finds that Sterling believed LCGMC had merged with it.

17  In a letter dated April 4, 1956, Fisher, Gordon & Company, Sterling's accountants, wrote

18  to LeRoy I. Harris, a CPA located in Nevada City, California, and asked "[i]n view of the

19  fact that this was a merger would American tax laws not provide that the values shown

20  by [LCGMC] books could be used by [Sterling] which took over the entire net assets.

21  You will note that Lava Cap was then dissolved."  Sterling's accountants do not question

22  the fact of the merger; they mention it in passing, as given.  Ex. 18 (Letter, Fisher,

23  Gordon & Company to LeRoy I. Harris, April 4, 1956 (EPA000564-567 at 564)).  Based

24  on these two letters, this Court finds that both Sterling and LCGMC understood the 1952

25  transaction to have been a de facto merger.

26
    _____
27      [7] At the time, a reorganization was defined as an "acquisition by one corporation in exchange
    solely for all or a part of its voting stock…of substantially all the properties of another corporation," entitled
    to the same beneficial tax treatment as a merger.  See Revenue Act of 1934, Section 112(g), 73rd Cong.,
28  2d Sess., May 10, 1934, ch. 277, 48 Stat. 680.

139.   Considering all of the evidence, and the equitable nature of the de facto merger doctrine, this Court finds that the 1952 transaction between Sterling and LCGMC was a de facto merger.   The evidence demonstrates a continuity of shareholders, assets and location, as well as continuities of both management and personnel.  Sterling assumed all of the obligations necessary to continue operations at the Lava Cap Mine, and continued LCGMC's pursuit of the means to reopen the Mine through repeated efforts to partner with other mining enterprises with the capital and expertise to extract the Mine's proven ore reserves.  Moreover, the equitable nature of the de facto merger doctrine compels its application here.  As the successor to LCGMC, the entity that created the mine waste, Sterling should pay for the costs of the arsenic cleanup at the Lava Cap Mine that, until now, has been borne primarily by federal and state taxpayers.

## V.   STERLING'S DIRECT OPERATION OF THE LAVA CAP MINE

140.   Plaintiffs' third theory of CERCLA liability is that Sterling operated the Lava Cap Mine and made the key pollution control and environmental compliance decisions.  For the reasons discussed below, this Court finds that during its 37-year association with the Lava Cap Mine, Sterling maintained pervasive control over operations at the Lava Cap Mine, including direct management of the environmental response to the 1979 partial dam collapse and disposal of arsenic contaminated tailings and water.  In reaching its decision, the Court evaluated Sterling's dominant role managing virtually all affairs concerning the Lava Cap Mine, as well as the affairs of its subsidiary, Keystone, which held title to the Mine.  Mindful that environmental operations are the focus of a Bestfoods analysis, this Court nevertheless found Sterling's ubiquitous hand in nearly all matters associated with the Mine and Keystone to be relevant in understanding Sterling's role concerning the limited environmental operations in this case.  Based on Sterling's inextricably interwoven involvement in the affairs of the Mine and Keystone, which strayed well beyond identified norms, this Court attributes CERLCA liability to

1   Sterling based on the decisions about how to respond to the Regional Water Board

2   directives and whether to invest in improvements to the crumbling infrastructure built to

3   contain the mine waste that Sterling inherited when it acquired all of LCGMC's assets in

4   1952.

5

6   **A.     The 1979 Partial Timber Dam Collapse and Jack Gilbert's Response**

7

8   141.   This Court reincorporates Findings 8-22.

9   142.   In a September 27, 1979 memorandum, the Regional Water Board

10   documented multiple instances of "discharges" of arsenic-contaminated water and

11   sediment from the Lava Cap Mine, through the existing tailings pile, and into Little

12   Clipper Creek, noting specifically a resident complaint "that high concentrations of

13   sediment were recently being discharged from the subject mine area into Little Clipper

14   Creek."  On the same day, the Regional Water Board sent a copy of this memorandum

15   to Keystone and its lessees stating that the Regional Water Board "is concerned with the

16   degradation of surface waters in the area that is occurring from the discharge of waste

17   material from your Lava Cap Mine area.  Therefore, this discharge should be stopped

18   immediately."  Ex. 60 (Regional Water Board Memorandum, 9/27/1979 (EPA000484-

19   485)); Ex. 59 (Letter from Jack Del Conte to Keystone, Ruth Flax & Tracy Hudgins,

20   9/27/1979 (EPA000483)).

21   143.   In an October 9, 1979 letter from the California Department of Fish and

22   Game ("CDFG") to the Regional Water Board, CDFG documented receiving two citizen

23   complaints about silt discharges from the Lava Cap Mine.   Within days of receiving the

24   complaints, the Warden of CDFG inspected Little Clipper Creek and the Mine and

25   determined that Lava Cap Mine "was the source of the silt" and "pollution."  It was also

26   noted that the arsenic and suspended solid concentrations were deleterious to fishlife.

27   ///

28   ///

1    The letter documents a State Biologist's observation "that the silt discharge consisted of

2    rock flour mill wastes that were being eroded from a huge old mill waste fill

3    (approximately 60 feet thick, 300 feet wide, and 300 feet long) placed in the creek

4    canyon by early day miners.  Both the log dam used to create the mill waste fill and the

5    outlet structure for the dam are badly decomposed. . . .  The entire structure appears

6    very unstable and with approaching fall rains, the situation can only get worse or

7    possibly disasterous [sic] if heavy rains cause mass movement of the fill downstream."

8    The CDFG concluded the letter by noting that "the present owner/operators  . . . are

9    responsible for permitting the discharge and a criminal complaint pursuant to Fish and

10   Game Code Section 5660 may be appropriate."  Ex. 61 (Letter from Robert Lassen to

11   James Robertson, 10/9/1979 (EPA000481-482)).

12        144.    The Regional Water Board issued a Cleanup and Abatement Order

13   ("CAO") to Keystone on October 25, 1979, which documented discharges of arsenic-

14   contaminated water and sediment from the Lava Cap Mine.  Ex. 64 (Cleanup and

15   Abatement Order, 10/25/1979 (EPA000478-000480)); DE 152 at 4:10-15 (Memorandum

16   and Order, 12/8/2011).

17        145.    The CAO noted that the Department of Fish and Game had determined

18   that along a one-mile section of Little Clipper Creek there were no live stream organisms

19   and that the "substrate was completely smothered by silt."  Ex. 64 (CAO, 10/25/1979

20   (EPA000478-000480 at 000479)).

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

1   146.   Jack Gilbert received a copy of the CAO and was aware that it directed

2   Keystone to:  (1) remove all mill tailings waste discharged from the fill deposit to Little

3   Clipper Creek and install silt catchment basins to restrict transportation of soil and

4   sediment downstream; (2) divert all surface runoff around the waste fill deposit located

5   below the Mine tunnel and discharges into Little Clipper Creek to prevent leaching of

6   arsenic from the fill, and divert surface runoff around or across the tailings so as to

7   preclude further discharge of sediment or erosion downstream of the dam; and

8   (3) submit a technical report prepared by a California registered civil engineer or

9   engineering geologist.  The technical report was to evaluate the integrity of the timber

10  dam to contain the mill waste deposits and its ability to not fail during storm conditions.

11  The technical report was also to provide improvements to the structural integrity of the

12  dam to prevent structural failure and subsequent discharge of the mill wastes and "an

13  implementation time schedule  . . . to prevent structural failure and subsequent

14  discharge of the mill wastes."  Ex. 64 (Cleanup and Abatement Order, 10/25/1979

15  (EPA000478-000480)); DE 152 at 4:10-15 (Memorandum and Order, 12/8/2011); Gilbert

16  Deposition at 206:5-14; 207:7-12; Ex. 62 (Toronto Stock Exchange Filing Statement,

17  11/15/1979 (RRFP001550-001581 at 001581)).

18  147.   Gilbert testified that, when he received the CAO, he "passed it on to Len

19  Carey," who recommended to Gilbert that Cranmer Engineering, Inc. ("Cranmer")

20  perform work required by the Order, and Gilbert hired Cranmer to perform the work.

21  Gilbert testified that Carey was acting as his agent in 1979.  Gilbert Deposition at

22  206:5-20, 207:7-17; Quivik, Trial Tr. 151:25-152:10; SUF ¶ 38.

23  148.   On November 6, 1979, Cranmer wrote to the Regional Water Board stating

24  that Cranmer had been retained to design and supervise steps to remedy the problems

25  being created by the subject discharge.

26  ///

27  ///

28  ///

45

1  Cranmer also noted the flow from the Mine shaft was diverted to the eastern edge of the

2  site and observed that the "old log dam . . . has disintegrated to the point where it is now

3  only debris," further noting that "the silt which is reaching Little Clipper Creek is being

4  washed to the creek by water flowing into the pond . . . and [a] relatively heavy amount

5  of silt has accumulated in the stream bottom immediately below the old log dam."  Ex. 65

6  (Letter from Jim Cranmer to James Pappas, 11/6/1979(EPA005857-005858 at 005857-

7  8)); DE 164-1 at 6:2-6 (Sterling's Memorandum of Points and Authorities, Quivik Motion

8  in Limine, 8/9/2012).

9        149.   Cranmer wrote a second letter to the Regional Water Board concerning the

10  "subject discharge" on November 14, 1979.  Cranmer reported that it had built three

11  settling basins and dug diversionary ditches at the Lava Cap Mine.  Sterling admits this

12  is the only time any work was done by Sterling or Keystone to physically alter the Lava

13  Cap Mine property.  DE 164 at 5:17-19 (Sterling's Memorandum of Points and

14  Authorities, Quivik Motion in Limine, 8/9/2012); Ex. 65 (Letter from Jim Cranmer to

15  James Pappas, 11/6/1979 (EPA005857-005858)); Ex. 66 (Letter from Jim Cranmer to

16  James Pappas, 11/14/1979 (EPA005859-05861)); Ex. 84 (Report of Inspection by the

17  Regional Water Board, 6/24/1982 (RRFP004149-004150) (noting the settling basins built

18  by Cranmer had already washed away).

19        150.   While Cranmer did mention the state of the timber dam in its letter to the

20  Regional Water Board ("it has disintegrated to the point where it is now only debris"),

21  Cranmer never submitted the technical report evaluating the integrity of the dam to

22  contain the mill waste deposits, never evaluated the dam's ability to withstand storm

23  conditions, never suggested improvements to the structural integrity of the dam, and

24  never submitted an implementation schedule, all of which were required by the CAO.

25  Quivik, Trial Tr. at 155:23-156:4; Ex. 65 (Letter from Jim Cranmer to James Pappas,

26  11/6/1979 (EPA005856-005858)); Ex. 66 (Letter from Jim Cranmer to James Pappas,

27  11/14/1979 (EPA005859-05861)).

28  ///

151.    Despite the advanced age of the timber dam, and its precarious position near a waterway, the Court finds that Sterling took no steps at all to maintain the structural integrity of the dam.  Quivik, Trial Tr. 155:23-156:4; DE 164-1 at 5:17-19 (Sterling's Memorandum of Points and Authorities, Quivik Motion in Limine, 8/9/2012) (Sterling admission that adding diversion ditches  and settlement basins was only work done by Sterling or Keystone to physically alter the Lava Cap Mine property).

152.    Cranmer also failed to remove "all mill tailings waste discharged from the fill deposit to Little Clipper Creek," as the CAO required.  Ex. 64 (Cleanup and Abatement Order, 10/25/1979 (EPA000478-000480)); Ex. 65 (Letter from Jim Cranmer to James Pappas, 11/6/1979 (EPA005856-005858)); Ex. 66 (Letter from Jim Cranmer to James Pappas, 11/14/1979 (EPA005859-05861)); Quivik, Trial Tr. 154:24-155:2.  On June 24, 1982, an inspector from the Regional Water Board toured the Mine "to find out if the directives specified in the [CAO] . . . had been followed."  In his report, the inspector noted the settling basins Cranmer had constructed had washed away.  Ex. 84 (Report of Inspection by Regional Water Board, 6/24/1982, (RRFP004149-004150 at 004149)).  There is no evidence that these settling basins were rebuilt.

153.    Based on this evidence, the Court finds that the work Cranmer performed did not fully comply with the CAO.

154.    Due to concern about the arsenic content in the water discharging from the Mine, specifically the long-term chronic toxicity, the inspector recommended collection of monthly water samples, and the Regional Water Board adopted the recommendation, ordering Keystone to perform water monitoring.  Ex. 83 (Letter from Regional Water Board to Keystone, 6/24/1982 (RRFP004147)); Ex. 84 (Report of Inspection by Regional Water Board, 6/24/1982, (RRFP004149-004150 at 004150)).

155.    The Regional Water Board sent the water monitoring order first to Keystone's local post office box and, after approximately two months had passed with no response, it then mailed the order to Gilbert in Toronto.

///

1   Ex. 89 (Letter from Regional Water Board to Jack Gilbert, 8/26/1982 (RRFP004151));

2   Ex. 92 (Letter from Jack Gilbert to Leonard Carey, 9/1/1982 (STCR012035)).

3       156.   Upon receipt of the Regional Water Board's letter, Gilbert again tasked

4   Leonard Carey to implement the response to the water monitoring requirements.  And,

5   Gilbert again approved Carey's recommendation that Cranmer perform the water

6   monitoring.  Quivik, Trial Tr. 185:17-189-8; Ex. 85 (Letter from Leonard Carey to Jack

7   Gilbert, 6/30/1982 (RRFP006513-006514)); Ex. 86 (Letter from Jack Gilbert to Leonard

8   Carey, 7/7/1982 (STCR012031)); Ex. 88 (Letter from Len Carey to Jack Gilbert, 7/13/82

9   (STCR012032)); Ex. 92 (Letter from Jack Gilbert to Leonard Carey, 9/1/1982

10  (STCR012035)); Ex. 93 (Letter from Carey to Gilbert, 9/8/1982 (RRFP000041)).

11      157.   The evidence supports the finding that Carey acted as Sterling's agent with

12  regard to Sterling's California affairs, including the response to the partial collapse of the

13  timber dam.  Carey's relationship with Sterling dates back to the 1960s.  Gilbert testified

14  that Carey had a "very long and agreeable history" with Sterling that lasted at least

15  through 1987.  Sterling repeatedly entered into agency agreements with Carey,

16  authorizing Carey to market its California real property for sale (including the Mine

17  property owned by Keystone) and even granted Carey an option to purchase the

18  property in 1959.  According to Gilbert, Carey "endeavoured over the years to introduce

19  people that he thought might be interested in doing something about the property."  Over

20  time, Gilbert came to rely on Carey for more than just real estate transactions.  Gilbert

21  testified that he "relied very heavily on him to sort of oversee the picture. . . . [t]he whole

22  situation that related to the Lava Cap property."  The Court finds that Gilbert, in directing

23  Carey to act in his stead to respond to the Regional Water Board's compliance orders,

24  was acting in his capacity as a Sterling official.  Moreover, the Court concludes that

25  Carey, in accepting that responsibility, acted as an agent to Sterling.

26  ///

27  ///

28  ///

1   Gilbert Deposition at 167:24-169:14; Quivik, Trial Tr. 146:8-15; Ex. 127 (Carey's

2   Exclusive Right to Sell, 12/21/1982 (RRFP000679)); Ex. 22 (Sterling Board of Directors

3   Minutes, 9/9/1959 (RRFP002809-002815 at 2813-2814); Quivik, Trial Tr. at

4   147:19-148:22 (noting the existence of another agency agreement between Carey and

5   Sterling authorizing Carey to sell Sterling's property); Ex. 128 (Letter from Carey to

6   McProud, 1/3/1984 (RRFP000930-000932)) (acknowledging working "with the Lava

7   Cap/Keystone properties for the last 20 years and for over 10 years represented Lava

8   Cap in this area").

9       158.   Cranmer began the water monitoring as early as September 8, 1982 and

10   continued it until March 2, 1987.  The reports showing elevated levels of arsenic were

11   sent by Cranmer to Gilbert.  Ex. 93 (Letter from Carey to Gilbert, 9/8/1982

12   (RRFP000041)); Ex. 94 (Cranmer Lab Report, 9/17/1982 (RRFP000048)); Ex. 95

13   (Cranmer Lab Report, 9/29/1982 (RRFP000047)); Ex. 96 (Cranmer Lab Report,

14   11/19/1982 (RRFP004152)); Ex. 109 (Cranmer Lab Report, 1/6/1983 (RRFP000045));

15   Ex. 110 (Cranmer Lab Report, 1/10/1983 (RRFP000044)); Ex. 112 (Cranmer Lab

16   Report, 2/16/1983 (RRFP00043)); Ex. 113 (Cranmer Lab Report, 3/25/1983

17   (RRFP00042)); Ex. 155 (Letter From Nick Wilcox to Jack Gilbert, 3/13/1987

18   (RRFP004318)).

19       159.   When Keystone transferred title to the Mine property to Franco Nevada in

20   1983, see Findings 119-122, Franco Nevada assumed responsibility for the monitoring.

21   When Franco Nevada terminated its agreement with Sterling and Keystone in 1986, it

22   informed Cranmer that Cranmer should send all future invoices to Sterling, which

23   Cranmer did.  Sterling never told Cranmer that the reports should be addressed to

24   Sterling – on the contrary, it appears that Sterling accepted the reports.  Quivik, Trial Tr.

25   at 152:13-20; Ex. 153 (Letter from Franco Nevada to Cranmer, 1/21/1987

26   (RRFP004316)); Ex. 160 (Letter from Hendry to Cranmer, 12/1/1987 (RRFP004355);

27   SUF ¶ 42.

28   ///

160.    In March 1987 Cranmer notified Gilbert that the monitoring program could be discontinued because Cranmer had "received word from [the Regional Water Board] that they now consider the intent of the order to have been fulfilled."  Ex. 155 (Letter from Nick Wilcox to Jack Gilbert, 3/13/1987 (RRFP004318); Gilbert Deposition at 251:8-252:19.  In contending that the Regional Water Board rescinded the CAO and in t arguing that this Court should infer compliance with the CAO because it was rescinded, Sterling points to a page from a Regional Water Board log book on which the word "rescinded" had been handwritten in an undated notation next to an entry for the Lava Cap CAO.  Ex. HHHHHH(6) (Log Book Page).  While Sterling  contends that Cranmer's March 1987 letter to Gilbert also suggests that the Regional Water Board considered the CAO to have been fulfilled.,  this Court is unpersuaded by either of Sterling's arguments.

161.    Taking the rescission argument first, this Court finds the evidence that the CAO was not rescinded to be more persuasive.  In 1991, a search of the Regional Water Board's files found no record that the CAO was ever rescinded.   Ex. 186 (Regional Water Board Memorandum, 5/20/1997 (RRFP003599-003601 at 003601)).  Another file search in 1997 also found no such record.  Ex. 186 (Regional Water Board Memorandum, 5/20/1997 (RRFP003599-003601 at 003601)); Ex. 187 (Regional Water Board Memorandum to DTSC, 6/9/1997) (LAVAPROD-000336-000337 at 000337)).  Moreover, there is no evidence that the Regional Water Board ever informed Sterling or Keystone that the CAO had been rescinded.

162.    Next, the Court notes Cranmer's March 1987 letter refers explicitly to the Regional Water Board's apparent determination that water monitoring could cease.  Since the CAO itself did not contain a water monitoring requirement, the Court concludes that Cranmer was referring to the water monitoring obligations imposed in 1982, and not the obligation to fix the dam imposed under the CAO in 1979.  There is no evidence in the record that compliance with the CAO was achieved.  The Court rejects Sterling's suggestion that Sterling's subsequent contacts with the Regional Water Board

1   constituted a tacit approval by the Regional Water Board of Sterling's actions under the

2   CAO.

3   163.   In any event, the Court finds that whether the CAO was in force or not is of

4   no consequence.  Even if the Regional Water Board had never issued the CAO, existing

5   laws and regulations imposed a duty to ensure the integrity of the wastes disposed of at

6   the Mine.  Gilbert had a duty to ensure that Cranmer addressed the precarious state of

7   the timber dam under the well-developed body of California statutory and common law

8   discussed above, at Findings 37-40.  His failure to do so gives rise to Sterling's CERCLA

9   liability because he acted on Sterling's behalf, as discussed below in Section V(C).

10

11   **B. CERCLA "Disposals" Occurred During Sterling's Operation of the Mine**

12

13   164.   It is uncontested that CERCLA disposals occurred during LCGMC's mining

14   and milling operations at the Lava Cap Mine.  DE 176 at 17:1-15, 19:23-24, 15:13-14,

15   24:12-13, 26:25-26. (Sterling's Trial Brief, 8/23/12) (conceding LCGMC would have

16   CERCLA liability if it existed today).

17   165.   This Court now finds that CERCLA disposals of the hazardous substance

18   arsenic continued at the Mine after Sterling's acquisition of LCGMC in 1952.  The

19   evidence of disposals indicates that they continued throughout Sterling's association

20   with the Lava Cap Mine.  See Findings 9-22, 142-152, 158.  In fact, they appear to have

21   continued up to the time the property was conveyed to Defendant Stephen P. Elder.

22   This Court has previously found that, prior to purchasing the Lava Cap Mine property in

23   1989, Elder hired Vector Engineering to prepare a Site Assessment that revealed

24   hazardous substance contamination, primarily arsenic.  DE 152 at 5:1-3 (Memorandum

25   and Order, 12/8/2011).  This Assessment documented the existence of "a dry tailings

26   pond, a waste rock pile and a mine adit which was discharging water at the time of our

27   investigation."

28   ///

1   Based on Vector's sampling of waste rock (for arsenic and lead) and tailings sand

2   (arsenic), the Assessment concluded that "the waste rock is considered hazardous by

3   the California Department of Health Services . . . . and "the tailings sand is also

4   considered hazardous."   The Assessment further stated that the sampled and tested

5   water drainage from the Lava Cap Mine adit exceeds the California Maximum

6   Concentration Level ("MCL") for arsenic.  Ex. 183 (Preacquisition Site Assessment

7   Report, 7/1/1989 (EPA006625-6664 at 006627-28)).

8        166.   Based on the extensive record, this Court finds that CERCLA "disposals" of

9   the hazardous substance arsenic occurred after Sterling acquired the Mine in 1952.  The

10   Court further finds these disposals included the continuous discharge of arsenic-

11   contaminated water from the Mine's adit and from below the tailings pile during Sterling's

12   37-year association with the Mine.  More pronounced disposals clearly occurred as a

13   result of the partial log dam collapse in 1979, which caused large quantities of arsenic-

14   contaminated tailings and water to leak, spill and discharge from the decomposing

15   containment system.  These were then dumped, deposited, and even placed into Little

16   Clipper Creek and downstream areas.

17

18   **C.   Sterling Managed, Directed and Controlled Environmental Matters at
         the Lava Cap Mine**

19   **1.  Jack Gilbert Directed the Response to the Partial Collapse of the
         Timber Dam on Sterling's Behalf**

20

21        167.   This Court finds that Gilbert directed the response to the partial collapse of

22   the timber dam between 1979 and 1987, when Cranmer ceased water monitoring. As

23   discussed below, this Court also finds that Gilbert was acting for Sterling when he

24   directed the response.  Because Sterling's direct management of environmental

25   compliance is sufficient to find Sterling was an operator at the time of a disposal under

26   Section 107(a) of CERCLA, this Court need not determine whether Gilbert was also

27   acting at times on behalf of Keystone.

28   ///

1   The Court does address Sterling's contention that Keystone alone directed the response

2   and finds the evidence unavailing to support that claim.  The record is clear that Gilbert

3   directed environmental affairs while wearing his Sterling hat.  Quivik, Trial Tr.

4   168:12-169:15.

5          168.   As discussed above at Finding 147, Gilbert testified that after he received

6   the CAO, he "passed it on to Len Carey."  According to Gilbert, "Len Carey [was]

7   responsible to see that something was done about it." He testified, "I think Len was

8   responsible for bringing in Jim Cranmer.  And the matter . . . and as a matter . . . my only

9   recollection is, it was dealt with. [. . .] Cranmer . . . apparently resolved the matter."

10   Gilbert Deposition at 205:25-209:12; Quivik, Trial Tr. 151:25-152:10; SUF ¶ 38.

11          169.   As noted above in Finding 157, the evidence supports the finding that

12   Carey acted as Sterling's agent with regard to Sterling's California affairs, including this

13   particular issue.  Carey's agency relationship with Sterling is readily apparent in the

14   correspondence between Gilbert and Carey regarding the Regional Water Board's water

15   monitoring requirements.  This collection of letters demonstrates that Gilbert authorized

16   Carey as Sterling's agent to instruct Cranmer to comply with the water monitoring order.

17   Carey addresses Gilbert as a Sterling official in this correspondence, and Gilbert

18   generally responds on Sterling letterhead.  Notably, neither Carey nor Gilbert typically

19   mentions Keystone in this correspondence.  Although one of Gilbert's communications

20   with Carey about the monitoring contains a handwritten notation, "for Keystone," this

21   Court finds Sterling's position that the notation indicates that Gilbert directed the

22   response on Keystone's behalf alone unavailing.  The weight of the evidence presented

23   at trial suggests otherwise.  Whether or not Gilbert acted on that particular occasion for

24   Keystone, it is clear that he acted on Sterling's behalf on many other occasions.

25   ///

26   ///

27   ///

28   ///

1    Quivik, Trial Tr. 185:17-189-8; Ex. 85 (Letter from Leonard Carey to Jack Gilbert,

2    6/30/1982 (RRFP006513-006514)); Ex. 86 (Letter from Jack Gilbert to Leonard Carey,

3    7/7/1982 (STCR012031)); Ex. 88 (Letter from Leonard Carey to Jack Gilbert, 7/13/82

4    (STCR012032)).  Ex. 92 (Letter from Jack Gilbert to Leonard Carey, 9/1/1982

5    (STCR012035)); Ex. 93 (Letter from Carey to Gilbert, 9/8/1982 (RRFP000041)).

6         170.    Although Sterling asserts that Carey, Cranmer and the Regional Water

7    Board all understood that Keystone was responding to the Regional Water Board's

8    compliance order,  the evidence suggests otherwise.  All of these parties addressed

9    Gilbert as a Sterling official regarding the implementation of the environmental response,

10   despite the fact that the Regional Water Board's compliance orders had been issued to

11   Keystone.  For example, in 1982, when the Regional Water Board did not receive a

12   response to its water monitoring order, it sought a response from Gilbert as a Sterling

13   official.  Ex. 89 (Letter from Regional Water Board to Jack Gilbert, 8/26/1982

14   (RRFP004151)); Ex. 90 (Unsigned Letter from Regional Water Board to Jack Gilbert,

15   with attachments, 8/27/1982 (EPA005866-005870)).  Gilbert contacted Carey about the

16   correspondence he had received from the Regional Water Board, on Sterling letterhead,

17   as a Sterling official.  Ex. 92 (Letter from Jack Gilbert to Leonard Carey, 9/1/82

18   (STCR012035)).  When Carey replied to Gilbert, he addressed him as a Sterling official.

19   Ex. 93 (Letter from Leonard Carey to Jack Gilbert, 9/8/92 (RRFP000041)).

20        171.    And, in 1987, Cranmer clearly believed that Gilbert, as a Sterling official,

21   was responsible for the arsenic monitoring program at the Lava Cap Mine.  Addressing

22   Gilbert in his Sterling capacity, Cranmer notified Gilbert that the monitoring program

23   could be discontinued.  Cranmer also clearly believed that Sterling, not Keystone, was

24   the appropriate recipient of its records pertaining to "the arsenic monitoring program at

25   the Lava Cap Mine," as it sent a copy of its files to Gilbert, as a Sterling official.   Ex. 155

26   (Letter from Nick Wilcox to Jack Gilbert, 3/13/1987 (RRFP004318); Gilbert Deposition at

27   251:8-252:19.

28   ///

1   The Court does not find it surprising that the Regional Water Board issued its orders to

2   Keystone, as the record holder of the Mine property, or that Carey and Cranmer referred

3   to Keystone when corresponding with the Regional Water Board about its orders.

4   However, the evidence demonstrates that these parties regarded Sterling as the entity

5   making the decisions about compliance.  See Quivik, Trial Tr. at 170:20-171:15;

6   190:19-191:14.

7        172.   Dr. Quivik relied on Gilbert's testimony and his accompanying statements,

8   discussed infra in Section V(E)(2), that he did not find it important to observe the rituals

9   of holding separate meetings or conducting the affairs of Keystone separate from the

10   affairs of Sterling to arrive at his opinion that Gilbert was acting for Sterling.  Gilbert

11   Deposition at 206:5-14, 207:7-17; Quivik, Trial Tr. 151:25-152:10,183:25-184:11.  The

12   Court also finds this testimony supports a finding that Gilbert acted on Sterling's behalf in

13   responding to the partial collapse of the timber dam, and the compliance orders that

14   ensued.

**2.   The Steel Management Agreement: Gilbert under Contract with
Sterling to Manage the Affairs of Keystone**

18        173.   Despite the evidence of Gilbert's direction of the response as a Sterling

19   official, Sterling contends that Gilbert acted on Keystone's behalf alone and asks this

20   Court to infer that, because Gilbert was an officer and director of Keystone when he

21   directed the response,  he must have done so on Keystone's behalf.  The Court finds

22   that when Gilbert responded to the partial collapse of the timber dam, he did so under a

23   contractual obligation to Sterling.  Steel Investments Ltd. ("Steel") was a company owned

24   by Gilbert's family, and Steel Investments entered into an agreement with Sterling on

25   January 15, 1980 ("the Steel Management Agreement").  Under this agreement, Gilbert

26   was to perform management and administrative services under the auspices of Steel for

27   Sterling and its subsidiaries, including Keystone.

28   ///

1    Steel also agreed to make Gilbert available to serve as director and president of

2    Keystone during the six-year term of the agreement.  In turn, Sterling agreed to pay

3    Steel Investments $45,000 in the first year, with annual increases in that fee over the

4    next five years of the agreement.  Sterling also agreed to make Sterling stock options

5    available to Steel.  The Steel Management Agreement began in January 1980 and

6    ended in 1985.  Quivik, Trial Tr. at 171:16-172:19; Ex. 69 (Sterling Shareholders'

7    Meeting Minutes, 6/16/1980 (RRFP001905-001953 at 1924-1926)); Ex. 67 (Schedule B

8    to Sterling Board of Directors' Meeting Minutes, Toronto Stock Exchange Filing, 1/3/1980

9    (RRFP001644-001657 at 1656-57)).

10          174.    Although the Steel Management Agreement itself is not in evidence, its

11   terms are reiterated in an information circular that Sterling distributed to its shareholders

12   in January 1980 as well as in a January 3, 1980 Sterling Toronto Stock Exchange filing,

13   both of which are before the Court.  Quivik, Trial Tr. at 177:11-180:2.  Ex. 69 (Sterling

14   Shareholders' Meeting Minutes, 6/16/1980 (RRFP001905-001953 at 1925) ("Under the

15   terms of the Management Agreement, Mr. J.A. Gilbert, will, on behalf of Steel, continue

16   to serve as an executive officer of the Corporation and as the President and a director of

17   each of Lava Cap (Oklahoma) Inc. and Keystone Copper Corporation, wholly-owned

18   subsidiaries of the Corporation, until December 31, 1985, and will carry on such

19   management and administrative responsibilities necessary for the proper operation of

20   the Corporation.  In addition, Mr. Gilbert will continue to act as general legal counsel to

21   the Corporation."); Ex. 67 (Schedule B to Sterling Board of Directors' Meeting Minutes,

22   Toronto Stock Exchange Filing, 1/3/1980 (RRFP001644-001657 at 1656-57)).

23   Dr. Quivik testified that he had reviewed the letter agreement itself, and that these

24   documents accurately described its terms.  Quivik, Trial Tr. at 180:10-16.

25          175.    Sterling made payments to Steel for Gilbert's management services under

26   the Steel Management Agreement, as documented in the related party transaction

27   footnotes to Sterling's financial statements.  Wright, Trial Tr. at 351:7-25.

28   ///

176.    Keystone was not a party to the Steel Management Agreement.  Quivik, Trial Tr. at 172:14-16.

177.    There is no evidence that Keystone participated in any way in the negotiation of the Steel Management Agreement.  Quivik, Trial Tr. 182:4:-8.

178.    There is no evidence that Sterling consulted Keystone about the decision whether to enter into the Steel Management Agreement.  Quivik, Trial Tr. 182:9:12.

179.    There is no evidence that Keystone accepted the management and other services that Sterling contracted with Steel Investments to provide.  Quivik, Trial Tr. 183:8-11.

180.    From 1980 to the end of 1985, during the period when the Regional Water Board required environmental response at the Mine, Gilbert was under contract to Sterling to serve as Keystone's director and President, and to manage Keystone, pursuant to the Steel Management Agreement.  This Court finds that any action taken by Gilbert during this period of time on Keystone's behalf arose out of Gilbert's obligation to Sterling under the Steel Management Agreement.  Even assuming that Gilbert acted on Keystone's behalf to respond to the partial collapse of the timber dam, this Court concludes that Gilbert's actions were controlled by Sterling under the Steel Management Agreement, which Keystone had no role in negotiating and no opportunity to review, consider or approve.  Quivik, Trial Tr. 175:14-176:16, 180:3-9, 182:4-183:11.

181.    Dr. Quivik testified that he was not surprised to see a parent corporation, Sterling, designate someone to manage and administer its affairs and the affairs of its subsidiaries.  However, he would have expected Keystone, as a separate corporation, to appoint or authorize Gilbert to serve in the capacity of president and director of Keystone.  Quivik, Trial Tr. 182:13-183:11.  The Court agrees, and concludes that Sterling's entry into the Steel Management Agreement without Keystone's input is not the conduct typically expected of a parent who respects the corporate separateness of its subsidiary.

///

1        182.   Sterling attempts to diminish the significance of the Steel Management

2   Agreement by arguing that Gilbert was a Keystone officer and director long before the

3   Steel Management Agreement was signed.  It asks this Court to find that the Agreement

4   was not the basis for Gilbert's actions during the response in light of Gilbert's pre-

5   existing role at Keystone.  As an initial matter, the evidence of Gilbert's service as a

6   Keystone officer and director is insufficient to determine his role prior to 1980.  Keystone

7   created no records of its election or appointment of directors and officers for that period.

8   Hendry Deposition at 71:19-72:24; 95:6-9.  Although Gilbert signed an addendum to a

9   lease of Mine property as Keystone's President in 1978, the Court cannot determine

10  from that document alone whether he continued to serve as President throughout 1978

11  and 1979.  Ex. LLL, (Addendum to Lease, 10/5/1978 (RRFP000183-187).

12       183.   The Court further concludes that, although the Steel Management

13  Agreement was not signed until January of 1980, the evidence suggests that the

14  Agreement merely formalized the duties Gilbert had been performing for Sterling for a

15  long time.  Prior to implementation of the Steel Management Agreement, Andrews, who

16  was president of Sterling, was unavailable to manage the affairs of Sterling and its

17  subsidiaries due to his wife's ill health.  Gilbert acted on Andrew's behalf while Andrews

18  was unavailable.  By the time the Steel Management Agreement went into effect, Gilbert

19  was already spending most of his time managing and administering the affairs of Sterling

20  and its subsidiaries.  Quivik, Trial Tr. at 172:20-173:15.

21       184.   Gilbert wanted to enter into a formal agreement with Sterling that

22  authorized him to do this work, so he suggested a management agreement to the

23  Sterling board at its December 1979 meeting.  In January 1980, Gilbert drafted a letter to

24  Sterling's board setting forth the proposed terms of the agreement.  At its January 1980

25  meeting, the Sterling Board authorized Murphy, Sterling's secretary, to sign the Steel

26  Management Agreement on Sterling's behalf.

27  ///

28  ///

1    Murphy signed Gilbert's January 1980 letter to the Sterling board, which contained the

2    terms of the Steel Management Agreement. Quivik, Trial Tr. 173:4-175:16; Ex. XXX

3    (Sterling Board of Director Meeting Minutes, 1/3/1980 RRFP001640-001642 at 1642).

4    The Court concludes that, although Gilbert's direction of the response to the partial

5    collapse of the timber dam began just prior to Sterling's entry into the Steel Management

6    Agreement, the Agreement merely formalized the role Gilbert already played for Sterling.

7    Quivik, Trial Tr. at 172:20-173:15, 180:3-9,182:15-23.

8

9                    **3.     Gilbert, as a Sterling Official, Controlled the Financial
                         Resources   Available to Address Environmental Matters and
10                       Keystone was Financially Dependent on Sterling for Its
                         Continued Existence from at Least 1980**

11

12           185.   The Plaintiffs and Defendant each presented expert accountants who

13   opined about the financial relationship between Keystone and Sterling.

14           186.   Plaintiffs' expert accountant, Wiley Wright, testified that his analysis shows

15   that Keystone was economically dependent upon Sterling and Sterling's wholly owned

16   subsidiaries from at least 1980 onward.  Wright, Trial Tr. at 336:2-4.

17           187.   Wright has been a certified public accountant for more than twenty-six

18   years, has more than ten years of experience preparing and auditing financial

19   statements (the very type of documents he analyzed in this case), and has testified in

20   federal court more than twenty times.  He has worked on more than 150 CERCLA cases,

21   performing cost recovery analyses or forensic investigations.  He evaluated all of the

22   available financial statements and documents underlying particular financial

23   transactions.  Wright, Trial Tr. at 332:17-334:17; 336:2-4; 336:14-337:2.  In addition, he

24   reviewed the depositions of Gilbert, Hendry and Green (Sterling's Rule 30(b)(6)

25   deponent).  Id. At 334:18-21.  Janet Hendry, like Jack Gilbert, is a significant figure in

26   this case and an unavailable witness whose video deposition testimony was admitted at

27   trial.

28   ///

1   Her testimony, as well as Gilbert's, was of particular relevance to Mr. Wright's analysis,

2   as she was CFO of Keystone for certain years and also held positions at Sterling.

3   Ex. 195 (Fed. R. Evid. 1006 Chart).  She has a close association with Gilbert and has

4   worked for him for more than forty years. Hendry Deposition at 8:3-9:4; Gilbert

5   Deposition at 35:7-36:3, 57:24-58:14.

6        188.   For all of these reasons, this Court credits Wright's opinion that Keystone

7   was economically dependent on Sterling from 1980 onward, which are the years during

8   which compliance with the Regional Water Board orders was necessary.

9        189.   Specifically, this Court credits Wright's testimony regarding financial trends

10   related to Keystone: as Keystone's assets declined, the amount it owed to Sterling

11   increased, indicating "that there [were] insufficient assets to meet the obligations of the

12   corporation. And in order to meet those obligations, Keystone Copper [was] having to

13   borrow or receive monies from the parent corporation [Sterling] and the parent

14   subsidiaries."  Wright, Trial Tr. at 337:3-342:12.  Also, for all of the years for which

15   Keystone financial statements exist, they show that for any given year, Keystone's

16   expenses exceed its income.  Wright, Trial Tr. at 334:6-9, 338:11-339:10.

17       190.   Indeed, examination of Keystone's financial statements shows Wright's

18   testimony to be true.  From 1980 through the end of 1986, Keystone's expenses

19   exceeded its income, and Keystone's assets were declining while the amount it owed to

20   Sterling and Sterling's other wholly-owned subsidiaries were increasing.  Wright, Trial Tr.

21   at 338:11-15, 339:14-340:13; see generally, Ex. 192 (Financial Statements for Keystone,

22   1980-1986, (EPA003307-003365)). For instance, in 1982, the year Gilbert approved the

23   water monitoring work by Cranmer at a cost of $80 per month, Keystone generated only

24   $25 in income and had expenses of $45,334, and had total assets of $114,454, but it

25   owed $117,905 to Sterling and Sterling's other wholly owned subsidiaries.  Wright, Trial

26   Tr. at 339:6-10; Ex. 192 (Financial Statements for Keystone, 1980-1986, (EPA003307-

27   003365 at 003329-003330)); Ex. 88 (Letter from Len Carey to Jack Gilbert, 7/13/82

28   (STCR012032)) (showing the water monitoring to cost $80 per month).

191.   By 1986, Keystone owed $199,264 to Sterling and Sterling's wholly-owned subsidiaries.  In contrast, Keystone had only $15,469 in assets, and Keystone's expenses of $32,308 greatly exceeded its income of $1,295.  Wright, Trial Tr. at 353:23-354:7; Ex. 192 (Financial Statements for Keystone, 1980-1986, (EPA003307-003365 at 003361-003362)).

192.   In addition, specific underlying financial transaction documents are consistent with Wright's analysis of Keystone's financial statements.  For instance, multiple exhibits and other documents Wright reviewed confirm that as "Keystone Copper needed monies, it would report them to the parent, and the parent would supply [Keystone] monies."  Trial Tr. at 343:13-350:1.  Sterling admits the same.  Sterling Rule 30(b)(6) Deposition at 235:1-236:3.

193.   Sterling admits that Keystone "was economically dependent upon its parent company for its continued existence" and owed Sterling almost $200,000 by 1987. DE 119-2 at 11:2-5 (Sterling's Statement of Undisputed Facts, Motion for Summary Judgment, 4/29/2011). Wright testified that this type of disclosure of economic dependence "relies on patterns.  In other words, trends – negative trends in this case – ongoing expenses exceeding revenue, declining assets, and borrowings from the parent and the parent subsidiaries.  So it's a consideration of trends.  Not just events in a single year."  Trial Tr. at 340:16-342:12.  This Court believes it is appropriate to infer that Keystone was similarly dependent on Sterling for its continued existence in the years leading up to its 1987 disclosure.

194.   To the degree that Keystone received funds from Sterling's wholly-owned subsidiaries (Lava Cap Oklahoma and Yelco Resources, Inc.), Gilbert controlled those funds as well.  Wright, Trial Tr. at 336:5-7; 350:2-351:25 (testifying that progress reports requesting funds from Keystone were addressed to Sterling; Gilbert signed multiple checks to Keystone from Yelco Resources; and noting Hendry and Gilbert's deposition testimony that as Keystone requested money, those requested would be forwarded to Gilbert, who would forward money taken from "any available source" to Keystone.

1    See Ex. 80 (Keystone Weekly Financial Report, 4/22/1982 (EPA004295)); Ex. 82 (Letter

2    from Gilbert to Anne Hall, 4/30/1982 (EPA004327)); Ex. 141 (Keystone Weekly Financial

3    Report, 4/30/1985 (EPA004319)); Hendry Deposition at 76:13-77:4 ("If we got

4    information from Anne Hall, who needed money, I would . . . through Jack [Gilbert],

5    would arrange to send her a cheque to cover expenses that were incurred on behalf of

6    Keystone Copper, in California."  Hendry would obtain funds for the cheque to Ms. Hall

7    from "[w]herever there was money.  Wherever Jack [Gilbert] had some money, because

8    Keystone Copper didn't have a bank account in Canada.").

9         195.   While Gilbert could access the funds of Sterling's other subsidiaries as the

10   President of Sterling, he had no authority to access them in his capacity as a director or

11   officer of Keystone.  Wright, Trial Tr. at 336:5-7; 350:2-351:25.

12        196.   Accordingly, the Court also credits Wright's opinion that the financial

13   resources used for Keystone were controlled by Gilbert on Sterling's behalf.  Wright,

14   Trial Tr. at 336:5-7.

15        197.   Ms. Hill, the Defendant's expert, offered an opinion that at some point prior

16   to 1980, Keystone had contributed to the surplus of Sterling.  As noted above in Findings

17   125-127, Ms. Hill's opinions were formulated in a very truncated period of time and her

18   analysis was riddled with errors.   During cross-examination, Ms. Hill acknowledged that

19   her analysis of Keystone's contribution to Sterling's surplus contained at least eighteen

20   numerical errors, stemming from her incorrect addition and subtraction of certain figures

21   or her failure to correctly transcribe information from the financial statements she

22   purportedly relied on.  Trial Tr. at 399:13-400:1; 410:6-8; see generally Trial Tr. at

23   401:3-410:8.

24        198.   Because of the numerous errors Ms. Hill made in her analysis, this Court

25   finds her credibility as an accountant too diminished to credit her testimony.

26   ///

27   ///

28   ///

1    199.   Moreover, Ms. Hill's analysis does not contradict or refute the Plaintiffs'

2  expert's opinion that Keystone was financially dependent on Sterling since at least 1980,

3  the time period during which the Defendant claims Keystone, and not Sterling,

4  responded to the Regional Water Board's orders.  Ms. Hill's analysis does nothing to

5  further Sterling's argument that *Keystone* conducted, directed, performed, and – as a

6  necessary corollary – <u>paid for</u> the work performed by Cranmer in response to the

7  Regional Water Board's orders.  Thus, even if this Court were to credit Ms. Hill's

8  testimony, which it does not, the overwhelming evidence compels a finding that

9  Keystone was financially dependent on Sterling during this critical time period.

10    200.   This Court concludes that Keystone was drastically underfunded and

11  financially dependent on Sterling and its other subsidiaries for its continued existence,

12  and therefore was financially incapable of responding to the partial collapse of the timber

13  dam.

14    201.   Considering these facts, all of the evidence concerning the finances of

15  Keystone during the critical time period after the partial timber collapse at the end of

16  1979, and the actions of Gilbert, the Court finds that Gilbert acted solely in his capacity

17  as a Sterling official when he made his decisions about which funds he would use to

18  cover the Mine's operating expenses, including the funds for the response to the partial

19  collapse of the timber dam.  This fortifies this Court's belief that Sterling directed the

20  environmental response to the partial collapse of the timber dam, including the decision

21  not to fund a study of repairs to the dam and a schedule for their completion, as the CAO

22  required.

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

1

2

**4.     Sterling's Decision Not to Repair the Dam, or to Rebuild the Settling Basins, Benefitted Sterling and Exposed Keystone to Potential Enforcement Action**

3

4     202.   While Sterling claims it is entitled to a presumption that Gilbert responded

5   to the partial collapse of the timber dam on Keystone's behalf because Gilbert was an

6   officer and director of Keystone at the time, already noted this Court concludes that the

7   evidence is insufficient to determine Gilbert's role at Keystone during the early portion of

8   the response.  Even assuming that Gilbert was a Keystone officer and director

9   throughout the response, the Court finds that Sterling is not entitled to the presumption it

10   seeks because Gilbert's actions benefitted Sterling, to Keystone's detriment, and

11   therefore suggest that Gilbert acted on Sterling's behalf alone.

12     203.   Because Keystone was financially dependent on Sterling, particularly

13   during the period it was faced with decisions about how to respond to the partial collapse

14   of the timber dam, this Court concludes that the cost of repairing the dam would have

15   been borne by Sterling, not Keystone.  Gilbert Deposition at 209:17-25 (stating that if

16   Anne Hall had insufficient funds, she would have had to seek money from Sterling to pay

17   for Cranmer Engineering's work); Ex. 80 (Keystone Weekly Financial Report, 4/22/1982

18   (EPA004295)); Ex. 81 (Letter from Anne Hall to Gilbert, 4/22/1982 (EPA004303))

19   (demonstrating Keystone's dependence on Sterling to pay taxes, and interest and

20   penalties on those taxes, in 1982); Ex. 82 (Letter from Gilbert to Anne Hall, 4/30/1982

21   (EPA004327)) (demonstrating Keystone's inability to pay taxes, interest, and penalties in

22   1982); Ex. 137 (Check from Hendry to Anne Hall for $1750, 10/15/1984 (EPA004315))

23   (demonstrating Sterling's payment of Keystone expenses in 1984); Ex. 141 (Keystone

24   Weekly Financial Report, 4/30/1985 (EPA004319)); Ex. 161 (Letter from Hendry to

25   Pfanner & Tate, 12/14/1987 (EPA004340)) (demonstrating Sterling paid for Keystone's

26   auditors).

27     204.   In 1979, Sterling had its eye on the lucrative oil and gas market and

28   embarked on an aggressive program of acquisition of oil and gas interests.

1   By May of 1980, Sterling had spent over $4.2 million to acquire interests in 105 wells in

2   the US and Canada.  By April 1981, Sterling had raised over $7 million through equity

3   financing and planned to raise an additional $10 million in capital expenditures over the

4   next year to invest in the oil and gas industry.  Ex. 69 (Sterling's Shareholders Meeting

5   Minutes, Exhibit A includes Sterling's 1979 Annual Report, 6/16/1980 (RRFP001905-

6   001953 at 1942); Ex. 75 (Sterling's 1980 Annual Report, 5/12/1981, EPA003567-003590

7   at 3570).

8           205.   As discussed above at Findings 119-124, in 1983, Sterling received

9   $200,000 from Franco Nevada for 50,000 Sterling shares.  Gilbert testified that Sterling

10  used that money for its oil and gas exploration programs.  Gilbert Deposition at

11  159:22-160:6.

12          206.   This Court finds that Sterling's investment priority during this period of time

13  was the oil and gas market.  The integrity of the timber dam holding back the mine waste

14  was not an investment priority, despite the Regional Water Board's compliance orders in

15  1979 and 1982.

16          207.   The Court finds that Gilbert's decision not to submit a technical report

17  evaluating the structural integrity of the dam, including its ability to withstand storms, and

18  proposing improvements to the dam's structural integrity inured to Sterling's financial

19  benefit.  Gilbert Deposition at 209:17-25 (stating that if Anne Hall had insufficient funds,

20  she would have had to seek money from Sterling to pay for Cranmer Engineering's

21  work); Wright, Trial Tr. at 336:2-4 (explaining that Keystone was economically dependent

22  upon Sterling from at least 1980 onward) and 336:5-7, 350:2-351:25 (explaining that

23  Jack Gilbert controlled the money used for Keystone expenses and obligations); Ex. 80

24  (Keystone Weekly Financial Report, 4/22/1982 (EPA004295)); Ex. 81 (Letter from Anne

25  Hall to Gilbert, 4/22/1982 (EPA004303)) (demonstrating Keystone's dependence on

26  Sterling to pay taxes, and interest and penalties on those taxes, in 1982); Ex. 82 (Letter

27  from Gilbert to Anne Hall, 4/30/1982 (EPA004327)) (demonstrating Keystone's inability

28  to pay taxes, interest and penalties in 1982);

Ex. 137 (Check from Hendry to Anne Hall for $1,750, 10/15/1984 (EPA004315))
(demonstrating Sterling's payment of Keystone expenses in 1984); Ex. 141 (Keystone
Weekly Financial Report, 4/30/1985 (EPA004319)); Ex. 161 (Letter from Hendry to
Pfanner & Tate, 12/14/1987 (EPA004340)) (demonstrating Sterling paid for Keystone's
auditors).

208.   The Court finds that Gilbert's decision not to reconstruct the settling basins
that had washed away by 1982 also inured to Sterling's financial benefit. Gilbert
Deposition at 209:17-25 (stating that if Anne Hall had insufficient funds, she would have
had to seek money from Sterling to pay for Cranmer Engineering's work); Ex. 80
(Keystone Weekly Financial Report, 4/22/1982 (EPA004295)); Ex. 81 (Letter from Anne
Hall to Gilbert, 4/22/1982 (EPA004303)) (demonstrating Keystone's dependence on
Sterling to pay taxes, and interest and penalties on those taxes, in 1982; Ex. 82 (Letter
from Gilbert to Anne Hall, 4/30/1982 (EPA004327)) (demonstrating Keystone's inability
to pay taxes, interest and penalties in 1982); Ex. 137 (Check from Hendry to Anne Hall
for $1750, 10/15/1984) (EPA004315)) (demonstrating Sterling's payment of Keystone
expenses in 1984); Ex. 141 (Keystone Weekly Financial Report, 4/30/1985
(EPA004319)); Ex. 161 (Letter from Hendry to Pfanner & Tate, 12/14/1987
(EPA004340))(demonstrating Sterling paid for Keystone's auditors).

209.   This Court likewise finds that Gilbert's failure to perform these
requirements of the CAO put Keystone at risk of an enforcement action by the Regional
Water Board.  Gilbert's actions therefore harmed Keystone's interests.  The Court
therefore declines to presume, as Sterling urges, that Gilbert was acting on behalf of
Keystone when he directed the response to the partial collapse of the timber dam.

///

///

///

///

///

66

1

2

**5.    Given Sterling's Direction of the Response, Keystone's Role in the Response Is Irrelevant to the Court's Determination of Sterling's CERCLA Liability**

3

4    210.    Although Sterling claims that Keystone directed "all activities" giving rise to

5    operator liability and that Gilbert's response to the Regional Water Board's orders was

6    "entirely in his capacity as an officer of Keystone without departing from the norms of

7    parental influence" (DE 176 at 23:20-21, 25:26-27:1 (Defendant's Trial Brief,

8    8/23/2012)),  the facts of the case do not align with that characterization.  The evidence

9    of Keystone's involvement is inconclusive as to whether Keystone, as a separate

10    corporate entity, was involved in managing and directing any aspect of the

11    environmental response to the dam failure.  This Court finds that whether Keystone had

12    an independent role is irrelevant, however, because the focus of a <u>Bestfoods</u> analysis is

13    whether Sterling itself directed environmental compliance.  It is possible both parent and

14    subsidiary played a role, but <u>Bestfoods'</u> direct liability is not limited to an either/or

15    analysis.  This Court finds that Sterling did direct, manage and control operations having

16    to do with the leakage or disposal of hazardous waste or decisions about compliance

17    with environmental regulations; thus, it need not determine whether Keystone also

18    played a role, or whether Gilbert sometimes wore his Keystone hat when directing

19    environmental matters.

20    211.    Alternatively, the Court finds that the evidence is insufficient to support

21    Sterling's claim that Gilbert directed the response to the partial dam collapse on

22    Keystone's behalf alone.  Sterling was an active natural resources company with

23    investments in mining and oil and gas production.  On the other hand, Sterling's

24    subsidiary, Keystone, was an inactive corporation whose principal purpose was to

25    dispose of its surface rights.

26    ///

27    ///

28    ///

1   DE 152 at 4:3-6 (Memorandum and Order, 12/8/2011); SUF ¶ 4;  Ex. 46 (Sterling Notes

2   to Consolidated Financial Statements, 12/31/1973 (RRFP003937-003968 at

3   003967))("Keystone Copper Corporation's principal activity is the disposition of its

4   properties . . . ."); Ex. 50 (Sterling Notes to Consolidated Financial Statements,

5   12/31/1974 (RRFP002446-002463 at 002460) ("Keystone Copper Corporation's

6   principal activity is the disposition of its properties . . . ."); Ex. 55 (Sterling Notes to

7   Consolidated Financial Statements, 12/31/1977 (RRFP002534-002555 at

8   002551))("Keystone Copper Corporation's principal activity is the disposition of its

9   properties . . . ."); Ex. 57 (Sterling Notes to Consolidated Financial Statements,

10   12/31/1978 (RRFP001515-001542 at 001534))("Keystone Copper Corporation's

11   principal activity is the disposition of its properties."); Gilbert Deposition at 60:11-15.

12       212.   Sterling points to evidence suggesting that people understood that

13   Keystone was responding to the partial dam collapse, such as letters that Cranmer and

14   Carey sent to the Regional Water Board and a memorandum prepared by the Regional

15   Water Board.  However, as discussed above in Findings 170-171, Cranmer, Carey and

16   the Regional Water Board itself all turned to Gilbert, as Sterling's president, when

17   questions arose about implementation of the response.

18       213.   Notably, Gilbert did not testify that he directed the environmental response

19   exclusively as an official of Keystone.  Dr. Quivik testified that, if Keystone was directing

20   the response, one would expect to see documents showing that Keystone had

21   authorized a management official to respond on its behalf.  Quivik, Trial Tr. at 171:9-15.

22   This Court credits Dr. Quivik's expectation as reasonable. Yet, there is no evidence that

23   Keystone authorized anyone to direct the environmental response, or that Gilbert

24   reported at any time to Keystone to recommend a response.  Id. at 171:13-15,

25   193:17-24, 276:5-9.  Nor is there any evidence that Keystone's board of directors took

26   any action to respond to the partial collapse of the timber dam at any time.  Id. at

27   193:17-20.

28   ///

214.   In fact, according to Dr. Quivik, who has reviewed the extensive historical record, there is no evidence that Keystone ever made a management decision about the Mine independent of Sterling, or contrary to Sterling's wishes.  Quivik, Trial Tr. at 193:25-194:5.

215.   This Court finds Sterling's evidence of Keystone's exclusive control of the response to the partial dam collapse unpersuasive.  To the extent that Gilbert acted to fulfill Keystone's responsibilities, this Court has already found that he did so pursuant to the Steel Management Agreement, under a contractual obligation to Sterling. This Court has also found that Keystone lacked the funds to act on its own.  Therefore, this Court concludes that Gilbert did not act solely on Keystone's behalf to respond to the partial collapse of the timber dam.

### D.   Sterling's Managed and Controlled Activities at the Lava Cap Mine

216.   Although a Bestfoods parent operator liability analysis focuses on control of decisions about pollution control and environmental compliance, courts have also examined the totality of a parent's control of a facility's operations to assess liability.  The Court finds based on the evidence summarized below that, consistent with Sterling's control of the response to the partial collapse of the timber dam, Sterling controlled virtually all other aspects of the Mine's operations.

### 1.   Sterling and Not Keystone Commissioned the Profitability Studies for the Mine

217.   The Court finds that Sterling (and not Keystone) set the direction and purpose for the Lava Cap facility by repeatedly commissioning profitability studies for the Mine.

///

///

218.   As discussed above in Findings 103-104, Sterling (and not Keystone) abandoned its initial plan of dismantling and transporting the plant and equipment to Canada, and immediately began to explore the economic viability of resuming production.

219.   As discussed above in Finding 96, Sterling (and not Keystone) retained LCGMC's chief geologist, J.F. Siegfried, to assess the Lava Cap Mine's potential. Ex. 17 (Letter, S. Ciglan to Sterling's Shareholders, 12/8/1953 (EPA000556-557)); Ex. 13 (Siegfried Report, 12/1/1952 (RRFP003373-003404 at 3373-376, 383, 385-392, 398-404)).

220.   When the gold market improved, Sterling (and not Keystone) hired other consultants to reassess the profitability of reopening the Lava Cap Mine.  As discussed above in Finding 97, in 1971 the Sterling Board (not the Keystone Board) authorized Jack Gilbert, then a director of Sterling, to retain a consultant to provide a report on the feasibility of reopening the Lava Cap Mine.  There is no evidence that Gilbert was a director or officer of Keystone at the time.  Ex. 39 (Sterling Board of Directors Meeting Minutes, 6/15/1971 (RRFP002966-002973 at 2968-2969); Ex. 195 (Fed. R. Evid. 1006 Chart); Quivik, Trial Tr. at 91:13-92:3.

221.   As discussed above in Finding 99, in 1973, Sterling (and not Keystone) hired W.P. McGill to assess the Lava Cap Mine and make recommendations about its future operation.  Ex. 47 (Letter, W.P. McGill to A.G. Andrews, 8/13/1973, enclosing Report entitled "Central and Banner Mines, Grass Valley, Nevada City Mining District, California, "8/14/1973 (RRFP006504-6512 at 6504, 6510-6512)); Quivik, Trial Tr. at 97:8-98:13.

222.   In contrast, there is no indication that Keystone assessed the Mine's profitability at any time.

///

///

///

1

2

### 2. Sterling and Not Keystone Decided to Reserve Sufficient Surface and Mineral Rights and Equipment to Resume Mining

3    223.    The Court finds that Sterling (and not Keystone) made the decisions about

4    what personal and real property to preserve to enable it to resume mining.  As discussed

5    above in Finding 102, Siegfried made certain recommendations to Sterling about

6    preservation of equipment and the acquisition of property.  Sterling made the decision

7    whether and to what extent to adopt these recommendations.   Quivik, Trial Tr. at

8    94:12-95:25; Ex. 13 (Siegfried Rpt., 12/1/1952 (RRFP003373-003404 at 3403-04)).

9    224.    Sterling (and not Keystone) decided to hold on to sufficient existing

10   infrastructure and equipment until "such time as conditions became more favourable for

11   the gold mining industry in the area."  Ex. 17 (Letter, S. Ciglan to Sterling's

12   Shareholders, 12/8/1953 (EPA000556-557)).

13   225.    Sterling (and not Keystone) decided to retain the real property needed to

14   resume mining at the Lava Cap Mine.  For example, as discussed above in Finding 108,

15   in 1971, the Sterling Board authorized Gilbert to seek sales of surface rights, but <u>not</u>

16   surface or mineral rights necessary for re-opening the Mine. Ex. 39 (Sterling Board of

17   Directors Meeting Minutes, 6/15/1971 (RRFP002966-002973 at 2968-2969)); Ex. 54

18   (Letter to Shareholders, 8/3/1978 (RRFP000605-000608, at 000605); Quivik Trial Tr.

19   91:13-92:3.  There is no evidence that Keystone had any input in this decision at all.

20   226.    As discussed above in Finding 111, Sterling's president Andrews reported

21   to Sterling shareholders in 1974 that he had travelled to California several times "to

22   determine the policy to be followed for the Lava Cap Mine property.. . . The Corporation

23   believes that this property continues to represent a prospect of merit and hopefully that

24   efforts will be successful resulting in further assessment and examination of the

25   property."  Ex. 49 (Letter, A.G. Andrews to Sterling Shareholders, 7/5/1974)

26   (RRFP002417-002431 at 2419-2420)).  There is no evidence that Andrews held a

27   Keystone officer or director position at any time.

28   ///

### 3.  Sterling Held Itself Out as Manager of the Mine

227.    The Court also finds that Sterling represented itself to others as manager of the Mine.  According to Dr. Quivik, who has examined the extensive collection of historical records in this case, there are two main types of documents in the record showing that Sterling represented itself as a manager of the Mine.  One class consists of the letters written by Jack Gilbert as president of Sterling, on Sterling letterhead, to prospective participants in agreements to reopen the Mine.  Another is the correspondence discussed above in Findings 169-170, between Jack Gilbert, as a Sterling official, and Leonard Carey, the real estate agent who represented Sterling's interests in California.   Quivik, at Trial Tr. 142:21-144-2.

228.    The Court has already summarized the second class of correspondence above in Findings 169-170.  Examples of the first class of correspondence also indicate that Sterling (and not Keystone) sought prospective developers for the Mine.  For example, in 1981, a Sterling director wrote to Newmont Mining Corporation noting that "[Sterling] does own a very promising gold mine near your Murchie property," and exploring Newmont's interest in "exploring the Lava Cap property on some kind of a joint venture basis and if this is of interest to you, I would very much like to bring Jack Gilbert, President of [Sterling] to New York for us to discuss this subject further."   Quivik, Trial Tr. 309:14-311:21; Ex. 78 (Letter from Bachenheimer to Malozemoff, 10/27/1981 (EPA004589)).

229.    In 1982 alone, Jack Gilbert sent at least seven letters signed by him as president of Sterling on Sterling letterhead.

///

///

///

///

///

1   Gilbert enclosed "material and reports" on the Mine's potential for profitability and stated

2   that Sterling had reasserted title to the Mine.  Ex. 98 (Letter from Jack Gilbert to Paul

3   Penna, 11/29/1982 (RRFP006612)); Ex. 100 (Letter from Jack Gilbert to Brian

4   Wadsworth, 12/3/1982 (RRFP000145)); Ex. 101 (Letter from Jack Gilbert to Paul

5   Mattinen, 12/7/1982 (RRFP000144)); Ex. 103 (Letter from Jack Gilbert to Donald

6   McLeod, 12/14/1982 (RRFP000125)); Ex. 105 (Letter from Jack Gilbert to Gordon

7   Stollery, 12/16/1982 (RRFP000135)); Ex. 106 (Letter from Jack Gilbert to Stanley

8   Holmes, 12/16/1982 (RRFP000136)); Ex. 107 (Letter from Jack Gilbert to John Kearney,

9   12/16/1982 (RRFP000166)).

10          230.    In correspondence to another potential business partner, Tim Callaway of

11  Sierra Engineering, Gilbert referenced his "board" or "directors" four times.  It is clear he

12  is referring to Sterling's board and Sterling's directors; there is no reference to Keystone,

13  and Gilbert signed the letter as Sterling's President and composed it on Sterling

14  letterhead.  Gilbert reported to Callaway that he had been "canvassing the directors"

15  about Callaway's proposed deal and noted that:

16          [m]y board's instructions are to go no further in these negotiations unless
        and until you can satisfy a committee of the board set up for that purpose
17      on your ability to meet the above [requirements].  In the meantime, my
        instructions are to aggressively follow up negotiations with several other
18      groups interested in the property.

19  Ex. 116 (Letter from Jack Gilbert to Tim Callaway, 4/21/1983 (RRFP004589); Quivik,

20  Trial Tr. 143:10-145:20.

21          231.    The Court notes that the record contains other correspondence from

22  Sterling officials to outside parties in which Sterling represents itself as manager of the

23  Mine.   Quivik, Trial Tr. at 189:14-190:1; Ex. 160 (Letter from Janet Hendry to Cranmer

24  Engineering, Inc., 12/1/1987 (RRFP004355)) (Janet Hendry, writing as a Sterling official

25  on Sterling letterhead informs Cranmer that some of its submitted invoices should be

26  sent to Franco Nevada because they relate to "work was completed during the period

27  prior to our taking over the mine. . . .")

28  ///

1    232.   The Court finds, based on Dr. Quivik's description of the historical record,

2    and its own review of examples of the two classes of correspondence identified by

3    Dr. Quivik, that Sterling held itself out as manager of the Lava Cap Mine.

4

5              **4.  Sterling Entered Into, Modified and Terminated Agreements with
                   Other Mining Enterprises to Reopen the Mine**

6

7    233.   The Court further finds that Sterling negotiated, modified and terminated

8    contracts on Keystone's behalf, without input from Keystone.  As discussed above in

9    Finding 115, in 1981, Sterling entered into an agreement, ultimately terminated, with

10   Mastermine to reopen the Lava Cap Mine.  Although this agreement was between

11   Mastermine and Keystone, Jack Gilbert, terminated the agreement as President of

12   Sterling without input from Keystone.  Ex. 73 (Minutes of the Board of Directors of Lava

13   Cap Resources Ltd.,  December 11, 1980, p. 5 (RRFP001865-1872 at 1872));  Ex. 76

14   (Minutes of the Board of Directors of Lava Cap Resources Ltd., May 12, 1981, pp. 2-3

15   (RRFP001810-1812 at 001811-1812)); Ex. 77 (Agreement between Keystone Copper

16   Corporation and Mastermine Gold Corporation, May 20, 1981 (RRFP001826-834));

17   Ex. 87  (Letter, Gilbert to Wood, July 13, 1982 (RRFP001977)); Quivik, Trial Tr. at

18   102:4-22, 138:18-139:23.

19   234.   As noted above in Findings 119-122, in 1983, Sterling and Keystone

20   entered into an agreement with Franco Nevada to reopen the Lava Cap Mine. The

21   agreement required Franco Nevada to pay royalties to Keystone, among other things.

22   SUF ¶ 35.

23   235.   In 1985, Franco Nevada sent a letter to Jack Gilbert, as President of

24   Sterling, requesting an amendment to the 1983 Agreement; Franco Nevada wanted to

25   postpone its payment of the advance royalty to Keystone.  On June 28, 1985, Jack

26   Gilbert, on behalf of Sterling, agreed to amend the proposed amendment.  He signed the

27   letter-agreement as Sterling's President.

28   ///

1   Likewise, Gilbert sent a letter back to Franco Nevada on Sterling letterhead, and signed

2   as Sterling's President, confirming an additional term to the letter-agreement.   Ex. 143

3   (Letter from Pierre Lassonde to Jack Gilbert, 6/27/1985 (EPA004499)); Ex. 144 (Letter

4   from Jack Gilbert to Pierre Lassonde, 6/28/1985 (EPA004692)); Sterling Rule 30(b)(6)

5   Deposition at 191:7-192:14.

6       236.   Although Gilbert had deprived Keystone of a major benefit of the bargain

7   with Franco Nevada when he agreed to Franco Nevada's request to postpone the

8   royalty payment, there is no evidence that Gilbert sought Keystone's input before

9   agreeing to the proposal.  In fact, Gilbert admitted during his deposition that Keystone

10  never approved any of the agreements or amendments related to the Franco Nevada

11  deal by any formal measure.  Gilbert Deposition at 213:12-214:15.

12

13          **5.  Sterling Managed Its Own Assets at the Mine**

14

15      237.   The Court further finds that Sterling managed its own personal property at

16  the Mine.  As noted above in Findings 24-27, the 1952 transaction was structured so that

17  LCGMC assigned all its personal property directly to Sterling, including equipment,

18  supplies, buildings, insurance policies, cash, and bonds, including $37,500 in United

19  States bonds deposited with the California Industrial Welfare Commission's Division of

20  Industrial Accidents for potential worker compensation claims against LCGMC.  Ex. 2

21  (1952 Agreement, 9/5/1952 (EPA002980-002986 at 2983-2984)); Ex. 9a (Assignment

22  from LCGMC to Sterling of Personal Property, 10/24/1952 (EPA000532-533)); Ex. 11

23  (Assignment from LCGMC to Sterling [for $37,500 in United States bonds], 10/24/1952

24  (EPA003007-3010 at 3009)); Sterling Admissions (DE 180-1), No. 16. Sterling thus

25  came to own all the buildings, equipment and supplies at the Lava Cap Mine and it

26  directly managed these assets.  Sterling managed its Mine assets primarily through

27  Charles Hall, who served as the resident manager at the Lava Cap Mine from 1952 to

28  approximately 1971.  Mr. Hall died in 1973.

1   Mr. Hall sold off Sterling's unneeded equipment and reported to the Sterling board on

2   these sales.  His work also included maintaining the equipment Sterling had decided

3   keep.  In this effort, Mr. Hall hired two former LCGMC employees who maintained the

4   machinery and equipment owned by Sterling so that it would be usable when mining

5   resumed.  Ex. 15 (Letter, C. Hall to L. M. Dumulon, 12/9/1952 (EPA004569-4570) ("On

6   good days outside maintenance is proceeding, on rainy days rust on shafts, etc., is

7   being cleaned up, shafts oiled and machinery turned over."); Quivik, Trial Tr.

8   106:18-107:15; SUFs ¶¶ 19, 34.

9       238.   Gilbert testified that the Halls had "duties were with respect to [Sterling]

10   and Keystone."  He explained that with respect to Sterling,

11       [t]heir responsibility was to protect the property.  Consider the potential prospect
        of the property.  See if they could sell any of the equipment that was not
12       necessary.  They also sold off . . . with the assistance of Len Carey, parcels of
        surface rights from time-to-time. [ . . .] And so their responsibility was to just
13       dispose of what they could and at the same time, continue to monitor prospects.

14   Gilbert Deposition at 66:18–67:15. Sterling admitted in its Rule 30(b)(6) deposition that

15   Mr. Hall acted for Sterling and not Keystone when he sold surplus equipment at the

16   Mine.  Sterling Rule 30(b)(6) Deposition at 215:5-23.

17       239.   When asked whether there is any distinction between the services that

18   Mr. Hall was rendering for Sterling as opposed to Keystone, Gilbert replied that "I would

19   think that the equipment was owned by [Sterling.] And the surface rights were owned by

20   . . . surface and mining rights were owned by Keystone. . . . He was trying to sell both."

21   Gilbert Deposition at 77:1-10.  As discussed above in Findings 65-72, Sterling also

22   controlled decisions about how to resolve workers compensation claims pending before

23   the California Industrial Welfare Commission that it had inherited from LCGMC.  Gilbert

24   testified that either Charlie or Anne Hall reported to Sterling about pending claims, and

25   recommend a proposed course of action with respect to each claim, which Sterling

26   almost always accepted.  Gilbert Deposition at 68:24-69:23.

27       240.   Sterling admitted in its Rule 30(b)(6) deposition that it owned the supplies

28   and equipment at the Mine from 1952 until at least 1964.

1   Sterling Rule 30(b)(6) Deposition at 67:4-12; 69:17-70:5; 146:23-147:3.  Sterling claims

2   that it transferred all of its California assets to Keystone in 1964, including bonds on

3   deposit with the California Industrial Welfare Commission for use in resolving workers

4   compensation claims.  However, there is no documentation of an actual assignment of

5   that property to Keystone.  Lacking evidence of an assignment, Sterling points to a June

6   4, 1964 Board decision that "[a]ll assets heretofore held by the company in California

7   should be conveyed to Keystone Copper Corporation … ."  Sterling Rule 30(b)(6)

8   Deposition at 143:10-145:3.  However, even Sterling admits that it does not know

9   whether the referenced conveyance actually occurred.  Green, when asked in his Rule

10  30(b)(6) deposition whether "it is the company's position that the board's resolution

11  alone was sufficient as a matter of law, to transfer its assets in California to Keystone"

12  replied, "[n]o, because it says 'should be conveyed,' so one would think there would be a

13  conveyance." Id. at 146:7-13.  Green further admitted on Sterling's behalf that Sterling

14  does not know whether the bonds or any other assets were in fact transferred to

15  Keystone. Id. at 70:11-71:12.

16      241.   Based on the evidence, the Court finds that Sterling controlled the

17  management and disposition of its own property and affairs at the Lava Cap Mine from

18  1952 until at least 1964, and perhaps longer.

19

20      **6.  Sterling Directed the Mine's Resident Manager and Local Real
        Estate Agent**

21

22      242.   Based on the evidence summarized below, the Court finds that Sterling

23  directed the resident manager's activities at the Mine.  Charles Hall attended to a

24  number of affairs at the Mine.  In 1961, for example, he reported in a letter to Lou

25  Pancer, president of Sterling, on financial matters, sales of surface rights, the resolution

26  of workers compensation claims, proposals for generating profit from timber sales, and

27  requests money to take care of immediate business at the Mine.  Hall also noted that he

28  had not been compensated for this work for over a year.

1   Pancer had no known position with Keystone.  Ex. 23 (Letter from Charles Hall to

2   Pancer, President of New Goldvue, 11/14/1961 (EPA003228)); Quivik, Trial Tr.

3   108:10-110:15.  The Court concludes that Mr. Hall reported on these matters to Pancer

4   as a Sterling official.

5          243.   There is ample other evidence that both Charles and Anne Hall reported

6   directly to Sterling, and responded to instruction from Sterling.  Ex. 14 (Letter from

7   Charles Hall to L.M. Dumulon, 12/8/1952 (RRFP003405-003408)); Ex. 15 (Letter from

8   Charles Hall to L.M. Dumulon, 12/9/1952 (EPA004569-004570)); Ex. 23 (Letter from

9   Charles Hall to Pancer, President of New Goldvue, 11/14/1961 (EPA003228)); Ex. 29

10  (Sterling Board of Directors Meeting Minutes, 11/6/1963 (RRFP002738-002746 at

11  002741-002742)); Ex. 36 (Sterling Board of Directors Meeting Minutes, 6/30/1969

12  (EPA003087-003089)); Gilbert Deposition at 77:1-10.

13         244.   At a June 1969 Sterling Board of Directors Meeting held in Toronto,

14  Ontario, both Mr. and Mrs. Hall were "present, at the invitation of the Board."  They

15  reported to the Sterling Board on the sale of property and sought direction from Sterling

16  in this regard.  Quivik, Trial Tr. 113:23-117:9; Ex. 36 (Sterling Board of Directors Meeting

17  Minutes, 6/30/1969 (EPA003087-003089)).

18         245.   Sterling also determined Mr. and Mrs. Hall's compensation.  Sterling Board

19  minutes from 1963 indicate Sterling's involvement in setting the compensation of

20  Mr. Hall, noting he was entitled to additional compensation due to his "faithful service to

21  the Company and the excellent job that he had been doing in preserving and disposing

22  of the Company's assets in the State of California."  The Court concludes that

23  "Company" refers to Sterling.  Quivik, Trial Tr. at 111:22-113-10; Ex. 29 (Sterling Board

24  of Directors Meeting Minutes, 11/6/1963 (RRFP002738-002746 at 002741-002742));

25  Gilbert Deposition at 77:11-78:5.

26         246.   At the June 1969 meeting of the Sterling Board, the directors took up the

27  issue of special compensation to Mr. Hall as well as setting Mr. and Mrs. Hall's monthly

28  salary.

The board resolved to provide five acres to Mr. Hall at a discounted price so he received compensation for his services.  The board also resolved to continue the then-current monthly salary of $500 month for Mr. Hall and $150 month for Mrs. Hall.  It is significant that the board also set Mrs. Hall's salary because, from the record, it appears she was doing work for Keystone, but her compensation was determined by the Sterling Board. Quivik, Trial Tr. 113:23-117:9; Ex. 36 (Sterling Board of Directors Meeting Minutes, 6/30/1969 (EPA003087-003089)).

247.    Sterling admitted that the 1969 sale to Mr. Hall of surface rights at the Mine was priced at a discount.  Sterling Rule 30(b)(6) Deposition at 149:2-7.  Sterling further admitted that the Sterling board reviewed the regular wages of Mr. and Mrs. Hall at its 1969 Board meeting, and resolved to continue those arrangements with the Halls, and also decided that the Halls would be awarded additional compensation for any special services they performed.  Id. at 149:25-150:9; 219:10-16; 221:7-14.   The Court finds that Sterling determined the Halls' regular wages, as well as any additional compensation paid for special services.

248.    There is also evidence showing that Anne Hall reported to Gilbert, as a Sterling official, concerning Keystone's financial affairs and requested additional funds to pay outstanding bills.   Quivik, Trial Tr. at 149:13-150:24, Ex. 81 (Letter from Anne Hall to Gilbert, 4/22/1982 (EPA004303)); Wright, Trial Tr. at 342:20-343:3, 344:1-19, (demonstrating that Anne Hall submitted financial reports to Sterling, requesting funds to pay for bills) 345:17-346:15 (same).

249.    After Mr. Hall died in 1973, no one served as resident manager of the Mine.  Although Sterling asserts that Anne Hall took over as manager of the Mine, there is insufficient evidence in the record to draw that conclusion.  The evidence shows that Anne Hall continued to serve as Keystone's bookkeeper and was responsible for maintaining the financial records, writing checks, paying taxes, and general clerical services of that sort, while Gilbert performed the management functions for the Mine. Quivik, Trial Tr. 117:2-9, 118:18-119:7.

1    250.    There is no historical record of Mr. Hall reporting to Keystone's board of

2  directors during his long tenure as the Mine's resident manager.  There is no record of

3  Keystone setting Mr. Hall's compensation at any time. There is no record of Keystone

4  setting Mrs. Hall's compensation either.  Quivik, Trial Tr. 117:20-118:4.

5    251.    Likewise, there is no evidence that Keystone consented to the sale of

6  property to Mr. and Mrs. Hall at a discount.

7    252.    Defendant's accountant, Ms. Hill, testified that Mr. Hall's salary must be

8  recorded as a "net loss from liquidation of assets in California" in the consolidated

9  financial statements because there is no other place in which she believes it could be

10  included, suggesting, Sterling argues, that Mr. Hall was a Keystone official.  Hill, Trial Tr.

11  at 386:20-24.  The Court declines to adopt such an inference.  The fact that Mr. Hall's

12  salary is recorded in the consolidated financial statements is not evidence that he was a

13  Keystone official because the financial statements are from the consolidated company.

14  *See* Hill, Trial Tr. at 385:1-8.  As Mr. Wright testified, the consolidated financial

15  statements do not provide the necessary "visibility" into the Keystone activities to

16  determine that Mr. Hall was acting as a Keystone official.  Wright, Trial Tr.

17  at334:22-335:16.  Indeed, after considering the weight of all of the evidence, the Court

18  finds that Sterling controlled and directed Mr. Hall's activities at the Mine.

19    253.    The Court also finds that Sterling directed Leonard Carey's activities with

20  respect to the Mine.  As discussed above in Finding 157, Carey worked on behalf of

21  Sterling to find developers and purchasers interested in the Lava Cap Mine and entered

22  into agency agreements with Sterling.  Gilbert Deposition at 167:24- 169:14 (testifying

23  that Sterling had a "very long, very agreeable history" with Carey who, under an agency

24  agreement for Sterling "endeavoured, over the years, to introduce people that he thought

25  might be interested in doing something about the property.

26  ///

27  ///

28  ///

1   That was his role."); Ex. 127 (Carey's Exclusive Right to Sell, 12/21/1982

2   (RRFP000679)); Ex. 128 (Letter from Carey to McProud, 1/3/1984 (RRFP000930-

3   000932)) (acknowledging working "with the Lava Cap/Keystone properties for the last 20

4   years and for over 10 years represented Lava Cap in this area"); Quivik, Trial Tr. at

5   147:19-148:22 (noting the existence of another agency agreement between Carey and

6   Sterling  authorizing Carey to sell Sterling's property).

7        254.   As discussed above in Finding 157, Leonard Carey sought and received

8   from Sterling an exclusive right to sell the properties owned by Sterling, including those

9   owned by Keystone, for all of 1983.  Sterling and Carey entered into agency agreements

10  for other years.  Keystone is not a party to any of these agreements and there is no

11  evidence that Sterling sought Keystone's consent to enter into them.  Ex. 127 (Exclusive

12  Authorization and Right to Sell, 12/21/82 (RRFP000679)); Quivik, Trial Tr. at 146:21-25,

13  147:19-148:22.

14       255.   As this Court has already found, Gilbert, wearing his Sterling hat, directed

15  Carey, Sterling's agent, to implement the response to both Regional Water Board

16  orders.  See Finding 157.

17       256.   Based on the evidence summarized above, this Court concludes that

18  Sterling controlled virtually all of the Mine's operations, just as it controlled the response

19  to the partial collapse of the timber dam.

20

21            **E.  Sterling Managed and Controlled the Activities of Keystone**

22

23       257.   This Court further finds that Sterling managed and controlled the affairs of

24  Keystone.  In particular, in the early years, Andrews and Pancer directed Mr. Hall, the

25  Mine's resident manager, in such matters as authorization of sales of real and personal

26  property.   Much later, Eugene Kalius, negotiated the final sale of Keystone's property to

27  Stephen Elder.

28  ///

As discussed above in Findings 227-229, Gilbert played a central role in courting other mining enterprises in reopening the Mine, and he did so as a Sterling official.  And, as already discussed in Section V(C) above, Gilbert acted as a Sterling official when he directed the response to the 1979 partial collapse of the dam.  Trial Tr. 74:9-75:6, 129:22-130:17.

258.   As evidence that Keystone directed its own affairs, Sterling points to a lease entered into by Gilbert on Keystone's behalf.  Ex. KKK (Lease between Keystone and Hudgins and Flax, 9/1/1976 (RRFP000172-177)).  Although Gilbert signed the lease for Keystone, the Court finds that Sterling clearly controlled the actions taken under it.  Sterling admitted that it was the one who took action to evict the lessees from the Mine property when litigation arose over the scope of a purchase option that was also granted to the lessees.  Sterling also admitted that the Sterling board had instructed its attorneys "to take every legal step available as expeditiously as possible, to have the lessees vacate the property and surrender possession and proceed to defend the lawsuit on its merits . . . ."  Sterling Rule 30(b)(6) Deposition at 154:190-12.  On the other hand, there is no evidence that Keystone resolved at any time to take action with respect to the lease of its property.

### 1. Sterling Controlled the Sale of Keystone's Real Property, Including the Final Sale of All of Keystone's Assets

259.   Based on the evidence discussed below, the Court finds that Sterling (and not Keystone) controlled the disposition of real property owned by Keystone, and that there is no record of Keystone's approval of any of these property transfers.  This is true even though Keystone's Articles of Incorporation required the vote or written consent of shareholders to sell or convey major portions of property.  Ex. 1 (Keystone Articles of Incorporation, 7/12/1943 (RRFP006431-006438 at 6435 ¶ 8)).

///

///

260.   In 1963, Sterling reported to the Toronto Stock Exchange that its "chief activity was negotiating the sale of surface rights to the Lava Cap Mine at Grass Valley, California, held by the Company's wholly owned subsidiary, Keystone Copper Corporation, resulting in the sale of a parcel of 360 acres (reserving the mineral rights below 100 ft). . . ."  Ex. 27 (Toronto Stock Exchange Filing Statement, 8/29/1963, (RRFP000106-000111 at 000111)).

261.   Sterling's board granted an option to purchase the Mine property in 1959 to local realtor Leonard Carey.  Ex. 22 (Sterling Board of Directors Minutes, 9/9/1959 (RRFP002809-002815 at 2813-2814) (indicating that under the terms of the option Sterling would receive $250,000 in cash or $300,000 with $100,000 down with remainder payable at rate of $40,000 a year plus 5% interest)).  There is no evidence that Keystone approved this option to purchase the Mine property.  Carey's offer  to Sterling, and Sterling's approval of the option, also indicate that Carey regarded Sterling as the Mine's manager and that Sterling (and not Keystone) controlled the disposition of Mine property.

262.   In Sterling Board of Directors Minutes from July 1963, Sterling's President reported on Sterling's decision to sell 360 acres of surface rights owned by Keystone:

> The Chairman reviewed his correspondence with Charles R. Hall Resident Manager of our company's subsidiary Keystone Copper Corporation, his discussions with Mr. Hall by long distance telephone calls and during a visit to the Lava Cap Mine . . . accompanied by Mr. J. A. Gilbert, solicitor. . . . [The Chairman] reported that after consultation with his fellow directors and officers and with the company's counsel, Samuel Ciglen, Q.C. and with their approval he had authorized Mr. Hall to enter into the agreement for the sale of the said 360 acres pursuant to the offer and that the transaction had been carried out.

Ex. 26 (Sterling Board of Directors Meeting Minutes, 7/3/1963 (RRFP002775-002777)). There is no evidence that Keystone approved of this sale.

263.   In 1963, Sterling's board of directors authorized the sale of another 940 acres of surface rights pursuant to terms negotiated by Charles Hall.  The Board gave Sterling's president authorization to instruct Hall to accept the offered terms, after consultation with and approval by "the Company's counsel."

1    Ex. 29 (Sterling Board of Directors Meeting Minutes, 11/6/1963 (RRFP002738-002746 at

2    002741)).  The Sterling Board required no further consultation with Keystone, and there

3    was none.

4         264.   As this Court has already recognized above, Sterling's Board authorized

5    Gilbert "to take whatever steps he deems advisable to seek out a sale of the Company's

6    surface rights at the Lava Cap property" (reserving sufficient surface and mineral rights

7    for possible re-opening of the mine) and "to retain an independent consultant to provide

8    a report on the feasibility of re-opening the Lava Cap Mine."  There is no evidence that

9    Keystone approved Sterling's resolution.  Ex. 39 (Sterling Board of Directors Meeting

10   Minutes, 6/15/1971 (RRFP002966-002973 at 2968-2969)).

11        265.   In Sterling's June 9, 1972 Information Circular it reports that by "agreement

12   dated April 17th 1972[,] the Corporation agreed to a sale by its wholly-owned subsidiary

13   to United Duvex of 326 acres of surface rights for $175,000 payable as . . .  cash . . . and

14   issue of 1,000,000 treasury shares. . . ."  Ex. 44 (RRFP003030-003033 at 003033).  In

15   the December 31, 1974 Notes to Consolidated Financial Statement, note 2 provides that

16   "Keystone will be required to hold 1,000,000 of United Duvex shares for investment only

17   and not with view to resale or distribution."  Ex. 50 (Notes to Consolidated Financial

18   Statements, 12/31/1974) (RRFP002460-002461)).  There is no indication that Keystone

19   approved the sale or the restrictions on use of the shares it would be required to hold.

20        266.   In 1987, Sterling granted Elder an option to purchase the remaining 146

21   acres of the Mine for $292,700 (US).  Sterling (and not Keystone) negotiated, approved

22   and signed Elder's option to purchase the Mine property.  After several extensions had

23   been executed, the Sterling Board of Directors resolved to require the approval of

24   Sterling to extend the option any further.  Again, Keystone was not consulted about the

25   disposition of its property rights.

26   ///

27   ///

28   ///

1    Sterling Admissions (DE 180-1), No. 40; Ex. 158 (Letter from Leonard Carey to Eugene

2    Kaulius, 7/29/1987 (RRFP004353)); Ex. 159 (Faxed Documents and Proposed Option to

3    Stephen Elder, 7/30/1987 (RRFP000456-000467)); Ex. 164 (Notice of Exercise of

4    Extension of Option Term, 5/10/1988 (RRFP000438)); Ex. 165 (Sterling Board of

5    Directors Minutes, 9/9/1988 (EPA003157-003160 at 3158)); Ex. 166 (Letter from Jack

6    Gilbert to Leonard Carey re: Option, 9/15/1988 (RRFP000437)); Gilbert Deposition at

7    170:3-172:1,172:6-174:6.

8         267.   Gilbert sought permission from Sterling president Eugene Kaulius to sign

9    escrow instructions dictating terms of the sale of the Mine from Sterling to Stephen

10   Elder.  The escrow instructions identified Sterling (and not Keystone) as Seller of the

11   Mine property.  Ex. 171 (Letter Jack Gilbert to Eugene Kaulius, 11/30/1988

12   (RRFP000411-000423 at 000411)); Ex. 179 (Escrow Instructions for Sale of Mine from

13   Sterling to Elder, 5/15/1989 (RRFP000334-000344 at 000339)); Wright, Trial Tr. at

14   353:17-22; Gilbert Deposition at 179:13-180:19.

15        268.   Sterling (and not Keystone) approved the sale of the Mine at a ten percent

16   discount if payment was made by Stephen Elder in cash.  Ex. 176 (Letter from Eugene

17   Kaulius to Leonard  Carey, 4/18/1989 (RRFP000357)).

18        269.   Sterling and Keystone sold the Lava Cap Mine property to Banner

19   Mountain Properties, Ltd., a limited partnership of which Stephen Elder was the general

20   partner, on June 9, 1989.  SUF ¶ 44.

21        270.   Sterling (and not Keystone) paid realtor Leonard Carey commission as

22   Elder's agent, paid a fee to law firm Berliner & Spiller to ensure clear title to the Mine,

23   and paid delinquent taxes owed on the Mine for years 1988 and 1989.  Ex. 180 (Seller's

24   Estimated Closing Statement, June 1989 (RRFP000242-000247 at 243-244)); Ex. 171

25   (Letter Jack Gilbert to Eugene Kaulius, 11/30/1988 (RRFP000411-000423)).Wright, Trial

26   Tr. at 353:1-2, 11-16; Gilbert Deposition at 196:24-197:22.

27        271.   Sterling (and not Keystone) received the proceeds from the sale of the

28   Lava Cap Mine to Stephen Elder.  Keystone received nothing.

1  Ex. 180 (Seller's Estimated Closing Statement, June 1989 (RRFP000242-000247 at

2  243-244)); Ex. 168 (Check written to Sterling, 11/11/1988 (RRFP000435)); Ex. 181

3  (Letter from McProud to Eugene Kaulius, 6/9/1989 (RRFP000241)); Ex. 182 (Check

4  written to Sterling, 6/9/1989 (RRFP004403)); Wright, Trial Tr. at 352:22-25; Gilbert

5  Deposition at 182:20-183:5,196:24-197:22, 260:24-261:2.

6      272.   Plaintiffs' expert accountant, Wiley Wright, testified that the economic

7  substance of the agreement to sell the Mine property to Elder was between Sterling and

8  Elder, and not between Keystone and Elder.  Wright, Trial Tr. 336:5-11.  The Court

9  agrees.

10     273.   The Court further notes that there is no record of Keystone director or

11 shareholder approval of the sale to Elder. Hendry Deposition at 84:17-86:3; Gilbert

12 Deposition at 214:1-7.

13     274.   Gilbert admitted that there were no Keystone minutes of a vote by its

14 directors on the sale of property to Elder.  When asked if there was a formal meeting of

15 the Keystone directors he testified that: "Whatever you might call formal, the parties were

16 together and they all agreed on the deal.  Now that is as formal as you have to get."

17 Gilbert Deposition at 214:1-15.

18     275.   Hendry signed the escrow instructions for the sale of Keystone's property

19 dated May 15, 1989.  At the time, Hendry was Secretary-Treasurer for Sterling and was

20 CFO of Keystone.   When asked if she reviewed these escrow instructions in her role as

21 CFO of Keystone, Hendry testified:  "Well, I read them at the time, and I can't really

22 perhaps say that I did it for Sterling . . . or, rather, for Sterling or for Keystone, but it

23 would have been the same, since it was the same company."  Hendry Deposition at

24 91:15-92:1 (emphasis supplied); Ex. 179 (Escrow Instructions for Sale of Mine from

25 Sterling to Elder, 5/15/1989 (RRFP000334-000344 at 000339)); Ex. 195 (Fed. R. Evid.

26 1006 Chart).

27 ///

28 ///

1     276.   While Sterling contends that the Sterling Board's approval of sales of

2  Keystone surface rights was sufficient to meet the requirement in Keystone's articles of

3  incorporation that such sales be approved by vote or written consent of Keystone's

4  shareholder, the fact that Sterling did not approve the sales as Keystone's shareholder

5  (as opposed to Sterling itself) indicates that Sterling did not observe the separation of

6  the two corporate management structures.  Quivik, Trial Tr. at 204:8-207:1.

7     277.   This Court finds, based on the evidence summarized above, that Sterling

8  controlled the sales of Keystone real property.

9

10          **2.  The Lack of Evidence of Independent Keystone Action**

11

12     278.   In contrast with the breadth of evidence of Sterling's control of Keystone's

13  affairs and the Mine's operations, there is a dearth of evidence that Keystone functioned

14  on its own, independent of Sterling.

15     279.   Dr. Quivik's expertise about the corporate norms applicable to Sterling in

16  its relationship with Keystone and the Lava Cap Mine derives from his study of the

17  primary documents of multiple mining companies, including companies with inactive

18  mines, Quivik, Trial Tr. at 60:8-19; 62:4-20; 64:9-20; his review of articles on American

19  corporate norms in the 1920's and 1950's, Quivik, Trial Tr. at 122:2-123:24; and his

20  review of standard texts on the organization of mining companies, Quivik, Trial Tr. at

21  124:2-16.

22     280.   Dr. Quivik testified that, based on his study of parent-subsidiary

23  relationships and his research of historic articles identifying typical behaviors of parents

24  and subsidiaries, he expects a parent and subsidiary to engage in certain behaviors

25  when operating independently.  First, the parent and subsidiary typically maintain a

26  separation of managerial structures by observing the ritual of holding and recording

27  separate meetings.

28  ///

1    Second, when officials of both the parent and subsidiary are dealing with outside parties,

2    they are clear in their communications with these entities which enterprise they are

3    representing. Quivik, Trial Tr. 166:9-167:3.  The Court finds ample evidence that Sterling

4    and Keystone routinely failed to engage in these expected behaviors.

5         281.   The testimony of Janet Hendry is illustrative.  Hendry began working for

6    Gilbert in 1965 when he hired her as a legal secretary.  Hendry continues to work for

7    Gilbert today managing his family's investments and looking after family matters.  In

8    describing his relationship with Hendry, Gilbert explained that "[s]he is almost like a

9    daughter, [. . .] [s]he maintains my banking, members of my family.  She sort of keeps

10   my three daughters and granddaughters somehow cool and collected. [ . . .]  The

11   relationship is a very friendly one. [. . .] [s]he is far more than a secretary."  Hendry

12   Deposition at 8:3-9:4; Gilbert Deposition at 35:7-36:3, 57:24-58:14.

13        282.   Hendry became an officer and director of Keystone when Gilbert asked her

14   to serve in those positions.  There was no vote by Keystone's shareholder to approve

15   Hendry's appointment as a Keystone director, or by Keystone's directors to approve

16   Hendry's appointment as a Keystone officer.   Hendry Deposition at 70:9-14; 95:6-9.

17        283.   Hendry testified that she could "not really" state what her responsibilities

18   were as a director of Keystone between 1986 until 1989, and she explained that "[t]here

19   was hardly . . . there was no activity. So  . . . unless Jack [Gilbert] had communicated

20   with Anne Hall over some problems.  Whatever was discussed on the telephone,

21   between them, he would discuss with me and, again, I would look after any

22   correspondence that went back and forth."  Hendry Deposition at 69:18–70:8.

23        284.   Although Hendry served as secretary for Keystone between 1986 and

24   1989, she could not recall performing any responsibilities as a secretary.  She testified

25   that "I didn't really have very much to do.  The company was inactive, and there really

26   wasn't much happening."  Hendry Deposition at 83:10-18.

27        285.   Hendry testified that she does not recall any particular responsibilities as

28   chief financial officer of Keystone in 1986.

88

1   She clarified that "If we got information from Anne Hall, who needed money, I would . . .

2   through Jack [Gilbert], would arrange to send her a cheque to cover expenses that were

3   incurred on behalf of Keystone Copper, in California."  Hendry would obtain funds for the

4   cheque to Ms. Hall from "[w]herever there was money.  Wherever Jack [Gilbert] had

5   some money, because Keystone Copper didn't have a bank account in Canada."

6   Hendry Deposition at 76:13-77:4.

7        286.   When Hendry and Gilbert served as Keystone directors, they did not hold

8   formal meetings and they did not keep records of their informal discussions.  When

9   asked whether there were director meetings for Keystone, Hendry testified, "Not really. [.

10  . .] They were very informal meetings, and whatever transpired, Jack and I would talk

11  about.  Whatever was going on that he felt was needed to discuss."  Hendry explained

12  that Keystone did not hold regular Board meetings, rather Keystone "was a private

13  company, and if there was a problem, [Gilbert] would discuss it with me if this was

14  something we had to discuss, but that is the only . . . I mean, I knew what was

15  happening out in California at the time, and we just would discuss it."  Hendry explained

16  that when she did meet with Gilbert as directors of Keystone, it was not her practice to

17  keep records of those meetings.  Hendry Deposition at 71:5-18; 74:13-75:13;

18  84:17-86:3.

19       287.   When asked if he ever held a meeting as a director of Keystone, Gilbert

20  testified that "the directors [Gilbert and Hendry] were sitting next to one another.  And

21  whatever business was conducted with reference to Keystone, I guess we were of

22  similar mind."  When asked if he ever provided notice to Keystone shareholders before

23  meeting with Hendry as a Keystone director, Gilbert explained that "my offices were

24  located in close proximity to my father-in-law [Sam Ciglen], to Lou Pancer and to others

25  who had knowledge of and were dealing with [Sterling] matters.  So it was sort of

26  common knowledge."  Gilbert Deposition at 39:19-40:2, 41:10-17, 14:37-15:5.

27       288.   Gilbert did not find it necessary to follow formal corporate rituals to

28  document and distinguish communication between Keystone and Sterling.

1 Rather, Gilbert testified that Keystone "was a private company.  And with many private

2 companies, matters were very informal.  And there would be communication from time-

3 to-time as was necessitated."  Gilbert Deposition at 41:24-42:5.

4      289.    Hendry did not recall whether any minutes were ever made of Keystone

5 directors' meetings.  She did not recall preparing or reading any such minutes.  Although

6 she searched, Hendry testified that she could not find any minutes of any directors'

7 meetings for Keystone.  Hendry Deposition at 71:19–72:13.

8      290.    Likewise, Hendry did not recall Keystone having a shareholders' meeting.

9 Hendry never read or prepared any minutes for a Keystone shareholders' meeting.

10 Hendry also did not recall ever seeing Keystone's articles of incorporation.  Hendry

11 Deposition at 72:14–24; 73:24-74:1.

12      291.    Like Hendry, Gilbert never located any Keystone minute books and never

13 prepared minutes for Keystone.  Gilbert Deposition at 39:153-18.

14      292.    Gilbert admitted that he never prepared or reviewed a Keystone annual

15 report or a budget for Keystone.  He testified that Keystone did not have an annual

16 budget.  Rather, "budgets were prepared by Anne Hall indicating cash in/cash out

17 requirements [. . . .] as circumstances dictated."  Gilbert Deposition at 53:24-54:21.

18      293.    Hendry maintained Sterling's minute books, annual reports, financial

19 statements, articles of incorporation and other Sterling corporate documents during her

20 association with Sterling.  Hendry Deposition at 135:8-138:6.

21      294.    Hendry also maintained "[w]hatever records there were" of Keystone's in

22 the same manner and location she kept Sterling files.  Sterling and Keystone never had

23 a document destruction policy and no Sterling or Keystone documents were destroyed.

24 Although some documents were put in storage a long time ago, and may have been

25 destroyed, Hendry has kept at least 25 or 30 years' worth of Keystone documents in the

26 office.  Hendry Deposition at 138:7-140:21.

27 ///

28 ///

1    295.   Although Sterling produced most of its board minutes for the relevant

2    period, Sterling did not produce any minutes of Keystone directors' or shareholders'

3    meetings, suggesting that no such meetings occurred.

4    296.   Another example of the failure to observe the separation between Sterling

5    and Keystone is the disregard of the requirement in Keystone's articles of incorporation

6    of three directors. The evidence shows that, for much of Keystone's existence, it had no

7    more than two directors.  Hendry testified that she first became a director in 1986 and

8    there were only two Keystone directors from 1984 through 1989.  Despite the

9    requirement of three directors, Gilbert reported to the State of California in Keystone's

10   1987 annual corporate filing that Keystone had "NIL" vacancies on its board of.  Hendry

11   Deposition at 64:12-68:3; Ex. 1 (Keystone Articles of Incorporation, ¶ 5, 7/12/1943

12   (RRFP006431-006438 at 006435)); Ex. 195 (Fed. R. Evid. 1006 Chart) (showing that

13   there is no evidence that there were more than two directors of Keystone from 1963-

14   1989, except in 1986); Ex. 188 (Compilation of California Secretary of State Domestic

15   Corporation information and filings for Keystone, RRFP004485-4495 at 4495)).

16   297.   Dr. Quivik concluded, based on the lack of any record of Keystone

17   corporate action, that Keystone was not acting independent of its parent, Sterling.  He

18   opined that if Keystone were acting independently, he would have expected to see

19   documentation of the election of Keystone directors at annual shareholder meetings and

20   the appointment of Keystone officers at Keystone board meetings.  He would have

21   expected to see Keystone appoint its own resident manager, if it had one, and to set his

22   compensation.  He would expect to see the Keystone board dealing with major financial

23   matters, such as the adoption of annual budgets.  He would expect to see minutes of

24   Keystone shareholder meetings approving of sales of Keystone property.  Quivik

25   concluded that these documents never existed.  If they had existed, he would have

26   expected these files to have been kept in the Toronto offices where Sterling's records

27   were kept.  Quivik stated that Hendry and Gilbert "did a very careful job of creating and

28   maintaining the records of Sterling.

1   And so had they created them for Keystone, [he expects] they would be there as well."

2   Trial Tr. at 120:17-121:4, 125:18-127:3.  This Court agrees and finds that Keystone

3   never created these types of documents.

4        298.   Based on this evidence, the Court concludes that Sterling and Keystone

5   did not observe Keystone's separate management structure by engaging in the rituals of

6   holding and recording corporate meetings, did not elect the required number of directors

7   to the Keystone board, and did not prepare many of the corporate records typically

8   expected of corporate entities, such as annual reports and annual budgets.

9        299.   The Court further finds that although Gilbert and Hendry did observe

10   Sterling's corporate management structure, they saw no need to observe Keystone's.

11   Dr. Quivik concluded that they did not regard themselves as officials of Keystone.

12   Gilbert and Hendry's testimony substantiates Dr. Quivik's opinion.  Dr. Quivik pointed to

13   deposition testimony by Gilbert that "encapsulates that attitude beautifully, in which when

14   talking about Keystone's directors, he referred to them as Keystone's so-called directors.

15   So he did not seem to place much importance on maintaining that corporate

16   management structure for Keystone and documenting that structure for the historical

17   record."  Trial Tr. 119:12-120:14 (emphasis added).  Hendry's testimony that she

18   regarded Sterling and Keystone the same, and her inability to recall duties she had as a

19   Keystone official are in accord.  Hendry Deposition at 76:13-77:4, 83:10-18, 91:15-92:1.

20        300.   The lack of any record showing that Keystone was directing affairs at the

21   Mine or directing Mr. or Mrs. Hall's activities further supports Dr. Quivik's expert opinion

22   that Sterling was in fact directing these activities.   Trial Tr. 75:14-22, 117:13-118:15.

23        301.   Sterling points to, and Dr. Quivik acknowledges, some Keystone records

24   showing corporate activity on Keystone's part, such as separate financial records, a

25   1981 amendment to Keystone's articles of incorporation, correspondence by Mr. Hall on

26   Keystone letterhead, and annual filings with the California Secretary of State starting in

27   1983.

28   *///*

1    While these records do show some independent activity on Keystone's behalf, Dr. Quivik

2    explained that these are generally documents that had to be maintained in order for

3    Keystone to remain an active corporation and they are not evidence of an  upper-level

4    management structure making decisions on behalf of Keystone independent of Sterling.

5    For example, while Keystone amended its articles of incorporation, there is no record

6    that Keystone's directors met to decide to amend the articles in order to engage in some

7    sort of business activity that was prohibited without the amendment.   Trial Tr. at 127:4-

8    129:21.

9         302.   The Court further finds that Sterling and Keystone failed to clearly

10   communicate their separate roles when corresponding with third parties.  If Sterling and

11   Keystone officials were clearly communicating their roles to others, Dr. Quivik opined

12   that he would expect to see Keystone engaged in correspondence concerning the sale

13   of its property and efforts to reopen the Mine.  And while Dr. Quivik did not find it

14   surprising that Sterling, as the parent company that wholly-owned Keystone, was

15   engaged in this type of correspondence, he testified he would have expected Sterling to

16   make it clear to others that it was Keystone's parent, and that Keystone owned the Mine

17   property.  He also would  expected to see evidence of an understanding on the part of

18   the recipients of such correspondence that Keystone owned the Mine. Trial Tr. at 167:7-

19   168:11.

20        303.   To the contrary, as discussed above in Findings 227-232, the evidence

21   shows that Sterling described the Lava Cap Mine as its own property and sought to

22   enter into a working relationship with third parties directly, as Sterling, and not through

23   Keystone.  At times, Sterling does refer to Keystone, but as a general matter, this Court

24   finds that Sterling was not clear in its correspondence about the distinction between

25   Sterling and Keystone.  Trial Tr. 168:4-11.

26   ///

27   ///

28   ///

1   304.   Based on the evidence summarized above, this Court concludes that

2   Sterling and Keystone failed to engage in the behaviors typically expected of parents

3   and subsidiaries who are acting independently and observing separate management

4   structures.

5

6   **3. Sterling's Evidence That It Followed Corporate Norms Is Unpersuasive**

7   **4.**

8   305.   Against Plaintiffs' evidence of Sterling's pervasive control of the activities of

9   Keystone and the Mine's operations, the Defendant offered the testimony of John Smith,

10   a corporate lawyer who has been practicing at the Lawson Lundell law firm in

11   Vancouver, Canada, since the early 1980s.  Trial Tr. 423-467.  Smith claims an expertise

12   in corporate governance.  Id. 471:12-14.

13   306.   Smith testified that certain behaviors he had observed of Sterling and

14   Keystone fall within norms of behavior for parents and subsidiaries operating in the time

15   period covered by his own 30-year law practice.   Trial Tr. 436:19-437:2.

16   307.   For the following five reasons, this Court finds Smith's testimony to be of

17   no value to the Court in its deliberations:

18   308.   First, the scope of the opinion offered by Smith is limited.  Sterling's

19   counsel instructed Smith to answer one specific question: whether Sterling's interaction

20   with its wholly-owned subsidiary Keystone, particularly with respect to the Lava Cap

21   Mine property, falls outside norms of corporate behavior for Canadian parent companies

22   dealing with small and largely inactive subsidiaries.  Trial Tr. 475:17-476:21.  Smith's

23   opinion admittedly does not go to Sterling's control of the response to the partial collapse

24   of the timber dam.  He was not asked to look at that aspect of Sterling's "interaction" with

25   Keystone.  Id. at 478:1-5.

26   ///

27   ///

28   ///

309.    The information Sterling's counsel provided to Smith to answer this question was also limited.  Sterling's counsel instructed Smith to review a very small subset of the available documents in order to arrive at his opinion.  The documents made available to Smith included only the Gilbert and Hendry deposition transcripts, the exhibits marked at those two depositions, approximately 20 other deposition exhibits that had been marked at a third deposition, and one other document dated October 24, 1952.  Trial Tr. 479:15-481:19.

310.    Many of the documents related to Sterling's direction of the response to the partial collapse of the timber dam were not among those made available to Smith.  Id. at 495:6-499:6.  In particular, Exhibits 85, 86, 88, 126, 108, 117, 144 and V were unavailable to Smith prior to his deposition and, therefore, could not have formed the basis for his opinions.  Id.

311.    Moreover, because Smith was not instructed to focus on Sterling's response to the environmental problems at the Lava Cap Mine, he admittedly did not give documents dealing with the condition of the Mine the same level of attention that he gave to financial statements, reports and board minutes.  Trial Tr. 481:20-482:13.

312.    The Court finds that the question Sterling's counsel instructed Smith to answer, and the materials counsel provided to Smith to answer that question, were so limited that Mr. Smith was unable to conduct a thorough analysis of the facts of this case before arriving at his opinion.   This was evident to the Court when Smith had to ask Sterling's counsel during questioning on direct examination whether an exhibit he was asked to testify about was in fact related to the Lava Cap Mine.  Trial Tr.  at 447:5-9 (A: . . . In fact, sorry, I need to ask you, was this to do with the actual mine?  Q: Yes. A: What had been the mine property?  Q: I think the record is clear about that.").

313.    Second, Smith's observations of normative corporate behavior are unreliable because they are based exclusively on his own unrefreshed recollection of events from his past.

///

314.   Smith has had no specialized training in the area of corporate governance. Trial Tr.  468:1-4; 471:15-472:18.  Whatever expertise Mr. Smith has was acquired solely through "on the job" training at his regional law firm in Vancouver.  Trial Tr. 467:10-21.

315.   Smith based his observations of normative corporate behavior on his own experiences over the course of his 30-year law practice.   His understanding of corporate behavior is based entirely on records he reviewed and conversations he had while working on matters for his clients.  Trial Tr. 483:4-18.

316.   Smith's approach to the task he was given in this case was to compare what he observed in the Gilbert and Hendry deposition testimony, and the documents he was provided, to behavior he had observed in his own clients over the years.  Trial Tr. 486:22-487:6.

317.   Although he was not called to the bar until 1982, Smith claims that his practice afforded an opportunity to look at events occurring as early as the 1960s.  Trial Tr. 474:5-475:7.  This is significant because some of the events Smith testified about at trial happened in the 1950s, a period about which Smith admittedly had little opportunity to observe any corporate behavior, normative or otherwise.  See, e.g., Trial Tr. at 439:1-15 (testimony about Ex. J, dated 10/24/52), 451:20-452:20 (testimony about Ex. V, dated 11/25/54).  The Court finds that Smith has no basis in his own experience to opine about or interpret events that took place in the 1950s.

318.   Some of the information Smith relied on in making his observations of corporate behavior involves corporate action taken by his clients and their acquisition targets more than 50 years ago, and he last reviewed the documentation of some of those events almost 30 years ago.  Trial Tr. 483:19-484:23.   Yet, Smith did not attempt to refresh his recollection of any of these events by reviewing available documentation, even when that documentation was easily within reach, located just outside his office.  Trial Tr. 484:2-485:7.

///

///

1    319.   Smith's recollection of these events is therefore entirely unrefreshed.  The

2    Court concludes that, given the passage of time, and Smith's admission that he has

3    handled hundreds of client matters during his 30-year practice, see Trial Tr. at 431:

4    13-16, it is possible, and even likely, that Smith has failed to recall significant details of

5    these events and has recalled some events incorrectly.

6    320.   While Sterling contends that Hendry and Gilbert's inability to remember

7    particulars about Keystone's operations and their duties as Keystone officers and

8    directors is due to passage of time, it tendered Smith as an expert who has gained his

9    purported expertise, in part, through interactions and events that occurred 30 years ago.

10   The Court finds these positions distinguishable.  Smith claims expertise based on his

11   unrefreshed memory of events that, in some cases, occurred 20 or 30 years ago.  As

12   discussed in more detail below, this Court cannot corroborate or test Smith's recall

13   because Smith cannot divulge the information necessary to do so.  On the other hand,

14   as discussed above in Section V(E)(2), the evidence before the Court is replete with

15   examples that suggest Hendry and Gilbert's inability to remember certain duties or

16   actions taken as officers and directors of Keystone is due to the fact that such duties did

17   not exist and that such actions did not occur.  This bolsters the weight of Gilbert and

18   Hendry's testimony.  Smith's testimony on the other hand does not benefit from any

19   corroboration.

20   321.   Third, the events Smith relied on to arrive at his observations of normative

21   corporate behavior are inherently suspect because he declined to provide any of the

22   details of these events from his past. As a Canadian barrister, Smith must follow a code

23   of conduct published by the Law Society of British Columbia, which prevents him from

24   acknowledging the existence of any attorney-client relationship, or providing the details

25   of that relationship.  Trial Tr. at 490:12-491:10.  Citing this code of conduct, Smith

26   refused to divulge any information that would allow the Plaintiffs or this Court to verify

27   the accuracy of his testimony regarding his client relationships.  Trial Tr. 491:11-16.

28   ///

1    322.   He also refused to provide the details he relied on with regard to clients

2    who might have engaged in the conduct he identified as normal corporate behavior.  Id.

3    at 491:24-492:18.

4    323.   Because Smith refused to provide the details of the events he relied on to

5    arrive at his observations of normative corporate behavior, this Court has no way to

6    evaluate the validity of Smith's observations by examining these events.  Trial Tr.

7    493:24-494:2.  In order for this Court to credit Smith's opinion, it must assume that

8    Mr. Smith has identified the appropriate events from his past for comparison purposes

9    and that he has accurately recalled those events.  This Court would also need to

10   assume that Mr. Smith has fairly described these events.  Id. at 495:2-5.

11   The Court would need to make these assumptions without the benefit of any cross-

12   examination on the specifics of Smith's experiences.  Id. at 494:23-495:1.  This Court

13   declines to make that leap of faith and concludes that Smith's opinions are inherently

14   suspect because they are not subject to cross-examination.

15   324.   Fourth, the Defendant has not established that Smith's experiences are

16   representative of those of other lawyers working in other Canadian law firms, or that the

17   corporate behavior he observed in his law practice is consistent with corporate behavior

18   across Canada.  Moreover, Mr. Smith's view of corporate norms is so broad as to be not

19   credible or helpful to the Court in determining the actual corporate norms to apply in this

20   case.  For example, Smith identified non-compliance with legal requirements as "normal"

21   as long as he observed no adverse consequences to his corporate clients.  Trial Tr.

22   487:7-22.

23   325.   Fifth, and significantly, Smith admitted during cross-examination that many

24   of the behaviors engaged in by Sterling and Keystone fall outside the very norms of

25   corporate behavior he identified.  For example, with respect to the sale of the Mine

26   property to Defendant Elder in 1989, Smith said he would expect to see a resolution

27   from Keystone approving the sale.   He further admitted that he could not imagine a

28   situation in which a lawyer representing the buyer would not ask for such a resolution.

1   Trial Tr. at 513:8-513:25.  Yet, there is no evidence that Keystone resolved at any time

2   to convey its sole asset, the Mine property.  Id. at 514:1-7; see discussion above at

3   Section V(E)(1).  Smith further admitted that, had Sterling asked for his advice as to

4   whether it should prepare a resolution approving the sale as Keystone's sole

5   shareholder, given the requirement in Keystone's articles of incorporation of written

6   shareholder approval, he would have said yes.  Id. at 487:23-489:1.

7          326.   As discussed above in Finding 271, Sterling received the net proceeds

8   from the sale of the Mine property to Defendant Elder.  Although Smith observed that it

9   is within norms for a parent to receive, directly, substantial receipts from the activities of

10   its wholly-owned subsidiary when those may freely be distributed to the parent, he

11   admitted that his opinion depends on whether and what restrictions are placed on those

12   funds.  Trial Tr. 511:25-512:11.  Yet, Smith acknowledged that he does not know

13   whether the funds from sale of the Mine property to Elder could be freely distributed to

14   Sterling.  Id. at 512:12-513:7.

15          327.   And, as discussed above in Findings 169-170, 227, 229-230 and 235,

16   Gilbert frequently corresponded on Sterling letterhead as Sterling's President when

17   taking action regarding the Mine.  Although Smith testified that his clients often

18   corresponded on the wrong letterhead (suggesting that Gilbert had made similar errors),

19   Smith said he would himself insist that letters he drafted for a client went on the correct

20   letterhead and would take numerous steps to ensure that his client complied.  Trial Tr.

21   500:19-503:3.  According to Smith, the reason for his insistence was two-fold: (1) the risk

22   that the recipient of the letter would be unable to tell whether he is dealing with the

23   parent or the subsidiary, and (2) that adverse consequences could flow from the use of

24   the wrong letterhead and corporate signature.  Id. at 505:7-506:15.

25          328.   Smith also testified that it would be unusual in his experience for the board

26   of a parent corporation to get involved in setting the regular wages of employees of the

27   subsidiary.  Trial Tr. 508:1-510:1.  Yet, the Sterling Board clearly was involved in setting

28   the regular wages of Mr. and Mrs. Hall.  See discussion above at Findings 245-247;

1  Ex. 36 (Sterling *Boa*rd of Directors Meeting Minutes, 6/30/1969 *(*EPA003087-003089 at

2  3089).

3      329.   Further, Smith admits that his observation that "sound governance

4  practices suggest that a parent company's board should approve material decisions by

5  the subsidiary" depends on the assumption that the subsidiary has made a decision for

6  the parent to approve.  Trial Tr. 506:16-507:11. But this Court finds no evidence that the

7  subsidiary, Keystone, made any decisions for the parent Sterling to approve.

8  To the contrary, as discussed above in Sections V(C), (D) and (E), the evidence

9  indicates that Sterling made the material decisions about Mine operations, and that

10  Keystone had no input at all.

11      330.   For all of these reasons, this Court declines to rely on the testimony of

12  Smith regarding normative corporate behavior.  His opinion is neither reliable nor

13  relevant.  However, even applying Smith's proposed norm – that a company may ignore

14  corporate formalities as long as it suffers no adverse consequences – it appears that

15  Sterling's chronic disregard of Keystone's separate management structure would fall

16  outside the norm Smith articulated, because Sterling now faces severe adverse

17  consequences as an outcome of this lawsuit.

18

19  **VI.    STERLING'S CONTACTS WITH THE FORUM**

20

21      331.   This Court concludes that it may exercise <u>in personam</u> jurisdiction over the

22  Defendant Sterling based on Sterling's status as successor to LCGMC and its

23  environmental liabilities, and based on Sterling's direction and control of the activities of

24  the Lava Cap Mine, including the response to the partial collapse of the timber dam.   It

25  is undisputed that LCGMC's contacts with the forum were extensive, as it mined the

26  property from 1934 to 1943.  As LCGMC's successor, these contacts are imputed to

27  Sterling.

28  ///

332.   Moreover, Sterling itself had extensive contact with the forum.  As discussed above in Findings 24-27, it held title to all of the California-based assets it acquired from LCMGC, other than the real property deeded to its subsidiary Keystone, including equipment, supplies, cash and bonds on deposit with the California Industrial Welfare Commission.  As discussed above in Findings 99, 103 and 111, Sterling officials and engineers repeatedly traveled to California to investigate the Mine's profitability and develop a strategy for resumed production.  As discussed above in Findings 103 and 237, Sterling sold its surplus supplies and equipment in the California market. As discussed above in Findings 65-72, Sterling resolved workers compensation claims brought against LCGMC.  As discussed above in Finding 259-277, Sterling marketed and sold surplus property rights through its local realtor, Leonard Carey, and was party to and received all proceeds from the 1989 sale of the Mine to Defendant Stephen Elder. As discussed above in Findings 227-232, 234-236, it actively courted other mining enterprises, many of them local, in its efforts to reopen the Mine, and was a party to one such agreement with Franco Nevada.  And, as discussed above in Section V(C), it directed the response to the partial collapse of the timber dam in 1979.

333.   The Court further notes that Sterling often referred to the personal property that it owned at the Lava Cap Mine (as distinguished from the real property owned by Keystone) as its "California Branch."  Ex. 33 (Sterling's Report to Shareholders, 4/17/1967 (RRFP002863-002866 at 002866)); Ex. 25 (1962 Annual Report, 6/14/1963 (RRFP002767-002773 at 002769)); Ex. 31 (Notes to Consolidated Balance Sheet, 12/31/1964 (RRFP002655-002662 at 2661)); Ex. 32 (Notes to Consolidated Balance Sheet, 12/31/1965 (RRFP002629-002635 at 2635)); Ex. 34 (Notes to Consolidated Balance Sheet, 12/31/1967 (RRFP003859-003869 at 3866)).  The Court finds based on this evidence that Sterling itself regarded its operations as California-based.

///

///

///

101

334.   Moreover, in 1978, lessees of the Lava Cap Mine property sued Sterling (then Lava Cap Resources Ltd.) and Keystone, among others, in the Superior Court of California in Nevada County.  SUF ¶ 54.  In the state court litigation, the lessees sought a declaration that, if they exercised a purchase option, they would be entitled to 540 surface acres (not 140 acres) and access to mineral rights from the surface.  SUF ¶ 54.

335.   Sterling hired local counsel to defend it in the state court litigation, made an appearance in the case, and defended itself without ever disputing the jurisdiction of the California court.  SUF ¶ 55.  Sterling responded to discovery and sought and obtained permission from the California courts to take an out-of-state deposition.  SUF ¶ 57.

336.   There was a trial in the matter, at which Sterling's President Jack Gilbert testified, where the California court's jurisdiction over Sterling was never an issue.  SUF ¶ 58; Ex. 74 (Letter From J. Higginbotham to Jack Gilbert, 4/16/1981 (RRFP001815)).

337.   This Court therefore rejects Sterling's present argument that it cannot submit to California jurisdiction.   Sterling has already availed itself of the benefits and protections of the California courts and it is disingenuous on Sterling's part to now argue that it was not entitled to do so.

IT IS SO ORDERED.

DATED:  June 19, 2013

MORRISON C. ENGLAND, JR., CHIEF JUDGE
UNITED STATES DISTRICT COURT