1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11  UNITED STATES OF AMERICA, and          No.  2:08-cv-02556-CE-JFM
    CALIFORNIA DEPARTMENT OF
12  TOXIC SUBSTANCES CONTROL,

13            Plaintiffs,                   **CONCLUSIONS OF LAW**

14        v.

15  STERLING CENTRECORP INC.,
    STEPHEN P. ELDER and ELDER
16  DEVELOPMENT, INC.,

17            Defendants.

18

19    **I.   THE ELEMENTS OF CERCLA LIABILITY[1]**

20

21        1.      This Court has previously held that in order to establish liability for

22  response costs under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), Plaintiffs must

23  make a four-part showing.  First, Plaintiffs must prove that the Site is a "facility" as

24  defined by CERCLA.

25  _____

26        [1] "To the extent that any of the Findings of Facts may be deemed Conclusions of Law, they also
    shall be considered conclusions.  Likewise, to the extent that any of the Conclusions of Law may be
27  deemed Findings of Fact, they shall be considered findings."  United States v. Newmont USA Limited and
    Dawn Mining Co., No. CV-05-020-JLQ, 2008 WL 4621566 at *2  n.1 (E.D. Wash. Oct. 17, 2008), citing
28  Miller v. Fenton, 474 U.S. 104, 113-14, 106 S. Ct. 445, 451-52 (1985) (noting the difficulty, at times, of
    distinguishing findings of facts from conclusions of law).

                                      1

1    Second, they must show that a "release" or "threatened release" of a hazardous

2    substance from the facility has occurred. Third, Plaintiffs must establish that the release

3    or threatened release caused Plaintiffs to incur response costs.  Fourth and finally, a

4    defendant must fall within one of the four classes of covered persons described in

5    Section 107(a). Cose v. Getty Oil Co., 4 F.3d 700, 703-04 (9th Cir. 1993); *3550* Stevens

6    Creek Assocs. v. Barclays Bank of California, 915 F.2d 1355, 1358 (9th Cir. 1990).

7    Docket Entry ("DE") 154 at 9:14-26 (Memorandum and Order, 12/22/2011).

8            2.      Among the four classes of covered persons described in Section 107(a) is

9    "any person who at the time of disposal of any hazardous substance owned or operated

10   any facility at which such hazardous substances were disposed of …."  42 U.S.C.

11   § 9607(a)(2).

12           3.      This Court has previously determined that (1) the Lava Cap Site is a

13   facility; (2) that arsenic is a hazardous substance; (3) that there were releases of arsenic

14   at and from the Site; and (4) that the Plaintiffs have incurred response costs responding

15   to those releases.  DE 152 (Memorandum and Order, 12/8/2011); see DE 154 at 10:9-16

16   (Memorandum and Order, 12/22/2011).

17           4.      The remaining issues for decision are Sterling's status as a covered person

18   under Section 107(a) of CERCLA, and this Court's in personam jurisdiction over Sterling.

19           5.      Under Section 101(21) of CERCLA, the definition of "person" includes a

20   "corporation."  42 U.S.C. § 9601(21); American Tel. & Tel. Co. v. Compagnie Bruxelles

21   Lambert, 94 F.3d 586, 591 n.8 (9th Cir. 1996).  The Court concludes, as an initial matter,

22   that Sterling is a person under Section 101(21) of CERCLA because it is a corporation.

23           6.      As discussed below, the Court concludes that (a) Sterling expressly and

24   impliedly assumed the liabilities of former owner/operator Lava Cap Gold Mining

25   Corporation ("LCGMC"); (b) that Sterling is the successor to LCMGC by de facto merger;

26   and (c) that Sterling operated the Lava Cap Mine at the time of a disposal of a

27   hazardous substance.   Any one of these three conclusions alone satisfies CERCLA

28   liability.

2

1    This Court further concludes that it has jurisdiction over Sterling based on its status as

2    LCGMC's successor, and based on its direct operation of the Lava Cap Mine.  Either of

3    these two conclusions alone is sufficient for the Court's exercise of jurisdiction over

4    Sterling.

5

6    II.    **STERLING'S EXPRESS AND IMPLIED ASSUMPTION OF LCGMC'S LIABILITIES**

7

8         7.     This Court has previously held that the Ninth Circuit recognizes that

9    corporate successors should answer for the liabilities of their predecessor corporations

10   under CERCLA. See Louisiana-Pacific Corp. v. ASARCO, Inc., 909 F.2d 1260, 1262 (9th

11   Cir. 1990) ("Congress did intend successor liability" under CERCLA), overruled on other

12   grounds, Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant, Inc., 132 F.3d 1295,

13   1301), amended and superseded by 159 F.3d 358, 364 (9th Cir. 1997).  DE 154, at

14   10:19-26.

15        8.     This Court has previously held that, in addition, other courts have uniformly

16   concluded that successor corporations are within the meaning of "persons" for purposes

17   of CERCLA liability. See United States v. Mexico Feed and Seed Co., Inc., 980 F.2d

18   478, 486-87 (8th Cir. 1992); United States v. Carolina Transformer Co., 978 F.2d 832,

19   837 (4th Cir. 1992); Anspec Co., Inc. v. Johnson Controls, Inc., 922 F.2d 1240, 1245-48

20   (6th Cir. 1991); Smith Land & Improvement Corp. v. Celotex Corp., 851 F.2d 86, 91-92

21   (3d Cir. 1988), cert. denied, 488 U.S. 1029, 109 S. Ct. 837 (1989).  DE 154, at 11:1-9.

22        9.     This Court has previously held that the Ninth Circuit has not squarely

23   addressed whether federal or state law governs when determining successor liability

24   under CERCLA.  Atchison, 159 F.3d at 362-64 (stepping back from a prior unequivocal

25   announcement as to the applicability of state law, on grounds that the court "need not

26   determine" whether state law is dispositive since both state law and federal common law

27   yield the same result).  DE 154, at 12:8-16.

28   ///

1    10.    This Court has previously held that, under both Ninth Circuit precedent and

2    California law, successor liability does not arise from an asset purchase "unless (1) the

3    purchasing corporation expressly or impliedly agrees to assume the liability; (2) the

4    transaction amounts to a 'de-facto' consolidation or merger; (3) the purchasing

5    corporation is merely a continuation of the selling corporation; or (4) the transaction was

6    fraudulently entered into in order to escape liability."  Atchison, 159 F.3d at 361; Ray v.

7    Alad Corp., 19 Cal. 3d 22, 28 (Cal. 1977).  As the quoted language makes clear,

8    successor liability can rest on any one of these four variants.  DE 154, at 10:11-21.

9    11.    This Court has previously held that parol evidence is admissible to show all

10   circumstances surrounding a transaction in order to determine the meaning intended

11   and understood by the parties.  See Brookes v. Adolph's Ltd., 170 Cal. App.2d 740, 746

12   (Cal. App. 2 Dist. 1959); see also Cal. Civ. Code § 1647 ("A contract may be explained

13   by reference to the circumstances under which it was made, and the matter to which it

14   relates").  DE 154, at 14:24-15:4.

15   12.    Successor liability exists when the parties have, through agreements,

16   words, or conduct, indicated their intent to shift liability from one party to another.  Fisher

17   v. Allis-Chalmers Corp. Product Liability Trust, 95 Cal. App.4th 1182, 1192-93 (Cal. App.

18   5 Dist. 2002); City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,

19   68 Cal. App. 4th 445, 474 (Cal. App. 1 Dist. 1998) ("The mutual intention to which the

20   courts give effect is determined by objective manifestations of the parties' intent,

21   including the words used in the agreement, as well as extrinsic evidence of such

22   objective matters as the surrounding circumstances under which the parties negotiated

23   or entered into the contract; the object, nature and subject matter of the contract; and the

24   subsequent acts and conduct of the parties.").

25   ///

26   ///

27   ///

28   ///

4

1    See also Florom v. Elliott Mfg., 867 F.2d 570, 576, reh'g denied, 879 F.2d 801 (10th Cir.

2    1989) (holding that material factual issues remained regarding successor liability,

3    preventing summary judgment for the purchaser, because the parties' agreement did not

4    expressly exclude successor tort or product liability, and the purchaser had maintained

5    product liability insurance coverage); Ambrose v. Southworth Products Corp.,

6    953 F. Supp. 728, 736 (W.D. Va. 1997) (holding that a letter taking responsibility for

7    product defects and other conduct and circumstances "suggest[ed] that an implied

8    agreement may have existed," transferring liability).

9        13.    A contracting party's assumption of liabilities may be express, implied, or

10   both. Atchison, 159 F.3d at 361; Ray, 19 Cal. 3d at 28.   As discussed below, the Court

11   concludes that Sterling expressly and impliedly assumed LCGMC's liabilities.

12

13        **A.     Sterling's Express Assumption of LCGMC's Liabilities**

14

15        14.    The analysis of whether a contracting party has expressly assumed the

16   liabilities of a seller begins by construing the parties' written agreements.  Schwartz v.

17   Pillsbury Inc., 969 F.2d 840, 845-46 (9th Cir. 1992); Gee v. Tenneco, Inc., 615 F.2d 857,

18   862 (9th Cir. 1980); United States v. Iron Mountain Mines, Inc., 987 F. Supp. 1233 (E.D.

19   Cal. 1997); Universal Sales Corp. v. California Press Mfg. Co., 20 Cal.2d 751, 760 (Cal.

20   1942).  But courts also routinely look beyond the parties' agreements to consider all

21   relevant circumstances.  In Warner Construction Corp. v. City of Los Angeles, 2 Cal.3d

22   285, 296-97 (Cal. 1970), the California Supreme Court stated that "[t]he construction

23   given the contract by the acts and conduct of the parties with knowledge of its terms,

24   before any controversy has arisen as to its meaning, is entitled to great weight and will,

25   when reasonable, be adopted and enforced by the court."

26   ///

27   ///

28   ///

1   Accord Western Med. Enter., Inc. v. Albers, 166 Cal. App. 3d 383, 391 (Cal. App. 1 Dist.

2   1985); Zito v. Firemen's Insur. Co., 36 Cal. App. 3d 277, 284-85 (Cal. App. 4 Dist. 1973);

3   Schmidt v. Macco Construction Co., 119 Cal. App. 2d 717, 732 (Cal. App. 1 Dist. 1953);

4   Bartel v. Assoc. Dental Supply Co., 114 Cal. App. 2d 750, 753-54 (Cal. App. 1 Dist.

5   1952).

6        15.    "The acts of the parties under the contract afford one of the most reliable

7   means of arriving at their intention."  Wolf v. Walt Disney Pictures & Television, 162 Cal.

8   App. 4th 1107, 1134 (Cal. App. 2 Dist. 2008); see also Spinks v. Equity Residential

9   Briarwood Apts., 171 Cal. App. 4th 1004, 1024 (Cal. App. 6 Dist. 2009) (the parties

10  "practical construction of a contract, as shown by their actions, is important evidence of

11  their intent"); Cedars-Sinai Med. Ctr. v. Shewry, 137 Cal. App. 4th 964, 983 (Cal. App. 2

12  Dist. 2006) (the parties' conduct subsequent to the formation of the contract may be

13  looked upon "for they are probably least likely to be mistaken as to the intent").

14       16.    Courts have universally held that "language transferring 'all liabilities' is

15  sufficiently broad to include environmental liabilities," including liability under laws

16  enacted after the operative contract.  Iron Mountain Mines, 975 F. Supp. at 1241; see

17  Jones-Hamilton Co. v. Beazer Materials & Services, Inc., 973 F.2d 688, 693 (9th Cir.

18  1992) (finding that a 1970 indemnification clause included after-arising CERCLA

19  environmental liability); Philadelphia Elec. Co. v. Hercules, Inc., 762 F.2d 303, 309-10

20  (3d Cir. 1985) (CERCLA liabilities included in "all debts, obligations and liabilities"); HRW

21  Sys., Inc. v. Washington Gas Light Co., 823 F. Supp. 318, 332-33 (D. Md. 1993) ("all

22  liabilities and obligations, liquidated or unliquidated" includes after-arising liabilities); see

23  also Olin Corp. v. Consolidated Aluminum Corp., 5 F.3d 10, 15-16 (2d Cir. 1993) ("all

24  liabilities (absolute or contingent)"); Purolator Prods. Corp. v. Allied-Signal, Inc.,

25  772 F. Supp. 124, 131-32 (W.D.N.Y. 1991) (finding the parties intended transfer where

26  indemnification agreement referred to "all liabilities").

27  ///

28  ///

6

1    17.    Sterling argues based on these cases that the word "all" must appear

2    before the word "liabilities" in order to conclude that all liabilities have been transferred

3    under an agreement.  The Court disagrees.  These cases do not stand for the

4    proposition that the word "all" is a prerequisite for a finding of broad assumption of

5    liabilities, as Sterling contends.  Rather, they suggest that use of the word "all" to

6    describe the liabilities assumed is one indicator of the parties' mutual intention to transfer

7    broad liabilities.  It is not the only indicator.

8    18.    Rather,  prevailing case law suggests that the parties' intentions should be

9    determined based on all of the circumstances surrounding the transaction.  The Court

10   notes that one court imposed successor liability under CERCLA based on an express

11   assumption of liabilities where the parties represented that the buyer had agreed to

12   purchase "substantially all of the assets and liabilities" of the seller.  See Ashley II of

13   Charleston, L.L.C. v. PCS Nitrogen, Inc., No. 2:05-2782-CWH, 2007 WL 2893372 at *7

14   n.10 (D.S.C. Sept. 28, 2007).  Courts have even considered whether the agreement

15   explicitly states that the parties did not intend the assumption of certain liabilities.  In

16   Philadelphia Elec. Co. v. Hercules, Inc., for example, the court concluded that the

17   defendant's "assumption of liability did not exclude liabilities that were unknown or

18   contingent," in contrast to cases in which "clear and specific language…[was] used to

19   effect the exclusion of unknown or contingent liabilities."  Philadelphia Elec. Co.,

20   762 F.2d at 309-10 (emphasis added) (reasoning that when a party transfers liabilities

21   except for certain listed exceptions, "it is of no consequence that the specific liability at

22   issue is not enumerated….Unless this liability comes within one of the express

23   exceptions, [the defendant] may be held to have assumed it.").

24   19.    This Court concludes that Sterling expressly assumed all the liabilities of

25   LCGMC, including its CERCLA liability.  As discussed in Findings 28-30, Sterling

26   acquired all of the assets of LCGMC "subject to its liabilities."  Sterling's assumption of

27   liabilities is broad and unfettered.

28   ///

1  The 1952 Agreement with LCGMC does not exclude any liability from those assumed by

2  Sterling, and does not reserve any liability to LCGMC.  Where specific liabilities are

3  mentioned, the 1952 Agreement is inclusive, not exclusive.  Sterling agreed, for

4  example, to assume all the expenses of LCGMC, "including" the obligation to cause the

5  dissolution of LCMGC and the distribution to LCGMC stockholders of Sterling stock.

6          20.     The parol evidence also indicates that the parties intended to transfer

7  broad liabilities to Sterling under the 1952 Agreement.  As discussed in Findings 47-54,

8  both parties represented to their shareholders that Sterling would assume broad

9  liabilities and Sterling represented to Chase Manhattan Bank that it had indeed assumed

10  all of LCGMC's liabilities when it sought access to funds in LCGMC's name.   All three of

11  these letters are significant admissions of senior officers of both contracting parties.  See

12  Ladjevardian v. Laidlaw-Coggeshall, Inc., 431 F. Supp. 834, 839-40 (S.D.N.Y. 1977)

13  (noting the importance of "[a]dmissions of liability on the part of officers or other

14  spokesmen of the successor corporation" as a factor in determining whether a party has

15  impliedly assumed liability).  They express a clear and mutual intent to transfer all

16  liabilities to Sterling.

17          21.     Sterling argues that it assumed only those liabilities of which it was

18  advised, and that it could not have been advised of LCGMC's CERCLA liability because

19  CERCLA was not yet enacted.  The Court finds this interpretation of the 1952

20  Agreement unnecessarily restrictive.  Sterling relies on a "Whereas clause" in the

21  Agreement, in which the parties represent that Sterling "has made an inspection by its

22  representatives of the physical assets of [LCGMC] and has been duly advised as to the

23  other assets and liabilities of [LCGMC]."  See Finding 32.  This language does not

24  restrict the scope of Sterling's assumption in any way.  It merely notes that Sterling has

25  conducted its due diligence, and that LCMGC has disclosed its liabilities to Sterling.

26  ///

27  ///

28  ///

8

1   Even if Sterling's interpretation of the 1952 Agreement prevailed, as discussed in

2   Findings 33-40, Sterling was constructively advised and was on notice of both the mine

3   waste and the environmental liability it posed prior to the closing of the 1952 Agreement.

4

5              **B.     Sterling's Implied Assumption of LCGMC's Liabilities**

6

7              22.    Even where there has been no express assumption of liabilities, an implied

8   assumption may still be found.  In Carter v. CMTA-Molders & Allied Workers Health &

9   Welfare Trust, for example, the court considered whether the defendant had impliedly

10   assumed agreements its predecessor had made with a third party.  563 F. Supp. 244,

11   247 (N.D. Cal. 1983), aff'd, 736 F.2d 1310 (9th Cir. 1984).  Only after considering

12   whether the purchaser was aware of these agreements, whether the contracting parties

13   discussed them, and the fact that the defendant had refused to execute new agreements

14   with the third party did the court conclude that the defendant had not assumed the

15   seller's agreements.  Id.  See also SCM Corp. v. Berkel, Inc., 73 Cal. App. 3d 49, 58-59

16   (Cal. App. 5 Dist. 1977) (holding that, although the parties' agreement transferring

17   liability took place before the adoption of strict product liability in California, it appeared

18   from the facts "that the parties intended the burden of liability for injuries…to fall entirely

19   on [the successor's] shoulders," and the parties' intent was determinative: "it should not

20   be necessary to look for unusually clear, express language in order to find a provision

21   transferring tort liability in the sale of a business"); Ambrose, 953 F. Supp. at 736

22   (holding that although there was no express assumption of liabilities in the form of an

23   agreement between the parties, the plaintiff had established a material factual issue as

24   to the existence of an implied assumption).

25              23.    Courts have emphasized that an implied assumption of liabilities is like an

26   express assumption, an agreement between parties with the intent of transferring

27   liability; it "may be inferred from the conduct, situation or mutual relation of the parties"

28   outside the parties' official agreement.

9

1  Truck Ins. Exch. v. Amoco Corp., 35 Cal. App. 4th 814, 824-25 (Cal. App. 2 Dist. 1995)

2  (internal citations omitted).  See also Antiphon, Inc. v. LEP Transport, Inc., 183 Mich.

3  App. 377, 384-85 (Mich. App. 1990) (holding that the successor's "conduct and

4  representations" indicating an intent to assume liability were sufficient to imply the

5  existence of an assumption of liabilities); cf. Cal. Civ. Code § 1621 (an implied contract is

6  one in which its "existence and terms…are manifested by conduct").

7       24.    Whether a party has impliedly assumed the liabilities of another "depends

8  on the facts and circumstances of each case" and the parties' conduct and

9  representations.  Ladjevardian, 431 F. Supp. at 839-40 (weighing "the effect of the

10  transfer [of liabilities] upon creditors of the predecessor corporation" and "[a]dmissions of

11  liability on the part of officers or other spokesmen of the successor corporation" to note

12  that "the facts do suggest that there may have been an implied assumption of liability").

13  See also Asarco, 909 F.2d at 1264 ("The question of implied assumption of liability is a

14  fact specific question, rather than a purely legal issue," and addressing it on appeal

15  would require "additional facts…to be developed"); Antiphon, 183 Mich. App. 377

16  ("Whether such an intent [to assume liability] exists must be determined from the facts

17  and circumstances of each case.").

18       25.    Sterling's broad assumption of LCGMC's liabilities may reasonably be

19  implied from the circumstances surrounding the transaction.  As discussed in Findings

20  24-30, Sterling took control of the entirety of LCGMC's business, which other courts

21  have found significant.  See Iron Mountain Mines, 987 F. Supp. at 1243 (noting that the

22  fact that the acquiring company took control of every aspect of the mining company's

23  operation suggested that the acquiring company intended to assume all of the mining

24  company's liabilities).

25       26.    As discussed in Findings 55-57, LCGMC assigned all of its insurance

26  policies to Sterling.  The Court infers from this assignment that LCGMC did not anticipate

27  any further need for coverage from losses of any kind.

28  ///

1      27.     Moreover, LCGMC directors and shareholders approved the dissolution of

2   their company.  The Court concludes that this is further evidence of the parties' mutual

3   intention to transfer all liabilities to Sterling.  LCGMC was a Delaware corporation and, in

4   1952, the extent of personal liability of Delaware directors and shareholders of dissolved

5   corporations was unresolved.  One Delaware court commenting on the relevant statutory

6   scheme noted that it "still leaves open the question, what, if any, rights are afforded to

7   persons who have no claim against a corporation at the time of its dissolution, or during

8   the statutory windup period, but who do thereafter acquire such a claim."  In re RegO

9   Co., 623 A.2d 92, 96 (Del. Ch. 1992).  The court was troubled, for example, by the open

10  question of whether a tort claimant injured by an arguably defective product "perhaps

11  years after" the corporation had been dissolved could bring a cognizable claim against

12  directors and shareholders of the dissolved entity.  Id. ("This I take to be an unclear and

13  troubling question.").  It noted that, "in this state of affairs, the question of a dissolving

14  corporation's duty, if any, to potential future claimants is problematic in at least two

15  ways."  Id.  First, "the problem of compensation to persons injured by defective products

16  or by undiscovered and actionable environmental injury, caused by dissolved

17  corporations, is of obvious social concern."  Id. (emphasis added).  And second, the

18  unsettled state of the law gave corporate directors "insufficient comfort to permit them

19  safely to make a final distribution, if they have reason to know that future claims are

20  quite likely to arise."  Id. (emphasis added).

21     28.     Sterling cites to In re Citadel Industries, Inc., 423 A.2d 500 (Del. Ch. 1980)

22  in support of its argument that LCGMC's directors were not potentially liable for claims

23  brought against the dissolved corporation.  The Court concludes that the case is

24  inapposite.  Citadel addressed the potential liability of the dissolved corporation, not of

25  the individual corporate directors.  And it addressed the state of the law fifteen years

26  after the corporation dissolved, not at the time of dissolution.

27  ///

28  ///

29.     The Court concludes that in 1952 there was a significant risk of personal liability for LCGMC's directors and shareholders in the event claims arose against LCGMC after dissolution.  In light of this risk, the directors and shareholders of LCGMC can only have understood that the company had transferred all liabilities to Sterling under the 1952 Agreement when they approved LCGMC's dissolution.  See Iron Mountain Mines, 987 F. Supp. at 1243.

30.     As discussed in Findings 65-72, Sterling's conduct is also consistent with its intention to acquire all of LCGMC's liabilities.  Sterling took full responsibility for workers compensation claims brought by former LCGMC miners.  Sterling never refused to pay a claim on the ground it was unknown, and there is no evidence that Sterling ever referred a claim to the former directors or shareholders of LCGMC for payment.  To the contrary, the evidence shows Sterling paid out more than $100,000 in claims, and that it continued to resolve claims as late as 1985.  It used all of the bond money it had acquired from LCGMC and, when that ran out, it used its own funds to resolve the claims.  The Court concludes that Sterling's conduct with respect to these claims demonstrates its intention to assume all liabilities of LCGMC, known and unknown.

31.     This Court concludes, based on the language of the 1952 Agreement, and all the facts and circumstances surrounding the transaction, that Sterling expressly and impliedly assumed all LCGMC's liabilities, including its CERCLA liability.

## C.      A Clear Intention to Transfer Broad Liabilities Is All That Is Needed to Transfer CERCLA Liability

32.     Sterling asserts that, for contracting parties to transfer liability under statutes enacted after a transaction occurs, the parties must clearly state their intention to do so in the agreement itself.  The Court concludes that no such requirement exists for a transfer of CERCLA liabilities based on a review of the pertinent case law discussed below.

///

1        33.     CERCLA liability has been held to have been transferred under

2   agreements made prior to its enactment.  In United States v. Iron Mountain Mines, Inc.,

3   the court held that the purchasing corporation had expressly assumed CERCLA liability

4   as part of its agreements with the seller, even though CERCLA was enacted years after

5   the agreements had been signed.  Iron Mountain Mines, 987 F. Supp. at 1243.

6        34.     Numerous other courts have also recognized CERCLA liability retroactively

7   in pre-CERCLA agreements.  See, e.g., Olin, 5 F.3d at 15-16 (holding that the parties did

8   intend to indemnify for CERCLA liability in an agreement made before CERCLA's

9   enactment); Beazer East, Inc. v. Mead Corp., 34 F.3d 206, 211 (3rd Cir. 1994)

10  (reasoning that "[o]ther courts that have analyzed pre-CERCLA indemnity provisions

11  have uniformly held that a pre-CERCLA agreement can require one party to indemnify

12  another against CERCLA liability" and holding that a pre-CERCLA agreement can trigger

13  CERCLA liability); Philadelphia Elec. Co., 762 F.2d at 309-10 (holding that the language

14  of liability assumption was broad enough to include contingent and unknown liabilities);

15  Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co., 14 F.3d 321, 327 (7th Cir. 1994)

16  ("A party may indemnify another party for liability arising out of a law not in existence at

17  the time of contracting," including CERCLA liability); Purolator Prods., 772 F. Supp. at

18  131-32 (reasoning that pre-CERCLA agreements with "broad, inclusive wording" on

19  liability can still be applied to CERCLA claims).

20       35.     California courts have found parties to have assumed liability under after-

21  enacted statutes.   For example, in SCM Corp. v. Berkel, Inc., a tort case, the defendant

22  and its predecessor had agreed to transfer liabilities in an agreement made before the

23  state adopted the doctrine of strict product liability.  73 Cal. App. 3d at 59.  The court

24  nonetheless held that the defendant was strictly liable for the plaintiff's injury as a

25  successor, since it appeared from the evidence "that the parties intended the burden of

26  liability for injuries" to be transferred to the defendant.  Id. at 58.

27  ///

28  ///

13

1  The court held that "although principles of contract law should apply and the intention of

2  the parties should be determinative, it should not be necessary to look for unusually

3  clear, express language in order to find a provision transferring tort liability in the sale of

4  a business….The question is one of contract interpretation, and we should use a

5  pragmatic approach." Id.

6      36.     In other contexts, California courts have held that contracts may be

7  "deemed to incorporate and contemplate not only the existing law but the reserve power

8  of the state to amend the law or enact additional laws for the public good and in

9  pursuance of public policy." In re Marriage of Walton, 28 Cal. App.3d 108, 112 (Cal.

10  App. 4 Dist. 1972) (holding that a statutory change in the grounds for divorce was not an

11  unconstitutional impairment of the right to contract).  Thus, "not only is the existing law

12  read into contracts in order to fix their obligations, but the reservation of the essential

13  attributes of continuing governmental power is also read into contracts as a postulate of

14  the legal order." People v. Gipson, 117 Cal. App. 4th 1065, 1069 (Cal. App. 6  Dist.

15  2004) (holding that the defendant's plea bargain contemplated the power of the state to

16  amend the law and incorporated subsequent changes in the law enacted in pursuit of the

17  public good).

18      37.     This Court in its December 22, 2011 Order (DE 154) indicated  that "under

19  California law, laws enacted after a contract was formed can still become part of an

20  assumption of liabilities," but in dicta noted that Swenson v. File appears to require "clear

21  and distinct" evidence that a broad assumption was in fact contemplated by the parties.

22  DE 154 at 12:25-26.  The "clear and distinct" standard that the Court attributed to

23  Swenson is not in fact specified in that opinion.  See Swenson v. File, 3 Cal.3d 389 (Cal.

24  1970).  Instead, the Swenson court notes that "laws enacted subsequent to the

25  execution of an agreement are not ordinarily deemed to become part of the agreement

26  unless its language clearly indicates this to have been the intention of the parties."  Id.

27  at 393.

28  ///

14

1   Thus, the Swenson court did not set a "clear and distinct" standard, but looked to the

2   parties' intent to determine the meaning of the agreement, as other courts have.  Id.   To

3   the extent the Court's December 22, 2011 Order indicated otherwise, that finding was in

4   error and the correct standard is set forth herein.

5           38.     At least one federal court has determined that the rule applied in Swenson,

6   preventing laws enacted after a contract was formed from becoming part of the contract

7   unless there is a clear statement to the contrary, "ought not be applied to CERCLA

8   liability."  Iron Mountain Mines, Inc., 987 F. Supp. at 1243.  The Iron Mountain Mines

9   court found the language of the parties' agreement broad enough to encompass

10  CERCLA liability, although it was silent as to after-enacted liability.  Id. at 1242.

11          39.     Reading Swenson to require courts to look for "clear and distinct" evidence

12  in the parties' written agreements would conflict with well-established state law

13  encouraging courts to examine parol evidence, which this Court previously held to be

14  "admissible to show all circumstances surrounding a transaction in order to determine

15  the meaning intended and understood by the parties."  DE 154, at 14:24-26.  See, e.g.,

16  Brookes, 170 Cal. App.2d at 746; Cal. Civ. Code § 1647 ("a contract may be explained

17  by reference to the circumstances under which it was made, and the matter to which it

18  relates").  It would also appear to conflict with other California cases holding that the

19  intentions of the parties are determinative, and that it "should not be necessary to look

20  for unusually clear, express language" to determine that intent.  See, e.g., SCM Corp.,

21  73 Cal. App.3d at 58.  These reasons, and those discussed in Iron Mountain Mines,

22  such as CERCLA's broad purpose and clear retroactivity, compel the conclusion that

23  Swenson v. File "ought not be applied to CERCLA liability."  Iron Mountain Mines, Inc.,

24  987 F. Supp. at 1242-43 (finding the language of the parties' agreement broad enough

25  to encompass CERCLA liability, although it did not mention after-enacted liability

26  specifically).

27  ///

28  ///

40.     This Court adopts the interpretation of the requirements for an express or implied assumption of after-enacted CERCLA liability in Iron Mountain Mines as the correct one, and holds that after-enacted CERCLA liability can be assumed if all the available evidence, including parol evidence, suggests that a broad assumption was in fact contemplated by the parties.

## III.     LCGMC'S DE FACTO MERGER WITH STERLING

41.     The doctrine of de facto merger is an equitable doctrine that recognizes that successor liability may attach "where one corporation is absorbed by another, but without compliance with the statutory requirements for a merger."  Iron Mountain Mines, 987 F. Supp. at 1243 n.19 (citations omitted).

42.     California law recognizes that "[a] transaction cast in the form of an asset sale [which] actually achieves the same practical result as a merger will be treated as a merger."  Marks v. Minnesota Mining and Mfg. Co., 187 Cal. App. 3d 1429, 1435 (Cal. App. 1 Dist. 1986).  The buyer corporation assumes the liabilities, known and unknown, of the seller corporation.  Id.

43.     When a de facto merger is alleged, the court must determine "the substance of the agreement [regardless of] the title put on it by the parties."  In re Acushnet River & New Bedford Harbor Proceedings re Alleged PCB Pollution, 712 F. Supp. 1010 (D. Mass. 1989) (citations omitted).   Courts typically consider the following factors in determining whether to characterize an asset purchase as a de facto merger:

(1)     There is a continuation of the enterprise of the seller corporation, so that there is continuity of management, personnel, physical location, assets, and general business operations.

///

///

1    (2)    There is a continuity of shareholders which results from the purchasing

2  corporation paying for the acquired assets with shares of its own stock, this stock

3  ultimately coming to be held by the shareholders of the seller corporation so that they

4  become a constituent part of the purchasing corporation.

5    (3)    The seller corporation ceases its ordinary business operations, liquidates,

6  and dissolves as soon as legally and practically possible.

7    (4)    The purchasing corporation assumes those obligations of the seller

8  ordinarily necessary for the uninterrupted continuation of normal business operations of

9  the seller corporation.  See, e.g., Philadelphia Elec. Co., 762 F.2d at 310.

10    44.    Courts have held that "[n]o one of these factors is either necessary or

11  sufficient to establish a de facto merger."  Acushnet River, 712 F. Supp. at 1015

12  (citations omitted).  See also Atlas Tool Co., Inc. v. Commissioner of Internal Revenue,

13  614 F.2d 860, 870 (3d Cir. 1980) ("[E]very factor is not essential for applying the

14  [de facto merger] doctrine.");  Menacho v. Adamson United Co., 420 F. Supp. 128, 133

15  (D. N.J. 1976) ("Not all of these factors are needed to demonstrate a merger; rather,

16  these factors are only indicators that tend to show a de facto merger.");  Lumbard v.

17  Maglia, Inc., 621 F. Supp. 1529, 1535 (S.D.N.Y. 1985).

18    45.    Those courts that have assigned weight to individual factors in evaluating

19  whether a de facto merger has occurred typically view continuity of shareholders (not

20  continuation of the seller's enterprise) as the most important of the factors supporting a

21  de facto merger.  See Louisiana-Pacific Corp. v. Asarco, Inc., 909 F.2d at 1265

22  ("Because there is no genuine issue of material fact as to continuity of shareholders, the

23  district court did not err in finding that the asset purchase was not a de facto merger.").

24  The Eleventh Circuit opined, for example, in Bud Antle, Inc. v. Eastern Foods, Inc., that:

25       [a]t the very least, there must be some sort of continuation of the
         stockholders' ownership interests. . . . The reason for this requirement is
26       that corporate liability adheres not to the nature of the business enterprise
         but to the corporate entity itself. . . .  Even if the corporation sells to
27       another corporation its entire business operation and all its assets, in
         exchange for some consideration other than stock, the two corporate
28       entities remain distinct and intact.

17

> The corporate entities have not merged, and each is liable for its own debts
> . . . .  Where the assets are sold for cash [rather than stock], no basic
> fundamental change occurs in the relationship of the stockholders to their
> respective corporations, . . . and absent continuity of shareholder interest,
> the two corporations are strangers, both before and after the sale.

758 F.2d at 1458 (citations omitted).  See also Dayton v. Peck, Stow and Wilcox Co.

(Pexto), 739 F.2d 690, 693 (1st Cir. 1984) (continuity of shareholders is "[o]ne of the key

requirements for a merger," because "the shareholders of the seller corporation become

a constituent part of the purchaser corporation"); Atlas Tool Co., 614 F.2d at 871 (noting

that "continuity is the basis and test" for the de facto merger exception and that

continuity existed in, among other things, "continuation of stockholder interest").

46.     Unlike other theories of successor liability, the de facto merger doctrine is a

judge-made rule that "rests on general equitable principles."  Acushnet River, 712

F. Supp. at 1015 (citations omitted).  "The question of whether a transferee of assets is

liable for the debts and liabilities of the transferor . . . must ultimately be decided by

weighing the 'policy protecting corporate creditors . . . against the equally important

policy respecting separate corporate entities.'"  Shannon v. Samuel Langston Co.,

379 F. Supp. 797, 802 (W.D. Mich. 1974) (internal quotes omitted).  The better-reasoned

decisions turn on the need for fairness, and conduct a holistic inquiry rather than a rote

factor-by-factor analysis.  For example, the court in Marks focused on whether "an asset

sale actually achieves the same practical result as a merger," and concluded that a de

facto merger had occurred because "the result of the transaction was exactly that which

would have occurred had a statutory merger taken place, and we are accordingly

convinced of the necessity and the fairness of transferring liability."  Marks, 187 Cal.

App. 3d at 1436-37.

47.     This Court has previously found that determining whether there is a

continuity of enterprise is a fact-intensive inquiry necessary to ensure that "solvent

corporations, going concerns, should not be permitted to discharge their liabilities to

injured persons simply by shuffling paper and manipulating corporate entities."

///

1    DE 154, at 17:7-12 (quoting <u>Marks v. Minnesota Mining and Mfg. Co.</u>, 187 Cal. App. 3d

2    1429, 1437 (Cal. App. 1 Dist. 1986) (internal citation omitted)).

3         48.    This Court concludes, on all the evidence presented, that the 1952

4    transaction had all of the indicia of a <u>de facto</u> merger.   The facts compel the conclusion

5    that Sterling was not merely acquiring LCGMC's assets, but rather that LCGMC was

6    being merged with and absorbed into Sterling.

7         49.    The Court concludes that there was a continuity of shareholders.  As

8    discussed in Findings 75-76, LCGMC's shareholders were absorbed as Sterling's

9    shareholders.

10        50.    The Court concludes that the seller corporation ceased its ordinary

11   business operations and promptly dissolved.  As discussed in Finding 77, LCGMC

12   dissolved soon after the transaction was completed.

13        51.    The Court concludes that the purchasing corporation assumed the seller's

14   obligations necessary for continuation of its business operations.  As discussed in

15   Findings 78-79, Sterling assumed the tax, payroll, insurance, and other expenses,

16   including responsibility for resolving workers' compensation claims.

17        52.    The Court concludes that there was a continuation of the enterprise of the

18   seller corporation, including continuity of management, personnel, physical location,

19   assets, and general business operations, as discussed in Findings 81-87.  Based on the

20   evidence discussed in Findings 89-91, the Court concludes that LCGMC's business

21   operations in 1952 consisted of holding the Mine for future reopening, and searching for

22   parties with the interest and wherewithal to return the Mine to production.

23        53.    This Court further concludes, based on the evidence discussed in Findings

24   88-139, that Sterling also wished to return the Mine to production, and that for decades it

25   sought partnerships with other mining enterprises to reopen the Mine.  LCGMC

26   employees continued to work at the Mine, indicating continuity of personnel.  Sterling

27   added two former LCGMC officials to its own board to provide representation for the

28   former LCGMC shareholders, indicating continuity of management.

1  Sterling acquired all the assets of LCMGC and decided to preserve some equipment for

2  future mining operations, and to dispose of surplus equipment in California.   The Court

3  concludes that these facts establish a complete continuity of assets and location.  And,

4  based on the evidence, the Court concludes that Sterling continued the general business

5  operations of LCGMC.  Sterling repeatedly commissioned profitability studies for the

6  Lava Cap Mine, it adopted and maintained a policy of holding sufficient equipment and

7  property rights to resume mining and, for decades, it actively courted business partners

8  in an effort to return the mine to production.

9       54.     Sterling argues that it did not acquire LCGMC's assets with the intent of

10  resuming production there.  Rather, it argues, its sole objective was to acquire the

11  surface plant for use at its mine in Duvernay, Quebec.  As discussed in Findings 92-124,

12  the Court rejects this interpretation of the evidence and finds that Sterling did intend to

13  reopen the Lava Cap Mine, if not from the outset, then, shortly after it acquired the Mine

14  in 1952.  Sterling has presented no case requiring or even suggesting that the intent of

15  the purchaser prior to the acquisition is the appropriate inquiry. The Court concludes that

16  continuity of the general business operations of the seller is best determined based on

17  what the surviving company actually did with the assets of the seller, not what it

18  considered doing with them prior to the acquisition.

19       55.     Sterling also argues that it did not continue the operations of LCGMC

20  because it sought and entertained offers to purchase the Mine over the course of its 37-

21  year association with the Mine.   Again, Sterling has presented the Court with no case

22  law in support of its argument.  The Court concludes that the law of <u>de facto</u> merger

23  does not require that the surviving company rigidly adhere to the business objectives of

24  the seller.  Even if that were a requirement of law, the Court concludes that Sterling's

25  willingness to sell the Mine if offered a sufficiently high price is consistent with its

26  business objectives, and LCGMC's business objectives, as an owner of a potentially

27  valuable gold mine.

28  ///

1       56.    An additional factor supporting a de facto merger is that the parties did in

2  fact treat the transaction as a merger for tax purposes, see  Findings 137-139, a factor

3  that other courts have relied on to determine that an asset purchase was a de facto

4  merger.  Marks, 187 Cal. App. 3d at 1430 n.2 & 1436 n.14; Acushnet, 712 F. Supp. at

5  1018 (noting that tax treatment of a transaction may also support a finding of de facto

6  merger).

7       57.    Based on the evidence, the Court concludes that Sterling absorbed

8  LCGMC in a de facto merger.  See Iron Mountain Mines, 987 F. Supp. at 1242 ("[The

9  purchasing corporation] did not purchase a component of [the seller's] business or a

10  portion of its assets. Rather, through its acquisition of all of [the seller's] stock and the

11  dissolution of the corporation, [the purchaser] absorbed all of [the seller] into itself.").

12       58.    The Court further concludes that the equities of treating Sterling's

13  acquisition as a de facto merger are clear.  Sterling should pay for the costs of the

14  arsenic cleanup at the Lava Cap Mine rather than federal and state taxpayers, because

15  it absorbed LCGMC, the entity that created the mine waste that resulted in the pollution.

16  See Marks, 187 Cal. App. 3d at 1433, 1437 (reasoning that "all of the indicia of a

17  de facto merger [were] present" where the predecessor corporation received shares of

18  the successor corporation's stock in exchange for all its assets and dissolved "as soon

19  as practicable" following the Agreement; despite "the disclaimer of liability for 'unknown

20  claims,'" the court was "convinced of the necessity and the fairness of transferring

21  liability"). This Court concludes that Sterling is LCGMC's successor by de facto merger.

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

1        **IV. STERLING'S OPERATION OF THE LAVA CAP MINE**

2

3        59.     In addition to concluding that Sterling is the successor to LCGMC and its

4    liabilities, the Court also concludes that Sterling is an operator under Section 107(a) of

5    CERCLA because it directed the activities of the Lava Cap Mine, including decisions with

6    respect to pollution control and environmental compliance, at the time of a disposal of a

7    hazardous substance.

8

9        **A.      Sterling Operated the Lava Cap Mine**

10

11       60.     An operator of a facility is any person that manages, directs, or conducts

12   "operations specifically related to pollution, that is, operations having to do with the

13   leakage or disposal of hazardous waste, or decisions about compliance with

14   environmental regulations."  United States. v. Bestfoods, 524 U.S. 51, 66-67, 118 S. Ct.

15   1876, 1887 (1998).  "If any such act of operating a corporate subsidiary's facility is done

16   on behalf of a parent corporation, the existence of the parent-subsidiary relationship

17   under state corporate law is simply irrelevant to the issue of direct liability."  Id. at 65, 118

18   S. Ct. at 1886.

19       61.     Under CERCLA, "operation" includes "the exercise of direction over the

20   facility's activities."  Id. at 71, 118 S. Ct. at 1889.  Norms of corporate behavior are

21   reference points for discerning which acts of direct operation give rise to liability and

22   which stem from the normal investor relationship between parent and subsidiary.

23   "[A]ctivities that involve the facility but which are consistent with the parent's investor

24   status, such as monitoring of the subsidiary's performance, supervision of the

25   subsidiary's finance and capital budget decisions, and articulation of general policies and

26   procedures should not give rise to direct liability."  Id. at 72, 118 S. Ct. 1889.

27   ///

28   ///

1

2

**1.      Sterling Is Not Entitled to a Presumption that Jack Gilbert Acted on Keystone's Behalf When He Responded to the Partial Collapse of the Timber Dam**

3

4

5

6

7

62.      The Supreme Court has stated several scenarios in which a parent corporation is liable for operating its subsidiary's facility.  One such scenario occurs when "a dual officer or director . . . depart[s] so far from the norms of parental influence exercised through dual officeholding as to serve the parent, even when ostensibly acting on behalf of the subsidiary in operating the facility."  Id. at 71, 118 S. Ct. at 1889.

8

9

10

11

12

13

14

63.      Although it is presumed that dual officers and directors "can and do change hats" to represent the corporations separately, id. at 69, 118 S. Ct. at 1888 (citing Lusk v. Foxmeyer Health Corp., 129 F.3d 773, 779 (5th Cir. 1997); see Schiavone v. Pearce, 77 F. Supp. 2d  284, 291 (D. Conn. 1999); Atlanta Gas Light Co. v. UGI Utilities, Inc., 463 F.3d 1201, 1205 n.6 (11th Cir. 2006), plaintiffs can rebut the presumption in various ways.  Bestfoods, 524 U.S. at 70 n.13, 118 S. Ct. 1889 n.13.  Specifically,

15

16

17

> It is prudent to say only that the presumption that an act is taken on behalf of the corporation for whom the officer claims to act is strongest when the act is perfectly consistent with the norms of corporate behavior, but wanes as the distance from those accepted norms approaches the point of action by a dual officer plainly contrary to the interests of the subsidiary yet nonetheless advantageous to the parent.

18

Id.

19

20

21

22

23

24

64.      As discussed in Findings 141-163, Jack Gilbert unquestionably directed the response to the partial collapse of the timber dam.  As an initial matter and as discussed in Finding 182, there is insufficient evidence to conclude that Jack Gilbert was in fact an officer or director of Keystone when he directed the response to the partial collapse of the timber dam.  As such, this Court cannot presume that he is entitled to the legal presumption of acting on Keystone's behalf.

25

26

27

28

65.      Even assuming Jack Gilbert was an officer or director of Keystone at that time, as discussed in Findings 141-163 and 202-209, Gilbert failed to review Cranmer's progress or follow up with Cranmer about compliance with the CAO, or to ensure the submission of a technical report and construction of lasting settling basins.

23

1   The Court concludes that Gilbert's failure put Keystone at risk of an enforcement action

2   by the Regional Water Board.  The Court further concludes that these same decisions by

3   Gilbert benefitted Sterling financially because it alone had the resources to comply, and

4   it avoided spending resources when it decided not to comply.  Thus, the Court declines

5   to presume that Gilbert acted on Keystone's behalf when he directed the response to the

6   partial collapse of the timber dam between 1979 and 1987.  Accordingly, the Court

7   concludes that Gilbert directed the response on behalf of, and for the benefit of, Sterling.

8          66.     Sterling argues that the CAO was rescinded, and therefore that the failure

9   to fully implement its requirements did not place Keystone at risk of enforcement.  The

10  Court has found that the CAO was not rescinded and remained in effect.  But, as

11  discussed below, the Court concludes that Sterling had a responsibility to fix the dam

12  even if the CAO was rescinded.

13         67.     By the 1980s, when Sterling had actual notice that the dam was "only

14  debris," see Finding 148, and was virtually certain to fail in severe weather, see Finding

15  143, California negligence law was clear that neglect resulting in environmental harm is

16  actionable.  In Sprecher v. Adamson Co., 30 Cal. 3d 358, 369 n.6 (Cal. 1981), the

17  California Supreme Court held that "[o]ne who takes possession of land upon which

18  there is an existing structure . . . unreasonably dangerous to persons or property outside

19  of the land is subject to liability for physical harm caused to them by the condition after . .

20  . he has failed, after a reasonable opportunity, to make it safe or otherwise to protect

21  such persons against it."

22         68.     In Pfleger v. Superior Court, 172 Cal. App.3d 421, 424-25 (Cal. App. 1 Dist.

23  1985), the California Court of Appeals found uphill property owners liable for nuisance

24  where they "had maintained their property in a dangerous condition and failed and

25  refused to design or construct a drainage system or [take other actions] for their property

26  adequate to . . .  prevent future flooding of  . . . [plaintiff's] properties.").

27  ///

28  ///

24

1   See also Leslie Salt Co. v. San Francisco Bay Conservation & Develop. Comm'n,

2   153 Cal. App. 3d 605, 622 (Cal. App. 1 Dist. 1984) (duty to take affirmative action

3   "flow[s] not from the land owner's active responsibility for a condition of his land that

4   causes widespread harm but rather, and quite simply, from his very possession and

5   control of the land in question.").

6        69.    Further, Sterling could not reasonably believe that its decision to place title

7   to the real property in Keystone insulated it from liability under California law.  The court

8   in Sprecher held that "the duties owed in connection with the condition of land are not

9   invariably placed on the person holding title but rather, are owed by the person in

10  possession of the land … because of the possessor's supervisory control over the …

11  condition of the land."  Sprecher, 30 Cal. 3d at 368 (citation omitted); see also Shurpin v.

12  Elmhirst, 148 Cal. App. 3d 94, 101 (Cal. App. 2 Dist. 1983) (soil engineer without

13  ownership interest in a property may be liable for nuisance); Portman v. Clementina Co.,

14  147 Cal. App. 2d 651, 659 (Cal. App. 1 Dist. 1957) (same for independent contractor).

15  Thus, California law imposed an obligation on Sterling to fix the dam even if the CAO did

16  not.

17

18        **2.    To the Extent That Keystone Was Involved in the Response at All, It Acted Alongside Its Parent Sterling**

19

20        70.    The second scenario for parent liability offered by the Supreme Court is

21  when a parent corporation "operates" its subsidiary's facility in the subsidiary's stead, or

22  alongside the subsidiary "in some sort of a joint venture."  Bestfoods. at 71, 118 S. Ct. at

23  1889.

24        71.    To show that a parent operated the facility alongside the subsidiary in

25  "some sort of joint venture," it is not necessary to establish all the formal requisites of a

26  joint venture under the common law; the standard is more flexible than the common law

27  definition of a joint venture.

28  ///

1    Yankee Gas Services Co. v. UGI Utilities, Inc., 616 F. Supp. 2d 228, 243-44 (D. Conn.

2    2009)  ("Justice Souter, who wrote Bestfoods, chose his words carefully and it can be no

3    accident that he chose the locution 'some sort of a joint venture,' as opposed to a 'joint

4    venture.'").

5           72.     This Court concludes, based on the evidence, that to the extent Keystone

6    acted at all to respond to the partial collapse of the timber dam, it did so alongside its

7    parent, Sterling.  As discussed in Findings 167-209, Gilbert directed the response on

8    Sterling's behalf much, if not all, of the time.  As discussed in Findings 169-170, Gilbert's

9    correspondence regarding the response is frequently on Sterling letterhead, and he

10    signs as Sterling's President.  As discussed in Findings 170-171, those who

11    implemented the response at Gilbert's direction addressed Gilbert as a Sterling official.

12    As discussed in Finding 169, Sterling's local real estate agent sought direction from

13    Gilbert as Sterling's President regarding environmental monitoring at the Mine.  And the

14    retained environmental consultant, Cranmer, invoiced Sterling for the monitoring it

15    performed, and sent some results directly to Sterling.  See Finding 171.  As discussed in

16    Finding 231, Janet Hendry's correspondence regarding the response is also on Sterling

17    letterhead, and she signs as a Sterling official, although like Gilbert she held a Keystone

18    officer and director position at the time.  As discussed in Findings 286-288 and 299,

19    Gilbert and Hendry testified in deposition that they did not distinguish their roles for

20    Sterling and Keystone, as Keystone was a wholly-owned subsidiary and they saw no

21    need to observe that formality.  The Court therefore concludes that Keystone did not, in

22    fact, act independent of Sterling to respond to the partial collapse of the dam.  And,

23    because Keystone was financially dependent on its parent, Sterling, for its continued

24    existence during the period of the response, as discussed in Findings 185-201, the Court

25    further concludes that Keystone was incapable of acting to respond to the partial

26    collapse of the dam independent of Sterling.

27    ///

28    ///

73.     The case is not unlike United States v. Newmont USA Limited and Dawn Mining Co., No. CV-05-020-JLQ, 2008 WL 4621566 (E.D. Wash. Oct. 17, 2008), where the court applied the guiding principles in Bestfoods.  It relied upon the parent's

> direct connection to the operations of the Mine" to find it liable as an operator, and also found relevant that "Newmont's inextricably interwoven involvement in the management of Dawn [its subsidiary] departed from the accepted norms of corporate oversight. . . . Both in terms of degree and detail, Newmont's involvement in reviewing and managing Dawn's operations exceeded the actions typically associated with investor status such as, oversight of finance and budgetary choices, monitoring performance and expression of general policies. . . . The facts show a level of participation and control by Newmont that exceeds the bounds of a merely interested investor and instead became an active operator.

Id. at *50; see also United States v. Kayser-Roth Corp., 272 F.3d 89 (1st Cir 2001) (parent corporation's control of subsidiary's environmental operations represented "pervasive control" sufficient to find liability); LeClercq v. Lockformer Co., No. 00 C 7164, 2002 WL 908037 (N.D. Ill. May 6, 2002) (holding that parent who "took immediate and substantial actions to manage and direct the operations relating to the TCE leakage" at facility could be liable as operator in denying defendants' summary judgment motion).

74.     Sterling argues that Keystone alone responded to the partial collapse of the timber dam, and that the use of Sterling letterhead and Sterling titles when corresponding about the response was just a mistake on Gilbert's part.  It points to evidence in the record suggesting that people involved in the response regarded Keystone as the responsible party, including Cranmer, Carey and Regional Water Board officials.  However, as discussed in Findings 170-171, all of these people turned to Gilbert as Sterling's President, not a Keystone official, when they had questions about the response.  The Court concludes that to the extent that Keystone acted at all, it did not act independent of Sterling.

75.     Moreover, to the extent that Gilbert acted on Keystone's behalf to respond, this Court concludes that he did so out of a contractual obligation to Sterling.

///

///

27

1   As discussed in Findings 170-171, Sterling entered into an agreement with Gilbert's

2   family company, Steel Investments, to provide management and administrative services

3   to Sterling and its subsidiaries, including Keystone.  As a condition of the Steel

4   Management Agreement, Gilbert was to make himself available to act as a Keystone

5   officer and director.  The Court concludes that Gilbert's actions as a Keystone officer and

6   director during the term of the Steel Management Agreement were performed under an

7   obligation to Sterling, and therefore that they were not taken independent of Sterling.

8
9   **3.    Other Evidence of Sterling's Control of Keystone and the Mine
         Is Relevant to The Court's Operator Liability Analysis Under
         Bestfoods**
10

11      76.    Bestfoods does not limit a court's scrutiny of parent activity to the parent's

12   activity with respect to environmental decisions.  When discussing how to analyze direct

13   parent operator liability, the Bestfoods Court observed that "the statute obviously meant

14   something more than mere mechanical activation of pumps and valves, and must be

15   read to contemplate 'operation' as including the exercise of direction over the facility's

16   activities."  524 U.S. at 71, 118 S. Ct. at 1889.  Accordingly, the Court concludes that the

17   evidence that Sterling controlled many other aspects of Keystone's actions is relevant to

18   its analysis of Sterling's operator liability under Bestfoods.

19      77.    Numerous federal courts have considered the totality of circumstances

20   when determining whether a parent corporation should incur direct operator liability at a

21   facility.  In Newmont USA, 2008 WL 4621566, the court found that Newmont, the parent

22   corporation of Dawn Mining Company, was liable as an operator.  While stressing

23   Newmont's "direct connection to the operations of the Mine," the court also considered

24   the closeness of the relationship between Newmont and Dawn, Newmont's

25   representation on the Dawn Board of Directors, the interlocking directors and officers

26   between the companies, Newmont's general financial oversight over Dawn, and

27   Newmont's monitoring of Dawn's performance.  Id. at *50.

28   ///

1    The court stated that such facts are "relevant in this case because in degree and detail,

2    Newmont's inextricably interwoven involvement in the management of Dawn departed

3    from the accepted norms of corporate oversight."  Id.

4         78.    Similarly, the court in Basic Management Inc. v. United States,

5    569 F. Supp. 2d 1106 (D. Nev. 2008), found that all of the parent's activities at the facility

6    resulted in operator liability.  The court found that the parent, Anaconda, was an operator

7    based on, inter alia, "overlapping managers, directors, and employees of Anaconda and

8    [its subsidiary], Anaconda's involvement in . . . daily operations of the facility, and

9    Anaconda's involvement in the . . . funding of waste management and disposal

10   systems."  Id. at 1116.  Based on the facts, the court held that the "Plaintiffs have shown

11   sufficient involvement by Anaconda beyond the norms of parental supervision to

12   establish that Anaconda was an operator of the facility, thereby rendering [Anaconda's

13   predecessor in interest] directly liable for its actions."  Id.  See also Kayser-Roth,

14   272 F.3d 89 (parent corporation's control of subsidiary's environmental operations

15   represented "pervasive control" sufficient to find liability) and Atlanta Gas Light, 463 F.3d

16   at 1205-07  ("Looking at the facts through the prism of corporate norms, as required by

17   Bestfoods," the court examined evidence of the parent's non-environmental

18   management of facility, including parent's dominance nominating the subsidiary's

19   superintendents and approving their salaries and a management contract between the

20   parent and subsidiary when evaluating a direct parent operator claim).

21        79.    In Browning-Ferris Industries of Illinois, Inc. v. Ter Maat, 13 F. Supp.2d

22   756, 764-65 (N.D. Ill. 1998), aff'd in part, rev'd in part, 195 F.3d 953 (7th Cir. 1999), the

23   court applied a Bestfoods analysis to conclude that a company called AAA was directly

24   liable, at the very least, as a joint operator of its sister company's (MIG's) facility.  In this

25   case, MIG was the operator of the landfill per a lease and AAA was a transporter to the

26   landfill.  Richard Ter Maat served as an officer of both corporations.  Id. at 762.

27   ///

28   ///

1  In reaching this decision, the court explained "that the dispositive question is whether

2  "[Richard Ter Matt's] conduct and that of AAA was done outside the norms of corporate

3  conduct so as to be considered done on behalf of AAA rather than MIG." Id. at 764.

4  Similar to the kind of evidence in the record here, the court considered the following

5  "pertinent evidence" in reaching its conclusion:

> MIG paid AAA a management fee to reimburse AAA, in part, for its
> performing certain administrative functions for MIG related to the site.
> Numerous outside parties who were involved with the site, including the
> [Illinois EPA or IEPA] and waste haulers, considered AAA to be the
> operator.  Some vendors sent correspondence and invoices to AAA for
> services related to site operations.  Additionally, Richard Ter Maat sent
> several letters to the IEPA pertaining to operational matters at the site
> which he signed as president of AAA.  He also sent a letter to the Illinois
> Division of Land/Noise Pollution Control pertaining to an operating permit
> for the site which was also signed by him as president of AAA.  While
> defendants attempted to explain these letters away as aberrations, the
> letters speak for themselves.  Furthermore, there are several letters from
> AAA's environmental consultant, M. Rapps Associates Inc., addressed to
> Richard Ter Maat and AAA which discuss pollution and clean-up issues at
> the site.

14  Id. at 764-65.   Like Ter Maat of AAA, as discussed in Findings 169-170, Jack Gilbert

15  consistently did business on Sterling letterhead signing as Sterling's President when

16  taking action to respond to the partial collapse of the timber dam.  He proposed that

17  Sterling contract with his family company Steel for the provision of management services

18  to Keystone.  See Findings 173-184.  He tasked Sterling agent Leonard Carey with the

19  job of implementing Gilbert's response to Regional Water Board compliance orders.  See

20  Findings 167-169.  Cranmer sent its invoices for water monitoring to Gilbert, and Sterling

21  paid them, because Keystone could not.  See Findings 185-201.

22      80.      Also akin to this case, the Browning-Ferris Indus. court found

23  unremarkable the existence of correspondence between MIG and IEPA and MIG and

24  AAA's environmental consultant, stating, "[a]ll this shows . . . at best is that AAA and MIG

25  both were involved as operators at the site."  Browning-Ferris Indus., 13 F. Supp.2d at

26  765.  The same can be said for Sterling and Keystone's respective involvement in

27  making the environmental decisions about the Lava Cap Mine.  See  Findings 210-215.

28  ///

81.     This Court holds, based on the record, that Sterling's pervasive control and management over the Lava Cap Mine exceeded actions typically associated with a parent's investor status.  See Bestfoods, 524 U.S. at 72, 118 S. Ct. at 1889.

82.     To the degree Keystone operated the Mine, Sterling's pervasive management of the Mine and control over Keystone leads this Court to conclude that Keystone acted alongside its parent, Sterling, in a joint venture of the type recognized in Bestfoods.  Id. at 71, 118 S. Ct. at 1889; see Yankee Gas Services Co., 616 F. Supp. 2d at 243-244.

**4.      The Court Declines to Apply Canadian Norms under Bestfoods**

83.     Sterling urges the Court to consider Canadian corporate norms in assessing whether its conduct with respect to Keystone and the Mine exposes it to operator liability under CERCLA.  The Court concludes that, to the extent there is any difference between Canadian corporate norms and those in the United States, American corporate norms would control.  The Mine is located in California.  Keystone was a California corporation.  The persons most likely to be immediately and directly affected by Sterling's conduct vis a vis environmental matters relating to Keystone and the Mine are in California, in the vicinity of the Mine.  To the extent Sterling "operated" the Mine, those operations occurred in California.  The burden of responding to environmental conditions at the Site, in the absence of a full and adequate response by Sterling or Keystone, falls to U.S. governmental authorities, including the State of California and the United States.  Therefore, the Court believes it is fair and appropriate to look to American law to determine what is normal for companies acting here.

84.     The Court's conclusion is further supported by choice of law principles.  When competing bodies of law from two jurisdictions are presented by opposing parties, California courts apply the law of the jurisdiction whose interest would be most impaired if the other jurisdiction's law is applied.

31

1    Brown v. Baden (In re Yagman), 796 F.2d 1165, 1170 (9th Cir. 1986).  "This choice of

2    law analysis embodies the presumption that California law applies unless the proponent

3    of foreign law can show otherwise."  Schlumberger Logelco Inc. v. Morgan Equipment

4    Co.,1996 WL 251951 (N.D. Cal. May 3, 1996) (citing Browne v. McDonnell Douglas

5    Corp., 504 F. Supp. 514, 517 (N.D. Cal. 1980).

6           85.    Failure to apply California laws and norms would impair California's

7    interests to a greater degree than Canada's.  California has an inherent interest in

8    applying its own laws to corporations operating within its borders.  It also has a

9    significant interest in protecting the health and welfare of its citizens and protecting its

10   environmental and natural resources.  There are no similar factors supporting the

11   application of Canadian law or norms in these circumstances.

12          86.    The record establishes at least two corporate norms that apply to parent-

13   subsidiary relationships:  the ritual of holding and recording separate meetings and the

14   clear representation of corporate identity in communications with outside parties.  See

15   Findings 279-280.  See also S.H. Riddle v. Leuschner, 51 Cal.2d 574, 581 (1959)

16   ("normal corporate procedures" include following corporate formalities such as holding

17   meetings and keeping records); Stark v. Coker, 20 Cal.2d 839 (1942).  This view is

18   further bolstered by contemporaneous scholarship.  See Douglas and Shanks,

19   "Insulation from Liability Through Subsidiary Corporations," Yale Law Journal, 1929;

20   Cataldo, "Limited Liability with One Man Companies and Subsidiary Corporations," Law

21   and Contemporary Problems, 1953.

22          87.    Sterling's deviation from these norms supports the Court's conclusion that

23   Sterling was directly operating Keystone and the Lava Cap Mine.

24          88.    Aside from the conclusion above that U.S. corporate norms, as reflected in

25   California law for purposes of this matter, should apply here, the Court faces the

26   practical problem that the record contains no credible articulation of Canadian corporate

27   norms and no basis to conclude that they differ from the U.S. norms identified above.

28   ///

32

1   As set forth in Findings 305-323, the only testimony purporting to articulate Canadian

2   corporate norms, from Defendant's expert witness John Smith, lacks foundation and

3   therefore relevance and reliability.

4         89.    Moreover, even if Smith's testimony as to Canadian norms had been

5   credible, his own testimony established that Sterling deviated from such norms on

6   multiple occasions.  <u>See</u> Findings 324-329.

7
8         **B.    CERCLA "Disposals" Occurred During Sterling's Operation of the Lava Cap Mine**
9

10         90.    In order for Sterling to be liable, it must operate the facility at the time of a

11   "disposal" of a hazardous substance.  42 U.S.C. § 9607(a).

12         91.    CERCLA defines "disposal" as "the <u>discharge</u>, deposit, injection, <u>dumping</u>,

13   <u>spilling</u>, <u>leaking</u>, or placing of any solid waste or hazardous waste into or on any land or

14   water so that such solid waste or hazardous waste or any constituent thereof may enter

15   the environment or be emitted into the air or discharged into any waters, including

16   ground waters."  <u>See</u> 42 U.S.C. § 9601(29), referencing 42 U.S.C. § 6903(3) (emphasis

17   added).  In comparison, CERCLA defines "release" as "any <u>spilling</u>, <u>leaking</u>, pumping,

18   pouring, emitting, emptying, <u>discharging</u>, injecting, escaping, leaching, <u>dumping</u>, or

19   <u>disposing</u> into the environment (including the abandonment or discharging of barrels,

20   containers, and other closed receptacles containing any hazardous substance or

21   pollutant or contaminant) . . . ."  <u>See</u> 42 U.S.C. §9601(22) (emphasis added to show

22   common terms between the CERCLA definitions of disposal and release).

23         92.    Based on these definitions, the Ninth Circuit concluded that "words used

24   more than once in the same statute have the same meaning . . . .; [t]herefore, 'release' is

25   broader than 'disposal' because the definition of 'release' includes 'disposing' . . . . But,

26   at the same time, the definition of 'disposal' and 'release' have several words in

27   common: 'discharge,'/ 'discharging'; 'injection'/'injecting'; 'dumping'' 'spilling'; and

28   'leaking.'"

1  <u>Carson Harbor Village, Ltd. v. Unocal Corp</u>, 270 F.3d 863, 878 (9th Cir. 2001)

2  (<u>en banc</u>).  To give meaning to these words, the <u>Carson Harbor</u> court instructed that,

3  "[i]nstead of focusing solely on whether the terms are 'active' or 'passive,' we must

4  examine each of the terms in relation to the facts of the case and determine whether the

5  movement of contaminants is, under the plain meaning of the terms, a 'disposal.' Put

6  otherwise, do any of the terms fit the hazardous substance contamination at issue?"  <u>Id.</u>

7  at 879.

8        93.    "Congress did not limit 'disposal' to the initial introduction of hazardous

9  material onto property." <u>Id.</u> at 877 *(*citing <u>Kaiser Aluminum & Chem. Corp. v. Catellus</u>

10 <u>Development Corp.</u>*,* 976 F.2d 1338, 1342 (9th Cir. 1992)).  Rather, "it is evident that

11 CERCLA's primary targets included spills and leaks from <u>abandoned sites - - sites at</u>

12 <u>which there was no longer any affirmative human activity.</u>*"* <u>Id.</u> at 885 (emphasis added).

13 "[I]f 'disposal' is interpreted to exclude all passive migration, there would be little

14 incentive for a landowner to examine his property for decaying disposal tanks, prevent

15 them from spilling or leaking, or to clean up contamination once it was found."  <u>Id.</u> at

16 881.

17       94.    Sterling does not dispute, and this Court concludes, that there was a

18 "disposal," as that term is defined in Section 101 of CERCLA, of a hazardous substance

19 at the Lava Cap Mine prior to 1952, during the time LCGMC owned and operated the

20 Lava Cap Mine.

21       95.    This Court further concludes that there was a "disposal," as that term is

22 defined in Section 101 of CERCLA, of a hazardous substance at the Lava Cap Mine

23 after 1952, during the period of Sterling's operation.  As discussed in Findings 165-166,

24 the partial collapse of the timber dam in 1979 resulted in the spilling, leaking and

25 dumping of arsenic-laden tailings and water into the environment.  The Court concludes

26 that this event itself is properly characterized as a "disposal" under CERCLA.

27 ///

28 ///

1   Moreover, there is evidence of additional and continuous spilling of arsenic-

2   contaminated water and tailings, both before and after the dam collapse.  Thus, the

3   Court concludes that the disposals were ongoing throughout the period of Sterling's

4   operation.

5

6        **V.**     **CERCLA IS CONSTITUTIONAL**

7

8        96.     Sterling argues that <u>Nat'l Fed. of Indep. Business v. Sebelius</u> ("NFIB"), ___

9   U.S. ___, 132 S. Ct. 2566 (2012), renders CERCLA unconstitutional as applied to this

10  case.  In <u>NFIB</u>, the Supreme Court dealt with the constitutionality of the Patient

11  Protection and Affordable Care Act.  One of the key provisions of the Act is the

12  "individual mandate," which requires most Americans to maintain "minimum essential"

13  health insurance coverage.  <u>Id.</u>, 132 S. Ct. at 2580.  For many individuals, the means of

14  satisfying this requirement is to purchase insurance from a private company.  <u>Id.</u>  The

15  question before the Court was whether Congress had the power under the Commerce

16  Clause to compel individuals not otherwise engaged in interstate commerce to become

17  engaged.  The Court held that the individual mandate did not regulate existing

18  commercial activity, and also required commercial activity.  <u>Id.</u>, 132 S. Ct. at 2588.  The

19  Court held that the regulation of inactivity was beyond Congress' powers under the

20  Commerce Clause.  <u>Id.</u>, 132 S. Ct. at 2589-991.

21        97.     Sterling again portrays its decades of neglect as a virtue – an "inactivity"

22  that the Commerce Clause does not permit Congress to regulate.  As an initial matter,

23  the Court concludes that, even if Sterling's interpretation of <u>NFIB</u> were correct, which it is

24  not, Sterling was anything but inactive.  As discussed in Finding 151, Sterling stored

25  contaminated tailings for 37 years without any effort to maintain the timber dam to

26  ensure its integrity and the safety of the tailings impound.  Further, it inadequately

27  responded to a spill, which contaminated downstream areas.

28  *///*

1 Sterling's argument, if adopted by this Court, would encourage owners and operators to

2 ignore hazardous conditions on their property in hopes that it would insulate them from

3 CERCLA liability.

4        98.    Moreover, this Court declines to adopt Sterling's interpretation of <u>NFIB</u>.

5 While Sterling rests it argument on a snippet from the concurring and dissenting opinion

6 of Justice Ginsberg, the Court finds the analysis of the <u>NFIB</u> majority more useful.  The

7 Supreme Court stated that "[t]he individual mandate, however, does not regulate existing

8 commercial activity.  It instead compels individuals to <u>become</u> active in commerce by

9 purchasing a product, on the ground that their failure to do so affects interstate

10 commerce.  <u>Id.</u>, 132 S. Ct. at 2587 (emphasis in the original).  "The power to <u>regulate</u>

11 commerce presupposes the existence of commercial activity to be regulated."  <u>Id.</u> at

12 2572 (emphasis in the original).

13        99.    CERCLA, on the other hand, does not require a person without any

14 connection to hazardous substances to become involved with hazardous substances.

15 Rather, it regulates the conduct of owners and operators of facilities containing

16 hazardous substances.  As an operator of the Lava Cap Mine, Sterling was clearly

17 engaged in commerce and voluntarily chose to become involved with the Lava Cap

18 Mine.  It voluntarily purchased the Lava Cap Mine in 1952, sold surplus mine equipment

19 and pursed reopening the Mine.  No one forced Sterling to ignore the continuous

20 discharges of contaminated water into the environment, or to allow the timber dam to

21 deteriorate to the point of failure.  Unlike the individuals discussed in <u>NFIB</u>, it was not

22 forced "to purchase an unwanted product."  <u>Cf.</u> <u>NFIB</u>, 132 S. Ct. at 2586.

23       100.   If Sterling's position controlled, CERCLA's provision that present owners

24 are liable for the costs of the cleanup would also be unconstitutional where an owner's

25 only activity is to purchase land. Yet, the Court observes that no court has ever

26 suggested that an owner of contaminated property cannot be compelled to assist in its

27 clean up.

28 *///*

1    Indeed, in United States v. Domenic Lombardi Realty, 204 F. Supp. 2d 318 (D.R.I.

2    2002), the defendant was a property management company that purchased a site, which

3    was later discovered to be contaminated with PCBs.  The defendant challenged the

4    constitutionality of CERCLA under the Commerce Clause, and the court had no difficulty

5    finding that "CERCLA is a constitutional exercise of Congress's Commerce Clause

6    power."  Id. at 324.

7         101.   The Court also observes that the Supreme Court has repeatedly stressed

8    that it will presume that a statute enacted by Congress is constitutional.  Bowen v.

9    Kendrick, 487 U.S. 589, 617, 108 S. Ct. 2562, 2579 (1988); Rostker v. Goldberg,

10   453 U.S. 57, 64, 101 S. Ct. 2646, 2651 (1981).  Consistent with this respect for the

11   constitutionality of acts of Congress, CERCLA has survived every challenge to its

12   constitutionality.  See, e.g., Freier v. Westinghouse Elec. Corp., 303 F.3d 176, 203 (2nd

13   Cir. 2002) ("Clearly CERCLA itself was enacted as a valid response to a national

14   problem, was directly related to a valid congressional concern, and was within

15   Congress's powers under the Commerce Clause.); United States v. Olin Corp., 107 F.3d

16   1506, 1510 (11th Cir. 1997); United States v. NL Indus. Inc., 936 F. Supp. 545, 563

17   (S.D. Ill. 1996); Nova Chemicals, Inc. v. GAF Corp., 945 F. Supp. 1098, 1105 (E.D.

18   Tenn. 1996) ("CERCLA does not violate the Commerce Clause."); United States v. Alcan

19   Aluminum Corp., 87-CV-920, 91-CV-1132 (Consolidated), 1996 U.S. Dist. LEXIS 16358,

20   *20 (N.D.N.Y. Oct. 25, 1996).

21        102.   Moreover, unlike the individual health insurance that NFIB found not to be

22   subject to regulation under the Commerce Clause, the Supreme Court has held that both

23   hazardous waste and ground water are articles of commerce subject to regulation under

24   the Commerce Clause.  See Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dept. of

25   Natural Resources, 504 U.S. 353, 359, 112 S. Ct. 2019, 2023 (1992); Sporhase v.

26   Nebraska, ex rel. Douglas, 458 U.S. 941, 953-54, 102 S. Ct. 3456, 3462-63 (1982).

27   ///

28   ///

1     The Court therefore concludes that Congress's regulation of hazardous substances

2     under the Commerce Clause is a valid exercise of its power under the Commerce

3     Clause, even as to defendants like Sterling, who fail to take steps to prevent an

4     environmental disaster.

5          103.    In a similar vein, Sterling argues that it cannot be held liable under

6     CERCLA for releases from mine waste that is attributable to the mining activity of

7     LCGMC. The Court disagrees. CERCLA imposes an obligation on owners and

8     operators of facilities like the Mine to respond to contaminant releases, even where there

9     is no longer "any ongoing affirmative human activity" at the facility. Carson Harbor,

10     270 F.3d at 885. The same was true before CERCLA's enactment, when the common

11     law of nuisance and public health statutes imposed a similar responsibility. See Lind v.

12     City of San Luis Obispo, 109 Cal. 340, 341-42 (Cal. 1895); Thompson v. Kraft Cheese

13     Co. of California, 210 Cal. 171, 173, 178-80 (Cal. 1930); People v. Truckee Lumber Co.,

14     116 Cal. 397, 400-02 (Cal. 1897); Cal. Water Code § 13000 (1949); Public Health Code,

15     1906 Cal. Stat. 893-94. Sterling acquired all of the assets of LCGMC, including the

16     legacy of mine waste resulting from the mining activities of LCGMC. The Court

17     concludes that, having acquired the mine waste, Sterling had a duty to prevent its

18     release to the environment.

19

20     **VI.     THE COURT HAS JURISDICTION OVER STERLING**

21

22          104.    This Court has previously found that it may exercise in personam

23     jurisdiction over Sterling by attributing LCGMC's contacts to Sterling under a theory of

24     successor liability. DE 151 at 7:21-26. Having found that Sterling is the successor to

25     LCGMC, the Court now holds that its contacts are sufficient to support the Court's

26     exercise of jurisdiction.

27     ///

28     ///

1      105.   In addition, the Court finds that it has jurisdiction to adjudicate Sterling's

2 liability as an operator under Bestfoods because Sterling's own contacts with the forum

3 are sufficient to support the Court's exercise of in personam jurisdiction.

4      106.   "The requirement that a court have personal jurisdiction flows . . . from the

5 Due Process Clause.  It represents a restriction on judicial power not as a matter of

6 sovereignty, but as a matter of individual liberty."  Omni Capital Int'l, Ltd. v. Rudolf Wolff

7 & Co., Ltd., 484 U.S. 97, 104, 108 S. Ct. 404, 409 (1987).   Due process is achieved

8 when a nonresident defendant has "certain minimum contacts with [the forum] such that

9 the maintenance of the suit does not offend traditional notions of fair play and substantial

10 justice."  International Shoe Co. v. State of Washington, 326 U.S. 310, 316, 66 S. Ct.

11 154, 158 (1945).

12      107.   The analysis is qualitative and focuses on the extent to which the

13 defendant has availed itself of the benefits and protections of the laws of the forum state.

14 International Shoe, 326 U.S. at  319, 66 S. Ct. at 160.  When applying "the flexible

15 standard of International Shoe," courts measure and balance the sufficiency of the

16 contacts under several factors.  Hanson v. Denckla, 357 U.S. 235, 251, 78 S. Ct. 1228,

17 1238 (1958).  In the Ninth Circuit, courts apply a three-part test to evaluate whether the

18 nature and quality of a defendant's contacts justify the exercise of specific jurisdiction:

19 (1) the nonresident defendant must do some act or consummate some transaction within

20 the forum or perform some act by which he purposefully avails himself of the privilege of

21 conducting activities in the forum, thereby invoking the benefits and protections of its

22 laws; (2) the claim must be one which arises out of or results from the defendant's

23 forum-related activities; and (3) exercise of jurisdiction must be reasonable.  Carson

24 Harbor Village, 270 F.3d at 923.

25      108.   After considering each of these three factors, the Court concludes that it

26 may exercise its jurisdiction over Sterling.  First, the Court concludes, based on the

27 evidence, that Sterling purposefully availed itself of the privilege of conducting business

28 in California.

1    Courts must examine the defendant's contacts with the forum at the time of the events

2    underlying the dispute when determining whether they have jurisdiction. Steel v. United

3    States, 813 F.2d 1545, 1549 (9th Cir. 1987).  Sterling purchased all the assets of the

4    American company LCGMC, and thereafter set upon a course to reopen the Lava Cap

5    Mine.  It evaluated the Mine's profitability, it sold surplus equipment located in California,

6    it marketed surplus surface rights using its local realtor, Leonard Carey, and it courted

7    other mining enterprises in an effort to resume production.  It also resolved numerous

8    California workers compensation claims it inherited from LCGMC.  When Sterling sold

9    the Mine to Defendant Stephen Elder in 1989, it was a party to the transaction and

10   received all the proceeds from the sale.  And, significantly, Sterling also directed

11   pollution control and environmental compliance decisions for the Lava Cap Mine.  The

12   "purposeful availment" requirement ensures that a defendant will not be haled into a

13   jurisdiction solely as a result of "random," "fortuitous," or "attenuated contacts," or of the

14   "unilateral activity of another party or a third person."  Burger King v. Rudzewicz,

15   471 U.S. 462, 475, 105 S. Ct. 2174, 2183 (1985).  The Court concludes that all of these

16   actions on Sterling's part were purposeful.  Here, Sterling's "conduct and connection with

17   the forum State are such that [it] should reasonably anticipate being hauled into court" in

18   California.  World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S. Ct.

19   559, 567 (1980).

20          109.   The Court also concludes based on the evidence that Plaintiffs' cause of

21   action arose from Sterling's forum-related activities.  Courts use a "but for" test to

22   analyze whether a cause of action arises from a defendant's forum-related activities.

23   Shute v. Carnival Cruise Lines, 897 F.2d 377, 385-86 (9th Cir. 1990), rev'd on other

24   grounds, 499 U.S. 585, 111 S. Ct. 1522 (1991); Ballard v. Savage, 65 F.3d 1495, 1500

25   (9th Cir. 1995).  Here, the cause of action under CERCLA is based on Sterling's

26   operation of the Lava Cap Mine.

27   ///

28   ///

1  All of the activities mentioned above are relevant to the Court's finding that Sterling

2  operated the Mine and is therefore liable under CERLCA.

3       110.    Sterling argues that the Court may not consider its contacts unless they

4  support an element of Plaintiffs' CERCLA claim.  This Court rejects the narrow

5  application of the "arising out of" requirement advanced by Sterling.  A restrictive reading

6  of the "arising out of" requirement is not necessary in order to protect potential

7  defendants from unreasonable assertions of jurisdiction.  Shute, 897 F.2d at 385.  Thus,

8  Sterling's contacts with the forum do not need to support an element of Plaintiffs' claims

9  in order to establish jurisdiction.  Id.  The ultimate concern of the Court in evaluating

10  whether Plaintiffs' claims arise out of, or are related to, Sterling's forum contacts is to

11  ensure that Sterling has had "fair warning" that its actions may subject it to litigation in

12  California.  See Shaffer v. Heitner, 433 U.S. 186, 218, 97 S. Ct. 2569, 2587 (1977)

13  (Stevens, J., concurring).  Nevertheless, the Court is able to conclude, even under the

14  application of law that Sterling advocates, that Plaintiffs' claims arose out of Sterling's

15  forum-related activities.

16       111.    Last, the Court concludes that its exercise of jurisdiction is reasonable.

17  Where a defendant has purposefully directed its activities at forum residents, as Sterling

18  has, it must present a compelling case that the presence of some other considerations

19  would render jurisdiction unreasonable.  Burger King, 471 U.S. at 476, 105 S. Ct. at

20  2184.  A defendant's "contacts may be considered in light of other factors to determine

21  whether the assertion of personal jurisdiction would comport with 'fair play and

22  substantial justice.'"  Id.  Courts may evaluate: (1) "the burden on the defendant"; (2) "the

23  forum State's interest in adjudicating the dispute"; (3) "the plaintiff's interest in obtaining

24  convenient and effective relief"; (4) "the interstate judicial system's interest in obtaining

25  the most efficient resolution of controversies"; and (5) "the shared interest of the several

26  States in furthering fundamental social policies."  Burger King, 471 U.S. at 476,

27  105 S. Ct. at 2184.

28  ///

1      112.    Consideration of these factors in this case supports this Court's exercise of

2   jurisdiction.  Plaintiffs have a strong interest in having their case heard by an American

3   court. CERCLA was a response by Congress to the threat to public health and the

4   environment posed by the widespread use and disposal of hazardous substances.  Its

5   purpose was to ensure the prompt and effective cleanup of waste disposal sites and to

6   assure that parties responsible for hazardous substances bore the cost of remedying the

7   conditions they created.  Mardan Corp. v. C.G.C. Music Ltd., 804 F.2d 1454, 1455 (9th

8   Cir. 1986).  American courts are uniquely qualified to hear and decide CERCLA cases.

9      113.    Moreover, the burden to Sterling from having to litigate in American courts

10   is minimal.  Courts have recognized that, as our nearby neighbors, the burden on

11   Canadian litigants is substantially less than for most other foreign defendants.  Aristech

12   Chemical Int'l Ltd. v. Acrylic Fabricators Ltd., 138 F.3d 624, 628-29 (6th Cir. 1998); see

13   also Ensign-Bickford Co. v. ICI Explosives USA Inc., 817 F. Supp. 1018, 1031 (D. Conn.

14   1993).

15      114.    Based on all of the evidence, the Court concludes that it may properly

16   exercise in personam jurisdiction over Sterling.

17

18   **VII.  CONCLUSION**

19

20      115.    Having established the Court's jurisdiction, and the four elements of

21   Sterling's liability, Plaintiffs are entitled to a judgment of liability unless Sterling is able to

22   invoke one of the limited statutorily permitted defenses to CERCLA liability.  See, e.g.,

23   United States v. Shell Oil Co., 841 F. Supp. 962, 968 (C.D. Cal. 1993).

24      116.    This Court has already entered summary judgment in favor of Plaintiffs,

25   holding that none of the three statutorily-permitted defenses to CERCLA liability is

26   available to Sterling.  DE 152 at 12.

27   ///

28   ///

117. The Court finds that Plaintiffs are entitled to a judgment of liability against Sterling for all costs of removal or remedial action incurred by Plaintiffs not inconsistent with the National Contingency Plan. 42 U.S.C. § 9607(a)(4)(A).

118. Recoverable expenses include both existing costs and costs to be borne in the future. In any action under Section 107 of CERCLA, in addition to entering judgment on liability for costs already incurred, "the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." 42 U.S.C. § 9613(g)(2).

119. Sterling argues that the matter of a declaratory judgment should be reserved for Phase 2 of these proceedings, during which Plaintiff's entitlement to response costs, and the amount thereof, will be adjudicated. This Court rejects that position. As the Court stated in its order bifurcating proceedings, Phase 1 of these proceedings includes discovery and trial on "Defendants' liability under Section 107(a) of CERCLA for past and future response costs." DE 26 at 1:23-25. The Court hereby enters a declaratory judgment of liability against Sterling, pursuant to Section 113(g)(2) of CERCLA.

IT IS SO ORDERED.

DATED: July 20, 2013

_____
MORRISON C. ENGLAND, JR, CHIEF JUDGE
UNITED STATES DISTRICT COURT