PATRICIA L. HURST (DC Bar No. 438882)
GABRIEL ALLEN (GA Bar No. 740737)
PETER KRZYWICKI (MI Bar No. P75723)
Environmental Enforcement Section
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC  20044
(202) 307-1242 / (202) 514-1032
patricia.hurst@usdoj.gov
gabriel.allen@usdoj.gov
peter.krzywicki@usdoj.gov

ATTORNEYS FOR PLAINTIFF UNITED STATES OF AMERICA

TIMOTHY E. SULLIVAN (CA Bar No. 197054)
California Department of Justice
Office of the Attorney General
1515 Clay Street, 20th Floor
Oakland, CA 94612
timothy.sullivan@doj.ca.gov

ATTORNEYS FOR PLAINTIFF
CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNITED STATES OF AMERICA, and CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL,**<br><br>Plaintiffs,<br><br>v.<br><br>**STERLING CENTRECORP INC., STEPHEN P. ELDER and ELDER DEVELOPMENT, INC.,**<br><br>Defendants. | No. 2:08-CV-02556-MCE-CKD<br><br>**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION *IN LIMINE* TO EXCLUDE THE EXPERT REPORTS AND EXPECTED TESTIMONY OF JOSEPH J. NILAND**<br><br>Date: February 11, 2016<br>Time: 2:00 PM<br>Courtroom: 7<br>Trial Date: July 18, 2016<br>Judge: Morrison C. England, Jr.<br><br>[Complaint Filed: October 27, 2008] |

**Introduction**

In resolving this motion, the Court need address only two issues, all else being peripheral:

**1. Record Review of EPA's Remedy Decisions.** After a trial, this Court held that Sterling Centrecorp is liable for all costs of the remedies selected for the Lava Cap Mine Superfund Site that are not inconsistent with the National Oil and Hazardous Substances Pollution Contingency Plan ("NCP"). Judicial review of any challenge to the consistency of a remedy decision with the NCP is limited by statute to the administrative record for that decision. Sterling intends to call Joseph Niland, a purported expert in remedy selection under the NCP, to testify in support of Sterling's challenge to two of the Environmental Protection Agency's remedy decisions. Should the Court refuse to hear Niland's testimony given the statutory bar on extra-record evidence?

**2. Niland Lacks Expertise in Remedy Selection.** Under federal evidentiary rules, expert witnesses must have the necessary knowledge, skill, experience, training, or education to testify. If Niland testified at trial, he would criticize EPA's remedy selection decisions. But Niland has no experience, education, or training in remedy selection under the NCP. Should Niland be permitted to testify as an expert in remedy selection when he has no such experience, education, or training?

An early resolution of these two questions will streamline both summary judgment briefing and trial proceedings.

**Summary of Facts**

**1.    The remedy selection provisions of the NCP are straightforward.**

Although the NCP governs all aspects of the United States' response to hazardous substance releases, the provisions applicable to remedy selection are relatively few.[1] The relevant part of the NCP requires a lead agency (in this case, EPA) to evaluate remedial alternatives using nine criteria, which are categorized in three groups: In the first group are two Threshold Criteria -- overall protection of human health and the environment; and compliance with applicable or

---

[1] *See* 40 C.F.R. § 300.430(f).

1

relevant and appropriate regulations, or ARARs. In the second group are five Primary Balancing Criteria -- long-term effectiveness and permanence; reduction of toxicity, mobility, or volume through treatment; short-term effectiveness; implementability; and cost. A remedy must provide the best balance of trade-offs among alternatives in terms of the five Primary Balancing Criteria. The balancing must emphasize long-term effectiveness and reduction of toxicity, mobility, or volume through treatment, and remedies that principally focus on treatment are preferred. In the third group are the two Modifying Criteria -- state and community acceptance.[2]

In addition to an evaluation of remedial alternatives against the nine criteria, the NCP requires an analysis of the cost-effectiveness of each remedial alternative, which is different from an evaluation of the cost criterion. A remedy is cost-effective if its costs are proportional to its overall effectiveness. Cost effectiveness is determined by evaluating the following three of the five Primary Balancing Criteria to determine overall effectiveness: long-term effectiveness and permanence; reduction of toxicity, mobility, or volume through treatment; and short-term effectiveness. Overall effectiveness is then compared to cost to ensure that the remedy is cost-effective.[3]

The selection of a remedy under the NCP is a two-step process.[4] First, EPA, in conjunction with the support agency (in this case, the Department of Toxic Substances Control), identifies a preferred alternative and presents it to the public in a proposed plan for comment.[5] Second, EPA reviews public comments and consults with DTSC to determine if the alternative remains the most appropriate remedial action for the site.[6] EPA must consider DTSC and community comments regarding EPA's evaluation of alternatives with respect to the other criteria; but EPA makes the final remedy selection decision, which is documented in a Record of Decision, or ROD.[7]

---

[2] *Id*. § 300.430(f)(1)(i).
[3] *Id*.
[4] 40 C.F.R. § 300.430(f)(1)(ii)(D).
[5] *Id*.
[6] *Id*.
[7] *Id*.

The NCP requires documentation of agency remedy selection decisions "in a level of detail appropriate to the site situation…."[8] The ROD must describe: (a) how the selected remedy is protective of human health and the environment, explaining how the remedy eliminates, reduces, or controls exposures to human and environmental receptors; (b) the ARARs that the remedy will attain; (c) the ARARs that the remedy will not meet, the waiver invoked, and the justification for invoking the waiver; (d) how the remedy is cost-effective, *i.e.,* how the remedy provides overall effectiveness proportional to its costs; (e) how the remedy uses permanent solutions and alternative treatment technologies or resource recovery technologies to the maximum extent practicable; and (f) whether the preference for remedies employing treatment which permanently and significantly reduces the toxicity, mobility, or volume of the hazardous substances, pollutants, or contaminants as a principal element is, or is not, satisfied by the selected remedy.[9]

**2. EPA has selected a remedy for Operable Unit 1 and an interim remedy for Operable Unit 2.**

The governments' response to the hazardous substance releases at the Site is extensive and ongoing. To facilitate cleanup of the Site, which covers a large geographic area, EPA has divided the Site into four Operable Units. In this action, Sterling challenges EPA's remedy selections for Operable Units 1 and 2 only.

Operable Unit 1 addresses (a) residences on the mine property, (b) buildings, soils and surface water contamination on the mine property, and (c) contaminated soils along Little Clipper Creek downstream to Greenhorn Road.[10] The mine property is approximately 30 acres and is heavily contaminated with arsenic, cyanide, lead and other trace metals.[11] EPA documented and explained its selection of a remedy for Operable Unit 1 in a ROD in 2004.[12] The ROD includes a three-part remedy to address the three components of Operable Unit 1. Sterling

---

[8] 40 C.F.R. § 300.430(f)(5)(i).
[9] *Id*. § 300.430(f)(5)(ii).
[10] OU1 Record of Decision ("OU1 ROD") (Ex. 1) at II-11.
[11] *Id*. at II-17.
[12] OU1 ROD (Ex. 1).

3

challenges only one these three remedy components, and only portions of that component.[13] Specifically, Sterling challenges EPA's selection of Alternative 2-3 for the contaminated mine buildings, soils, and surface water contamination.[14] Alternative 2-3 included, among other things, excavating contaminated soils, regrading and capping of the tailings pile, installation of a High Density Polyethylene ("HDPE") liner, constructing a water treatment plant to treat surface water from the mine tailings, and access and land use restrictions.[15] The ROD explains how EPA evaluated six remedial alternatives for that portion of the Operable Unit 1 remedy against the nine NCP criteria, and why it selected Alternative 2-3.[16]

Operable Unit 2 addresses contaminated groundwater underlying the entire Site, from the mine property to Little Greenhorn Creek, and in the Lost Lake/Deposition Area, which extends to the confluence of Clipper Creek and Little Greenhorn Creek.[17] The study of the groundwater system is complex, both because the Site consists of fractured bedrock penetrated by underground mine-workings and because arsenic occurs naturally in the system.[18] Groundwater studies are ongoing and EPA has not yet selected a final remedy for Operable Unit 2.[19] People living near the mine have historically used groundwater wells. Many of these wells are contaminated with arsenic, or are located in the flowpath of contaminated groundwater under the mine property.[20] To address the danger that people who use wells for drinking water would be exposed to contaminants, EPA selected an interim remedy to provide a safe source of drinking water to them.[21]

EPA considered four different remedial alternatives to address contaminated residential wells: Alternative 1 (no action), Alternative 2 (point-of-use treatment), Alternative 3 (wellhead treatment) and Alternative 4 (connecting to the Nevada Irrigation District ("NID") water

---

[13] Report of Joseph Niland on Remedy Selection for Operable Unit 1 ("Niland OU1 Report") (Ex. 2).
[14] *Id.*
[15] OU1 ROD (Ex. 1) at II-47, 48.
[16] *Id.*
[17] Interim Record of Decision for Operable Unit 2 ("OU2 Interim ROD") (Ex. 3) at II-7.
[18] *Id.*
[19] *Id.* at I-1.
[20] *Id.* at II-11, II-14-15, II-20, II-36, II-46.
[21] *Id.* at I-1-2, II-7.

4

supply).[22] After evaluating the four alternatives against the nine NCP criteria, EPA selected Alternative 4 because "it is the only alternative that meets the two Threshold Criteria without qualification, and it provides a safe, long-term drinking water supply for residences affected by mine-related arsenic."[23]

**3.      Sterling had ample opportunity to participate in EPA's remedy selection process.**

Sterling had notice of the remedy selection process for both Operable Units 1 and 2. On June 26, 2001, EPA wrote to Sterling about the contamination at the Site, its investigation of that contamination, and the basis for EPA's belief that Sterling is responsible for the cleanup of the Site.[24] On October 22, 2001, Sterling replied, and objected to the jurisdiction of the United States over Sterling, a Canadian company.[25] On July 21, 2003, EPA sent Sterling a second letter notifying Sterling of contaminated groundwater at the Site and its potential liability for the cleanup of groundwater.[26] Sterling responded on August 11, 2003.[27] It declined to participate in the investigation or cleanup of groundwater because it continued to believe that the United States lacked jurisdiction over Sterling.[28] Consistent with the NCP community relations provisions,[29] EPA published notice of its proposed plans for Operable Units 1 and 2 in *The Union*, a major local newspaper of general circulation in Nevada County.[30] The proposed plans and supporting analyses were available to all members of the public, including Sterling, at two local repositories (the Nevada County Library and the Grass Valley Library) as well as at EPA's record center in

---

[22] *Id*. at II-33-36.
[23] *Id*. at II-46.
[24] June 26, 2001, Letter from J. Kemmerer, EPA, to D. Kosoy, Sterling, and to E. Berliner, counsel to Sterling (Ex. 4).
[25] October 22, 2001, Letter from J. Bilheimer and R. Ellers, counsel to Sterling, to J. Kemmerer and T. Blumefield, EPA (Ex. 5), at 1.
[26] July 21, 2003, Letter from E. Adams, EPA, to R. Green, D. Kosoy and J. Gilbert, of Sterling, and to R. Ellers and J. Bilheimer, counsel for Sterling, among others (Ex. 6).
[27] August 11, 2003, Letter from R. Ellers, counsel to Sterling, to K. Muratore, EPA (Ex. 7) at 1.
[28] *Id*.
[29] 40 C.F.R. § 300.430(f)(3).
[30] For OU1 *see* EPA, Fact Sheet on Proposed OU1 Remedy, February 2004 (EPA015135–EPA015150); *The Union,* Affidavit of Publication of EPA Notice of Public Meetings, November 7, 2001 (EPA013761); *The Union,* EPA Notice of Proposed Plan for OU1 (EPA015998) (Ex. 8). For OU2 *see* EPA, Proposed Plan for Interim OU2 Remedy (EPA011144-EPA011151); *The Union,* EPA Notice of Proposed Plan for Interim OU2 Remedy (EPA011358) (Ex. 9).

1  San Francisco.[31] The documents were also available to Sterling online.[32] EPA held a public

2  meeting on both proposed plans, and provided at least 30 days for written and oral public

3  comments.[33] Sterling did not comment on either of the proposed plans for Operable Unit 1 and 2.

**4.  Sterling seeks to use Niland to support its defense that EPA's remedy selection decisions are inconsistent with the NCP.**

The United States and the California Department of Toxic Substances Control sued Sterling and others in 2008 to recover the costs of responding to the contamination at the Lava Cap Site. In the first phase of trial, the Court determined that Sterling is liable for "all costs of removal or remedial actions … not inconsistent with the national contingency plan."[34] In this second phase of trial, the Court will adjudicate: (a) the amount of Plaintiffs' response costs, (b) the defenses asserted by the Defendants in an attempt to avoid paying for those costs, and (c) Sterling's counterclaim for contribution from the United States.[35]

Sterling asserts as a defense that EPA's remedy selections for Operable Units 1 and 2 are inconsistent with the NCP.[36] Sterling seeks to introduce Niland's reports and/or testimony to dispute the presumption that EPA's remedies were selected in manner that is consistent with the NCP. Sterling asked Niland "to evaluate whether EPA's remedial decisions are supported by the data and analysis in the record, including whether EPA adequately considered the facts in the record, whether EPA considered all relevant facts, and whether EPA articulated a reasonable explanation for its remedy selection."[37] In response, Niland produced two reports for Sterling:

In his first report, Niland concludes that a simple soil cap over the tailings, and a fence around the most contaminated soils at the Site (Altenative 2-2), would have been protective enough; EPA did not need to spend additional sums on an engineered cap and excavation of the

---

[31] *Id.*
[32] *Id.*
[33] OU1 ROD (Ex. 1) at Part III (EPA015819-EPA015997); OU2 Interim ROD (Ex. 3) at Part III (EPA011234-EPA011344).
[34] 42 U.S.C. § 9607(a)(4); Findings of Fact (DN 211), Conclusions of Law (DN 212).
[35] Phase 2 Scheduling Order (DN 229) at 2.
[36] Sterling Answer (DN 11).
[37] Niland OU1 Report (Ex. 2) at 1; Report of Joseph Niland on Selection of an Interim Remedy for Operable Unit 2 ("Niland OU2 Report") (Ex. 10) at 1. *See also* Deposition of Joseph J. Niland, November 19, 2015 ("Niland Dep.") (Ex. 11) at 22 (ll. 14-22).

1 most contaminated soil for off-Site disposal (Alternative 2-3).[38] To arrive at this opinion, Niland
2 downplays the benefits of EPA's selected remedy (Alternative 2-3), and emphasizes the lower
3 cost of Alternative 2-2.[39] Niland asserts, for example, that "with regard to the Protection of
4 Human Health and the Environment Threshold criterion … [Alternative 2-2] is equally
5 protective of human health and the environment as Alternative 2-3."[40] Niland supports this
6 assertion by attacking the significance of EPA's determination that the high-density polyethylene
7 ("HDPE") liner included in the engineered cap will limit seepage.[41] He opines, based on his own
8 experience with HDPE liners, that "limiting infiltration does not improve the protectiveness of
9 [Alternative 2-3] as the runoff will either seep into the ground or be captured at the buttress."[42]

10     In his second report, Niland concluded after reviewing portions of the administrative
11 record for Operable Unit 2 that EPA's interim drinking water remedy is flawed.[43] He asserts that
12 EPA could have installed wellhead treatment systems at each of the contaminated residential
13 wells (Alternative 3) instead of connecting affected residents to the NID public water supply
14 (Alternative 4).[44] Niland's opinion largely depends on his own, uninformed, understanding of the
15 maintenance that would be required of the wellhead treatment systems in his preferred
16 Alternative 3. Niland asserts that "maintenance to assure proper operation of the well-head
17 treatment systems proposed in Alternative 3 could easily be incorporated into [existing Land Use
18 Covenants, Soil Management Plans and Operation and Maintenance Plans] without significant
19 cost or O&M burden."[45] But Niland acknowledged during his deposition that there are no land

---

[38] Niland OU1 Report (Ex. 2) at 11-18.
[39] *Id.*
[40] *Id*. at 12.
[41] *Id*. at 11 ("EPA also overvalues the HDPE liner in Alternative 2-3…"); 13 ("[T]here are no data to show that the HDPE liner will limit seepage to the buttress."); 14 ("EPA over-valued the ability of the HDPE liner in Alternative 2-3 to provide a barrier to intrusion, better groundwater protection and less erosion. The soil cap provided for in Alternative 2-2 provides each of these same benefits.").
[42] *Id*. at 13.
[43] Niland OU2 Report (Ex. 10) at 3-4.
[44] *Id*.
[45] *Id*. at 10.

7

use covenants on the residential parcels with contaminated wells, and that he had not read the soil management plan or operation and maintenance plan on which his opinion relies.[46]

**Argument**

**1. Niland's testimony is inadmissible because judicial review of Sterling's NCP challenge is limited to the administrative record of EPA's remedy selection.**

Section 113(j) of CERCLA imposes an arbitrary and capricious standard on this Court's review of Sterling's challenge to EPA's remedy selection decisions:

> **Standard:** In considering objections raised in any judicial action under this chapter the court shall uphold the President's decision in selecting the response action unless the objecting party can demonstrate, on the administrative record, that the decision was arbitrary and capricious or otherwise not in accordance with law.[47]

EPA's actions are presumed to be consistent with the NCP, and it is Sterling's burden to prove that a remedy selection decision is inconsistent with the NCP.[48] As the Ninth Circuit stated in *Chapman*, "[t]o prove that a response action of the EPA was inconsistent with the NCP, a defendant must prove that the EPA's response action was arbitrary and capricious."[49] In addition to proving an inconsistency with the NCP, Sterling must also show that the remedy cost more than it would have if EPA had acted consistent with the NCP.[50]

To determine whether Sterling meets its burden of proving that EPA acted inconsistently with the NCP, the Court reviews only the administrative record of EPA's remedy selection decisions:

---

[46] Niland Dep. (Ex. 11) at 116 (ll. 17-19), 117 (ll. 7-10); 115 (ll. 12-16).
[47] 42 U.S.C. § 9613(j).
[48] *United States v. Chapman*, 146 F.3d 1166, 1170-71 (9th Cir. 1998).
[49] *Id.* at 1170-71 (citations omitted). *See also United States v. W.R. Grace & Co.*, 429 F.3d 1224, 1233 (9th Cir. 2005); *Washington State Dept. of Transp. v. Washington Natural Gas Co.*, 59 F.3d 793, 802 (9th Cir. 1995); *United States v. Hardage*, 982 F.2d 1436, 1442 (10th Cir. 1992), *United States v. R.W. Meyer, Inc.*, 889 F.2d 1497, 1508 (6th Cir. 1989).
[50] *See, e.g.*, *United States. v. Burlington Northern R.R. Co.*, 200 F.3d 679, 695 (10th Cir. 1999) (analogizing "to the difference between breach and damage under tort law" that even if the party proves a breach of the NCP they must still prove that it resulted in damages); *O'Neil v. Picillo*, 682 F. Supp. 706, 729 (D. R.I. 1988) ("[D]efendants have the burden of demonstrating that the clean-up, because of some variance from the [NCP], resulted in demonstrable excess costs for which they should not be responsible.").

8

> **Limitation**: In any judicial action under this chapter, judicial review of any issues concerning the adequacy of any response action taken or ordered by the President shall be limited to the administrative record. Otherwise applicable principles of administrative law shall govern whether any supplemental materials may be considered by the court.[51]

Congress limited judicial review in this manner for two reasons: it recognized both EPA's technical expertise and the limited resources of the courts. As the Sixth Circuit explained in *Akzo Coatings*:

> Ours should not be the task of engaging in *de novo* review of the scientific evidence pro and con on each proposed remedy in the hazardous substance arena. The federal courts have neither the time nor the expertise to do so, and CERCLA has properly left the scientific decisions regarding toxic substance cleanup to the President's delegate, the EPA administrator and staff.[52]

By designating Niland as an expert witness, Sterling is inviting this Court to go beyond the administrative record and, ultimately, to substitute its own judgment for that of EPA. Extra-record material, including the testimony of experts, generally is excluded from consideration by the Courts and CERCLA Section 113(j).[53] Consistent with this established precedent and the governing statute, the Court should refuse to consider Niland's reports or testimony in this case.

Sterling would suffer no hardship as a result of excluding Niland's reports and testimony. Sterling had actual notice and ample opportunity to participate in EPA's remedy selection process, during which time it could have submitted scientific reports to EPA and made them part of the administrative record. But it did not. Having chosen not to comment on the proposed remedies during the public comment period, Sterling should not be permitted now to second-guess EPA's remedy decisions. As the Supreme Court recognized in *Camp v. Pitts*, "the focal

---

[51] 42 U.S.C. § 9613(j).

[52] *United States v. Akzo Coatings of America, Inc.*, 949 F.2d 1409, 1424 (6th Cir. 1991); *Cf. Carson Harbor Village, Ltd. v. Unocal Corp.*, 287 F.Supp.2d 1118, 1152-53 (C.D. Cal. 2003) (private party seeking to recover costs "must make a *prima facie* showing of NCP compliance" because lacks expertise of agency).

[53] *Inland Empire Public Lands Council v. Glickman*, 88 F.3d 697, 703 (9th Cir. 1996) (citing *Camp v. Pitts*, 411 U.S. 138, 142 (1973)). *See also United States v. Iron Mountain Mines, Inc.*, 987 F. Supp. 1250, 1254-55 (E.D. Cal. 1997) (review of EPA decisions under CERCLA subject to record review); *United States v. Amtreco, Inc.*, 806 F. Supp. 1004, 1005-06 (M.D. Ga. 1992) (court limited to administrative record review in CERCLA cases); *United States v. Wastecontrol of Florida, Inc.*, 730 F. Supp. 401, 403 (M.D. Fla. 1989) (review of EPA response actions based on record).

9

BRIEF IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE THE EXPERT REPORTS AND EXPECTED TESTIMONY OF JOSEPH J. NILAND, *United States et al. v. Sterling Centrecorp Inc. et al.*, No. 2:08-CV-02556-MCE-CKD

point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."[54]

In *United States v. Washington Dept. of Transportation*, the district court rejected an attempt to introduce expert opinion testimony during NCP consistency review.[55] There, the defendant argued that the court should decide the issue on the record developed during trial because EPA had not sufficiently explained its remedy selection decision in the administrative record.[56] The court held that, "given the strong and clear intent behind Section 113(j)(1) of CERCLA to limit judicial review to the administrative record," the expert testimony would be excluded.[57] For the same reason, this Court should refuse to hear Niland's testimony.

Sterling may argue that the Court should make an exception to the statutory bar on extra-record evidence. The Ninth Circuit has recognized only four narrow exceptions: "This circuit has only allowed extra-record materials (1) if necessary to determine 'whether the agency has considered all relevant factors and has explained its decision,' (2) 'when the agency has relied on documents not in the record,' or (3) 'when supplementing the record is necessary to explain technical terms or complex subject matter.' A fourth circumstance occurs 'when plaintiffs make a showing of agency bad faith.'"[58]

Sterling cannot meet its heavy burden of showing that any of these exceptions applies. There is no allegation of bad faith. There is no evidence that EPA relied on documents that are not in the record. The remedy selection decisions at issue here do not involve technical terms or complex subject matter, nor does Niland suggest that he prepared his report to explain such matters. Sterling presumably will argue that this Court is unable, without Niland, to determine whether EPA considered all relevant factors and explained its remedy decisions. But the Court does not need Niland's help to evaluate EPA's adherence to the NCP remedy selection process.

---

[54] 411 U.S. 138, 93 S. Ct. 1241, 1244 (1973).
[55] 450 F.Supp.2d 1207 (W.D. Wash. 2006).
[56] *Id.* at 1213.
[57] *Id.*
[58] *Inland Empire*, 88 F.3d at 703-04 (citations omitted).

1  It is fully capable of interpreting the NCP remedy selection provisions and related EPA
2  guidance. It is also capable of reviewing the record for evidence of inconsistency with the NCP.
3      Basic principles of administrative law counsel against admitting Niland's testimony.
4  Broadly speaking, Niland criticizes EPA for choosing a remedial alternative when, in his view,
5  the record supports another alternative. At best, Niland's opinions represent no more than routine
6  disagreement among scientists.[59] But routine disagreement is not enough to meet Sterling's
7  burden of establishing that, without Niland's testimony, this Court is unable review EPA's
8  remedy decisions.[60] If such routine disagreements were a basis for an exception to the general
9  rule barring extra-record evidence, the exception would swallow the rule.
10     Administrative law principles further counsel against admitting Niland's testimony
11 because that "inevitably leads the reviewing court to substitute its judgment for that of the
12 agency."[61] There are two ways in which admitting Niland's testimony may lead to this Court to
13 substitute its judgment for the judgment of the agency. First, allowing Niland's testimony will
14 result in a "battle of the experts" that will cause the Court to hear evidence from competing
15 experts and resolve their disputes as a matter of fact. Second, admitting Niland's testimony
16 suggests that the administrative record is still open. Sterling would argue that EPA's
17 administrative record is inadequate, and the Court would need to decide whether EPA's decision
18 based on that administrative record was justified based on evidence developed at trial. These two
19 concerns recently led the Ninth Circuit to hold that a court in the Eastern District of California
20 "overstepped its bounds" in admitting experts in a case governed by administrative law
21 principles.[62] Thus, in accordance with settled case law, the text of CERCLA, and administrative
22 law principles, this Court should hold that Niland's testimony is inadmissible.

---

[59] *Lands Council v. McNair*, 537 F.3d 981, 1000 (9th Cir. 2008) (en banc).
[60] *See Fence Creek Cattle Co. v. United States Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010).
[61] *Center for Biological Diversity v. United States Fish & Wildlife Service*, 450 F.3d 930, 943 (9th Cir. 2006). *See also Tri-Valley CAREs v. United States Dept. of Energy*, 671 F.3d 1113, 1130-31 (9th Cir. 2012).
[62] *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 604 (9th Cir. 2014), *cert. denied sub nom. Stewart & Jasper Orchards v. Jewell*, 135 S. Ct. 948, 190 L. Ed. 2d 830 (2015), and *cert. denied sub nom. State Water Contractors v. Jewell*, 135 S. Ct. 950, 190 L. Ed. 2d 830 (2015).

### 2. Niland's testimony is inadmissible because Niland is unqualified to serve as an expert on remedy selection under the NCP.

A second and independent basis for excluding Niland's reports and testimony is that he is not qualified to provide expert opinions on remedy selection under the NCP. As the party seeking to introduce Niland's testimony, Sterling has the burden of establishing its admissibility.[63] "[T]he trial judge … must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."[64] District court judges are to act as "gatekeepers"[65] with regard to expert testimony.[66] The Supreme Court made clear in *Kumho Tire Co.* that courts are to undertake this inquiry with all experts, be they specialized, technical, or scientific.[67] Scientific evidence can be tested by the scientific method or through statistical analysis; testimony based on experience cannot. Courts must make certain that an expert with specialized knowledge possesses genuine expertise in the field and that the testimony adheres to the same standard of intellectual rigor.[68] Recognizing this well-established body of law, Federal Rule of Evidence 702 specifies that only witnesses who are qualified by "knowledge, skill, experience, training, or education" may provide expert testimony.[69] As the Ninth Circuit explained in *Vallejo,* "expert testimony must . . . address an issue beyond the common knowledge of the average layman."[70]

Sterling seeks to offer Niland's opinions in support of its contention that EPA's remedy selection decisions are inconsistent with the NCP. But Niland has none of the qualifications necessary to provide expert testimony on remedy selection under the NCP. He is a professional

---

[63] *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993).
[64] *Id.* at 589, 113 S. Ct. at 2795.
[65] This characterization may be found in the Advisory Committee Notes following the 2000 amendments to Federal Rule of Evidence 702. *See also General Electric Co. v. Joiner,* 522 U.S. 136, 142, 118 S. Ct. 512, 517 (1997).
[66] *Daubert,* 509 U.S. at 589, 113 S. Ct. at 2795.
[67] *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152, 119 S. Ct. 1167, 1176 (1999) (court must ensure the reliability and relevancy of specialized expert testimony whether the expert is "basing testimony upon professional studies or personal experience").
[68] *Id.* (court must ensure that an expert proffering non-technical testimony "employ in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field").
[69] Fed. R. Evid. 702.
[70] *United States v. Vallejo,* 237 F.3d 1008, 1019 (9th Cir.), *amended by* 246 F.3d 1150 (9th Cir. 2001). *See also United States v. Hanna,* 293 F.3d 1080, 1086 (9th Cir. 2002).

geologist and environmental consultant for Geosyntec Consultants, Inc. in Sacramento, California.[71] He has experience performing tasks that lead up to a remedy selection decision, such as remedial investigations ("RI") and feasibility studies ("FS"), and he has implemented remedies selected by others, including EPA.[72] But Niland has no experience making remedy selection decisions under the NCP. He has never been an employee of EPA, or of any other regulatory body with remedy selection authority.[73] Thus, he has never selected a remedy under the NCP.  He has not participated in applying the Threshold Criteria after the preparation of an FS.[74] Nor has he participated in applying the Primary Balancing Criteria after the preparation of an FS.[75] Niland has never prepared a proposed plan seeking public comment on an agency's proposed remedy.[76] Nor has he applied the two Modifying Criteria – state and community acceptance – because he has not been involved at that point in the NCP process.[77] In his work on Records of Decision, which was at least 15 years ago, Niland had no role in assessing remedial alternatives, or in explaining the rationale for an agency's remedy selection.[78] He has no legal education[79] and, although he has been trained in implementation of remedies selected by others under the NCP, none of his training focused on remedy selection.[80] In sum, although Niland has provided certain kinds of support to agencies charged with making remedy selection decisions, he has never participated in making a remedy selection decision.

Because he lacks any experience, education, or training in remedy selection under the NCP, Niland is unfamiliar with EPA's remedy selection guidance. Niland consulted only one EPA guidance document in forming his opinions.[81] That guidance concerns RI and FS

---

[71] Niland OU1 Report (Ex. 2) at 1.
[72] *Id.* at 1-2; Niland Dep. (Ex. 11), at 7 (ll. 1-13), 10 (ll. 5-23).
[73] Niland Dep. (Ex. 11) at 8 (ll. 11-14); Niland OU1 Report (Ex. 2) (resume).
[74] Niland Dep. (Ex. 11) at 125 (l. 25)-126 (ll. 1-3).
[75] *Id*. at 125 (ll. 4-7).
[76] *Id*. at 122 (ll. 20-22).
[77] *Id*. at 124 (ll. 14-24), 125 (ll. 19-24).
[78] *Id*. at 12 (ll. 4-13), 123 (ll. 13-17), 125 (ll. 12-18), 129 (ll. 14-16).
[79] *Id*. at 130 (ll. 10-12).
[80] *Id*. at 126 (ll. 21-23); 127 (ll. 19-22).
[81] *See* Niland OU1 Report (Ex. 2) at 3 (*citing* EPA, *Guidance for Conducting Remedial Investigations and Feasibility Studies Under CERCLA,* EPA Office of Emergency and Remedial Response, Washington DC,

exclusively, and does not address remedy selection. The RI and FS are important steps leading up to remedy selection, and EPA bases its remedy selection decisions on information gathered during the RI and FS.[82] But the act of making and explaining a remedy decision occurs only after the RI and FS are completed, and that act is performed exclusively by the regulatory agency.[83] Thus, the sole guidance document Niland relied on in support of his opinions has very little, if anything, to say about EPA's remedy selection decisions.

In contrast, EPA's remedy selection guidance has everything to do with EPA's exercise of its remedy selection authority under the NCP. Yet, Niland failed to review any of it during the course of his evaluation of EPA's remedy decisions for Operable Units 1 and 2. He did not consult EPA's remedy selection guidance because he felt it was not "critical" to the opinions he provided.[84] Niland overlooked EPA's remedy selection guidance even though he concedes that it is reasonable for EPA to follow that guidance when making remedy decisions.[85] When asked during his deposition to identify EPA's main guidance on remedy selection, Niland was unable to do so; he said he would need to consult a list first.[86] Niland was also unsure whether EPA has any guidance on how to present the comparison of remedial alternatives in the ROD.[87]

Niland is simply unfamiliar with EPA's remedy selection process under the NCP because he has never done it, has never studied it, and has never received any training on it. As such, Niland is incapable of serving as an expert on remedy selection under the NCP.

---

October 1988, EPA/540/G-89/004); Niland OU2 Report (Ex. 10) at 3 (same). *See also* Niland Dep. (Ex. 11) at 27 (ll. 17-22); 28 (ll. 13-22).

[82] Preparation of an RI and FS is governed by one part of the NCP; remedy selection is governed by another. *Compare* 40 C.F.R. § 300.430(d) and (e) *with* 40 C.F.R. § 300.430(f). The purpose of the RI and FS "is to assess site conditions and evaluate alternatives to the extent necessary to select a remedy." *Id*. § 300.430(a)(2).

[83] 40 C.F.R. § 300.430(f).

[84] Niland Dep. (Ex. 11), at 30 (ll. 3-9).

[85] *Id*. at 30 (ll. 10-13).

[86] *Id*. at 31 (ll. 12-15).

[87] *Id*. at 143 (ll. 1-5).

14

BRIEF IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE THE EXPERT REPORTS AND EXPECTED TESTIMONY OF JOSEPH J. NILAND, *United States et al. v. Sterling Centrecorp Inc. et al.,* No. 2:08-CV-02556-MCE-CKD

**Conclusion**

Congress limited judicial review of agency remedy selection decisions to the administrative record in recognition of agency expertise and limited judicial resources. Sterling had an opportunity to criticize EPA's proposed remedies during the remedy selection process, but remained silent. Sterling should not be permitted to undermine the administrative record of EPA's decision-making with Niland's testimony in this proceeding.

This Court should issue an order (1) acknowledging that Section 113(j) of CERCLA governs the Court's review of EPA's remedy selections, and (2) refusing to hear testimony from Niland on that ground. The Court should further order that (3) Niland is unqualified to offer expert testimony on EPA's remedy selections because he lacks the necessary experience, education, or training in remedy selection under the NCP. A proposed order is filed herewith.

Respectfully submitted,

/s/ Patricia L. Hurst

---
PATRICIA L. HURST
GABRIEL ALLEN
PETER KRYZWICKI
Trial Attorneys
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC  20044

Attorneys for Plaintiff United States of America

/s/ Timothy E. Sullivan

---
TIMOTHY E. SULLIVAN
California Department of Justice
Office of the Attorney General
1515 Clay Street, 20th Floor
Oakland, CA 94612

Attorneys for Plaintiff
California Department of Toxic Substances Control