1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                           EASTERN DISTRICT OF CALIFORNIA

10

11    UNITED STATES OF AMERICA,                No. 2:08-cv–02556-MCE-JFM
      and CALIFORNIA DEPARTMENT
12    OF TOXIC SUBSTANCES CONTROL,

13                 Plaintiffs,                 **MEMORANDUM AND ORDER**

14          v.

15    STERLING CENTRECORP INC.,
      STEPHEN P. ELDER and ELDER
16    DEVELOPMENT, INC.,

17                 Defendants.

18

19          Both the United States and the California Department of Toxic Substances

20    (hereinafter collectively referred to as "Plaintiffs" or "government" unless otherwise

21    specified) have designated the former Lava Cap Mine, located in Nevada County,

22    California, as a Superfund site polluted by elevated levels of arsenic that were

23    disseminated through tailings and waste materials generated by mine operations.

24    Plaintiffs have undertaken cleanup efforts designed to remediate that arsenic

25    contamination.  The present action, filed pursuant to the Comprehensive Environmental

26    Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601, et seq.

27    ("CERCLA"),  seeks contribution for the costs of those activities both from former owners

28

                                              1

1   of the site and operators responsible for its mining.  After bifurcating the case between

2   liability and damages, a bench trial as to the liability of Defendant Sterling Centrecorp

3   Inc. ("Sterling") was held over four days between October 31, 2012, and November 7,

4   2012.  Those proceedings resulted in Findings of Fact and Conclusions of Law filed

5   June 20, 2013, and June 24, 2013, that found Sterling liable for all proper removal and

6   remedial costs incurred by Plaintiffs at the Mine.  ECF Nos. 211, 213.[1]

7       Presently before the Court are two related motions for summary judgment

8   pertaining to the second damages phase of this case.  First, Defendant Sterling

9   Centrecorp Inc. ("Sterling") moves for partial summary judgment as to the issue of

10   operator liability, alleging that the government was an operator of the Lava Cap Mine

11   Superfund Site after it issued, in 1943, an order closing the Mine during World War II

12   pursuant to War Production Board Limitation Order L-208 ("Order L-208").  The

13   government, in turn, has filed its own request for summary judgment as to Sterling's

14   Counterclaim[2] that the government is liable to pay a portion of the response costs

15   incurred in the Lava Cap Mine Superfund Site because it temporarily prohibited, through

16   Order L-208, the mine from operating during the 1940's so that national resources could

17   be concentrated in industries that produced materials, like copper and zinc, that were

18   necessary for the war effort.   For the reasons set forth above, the Court finds that the

19   government was not an "operator" of the Lava Cap Mine for CERCLA purposes because

20   it closed the facility in accordance with Order L-208.  Consequently, the government's

21   motion for summary judgment will be granted, and Sterling's motion is denied.[3]

22   ///

23   ///

24

[1] The liability of the remaining Defendants, Stephen P. Elder and Elder Development, had already
25   been adjudicated by orders dated February 23, 2010, September 20, 2011, and December 8, 2011, (ECF
Nos. 78, 149 and 153) respectively.

26

[2] Citations to "Counterclaim" in this memorandum and order refer to Sterling's counterclaim, as
27   incorporated in its First Amended Answer filed August 25, 2009 (ECF No. 33).

28

[3] Because it determined that oral argument would not have been of material assistance, the Court
ordered both Motions submitted on the briefing in accordance with Eastern District Local Rule 230(g).

1

2

**BACKGROUND**

3    The Lava Cap Mine Superfund Site is located on approximately thirty acres

4    located in a rural residential area in the foothills of the Sierra Nevada Mountains.  Gold

5    and silver mining activities at the site began in approximately 1860.  Between 1943 and

6    1945 mining was conducted at the site by the Lava Cap Gold Mining Corporation

7    ("LCGMC").  Mining operations resulted in two piles of mining waste, a waste rock pile

8    and a mill tailings pile.  Findings of Fact ¶¶ 34-35.[4]  The waste rock pile, estimated to be

9    several stories high, was situated immediately next to the mine and mill building.  Id. at

10    ¶ 34.  The fine-grained materials comprising the mill tailings were impounded

11    downstream from the mill behind a timber dam on Little Clipper Creek.  Id. at ¶¶ 12, 35.

12    In 1938, LCGMC created another dam on Greenhorn Creek to also trap mill tailings,

13    thereby creating Lost Lake.  Id. at ¶ 13.

14    In 1941, shortly after World War II began, the government took steps to address a

15    shortage of nonferrous metals along with the machines and supplies necessary to

16    produce those metals.  On January 16, 1942, President Roosevelt established the War

17    Production Board, an entity tasked with the conversion of civilian industry to wartime

18    production.  The Board proceeded to issue a series of orders giving priority to copper

19    mining.  Gold mines were classified as nonessential and given the lowest priority rating.

20    See United States v. Central Eureka Mining Co., 357 U.S. 155, 157 (1958).

21    On October 8, 1942, the Board issued Order L-208, which, after a seven-day

22    notice period, prohibited owners of non-essential mines from any action to "acquire,

23    consume, or use any material, facility, or equipment to break any new ore or to proceed

24    with any development work or any new operations in or about such mine."  Plaintiffs'

25    Statement of Undisputed Fact ("PUF") No. 1.  Order L-208 went on preclude owners of

26    non-essential mines from removing, after sixty days, "any ore or waste from such mine,

27

28    _____
     [4] Citations to "Findings of Fact" refer to the Court's Findings of Fact in the liability portion of this case, filed June 20, 2013.  ECF No. 211.

3

1   either above or below ground, or [from] conduct[ing] any other operations in or about

2   such mine, except to the minimum amount necessary to maintain its buildings,

3   machinery, and equipment in repair, and its access and development workings safe and

4   accessible." Id. at No. 2.

5        Although the Board did not originally invoke the provisions of Order L-208 and

6   allowed operations at the Lava Cap Mine to continue, on May 12, 1943, the Board

7   advised LCGMC that as of June 1, 1943, it would be subject to the requirements of the

8   Order.  Id. at Nos. 4-5.  By July of 1943, LGMC had ceased extracting ore that had

9   already broken down and had removed mine equipment.  Id. at 7-8.

10       A little over two years later, on June 30, 1945, the Board revoked Order L-208

11  and thereby permitted the resumption of gold mining activities at mines that had

12  previously been designated non-essential.  Id. at No. 9.  LCGMC nonetheless did not

13  resume operations at the Lava Cap Mine, and in September of 1952, Defendant

14  Sterling's predecessor, New Goldvue Mines, Inc.,[5] signed an agreement to acquire

15  LCGMC's assets, including the Lava Cap Mine, through its wholly owned subsidiary,

16  Keystone Copper Corporation.[6]  Findings of Fact ¶¶ 24-27.  Sterling therefore became

17  LCGMC's successor by de facto merger (Conclusions of Law ¶¶ 6, 58),[7] and took no

18  action at the mine site for decades.

19       In 1979, a partial log dam collapse led to a release of mine tailings into Little

20  Clipper Creek which, in turn, caused downstream neighbors to complain about pollution

21  from the resulting silt.  Findings of Fact ¶¶ 142-43, 166.  In October of 1979, the Central

22  Valley Regional Control Board and the California Department of Fish and Game

23  investigated and found that arsenic contaminated tailings had entered Little Clipper

24       [5] New Goldvue changed its names several times over the years before becoming Sterling
25  Centrecorp Inc. in 2001.  New Goldvue and the subsequent names by which the corporation was known
    will be simply referred to as "Sterling" throughout the remainder of this Memorandum and Order unless
26  otherwise noted.

27       [6] Keystone was subsequently itself conveyed to New Goldvue.

28       [7] Citations to "Conclusions of Law" refer to the Court's Conclusions of Law with regard to Sterling's
    liability in this case, filed June 24, 2013.  ECF No. 213.

1    Creek and flowed downstream to Lost Lake.  Id. at ¶ 142-43, 21.  The Regional Water

2    Quality Control Board thereafter issued a Cleanup and Abatement Order to Keystone,

3    which technically held title to the mine at the time, on October 25, 1979.  Id. at ¶ 144.

4    Following an ultimately unsuccessful attempt to sell the Lava Cap Mine to another

5    company, Keystone sold the property to Banner Mountain Properties, Ltd., an entity

6    controlled by Defendant Stephen Elder, who currently owns four of the seven parcels

7    comprising the former mine site, in 1989.  The remaining three parcels are owned by

8    another Elder business interest, Defendant Elder Development, Inc.

9    The United States Environmental Protection Agency ("EPA") completed a

10    Preliminary Assessment on the mine site in April of 1993, after Elder's purchase of the

11    mine site.  Sediment and soil samples revealed elevated concentrations of both arsenic

12    and lead.

13    Heavy rainstorms in 1997 washed mine wastes downstream into Little Clipper

14    Creek and Lost Lake.   The upper half of the log dam thereafter collapsed, discharging

15    an estimated 10,000 cubic yards of additional tailings contaminated with arsenic.

16    Findings of Fact ¶ 21.  In October of 1997, the U.S. Environmental Protection Agency

17    ("EPA") determined that the tailings release from the Mine met the National Contingency

18    Plan ("NCP") criteria for a removal action under 40 C.F.R. § 300.415(b)(2). During 1997

19    and 1998, the EPA conducted a physical removal action at the Site.  Pls.' Compl.,

20    ¶¶ 35-39.  Thereafter, in January of 1999, the Site was officially designed a Superfund

21    site in light of its potential risk to human health and the environment.

22    Removal operations included the removal and relocation of tailings,

23    reinforcement of the log dam, and diversion of Little Clipper Creek around the tailings

24    pile.  Future remedial work contemplated by the EPA for the site will include actions to

25    address the polluted groundwater.  In September of 2004, the EPA issued a Record of

26    Decision which selected its final remedy for the Mine Area Operable Unit.  Phase One

27    remedial work was completed in 2007.  Work on the remedial design for so-called

28    Phase 2, which involves treatment of the mine drainage continues.  Additionally, in

1  September of 2008, the EPA issued an interim Record of Decision for the drinking water

2  component of the groundwater operable unit.  Finally, the EPA continues to develop a

3  feasibility study for the Lost Lake Operable Unit.  According to the government, through

4  November 30, 2012, it incurred $32,205,011.39 in response costs at the Site.

5  Additionally, the California Department of Toxic Substances Control ("DTSC") has itself

6  spent $847,912.116 in unreimbursed response costs through October 31, 2014, and

7  expects that figure to increase in the future.

8        On October 27, 2008, the United States and the DTSC commenced this civil

9  action to recover both their past response costs under CERCLA and to obtain a

10  declaratory judgment that Defendants are responsible for future response costs at the

11  Site.  Thereafter, on August 25, 2009, Sterling asserted a contribution counterclaim

12  against the government alleging that the United States is liable under CERCLA as an

13  owner and an operator of the Lava Cap Mine.  According to the counterclaim that

14  contention is premised on the Board's issuance of Order L-208 "and its prohibition on the

15  use of material or equipment to remove any waste or conduct any other operations in or

16  about the Lava Cap Mine."  Counterclaim, ¶¶ 8, 14.  Sterling accordingly requests a

17  declaration that the United States is liable under the CERCLA along with an equitable

18  apportionment of response costs under CERCLA Section 113 (f)(1), 42 U.S.C.

19  § 9613(f)(1).

20        Sterling's March 20, 2015, answers to the government's contention interrogatories

21  on this issue revealed that Sterling's assertion of the United States as an "operator" was

22  based on Sterling's view that the United States was "controlling hazardous waste

23  management decisions at the mine" during the period it was closed by Order L-2089

24  between 1943 and 1945.  PUF No. 12.  Sterling goes on to assert that "the United States

25  prevented the mine operator from securing the mine tailings in a manner that would have

26  prevented erosion of tailings into Little Clipper Creek and the dispersal of mine tailings

27  during the storm event that occurred on or about January 1, 1997.  Id.  At the same time,

28  ///

1    Sterling withdrew its claim that the United States was an "owner" of the Lava Cap Mine
2    during the period in question.

3

4                                        **STANDARD**

5

6         The Federal Rules of Civil Procedure provide for summary judgment when "the
7    movant shows that there is no genuine dispute as to any material fact and the movant is
8    entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v.
9    Catrett, 477 U.S. 317, 322 (1986).  One of the principal purposes of Rule 56 is to
10   dispose of factually unsupported claims or defenses.  Celotex, 477 U.S. at 325.
11        Rule 56 also allows a court to grant summary judgment on part of a claim or
12   defense, known as partial summary judgment.  See Fed. R. Civ. P. 56(a) ("A party may
13   move for summary judgment, identifying each claim or defense—or the part of each
14   claim or defense—on which summary judgment is sought."); see also Allstate Ins. Co. v.
15   Madan, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995).  The standard that applies to a
16   motion for partial summary judgment is the same as that which applies to a motion for
17   summary judgment.  See Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic
18   Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998) (applying summary
19   judgment standard to motion for summary adjudication).
20        In a summary judgment motion, the moving party always bears the initial
21   responsibility of informing the court of the basis for the motion and identifying the
22   portions in the record "which it believes demonstrate the absence of a genuine issue of
23   material fact."  Celotex, 477 U.S. at 323.  If the moving party meets its initial
24   responsibility, the burden then shifts to the opposing party to establish that a genuine
25   issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co. v. Zenith
26   Radio Corp., 475 U.S. 574, 586-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S.
27   253, 288-89 (1968).
28   ///

In attempting to establish the existence or non-existence of a genuine factual dispute, the party must support its assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits[,] or declarations . . . or other materials; or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251-52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1987).  The opposing party must also demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.  In other words, the judge needs to answer the preliminary question before the evidence is left to the jury of "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 251 (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)) (emphasis in original). As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule [56(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586.  Therefore, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Id. 87.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. Anderson, 477 U.S. at 255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.

///

8

1  Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd,
2  810 F.2d 898 (9th Cir. 1987).

3

4  **ANALYSIS**

5

6        Sterling's contention that the government is liable for response costs at the Lava
7  Cap Mine Site is based on an argument that the War Production Board's temporary
8  shutdown of the mine between 1943 and 1945 prevented Sterling's predecessor,
9  LCGMC, from properly securing mine tailings at the Site, and therefore give rise to
10  operator liability on the government's part under CERCLA.  Sterling goes so far as to
11  concede that this is the "sole issue for the Court to decide" in these motions.  Sterling's
12  Reply, ECF No. 292, 1:2-5.

13        Sterling argues that because The War Production Board shut the mine down
14  during World War II, it "operated the mine exclusively for two years and controlled all
15  decisions about the Mine."  Sterling Mot., ECF No. 272-1, 4:27-28.  By that simple act of
16  closure, according to Sterling, the government "controlled every decision relating to the
17  activity of the mine, including preventing [LCGMC] from managing waste in any manner,"
18  thereby dictating a finding of CERCLA operator liability.  Id. at 7:1-3.  Sterling makes this
19  argument despite the fact that, as the government points out, the Board never had any
20  presence at the mine and neither constructed any facilities or built any roadways to
21  facilitate access to mining operations.  Nor did the Board have any role in managing
22  LCGMC, direct any aspect of the company affairs, provide raw materials, dictate
23  production, or regulate profits at the mine.  It was LCGMC alone that generated mining
24  waste, including tailings, and determined how and where that waste would be disposed.
25  It was also LCGMC and not the government who designed and constructed the disposal
26  system such that tailings were discharged into Little Clipper Creek and flowed
27  downstream where they were impounded.
28  ///

1        Under CERCLA, a person or entity may be liable for response costs if "at the time

2   of disposal of any hazardous substance [it] owned or operated any facility at which such

3   hazardous substances were disposed of."  42 U.S.C. § 9607(a)(2).  The statute defines

4   the word "operator" as "any person . . . operating" a facility."  42 U.S.C. § 9601(20)(A).

5        The United States Supreme Court has held that for CERCLA purposes an

6   "operator is simply someone who directs the workings of, manages, or conducts the

7   affairs of a facility."  United States v. Bestfoods, 524 U.S. 51, 66 (1998).  In further

8   clarifying that definition, the Court found that such "an operator must manage, direct, or

9   conduct operations specifically related to pollution, that is, operations having to do with

10  the leakage or disposal of hazardous waste, or decisions about compliance with

11  environmental regulations."  Id. at 66-67.

12       The Ninth Circuit has made it clear that "operator" liability under CERCLA requires

13  active management of the enterprise and/or decision-making authority over the facility's

14  waste disposal operations.  See, e.g., Redevelopment Agency of the City of Stockton v.

15  BNSF Ry. Co., 643 F.3d 668, 680 (9th Cir. 2011) (affirming the district court's holding

16  that the defendants were not operators because they did not "'manage, direct, or

17  conduct operations specifically related to [the] pollution, that is, operations having to do

18  with the leakage or disposal of [the] hazardous waste.'") (quoting Bestfoods, 524 U.S. at

19  66-67); Long Beach Unified Sch. Dist. v. Godwin California Living Trust, 32 F.3d 1364,

20  1367 (9th Cir. 1994) ("[A] party must do more than stand by and fail to prevent the

21  contamination.  It must play an active role in running the facility, typically involving hand-

22  on, day-to-day participation in the facility's management.").

23       In interpreting the scope of operator liability under this standard, the Eastern

24  District's decision in United States v. Iron Mountain Mines, Inc., 881 F. Supp. 1432 (E.D.

25  Cal. 1995) is particularly instructive.  In that case, like the present matter, the United

26  States and the State of California brought cost recovery actions under CERCLA.  Those

27  actions were brought, in part, as a result of acid mine drainage flowing from the site of

28  the former Iron Mountain Mine near Redding, California.  Id. at 1434.  Like Sterling here,

1   one of the potentially responsible parties, Rhone-Poulenc, was a successor to Mountain

2   Copper who owned the mine during World War II.  In <u>Iron Mountain</u>, however, the

3   government did more than simply prohibit gold mining at the site as not essential to the

4   war effort.  It established a Premium Price Plan as an incentive for the production of

5   copper and zinc, secured an agreement from Mountain Copper to sell its entire copper

6   and zinc output to the government and controlled marketing and pricing of the ore

7   produced at the mine.  <u>Id.</u> at 1435-36.  Rhone-Poulenc also argued that the government

8   was involved in the activities of the mine in numerous respects, including hiring workers,

9   building access roads, facilitating shipments, and paying for equipment needed  to

10  expand ore exploration.  <u>Id.</u> at 1449-50.

11          Despite these allegations, which entailed substantially more involvement on the

12  government's part that in the case at bar, the Iron Mountain court granted the United

13  States' motion to dismiss, concluding that Rhone-Poulenc had not made any allegations

14  that the United States "was involved in the 'hands-on, day-to-day' management of the

15  mine" or that the government "controlled the cause of contamination, the mining

16  equipment, or made any decisions regarding disposal of the mining waste."  <u>Id.</u> at 1450.

17  As the court noted, even "[p]urchasing a product and encouraging its production are not

18  the same as controlling the cause of the contamination or managing the mine."  <u>Id.</u>

19          Significantly for purposes of the present case, the <u>Iron Mountain</u> court later

20  analyzed the case on summary judgment since Rhone-Poulenc was allowed to amend

21  its complaint after the government's motion to dismiss was granted.   <u>United States v.</u>

22  <u>Iron Mountain Mines, Inc.</u>, 987 F. Supp. 1277 (E.D. Cal. 1997).  In the summary

23  judgment phase, Rhone-Poulenc also argued that the government exercised control

24  over mining waste due to its construction of a roadway utilizing the waste.  Nonetheless,

25  the court granted summary judgment in favor of the United States on Rhone-Poulenc's

26  counterclaim, concluding that the government's wartime efforts to assist, facilitate, and

27  provide incentives to Mountain Copper still did not make the government an "operator"

28  within the meaning of CERCLA.  <u>Id.</u> at 1284.  In reaching that determination, the court

1    concluded that Mountain Copper remained in control of all the basic operational

2    decisions of the mine and never shared control with the United States.  Id.  As the court

3    observed, the "United States did not participate in 'day-to-day' management nor did it

4    have the right to do so." Id. at 1285.

5          Here, there is similarly no evidence that the government was involved in any way

6    with basic operations at the Lava Cap Mine.   If anything, the government's involvement

7    in this case was much less extensive in that it did nothing more than issue and enforce

8    Order L-208, which closed the mine as non-essential for the war effort.  Other than

9    closing the mine pursuant to Order L-208, the government had nothing to do either with

10   its operation or the design and disposal of the tailings that resulted from mining

11   operations.[8]

12         While Sterling cites several Third Circuit cases in arguing that the government

13   should nonetheless be subject to liability under CERCLA,  the government's actions in

14   those cases presented ongoing direct governmental involvement and site-specific

15   decision-making absent from the present matter and distinguishable on that basis.  FMC

16   Corp. v. United States Dep't of Commerce, 29 F.3d 833 (3rd Cir. 1994), involves the

17   government's efforts to secure high tenacity rayon needed for the manufacturing of war-

18   related products after the United States lost 90 percent of its crude rubber supply at the

19   onset of World War II.[9]  The War Production Board accordingly required American

20   Viscose to convert its plant from making textile rayon to high tenacity rayon and the

21   company did so.  Id. at 836.  The Board controlled the rayon facility in various ways,

22   including ensuring that the plant had sufficient quantities of the products needed to

23   manufacture rayon, controlling the labor force at the facility, and placing a representative

24          [8] Sterling's argument that the government precluded any disposal of mining wastes during the
25   period it closed the mine, and thereby should be deemed an "operator" for CERCLA purposes, also
     misses the mark since there is no evidence that the Board knew about the mine's tailing pile, let alone
26   made any decisions pertaining to its disposal.  Moreover, to the extent that Sterling relies on L-208's
     provision generally restricting the removal or "ore or waste" during closure, even that condition was subject
27   to the actions needed to keep the facility safe and in good condition.

             [9] High tenacity rayon could be used as a synthetic rubber substitute to strengthen and lengthen
28   the life of heavy duty truck and aircraft tires, thus reducing natural rubber consumption.

1   on-site.  Id. at 837.  The Board also knew that the plant generated hazardous waste.  Id.

2   at 837-38.  Under these circumstances, the FMC court found that the government's

3   actions were sufficient to support a finding of operator liability under CERCLA for

4   eventual removal and remediation activities.  In so finding, the Third Circuit concluded

5   that the government "exerted considerable day-to-day control" over the site, controlled

6   what and how much product was manufactured, and "maintained a significant degree of

7   control over the production process through regulations, on-site inspectors and the

8   possibility of seizure."  Id. at 844.[10]  No analogous imposition of operational control is

9   present here.  All the government did was close the mine for the duration of World

10  War II.  It played no role otherwise in dictating how the mine was operated.

11      Sterling's reliance on another Third Circuit case, Gould Electronics Inc. v. United

12  States, 220 F.3d 169 (3rd Cir. 2000) is equally unavailing.  There, under facts similar to

13  FMC but dissimilar to the present case, the court concluded that the United States was

14  an "operator" for CERCLA purposes because it controlled what the plant in question

15  "would produce, had access to the plant at all times, reserved the right to dismantle or

16  repair the part the plant, reserved the right to shut down the plant, and had the ability to

17  exercise day-to-day control over the operations of the plant."  Id. at 182 n.18.

18  Significantly, in Gould, the government and the business owner actually entered into a

19  contract which provided that the government "retained ultimate supervision and control

20  over the day-to-day operations of the plant."  Id. at 174.  Obviously, no such

21  circumstances are present here.

22      Instead, as the Ninth Circuit's Long Beach Unified case instructs,  the passive

23  aftermath of the government's decision to close the mine for two years in the 1940's  is

24  insufficient, standing alone, to support operator liability under CERCLA.  Instead,

25  operator liability requires "an active role in running the facility, typically involving hand-

26  on, day-to-day participation in the facility's management."  32 F.3d at 1367.  Here, any

27  _____

        [10] Sterling has conceded that it is not arguing here that the government's closure of the Lava Cap
28  Mine under Order L-208 amounted to a "seizure" of LCGMC's property here.  Sterling's Reply, ECF No.
    292, 1:21-23.

1  such role is plainly absent, and the government's enforcement of L-208 did not, as a

2  matter of law, make it an "operator" of the Lava Cap Mine.  Consequently, Sterling's

3  counterclaim in that regard fails, and the government is entitled to summary judgment

4  that no such liability is present.

5

6                                    **CONCLUSION**

7

8          For all the foregoing reasons, the government was not an "operator" of the Lava

9  Cap Mine for CERCLA purposes, and its enforcement of Rule L-208 during World War II

10  does not give rise to any right of contribution from the government to share in clean-up

11  response costs on that basis.  Consequently, the United States' Motion for Summary

12  Judgment as to the Counterclaim of Sterling Centrecorp Inc. (ECF No. 274) is

13  GRANTED.  Sterling's own Motion for Partial Summary Judgment on the Issue of

14  Operator Liability (ECF No. 272), which makes the opposite argument, is DENIED.

15          IT IS SO ORDERED.

16  Dated:  September 20, 2016

17

18                                            MORRISON C. ENGLAND, JR.
                                              UNITED STATES DISTRICT JUDGE

19

20

21

22

23

24

25

26

27

28

                                              14