UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, and CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>STERLING CENTRECORP INC., STEPHEN P. ELDER and ELDER DEVELOPMENT, INC.,<br><br>　　　　Defendants. | No. 2:08-cv–02556-MCE-JFM<br><br>**MEMORANDUM AND ORDER** |

　　Both the United States and the California Department of Toxic Substances (hereinafter collectively referred to as "Plaintiffs" or "government" unless otherwise specified) have designated the former Lava Cap Mine, located in Nevada County, California, as a Superfund site polluted by elevated levels of arsenic that were disseminated through tailings and waste materials generated by mine operations. Plaintiffs have undertaken cleanup efforts designed to remediate that arsenic contamination. The present action, filed pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601, et seq. ("CERCLA"), seeks contribution for the costs of those activities both from former owners

of the site and operators responsible for its mining. After bifurcating the case between liability and damages, a bench trial as to the liability of Defendant Sterling Centrecorp Inc. ("Sterling") was held over four days between October 31, 2012, and November 7, 2012. Those proceedings resulted in Findings of Fact and Conclusions of Law filed June 20, 2013, and June 24, 2013, that found Sterling liable for all proper removal and remedial costs incurred by Plaintiffs at the Mine. ECF Nos. 211, 213.[1]

Presently before the Court are two related motions for summary judgment pertaining to the second damages phase of this case. Both Plaintiffs and Defendant Sterling Centrecorp Inc. ("Sterling") ask the Court to summarily adjudicate the extent and recoverability of Plaintiff's response costs under Section 107 of CERCLA. As set forth below, Plaintiffs' Motion is GRANTED and Defendant Sterling's Motion is DENIED.[2]

## BACKGROUND

The Lava Cap Mine Superfund Site is located on approximately thirty acres in a rural residential area in the foothills of the Sierra Nevada Mountains. Gold and silver mining activities at the site began in approximately 1860. Between 1943 and 1945 mining was conducted at the site by the Lava Cap Gold Mining Corporation ("LCGMC"). Mining operations resulted in two piles of mining waste, a waste rock pile and a mill tailings pile. Findings of Fact ¶¶ 34-35.[3] The waste rock pile, estimated to be several stories high, was situated immediately next to the mine and mill building. Id. at ¶ 34. The fine-grained materials comprising the mill tailings were impounded downstream from the mill behind a timber dam on Little Clipper Creek. Id. at ¶¶ 12, 35. In 1938, LCGMC

---

[1] The liability of the remaining Defendants, Stephen P. Elder and Elder Development, had already been adjudicated by orders Dated February 23, 2010, September 20, 2011, and December 8, 2011 (ECF Nos. 78, 149 and 153, respectively.

[2] Because it determined that oral argument would not have been of material assistance, the Court ordered both Motions submitted on the briefing in accordance with Eastern District Local Rule 230(g).

[3] Citations to "Findings of Fact" refer to the Court's Findings of Fact in the liability portion of this case, filed June 20, 2013. ECF No. 211.

2

created another dam on Greenhorn Creek to also trap mill tailings, thereby creating Lost Lake. Id. at ¶13.

In 1979, a partial log dam collapse led to a release of mine tailings into Little Clipper Creek which, in turn, caused downstream neighbors to complain about pollution from the resulting silt. Findings of Fact ¶¶ 142-43, 166. In October of that year, the Central Valley Regional Control Board and the California Department of Fish and Game investigated and found that arsenic contaminated tailings had entered Little Clipper Creek and flowed downstream to Lost Lake. Id. at ¶ 142-43, 21. The Regional Water Quality Control Board thereafter issued a Cleanup and Abatement Order to Keystone, which technically held title to the Mine at the time. Id. at ¶ 144.

Following an ultimately unsuccessful attempt to sell the Lava Cap Mine to another company, Keystone sold the property in 1989 to Banner Mountain Properties, Ltd., an entity controlled by Defendant Stephen Elder, who currently owns four of the seven parcels comprising the former mine site. The remaining three parcels are owned by another Elder business interest, Defendant Elder Development, Inc.

The United States Environmental Protection Agency ("EPA") completed a Preliminary Assessment on the mine site in April of 1993, after Elder's purchase of the property. Sediment and soil samples revealed elevated concentrations of both arsenic and lead.

Heavy rainstorms in 1997 washed mine wastes downstream into Little Clipper Creek and Lost Lake. The upper half of the log dam thereafter collapsed, discharging an estimated 10,000 cubic yards of additional tailings contaminated with arsenic. Findings of Fact ¶ 21. In October of 1997, the EPA determined that the tailings release from the Mine met the National Contingency Plan ("NCP") criteria for a removal action under 40 C.F.R. § 300.415(b)(2). During 1997 and 1998, the EPA conducted a physical removal action at the Site. Pls.' Compl., ¶¶ 35-39. Thereafter, in January of 1999, the Site was officially designated a Superfund site in light of its potential risk to human health

///

and the environment. Soil, sediment, surface water and groundwater contamination from mining operations continues at the Site.

The EPA has conducted a variety of response activities to address this contamination. Plaintiffs' Statement of Undisputed Facts ("PUF") No. 12. It has reviewed information and sampling data for prior assessments, performed and analyzed groundwater, surface water, sediment and soil sampling to determine the extent of contamination, analyzed alternatives for eliminating or reducing said contamination, and performed several response actions to prevent exposure to hazardous contaminants. Id. at 13-24.

Because of the size of the Site, the EPA elected to divide it into four operable units. Sterling's Statement of Undisputed Facts ("DUF") at No. 7. Only two of those operative units are at issue in the current motions. Operative Unit 1 ("OU1") consisted of: 1) the residences on the mine property; 2) building, soils, and surface water contamination on the mine property; and 3) contaminated soils along Little Clipper Creek downstream to Greenhorn Road. Id. at 8. The EPA selected remedial treatment for OU1 consisting of removing "hot spots" of soil contamination near the mine buildings, removing mine equipment, constructing surface water diversions around the tailings and waste rocks piles, and installing a system to collect and treat water flowing from the mine entrance and seeping from the buttress containing the failings. Id. at 11. In addition, the treatment employed also included covering the waste rock pile with soil and vegetation, and covering the tailings pile with a High Density Polyethylene ("HDPE") synthetic liner and vegetated soil. Id. at 12.

Operative Unit 2 ("OU2") addressed risks posed by contaminated groundwater, including groundwater then used for drinking water by five residences. The remedy chosen by EPA was interim in nature because studies for possible long-term groundwater treatment were still ongoing, and potentially years away. See id. at 18. As an interim measure, EPA built a $3.795 million pipeline to connect the impacted

///

residences to a municipal water supply provided by the Nevada Irrigation District. Id. at 24.

According to the government, through November 30, 2012, it incurred $32,205,011.39 in response costs at the Site. PUF at No. 42. Additionally, the California Department of Toxic Substances Control ("DTSC") has $781,878.01 in unreimbursed response costs through October 31, 2014, and expects that figure to increase. Id. at 56. Of those amounts, the government claims it spent $3,611,624 on enforcement and legal costs that will be presented to the Court at a later date, and the DTSC spent some $58,151.25 for similar costs. Id. at 47, 56. Plaintiffs accordingly argue that Defendants, including Sterling, are liable for $28,593,387.39 in response costs to the government at this time, and $723,726.78 for response costs to DTSC. Id.[4]

On October 27, 2008, the United States and the DTSC commenced this civil action to recover both their past response costs under CERCLA and to obtain a declaratory judgment that Defendants are responsible for future response costs at the Site. Plaintiffs' motion now before the Court seeks to establish its unreimbursed response costs as set forth below. Sterling, on the other hand, seeks summary adjudication that because some of Plaintiffs' costs incurred at OU1, and all in OU2, were arbitrary or capricious or otherwise inconsistent with the NCP, they are unrecoverable.

## STANDARD

The Federal Rules of Civil Procedure provide for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. Celotex, 477 U.S. at 325.

///

---

[4] DTSC calculates the total balance owed as $847,912.86 after the addition of interest.

Rule 56 also allows a court to grant summary judgment on part of a claim or defense, known as partial summary judgment. See Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."); see also Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995). The standard that applies to a motion for partial summary judgment is the same as that which applies to a motion for summary judgment. See Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998) (applying summary judgment standard to motion for summary adjudication).

In a summary judgment motion, the moving party always bears the initial responsibility of informing the court of the basis for the motion and identifying the portions in the record "which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968).

In attempting to establish the existence or non-existence of a genuine factual dispute, the party must support its assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits[,] or declarations . . . or other materials; or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251-52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1987). The opposing party must also demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In other words, the judge needs to answer the preliminary question before the evidence is left to the jury of "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 251 (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)) (emphasis in original). As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule [56(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. Therefore, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Id. 87.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. Anderson, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

## ANALYSIS

### A. Statutory Framework

The EPA is authorized until CERCLA § 104(a) to address a release or a substantial threat of release of hazardous substances. 42 U.S.C. § 9604(a). Permissible responses in that regard include "removal" actions, "remedial" actions, and any other actions necessary to protect the public health or welfare or the environment. Id. "Removal" actions including evaluative, assessment, and monitoring activities and related investigations, as well as actions necessary to prevent, minimize or mitigate

environmental damage. 42 U.S.C. § 9601(23). "Remedial" actions refer to measures taken to permanently deal with hazardous substances. 42 U.S.C. § 9601(24). In addition, CERCLA provides that the term "response" means either a removal or remedial action as well as enforcement activities related thereto. 42 U.S.C. § 9601(25).

The National Contingency Plan, or NCP, "provide[s] the organizational structure and procedures for preparing for and responding to . . . releases of hazardous substances." Washington State Dep't of Transp. v. Washington Natural Gas Co., Pacificorp, 59 F.3d 793, 799 (9th Cir. 1995) (quoting 40 C.F.R. § 300.1). A party found liable under CERCLA § 107 is liable for "all costs of removal or remedial action incurred by the United States . . . not inconsistent with the [NCP]." 42 U.S.C. § 9604(a)(4)(A).

Once Plaintiffs establish a prima facie case that their response costs were incurred in connection with the release of hazardous substances from the Lava Cap Mine Site, such costs are presumed to be consistent with the NCP, and the burden shifts to Defendants to prove otherwise. Id. at 1170-71. Pursuant to CERCLA § 113(j) and well established Ninth Circuit precedent, Defendant Sterling then has the burden, in showing that a particular action was inconsistent with the NCP, to show that such response was "arbitrary and capricious" based on the administrative record. 42 U.S.C. § 9613(j); Chapman, 146 F.3d at 1170. The arbitrary and capricious standard of review is indicated "because determining the appropriate removal and remedial action involves specialized knowledge and expertise, [and therefore] the choice of a particular cleanup method is a matter within the discretion of the [government]. United States v. Hardage, 982 F.2d 1436, 1442 (10th Cir. 1992) (quoting United States v. Northeastern Pharmaceutical & Chem. Co., 810 F.2d 726, 748 (8th Cir. 1986)).

"If the Court finds that the selection of a response action was arbitrary and capricious or otherwise not in accordance with law, the court shall award (A) only the response costs or damages that are not inconsistent with the [NCP], and (B) such other relief as is consistent with the [NCP]." 42 U.S.C. § 9613(j)(3). In making that determination, the NCP identifies guides for investigation as well as the consideration of

1  remedial alternatives, and establishes criteria to be used in selecting remedies for the
2  identified alternatives.  First, the EPA requires that a remedial investigation/feasibility
3  study be undertaken for both the assessment and evaluation of site conditions and
4  associated risks, with a range of alternatives then develop to address those concerns.
5  40 C.F.R. §300,420, 300.430.  Then, the proposed alternatives must be addressed using
6  nine different criteria divided into three general categories denominated as Threshold,
7  Balancing, and Modifying Criteria.  The two Threshold Criteria are overall protection of
8  human health and the environment, and compliance with applicable or relevant and
9  appropriate requires.  Threshold Criteria are essentially "pass-fail" screening criteria
10 designed to determine whether proposed alternatives should be further considered.  The
11 Balancing Criteria contain five factors used to evaluate and compare alternatives that
12 passed screening criteria.  Those factors include long-term effectiveness and
13 permanence, reduction of toxicity, mobility or volume through treatment, short-term
14 effectiveness, implementability and cost.  Finally, the two Modifying Criteria are state and
15 community acceptance.  40 C.F.R. § 430(e)(9).
16     In addition to overall cost, the NCP also requires that the EPA analyze the cost-
17 effectiveness of each remedial alternative.  40 C.F.R. § 300.43(f)(1)(ii)(D).  A remedy is
18 deemed cost-effective only if "its costs are proportional to its overall effectiveness."  Id.

19     **B.  Recoverable Response Costs**

20     In opposing Plaintiffs' Motion, Defendant Sterling does not question that either the
21 government or the DTSC incurred the costs they claim through clean-up efforts at the
22 site, or that the figures are improperly calculated, documented, and/or presented.
23 Sterling's Opp., ECF No. 284, 1:4-7.  Instead, Sterling argues only that because some of
24 the remedies utilized were arbitrary or capricious or otherwise inconsistent with the NCP,
25 not all of Plaintiffs' claimed costs can be recovered.
26     Specifically, as indicated above, Sterling takes issue with the remedies employed
27 at the Site for part of OU1, as well as the entirety of the interim remedy for OU2.
28 ///

9

### 1.   Operable Unit One ("OU1")

Turning first to OU1, the EPA chose so-called Alternative 2-3 over Alternative 2-2 to address contamination from the mine buildings, tailings, waste rock and acid drainage.  Sterling argues that Plaintiff's selection of Alternative 2-3 was arbitrary and capricious because the EPA: 1) failed to conduct the required NCP analysis before deciding to cover the waste rock with a vegetated soil cover; 2) failed to similarly analyze its decision to cover the tailings pile with an HDPE liner; and 3) failed to explain why its decision to excavate contaminated soil near the mine buildings was cost effective.  These arguments will be addressed in turn.

#### a.   Waste Rock Cover

Samples taken of the waste rock and mine tailings revealed that arsenic concentrations as high as 3,190 mg/kg.  See Pls.' Statement of Disputed Material Facts ("SOF"), ¶ 7.  Given those results, the EPAA decided to regrade the waste rock pile and cap it with vegetated soil.   Sterling does not dispute the need to regrade the pile and reduce infiltration, since that measure was included within Alternative 2-2, the remedial measure Sterling advocates.  Sterling instead challenges the EPA's decision to cap the regraded pile as set forth in Alternative 2-3.

The EPA claims it determined that capping was needed in order to make the waste rock more difficult to disturb and to further reduce infiltration.  Id. at 8-14.  The government maintains that a cap does a better job of preventing people from disturbing the waste rock than no cap, a conclusion which seems obvious, and a distinction that Sterling appears reluctant to recognize.  Sterling's only counter is to take the unpersuasive position that the EPA should have discussed the likelihood that intruders would break into the Site to remove waste rock, an estimation that would be virtually impossible to quantify.

Sterling's main argument against the selection of a vegetated soil cap rests with its contention that arsenic concentrations were primarily bound up in the rock matrix, and that, accordingly, they did not have the same potential to erode or leach into the soil as

the tailings pile. According to Sterling, in the absence of field investigation and/or solubility testing to determine just how much arsenic was apt to leach into the environment from the waste rock, the EPA's decision to install the cap was arbitrary and capricious.

The Court disagrees. Evidence in the record indicates that EPA's concern about infiltration from the waste rock was justified. Although Sterling is correct that the larger pieces of waste rock were less problematic in this regard, waste rock at the site ranged from eight inches in diameter to very small, sand-size particles, with fine-grained material situated throughout the waste rock pile to a depth of some 21 feet. Id. at 9, 10. As EPA Remedial Project Manager David Seter noted in public hearings on its planned remediation, the Site's waste rock "needs to be shaped to shed the rainwater, it needs to be capped, because there probably are some fine materials interspersed with the rock, and we just want to try to keep it all in place." Id. at 14. Installing a cap under these circumstances would appear the prudent approach and it hardly can be considered arbitrary and capricious.

Sterling's other objections are no more availing. While Sterling argues that the necessary data gathering failed to take place, it appears that solubility testing was done and that those results are part of the administrative record even if they were not expressly flagged by the EPA. Two of the three waste rock samples contained arsenic at levels in both in excess of the applicable maximum contaminant level and Site goals for the clean-up of arsenic in surface water. See SOF at Nos. 18-21. Making a determination that the EPA's remedial choice was arbitrary and capricious solely because it failed to directly rely on adverse testing results already contained in the record would be nonsensical. Additionally, in response to Sterling's argument that cost-effectiveness was not considered, because capping created a better long-term barrier, the EPA determined that Alternative 2-3 (the next most economical option after Alternative 2-2, which did not envision installation of a cap) provided the best balance of

///

cost in combination with both long and short-term effectiveness. SOF at No. 26. That conclusion itself was sufficient for NCP purposes.

### b.   Waste Tailings Cover

The tailings pile posed an even greater environmental risk than did the concentration of waste rock at the Site. The EPA concluded that the tailings pile was both highly toxic and mobile, with surface water seeping from the tailings pile and groundwater beneath it containing elevated arsenic levels. Id. at 28. Alternative 2-3, the treatment choice adopted by the EPA, included six inches of sand over the tailings, followed by an impermeable HDPE liner and eighteen inches of vegetated low-permeability soil. Alternative 2-2 as advocated by Sterling, on the other hand, called for only twelve inches of non/low-permeability soil to assist in revegetation, and no liner. Id. at 4. As Sterling itself indicates, the EPA judged the engineered cap to be more effective because it concluded that the combination of an impermeable liner and low-permeability soil deflected nearly all direct precipitation away from the tailings pile. See Sterling Mot., ECF No. 273-1, pp. 8-9. The EPA determined that Alternative 2-2, on the other hand, "would allow water flow to enter the tailings and continue to produce leachate." SOF at No. 29. Additionally, the EPA found that because it provided more of an access barrier to the tailings pile it made it more difficult for people and animals to come into contact with the contaminated tailings. Id. at 30.

In an argument similar to that employed against the EPA's remedial choice for the Site's waste rock pile, Sterling argues that the government's choice to use an HDPE liner was arbitrary and capricious because the EPA failed to conduct appropriate testing and modeling to determine what, if any, increased benefit to groundwater and soil contamination was achieved by covering the tailings with the liner. According to Sterling, because the EPA failed to determine the amount of water infiltrating the pile and the arsenic migration caused thereby, it acted inconsistently with the NCP. Sterling also contends that the agency did not determine whether the HDPE liner was cost-effective. See Sterling Mot., ECF No. 273-1, 9:19-22.

     Sterling's argument notwithstanding, the EPA need not calculate the precise amount of water deterred by the engineered cap in order to satisfy the NCP. Section 300.430(d)(2) of the NCP, which Sterling cites to support that proposition, requires no such calculation. The record does show, however, that the impermeable liner reduces some 99 percent of infiltration and resists cracking, as opposed to the soil cap envisioned in Alternative 2-2 which the EPA determined would continue to allow for both infiltration and the generation of tailings leachate. SOF at Nos. 32-33. As indicated above, the EPA knew that the tailings released arsenic into both surface and groundwater. Common sense dictates that Alternative 2-3 was a safer choice under these circumstances, irrespective of whether precise testing was employed. Moreover, and in any event, although the EPA did not explicitly rely on testing to support its conclusion , a waste extraction test on the tailings using deionized water was performed, and arsenic levels in the sample showed levels in excess of the applicable maximum contaminant level and Site clean-up goals. Id. at 34, 21.

     Even Sterling cannot challenge the superior long-term effectiveness of the liner, which was expected to last hundreds of years. See SOF at No. 36. Finally, with regard to cost-effectiveness, Sterling argues only that because the EPA did not determine the incrementally increased protection the HDPE liner offered, it could not determine whether the increased cost was proportional to that greater efficacy. Again, however, the EPA concluded that Alternative's 2-3's significantly better benefits were worth the additional cost. SOF at No. 41. A quantitative comparison of risk reduction under the circumstances was not necessary.

     Given all these factors, the EPA's decision to employ Alternative 2-3 in treating the waste tailings pile cannot be deemed arbitrary and capricious.

### c.  Excavation of Contaminated Soil

     The EPA determined that the soils near the mine buildings were the most heavily contaminated on the entire Site, with arsenic and cyanide contaminant levels at 31,200 and 419 ppm, respectively. Id. at 43. Sterling nonetheless faults the EPA for removing

13

those "hot spots" rather than simply fencing the affected areas and claims that the EPA did not explain in the record why excavating the polluted soils was more cost-effective. Given the superior protection provided by removing the soils as compared to fencing, whose protection against human exposure would depend on enforcement and whose deterrence to animal intrusion was at best, questionable, it appears plain to this Court that EPA's remedial choice was not arbitrary or capricious.

### 2. Operable Unit Two ("OU2")

OU2 addressed contaminated groundwater at the Site, and because a long-term solution was complex, and potentially years away, the EPA determined that residents of the area drinking from contaminated groundwater wells needed a safe and reliable source of drinking water. Consequently, as an interim and partial remediation measure, EPA connected area residents to Nevada Irrigation District water through construction of a pipeline costing some $3.795 million. Sterling argues that the EPA's interim decision to construct the pipeline was arbitrary and capricious because it did not require residents to abandon their private wells and that therefore the underlying risk of contaminated groundwater was not addressed. That consideration, particularly when balanced against the significant cost of the pipeline and the fact that it affected only five residential wells used for drinking water (two additional wells were used only for irrigation, see DUF at No. 21), underlies Sterling's belief that the remedy chosen did not pass muster under the NCP. Sterling also contends that because pipelining an additional water source does not technically involve treatment, that factor has to be balanced against water treatment measures at the wellheads themselves.

Sterling urges the Court to therefore find that wellhead treatment should have been employed for the residences at issue at a significantly lower cost of some $943,000 over a 50-year treatment for both installation and maintenance. DUF at No. 27. The EPA determined that construction of the pipeline was nonetheless the safer choice since it met threshold criteria like implementability, short-term effectiveness and treatment without qualification and provided a solution that required, unlike well treatment, no

1    additional maintenance from the EPT, the State of California, or the property owner.  Id.
2    at 68-69.[5]

3         Again, while Sterling may disagree with the EPA's selected remedy, that does not
4    mean that the government's choice to pipe in safe drinking water from a public supply
5    was arbitrary and capricious.[6]  Wellhead treatment would require continuous monitoring
6    and maintenance and coordination with individual residents, who could change over
7    time, for access to ensure that treatment units were operating properly and were
8    consequently safeguarding drinking supply.  SOF at Nos. 56, 60, 65.  This was not a
9    hypothetical concern since wellhead treatment units at the site had failed before.  Id. at
10   59.  On the other hand, the pipeline could deliver safe drinking water to affected
11   residents in perpetuity without the necessity of any ongoing monitoring.  Selecting a
12   more protective remedy in that regard cannot be arbitrary and capricious.

13        The cost of building the treatment as opposed to maintaining wellhead treatments
14   is nonetheless a balancing factor that has to be considered.  Although the cost
15   difference between those options is clearly significant, it is equally clear that the pipeline
16   provides a fail-free method for delivering safe water without the need for ongoing, and
17   potentially problematic, monitoring needed to maintain wellhead systems.  Given those
18   considerations, the Court again cannot say that EPA's decision to employ the more
19   expensive pipeline was arbitrary and capricious.

20   ///
21   ///
22   ///
23   ///
24   ///

---

[5] Wellhead systems, once professionally installed, require two filter and membrane changes and a water quality analysis each year.  See ECF No. 289-4 at EPA011112.

[6] The fact that individual residents could not be required to disconnect their individual wells does not alter this conclusion.  As the EPA has noted, individual residents could be continuing to use wellhead water for reasons other than drinking purposes.

**CONCLUSION**

Based on all the foregoing, Plaintiffs' Motion for Partial Summary Judgment as to Amount of Recoverable CERCLA Response Costs is GRANTED. Defendant Sterling's corresponding Motion for Summary Judgment as to the recoverability of certain response costs in the Lava Cap Mine Site's Operable Units One and Two is DENIED.[7]

IT IS SO ORDERED.

Dated: September 21, 2016

MORRISON C. ENGLAND, JR
UNITED STATES DISTRICT JUDGE

---

[7] The Court notes that Plaintiff DTSC has filed a reply memorandum (ECF No. 291) that purports to take issue with Defendant Sterling's alleged claim that certain costs incurred by DTSC are divisible and are accordingly not property attributable to Sterling. Since neither Motion presently before the Court purports to ask it to make any such determination, that issue is not before the Court at this time.