**FILED**

**Oct 05, 2020**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA; CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL, *Plaintiffs-Appellees*, | No. 18-15585 |
| v. | D.C. No. 2:08-cv-02556-MCE-DB |
| STERLING CENTRECORP INC., *Defendant-Appellant*, | OPINION |
| and | |
| STEPHEN P. ELDER; ELDER DEVELOPMENT, INC., *Defendants.* | |

Appeal from the United States District Court
for the Eastern District of California
Morrison C. England, Jr., District Judge, Presiding

Argued and Submitted October 25, 2019
San Francisco, California

Filed October 5, 2020

2    UNITED STATES V. STERLING CENTRECORP.

Before:  Michael J. Melloy,* Jay S. Bybee, and
N. Randy Smith, Circuit Judges.

Opinion by Judge Melloy;
Partial Concurrence and Partial Dissent by
Judge N.R. Smith

## SUMMARY**

## CERCLA

The panel affirmed the district court's judgment in a case brought by the United States and the California Department of Toxic Substances Control against Sterling Centrecorp, Inc. under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA") to recover cleanup costs incurred at a Superfund site – the Lava Cap Mine located in Nevada County, California.

Strict CERCLA liability arises when four key elements are satisfied: (1) the site in question is a "facility" as defined by CERCLA; (2) a "release" or "threatened release" of a hazardous substance has occurred; (3) the release or threatened release requires expenditures that are consistent with a national contingency plan; and (4) the defendants fall within one of four categories of "covered persons" subject to liability.  "Covered persons" include prior operators of the

---

* The Honorable Michael J. Melloy, United States Circuit Judge for the U.S. Court of Appeals for the Eighth Circuit, sitting by designation.

** This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

facility.  42 U.S.C. § 9607(a)(2).  Sterling conceded the first three elements of CERCLA liability prior to trial.

The panel held that the record supported the district court's finding that Sterling was an "operator" of the Site because Sterling maintained pervasive control of the Site. The record also supported the finding that Jack Gilbert, the man tasked with directing the response to the Regional Water Board's Cleanup and Abatement Order, wore his Sterling "hat" while doing so.  The record also supported the conclusion that Gilbert acted on Sterling's behalf.  Finally, the record reflected that Sterling must have made the environmental response decisions at the Site. The panel concluded that Sterling was subject to CERCLA liability as a prior operator of the Mine.

The panel held that the United States was not subject to CERCLA liability as a prior operator.  The record showed that, through Order L-208, the United States instructed the Mine to shut down its operations, and that was the extent of its involvement.  The record does not show that the United States ever managed, directed, or conducted operations specifically related to pollution at the facility.

The panel held that the interim remedy selected by the Environmental Protection Agency to supply non-contaminated drinking water at the Site was not arbitrary and capricious or otherwise not in accordance with law. The panel further held that Sterling failed to overcome the presumption of consistency with the National Contingency Plan.

Judge N.R. Smith concurred with the majority's conclusions that Sterling was liable for response under CERCLA, and the EPA's selection of the interim remedy

4 UNITED STATES V. STERLING CENTRECORP.

was not arbitrary and capricious or otherwise inconsistent with the National Contingency Plan.  He dissented from the majority's conclusion that the United States was not an "operator" under CERCLA because the majority misinterpreted and misapplied controlling Supreme Court precedent.

## COUNSEL

Kaitlyn D. Shannon (argued) and Gary J. Smith, Beveridge & Diamond P.C., San Francisco, California, for Defendant-Appellant.

Allen M. Brabender (argued), Patricia L. Hurst, Paul Cirino, and Peter Krzywicki, Attorneys; Eric Grant, Deputy Assistant Attorney General; Jeffrey H. Wood, Acting Assistant Attorney General; Environment & Natural Resources Division, United States Department of Justice, Washington, D.C.; Xavier Becerra, Attorney General; Sally Magnani, Senior Assistant Attorney General; Edward Ochoa, Supervising Deputy Attorney General; Olivia Karlin and John W. Everett, Deputy Attorneys General; Office of the Attorney General, San Diego, California; for Plaintiffs-Appellees.

**OPINION**

MELLOY, Circuit Judge:

The United States and the California Department of Toxic Substances Control (collectively, Plaintiffs) designated the former Lava Cap Mine (Mine), located in Nevada County, California, as a Superfund Site (Site)[1] known to be polluted by elevated and potentially dangerous levels of arsenic generated through mining operations. Starting in the mid-1990s, Plaintiffs undertook efforts to clean up and remediate the arsenic contamination and its effect on the local groundwater, inhabitants, and environment. Plaintiffs later sued Defendant, Sterling Centrecorp, Inc. (Sterling), under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9601, et seq. (CERCLA), to recover response costs incurred at the Site. Sterling contested Plaintiffs' claims and filed a counterclaim arguing the United States was itself liable for response costs under CERCLA as a prior "operator" of the Mine during World War II.

After bifurcating the case between liability and damages, the district court held a bench trial as to liability and found Sterling liable for response costs. As to damages, the district court concluded on summary judgment that Plaintiffs could recover all response costs because the remedy selected by the Environmental Protection Agency (EPA) was not arbitrary and capricious, and that the United States was not

---

[1] Hereinafter, this opinion will use "Mine" to describe the Lava Cap Mine before it was designated a Superfund Site and use "Site" to describe the same location once it was designated to be an environmental hazard. For most purposes, the titles are interchangeable.

liable as an "operator" under CERCLA.  Sterling appeals the district court's final judgment.  We have jurisdiction under 28 U.S.C. § 1291 and affirm the district court's rulings.

## I.  BACKGROUND

Between 1934 and 1943, the Lava Cap Gold Mining Corporation (LCGMC) owned and operated the Lava Cap Mine.  The Mine was located in the foothills of the Sierra Nevada Mountains and, at the time, was one of the largest gold and silver mining operations in California.  Mining operations produced two kinds of mining waste: waste rock and mill tailings.  The waste rock was piled up next to the Mine.  The mill tailings required more care.  Because mill tailings are fine-grained materials with high concentrations of arsenic and are particularly susceptible to being carried away by water, LCGMC built two log dams to hold the tailings in place.

The United States entered World War II in 1941.  It was "apparent to those in charge of the Nation's defense mobilization that [the United States] faced a critical shortage of nonferrous metals, notably copper, and a comparable shortage of machinery and supplies to produce them." *United States v. Cent. Eureka Mining Co.*, 357 U.S. 155, 157 (1958).  On January 16, 1942, President Roosevelt created the War Production Board (Board), Exec. Order No. 9024 ¶ 2, 7 Fed. Reg. 329, 329–30 (Jan. 17, 1942), to "promote the national defense" and convert various civilian industry to wartime production, Limitation Order L–208, 7 Fed. Reg. 7992, 7992–93, 1942 WL 49008 (Oct. 8, 1942).  The Board "issued a series of Preference Orders" classifying copper mines as essential to the war effort and classifying gold mines as nonessential.  *Cent. Eureka Mining*, 357 U.S. at 157.  At first, these orders merely prevented nonessential mines from acquiring new machinery or supplies.  *Id.*

Eventually, the Board needed to address "a severe shortage of skilled labor" in the nonferrous metal mines. *Id.*

To that end, on October 8, 1942, the Board issued Limitation Order L–208, which provided requirements for the gold mining industry.

> It directed each operator of a gold mine to take steps immediately to close down its operations and, after seven days, not to acquire, use or consume any material or equipment in development work. The order directed that, within 60 days, all operations should cease, excepting only the minimum activity necessary to maintain mine buildings, machinery and equipment, and to keep the workings safe and accessible. Applications to the [Board] were permitted to meet special needs and several exceptions were made under that authority. Small mines were defined and exempted from the order. The [Board] did not take physical possession of the gold mines. It did not require the mine owners to dispose of any of their machinery or equipment.

*Id.* at 158–60.[2]  Under subsection (b)(3) of Order L–208, following the 60-day mark, gold mines were not allowed to

---

[2] *See* Limitation Order L–208, 7 Fed. Reg. 7992, 7992–93, 1942 WL 49008 (Oct. 8, 1942); *see also Cent. Eureka Mining*, 357 U.S. at 158 n.4 (providing the full text of Order L–208).  In *Central Eureka Mining*, the Supreme Court addressed the history and scope of Order L–208 in the context of a takings claim.  It held that the issuance of Order L–208 did not amount to a Fifth Amendment taking because "the Government did not occupy, use, or in any manner take physical possession of the gold

8        UNITED STATES V. STERLING CENTRECORP.

"acquire, consume, or use any material, facility, or equipment to remove any ore or waste from such mine, either above or below ground, or to conduct any other operations in or about such mine, except to the minimum amount necessary to maintain its buildings, machinery, and equipment in repair, and its access and development workings safe and accessible."  Limitation Order L–208, 7 Fed. Reg. 7992, 7993, 1942 WL 49008 (Oct. 8, 1942).  The Board amended Order L–208 several times to reflect additional instructions related to machinery.  In a letter dated May 12, 1943, the Board advised LCGMC that as of June 1, 1943, the Lava Cap Mine would be subject to Order L–208.

On June 30, 1945, the Board revoked Order L–208. However, LCGMC never resumed mining operations.  In 1952, LCGMC was acquired by Sterling, a Canadian corporation then known as Goldvue Mines Limited, through its wholly owned subsidiary, Keystone Copper Corporation (Keystone).  Sterling took no actions at the Mine for decades.

In 1979, one of the dams built to contain the mill tailings partially collapsed, triggering a release of contaminated waste into the local water system.  Following the collapse, the Central Valley Regional Water Quality Control Board investigated complaints by the Mine's downstream neighbors regarding the pollution and issued a Cleanup and Abatement Order (CAO) to Keystone, as title holder to the Site.  The CAO instructed Keystone to stop the discharge immediately and provide a report detailing needed

---

mines or of the equipment connected with them."  *Cent. Eureka Mining*, 357 U.S. at 165–66.

improvements to the structural integrity of the dam.[3] Keystone failed to comply.  Neither Keystone nor its parent company, Sterling, conducted the required evaluation of the dam.  The dam remained in poor condition through the remainder of Keystone's ownership of the Mine.  Through Keystone, Sterling eventually sold the Mine to an entity controlled by Stephen Elder in 1989.

In 1997, catastrophic flooding completely collapsed the log dam and washed an estimated 10,000 cubic yards of arsenic-contaminated mill tailings into the local water system.  Following this event, the EPA and the California Department of Toxic Substances Control (California DTSC) conducted an extensive response action under CERCLA to remove hazardous materials from the Site and to protect local residents from the contamination.  The EPA officially designated the Site as a Superfund site in January 1999.  The EPA split the Site into four operable units, including as is relevant here, Operable Unit 2 (OU2).  In OU2, groundwater wells were contaminated, and the EPA was concerned with providing a safe and reliable source of drinking water to local residents.  Because a long-term solution would be years in the making, the EPA constructed a pipeline to connect residences to an uncontaminated public water supply as an interim remedy.  Pipeline construction cost an estimated $3.795 million.  To date, total response costs at all four operable units at the Site have totaled more than $32 million.

---

[3] The California Department of Fish and Game also investigated and warned of a future catastrophic failure of the decaying dam if not properly repaired.

The United States and California DTSC sued Sterling and Elder[4] under CERCLA seeking contribution for response costs incurred at the Site. In addition to asserting multiple defenses, Sterling filed a contribution counterclaim against the United States, alleging Order L–208 made the United States liable as a prior operator.

The district court bifurcated the litigation into a jurisdiction and liability phase, followed by a damages phase. After a four-day bench trial for the first phase, the court ruled that it had personal jurisdiction over Sterling, and Sterling was liable under CERCLA for response costs under three separate theories: (1) Sterling directly operated the Mine at the time of the disposal of hazardous substances, (2) Sterling assumed the liabilities of LCGMC, and (3) Sterling's acquisition of LCGMC was a de facto merger.

In phase two, proceeding on cross-motions for summary judgment, the district court concluded Order L–208 did not subject the United States to CERCLA liability as an "operator" of the Mine. It found that other than closing the Mine, the United States had no involvement with the Mine's operations or the disposal of mill tailings. The district court also concluded, again on separate cross-motions, that Plaintiffs were entitled to recover all response costs. The district court then issued a judgment of roughly $32 million against Sterling and Elder. This appeal followed.

## II. DISCUSSION

Sterling appeals the district court's rulings on (1) its own liability; (2) the liability of the United States; and

---

[4] The companion appeal is also filed today in *United States v. Elder*, No. 18-15878.

(3) response costs related to the EPA's interim remedy in OU2.  Following a bench trial, we review the district court's legal conclusions de novo and factual findings for clear error.  *Lentini v. Cal. Ctr. for the Arts, Escondido*, 370 F.3d 837, 843 (9th Cir. 2004).  We will accept the factual findings unless we are "left with the definite and firm conviction that a mistake has been committed."  *Id.* (citations omitted).  We review de novo the district court's grant of summary judgment and interpretation of CERCLA.  *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 870 (9th Cir. 2001) (en banc).

## A.  CERCLA Liability

In 1980, Congress enacted CERCLA as a "response to the serious environmental and health risks posed by industrial pollution."  *United States v. Bestfoods*, 524 U.S. 51, 55 (1998).  "As its name implies, CERCLA is a comprehensive statute that grants the President broad power to command government agencies and private parties to clean up hazardous waste sites."  *Key Tronic Corp. v. United States*, 511 U.S. 809, 814 (1994).  We construe CERCLA liberally in order to effectuate its two primary goals: "(1) to ensure the prompt and effective cleanup of waste disposal sites, and (2) to assure that parties responsible for hazardous substances [bear] the cost of remedying the conditions they created."  *Carson Harbor*, 270 F.3d at 880.

CERCLA authorizes the EPA to finance cleanup efforts at hazardous sites that meet certain statutory criteria, 42 U.S.C. § 9604; *Bestfoods*, 524 U.S. at 55, and to recover costs from liable parties.  Strict CERCLA liability arises when four key elements are satisfied: (1) the site in question is a "facility" as defined by CERCLA; (2) a "release" or "threatened release" of a hazardous substance has occurred; (3) "such release or 'threatened release' will require the

expenditure of response costs that are 'consistent with the national contingency plan'"; and (4) the defendants fall within one of four categories of "covered persons" subject to liability. *See Cose v. Getty Oil Co.*, 4 F.3d 700, 703–04 (9th Cir. 1993).  Relevant here, "covered persons" include prior operators of the facility, defined as "any person who at the time of disposal of any hazardous substance . . . operated any facility at which such hazardous substances were disposed of."  42 U.S.C. § 9607(a)(2).

### 1.   Liability of Sterling

After conducting the bench trial, the district court concluded Sterling is liable for response costs as a prior "operator" under CERCLA because it directed operations related to pollution at the Site.  Sterling appeals this ruling. We agree with the district court.[5]

Sterling conceded the first three elements of CERCLA liability prior to trial.  Therefore, only one element was contested and is contested on appeal: whether Sterling was an "operator" of the Site when hazardous substances were disposed there.  *See* 42 U.S.C. § 9607(a).  CERCLA defines "operator" circularly as "any person . . . operating [a] facility." 42 U.S.C. § 9601(20)(A)(ii).  We look to common law for additional guidance.  *City of Los Angeles v. San Pedro Boat Works*, 635 F.3d 440, 443 (9th Cir. 2011).

In *Bestfoods*, the Supreme Court defined "operator" when determining whether a parent corporation was liable under CERCLA for a subsidiary's actions.  Looking to the

---

[5] Because we do so, Sterling's argument as to a lack of personal jurisdiction is no longer viable.  Indeed, the parties agreed in briefing that if Sterling was found liable as an operator, Sterling's contacts with the forum would be sufficient to establish personal jurisdiction.

ordinary meaning of the term, *Bestfoods*, 524 U.S. at 66, and the context of CERCLA's environmental focus, the Court stated that "an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations," *id.* at 66–67. *Bestfoods* emphasized that any determination as to whether an entity is liable as an operator must turn on the relationship between the potentially responsible party and the waste-producing facility at issue. *Id.* at 68. Such liability may be inferred from the totality of the circumstances; it need not be proven by direct evidence. *Tosco Corp. v. Koch Indus., Inc.*, 216 F.3d 886, 892 (10th Cir. 2000).

Whether Sterling is liable as a prior operator under CERCLA is a fact-intensive inquiry, and we therefore review the district court's post-bench trial determinations for clear error. *See United States v. Depew*, 210 F.3d 1061, 1067 (9th Cir. 2000) (indicating that a "fact-intensive inquiry" will generally be reviewed for clear error). The record supports the district court's finding that Sterling was an "operator" of the Site because "Sterling maintained pervasive control over operations at the [Site], including direct management of the environmental response to the 1979 partial dam collapse and disposal of arsenic contaminated tailings and water." The factual record supports the district court's finding that Jack Gilbert, the man tasked with directing the response to the Regional Water Board's Cleanup and Abatement Order (CAO) regarding the hazardous substances at the Site, wore his Sterling "hat" while doing so. Gilbert directed compliance with the CAO using Sterling letterhead, received communications related to the response addressed to him in his capacity as a Sterling official, and rarely mentioned

14    UNITED STATES V. STERLING CENTRECORP.

Sterling's subsidiary in his correspondence regarding the CAO. The record also supports the district court's conclusion that Gilbert acted on Sterling's behalf since Gilbert's actions "benefitted Sterling, to Keystone's detriment," and were thus "contrary to the interests of the subsidiary yet nonetheless advantageous to the parent." *See Bestfoods*, 524 U.S. at 70 n.13. Sterling's involvement is further shown by the fact that compliance reports regarding the monitoring orders were sent directly to Sterling for a time. Finally, the record reflects that Sterling must have made the environmental response decisions at the Site, because Keystone did not have the financial wherewithal to do so. Therefore, Sterling is subject to CERCLA liability as a prior operator of the Mine.[6]

## 2. Liability of the United States

Sterling also challenges the district court's summary judgment ruling as to whether, by issuing Order L–208, the United States acted as an "operator" and is therefore liable for response costs. Sterling argues that the United States was an operator because of the all-encompassing nature of Order L–208. This argument proves too much. The definition of "operator" in *Bestfoods* clarifies that actual participation in

---

[6] The district court concluded Sterling could also be liable under two separate theories: (1) the transaction between Sterling and its predecessor was a de facto merger, thus subjecting Sterling to successor liability; and (2) Sterling expressly assumed its predecessor's environmental liabilities. We agree that the evidence at trial also supports these theories as alternative bases for holding Sterling liable for response costs. However, our analysis focuses only on direct operator liability as that is the typical basis for CERCLA liability in these circumstances, and it is dispositive of the issue. *See McMurtrey v. Ryan*, 539 F.3d 1112, 1132 (9th Cir. 2008) (noting that where one issue is dispositive, the court need not address the remaining issues).

decisions related to pollution is necessary for a finding of operator liability. We have similarly held that "[t]o be an operator of a hazardous waste facility, a party must do more than stand by and fail to prevent the contamination. It must play an active role in running the facility, typically involving hands-on, day-to-day participation in the facility's management." *Long Beach Unified Sch. Dist. v. Dorothy B. Godwin Cal. Living Tr.*, 32 F.3d 1364, 1367 (9th Cir. 1994). The *Bestfoods* standard confirms that operator status has a nexus requirement. That is, it requires that an operator's relationship to the facility at issue must, at least in part, focus on "operations specifically related to pollution." *Bestfoods*, 524 U.S. at 66. Therefore, operator liability requires something more than general control over an industry or facility. It requires some level of direction, management, or control over the facility's polluting activities.

The record shows that, through Order L–208, the United States instructed the Mine to shut down its mining operations. That is the extent of its involvement. The record does not show that the United States ever managed, directed, or conducted operations specifically related to pollution at the facility. Nor does the record show that the United States even had knowledge of the Mine's mill tailings disposal or the log dam structures that held the mill tailings. *Cf. PPG Indus. Inc. v. United States*, 957 F.3d 395, 404 (3d Cir. 2020) (stating that "knowledge of a practice is not the same as undertaking that practice for the purposes of operator liability under CERCLA"). Order L–208 included no requirements as to "operations specifically related to pollution." *Bestfoods*, 524 U.S. at 66. Its terms cannot make the United States liable as a prior operator.

Further, the record does not show that the United States ordered the abandonment of existing pollution controls. Rather, subsection (b)(3) of Order L–208 specifically allowed for the Mine to continue minimal operations "to maintain its buildings, machinery, and equipment in repair, and its access and development workings safe and accessible."[7] This exception makes clear that, while Order L–208 was in effect, the Mine retained control over its own maintenance and safety operations. It had the ability to maintain structures such as the mill tailings dams and otherwise keep its own investment safe. This included taking necessary steps related to pollution and waste. Therefore, while the United States had general regulatory authority over the mining industry during World War II, by issuing Order L–208 and applying it to the Mine, it did not "manage, direct, or conduct . . . operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Bestfoods*, 524 U.S. at 66–67.

Taking into consideration, as we must, the broad remedial nature of CERCLA, the undisputed facts in the record show that, by issuing Order L–208, the United States did not "manage, direct, or conduct operations" specifically related to pollution at the Lava Cap Mine Site. *Bestfoods*, 524 U.S. at 66. Therefore, the United States is not subject to CERCLA liability as a prior operator.

---

[7] Limitation Order L–208, 7 Fed. Reg. 7992, 7993, 1942 WL 49008 (Oct. 8, 1942); *see also Cent. Eureka Mining*, 357 U.S. at 158 n.4 (providing the full text of Order L–208).

**B.  Remedy Selection**

Finally, Sterling challenges the district court's ruling as to the EPA's interim remedy in OU2.  Sterling argues the decision to create a pipeline to provide residents with safe water was arbitrary and capricious because the pipeline failed to achieve its primary objective, and a cheaper alternative existed.  Sterling argues the EPA should have installed point-of-use wellhead treatment instead of constructing the pipeline, thus saving nearly $3 million in response costs.  Sterling also argues the EPA improperly weighed certain criteria under 40 C.F.R. § 300.430.

The National Contingency Plan (NCP) holds "the organizational structure and procedures for preparing for and responding to . . . releases of hazardous substances." *Wash. State Dep't of Transp. v. Wash. Nat. Gas Co., Pacificorp*, 59 F.3d 793, 799 (9th Cir. 1995) (quoting 40 C.F.R. § 300.1).  A party subject to CERCLA liability is responsible for "all costs of removal or remedial action incurred by the United States . . . or a State . . . not inconsistent with the [NCP]."  42 U.S.C. § 9607(a)(4)(A).   Once Plaintiffs established a prima facie case that their response costs were incurred in connection with the release of hazardous substances from the Site, such costs were presumed to be consistent with the NCP, and the burden shifted to Sterling to prove otherwise.  *United States v. Chapman*, 146 F.3d 1166, 1170–71 (9th Cir. 1998).

The interim remedy selected by the EPA to supply non-contaminated drinking water at the Site was not "arbitrary and capricious or otherwise not in accordance with law." *See* 42 U.S.C. § 9613(j)(2) (providing the standard of review).    The EPA's interim remedy achieved its objective—to provide clean drinking water to the impacted residents—and was not contrary to the evidence.  *See*

18      UNITED STATES V. STERLING CENTRECORP.

*Chapman*, 146 F.3d at 1170–71; *see also Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 521 (9th Cir. 2010) (explaining that the court's role is to confirm that the agency's decision is rational and based on the record). Further, the response costs were not inconsistent with the NCP. Based on its careful evaluation of the required criteria, the EPA concluded the comparative benefits justified the higher cost of the selected remedy because the pipeline "provides much greater protectiveness by permanently removing the exposure pathway," and by "eliminat[ing] the requirement for long-term federal and state management of individual residents' drinking water." Although the pipeline was the more expensive alternative, the EPA met its obligation to consider the cost-effectiveness of each alternative and to, in the end, select a cost-effective remedy. 40 C.F.R. § 300.430(f)(1)(ii)(D) ("Each remedial action selected shall be cost-effective."); *see also Franklin Cty. Convention Facilities Auth. v. Am. Premier Underwriters, Inc.*, 240 F.3d 534, 546 (6th Cir. 2001) (affirming the selection of a more expensive, yet cost-effective alternative as consistent with the NCP).

Contrary to Sterling's arguments, the EPA did not improperly weigh the statutory criteria under 40 C.F.R. § 300.430. Instead, the record shows that the EPA conducted the required comparative analysis before concluding that the pipeline "provides the best balance of tradeoffs in terms of . . . balancing criteria, while also considering . . . State and community acceptance." For these reasons, and because there was a rational connection between the record and the EPA's selection of the interim remedy, Sterling fails to overcome the presumption of consistency with the NCP.

## III.  CONCLUSION

We affirm the rulings of the district court.

**AFFIRMED.**

---

N.R. SMITH, Circuit Judge, concurring in part[1] and dissenting in part:

Because Supreme Court case law makes clear that the United States is an "operator" at the Site, I cannot join the majority opinion on this issue.

## I.

To promote the national defense during World War II, the Office of Production Management and its successor, the War Production Board, issued a series of orders prioritizing the acquisition of certain nonferrous metals, notably copper. *See United States v. Cent. Eureka Mining Co.*, 357 U.S. 155, 156–157 (1958).  These orders gave "those mines, which were deemed important from the standpoint of defense or essential civilian needs, a high priority in the acquisition" of mining machinery. *Id.* at 157.  "Gold mines were classified as nonessential and eventually were relegated to the lowest priority rating" for obtaining mining machinery, meaning that these mines had to use only the machinery and supplies they had on hand. *Id.*  The Lava Cap Gold Mine, the Site at issue in this case, was thus not deemed important from the

---

[1] I agree with the majority's conclusions that (1) Sterling is liable for response costs under CERCLA, and (2) the EPA's selection of the interim remedy was not arbitrary and capricious or otherwise inconsistent with the National Contingency Plan.

standpoint of defense or essential civilian needs and therefore could not obtain machinery.

The shortage of supplies for the war effort soon spread beyond machinery as the "expanding need for nonferrous metals," together with the "depletion of mining manpower as a result of the military draft and the attraction of higher wages paid by other industries," caused a "severe shortage of skilled labor." *Id.* at 157. To remedy this labor shortage, the War Production Board issued Limitation Order L–208 in 1942. *Id.* at 158. The Order was addressed exclusively to the "nonessential" gold mining industry and directed all operations to cease, "except to the minimum amount necessary to maintain its buildings, machinery, and equipment in repair, and its access and development workings safe and accessible." Limitation Order L–208, 7 Fed. Reg. 7992, 7992–93 (Oct. 8, 1942) [hereinafter Order L–208]. Although the "[War Production Board] did not take physical possession of the gold mines," *Cent. Eureka Mining Co.*, 357 U.S. at 160, it just as well have; it expressly prohibited the "use [of] any material, facility, or equipment *to remove any ore or waste*" from the mine, or the conducting of "any other operations in or about such mine," Order L–208 at 7993 (emphasis added).

The Order became specifically applicable to the Lava Cap Gold Mine on May 12, 1943, when the War Production Board sent a letter stating that "operation of the Lava Cap Gold Mine is no longer essential to the war effort. Your Serial Number 31-197-T is cancelled, effective June 1, 1943." Under threat of imprisonment, those charged with operating the Mine were thus directed to cease removal of "any ore *or waste* from such mine," Order L–208 at 7993 (emphasis added), until the Order was revoked in 1945, *see*

Limitation Order L–208, Revocation, 10 Fed. Reg. 8110 (June 30, 1945).

In its counterclaim to the government's claims below, Sterling argued that, through the issuance of the Order, the United States is potentially subject to CERCLA liability as an "operator" of the Site.  The district court entered summary judgment for the United States on Sterling's counterclaim, finding that the Order did not render the United States an "operator" of the Site.  We review that conclusion de novo. *See Cal. Dep't of Toxic Substances Control v. Westside Delivery, LLC*, 888 F.3d 1085, 1090 (9th Cir. 2018).

## II.

CERCLA imposes liability for incurred response costs to "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of."  42 U.S.C. § 9607(a)(2).  In this case, it is uncontested that the Site is a "facility" under 42 U.S.C. § 9601(9).  Furthermore, we assume based on the parties' representations that there was a "disposal of hazardous substances" at the facility when the Order was in effect.[2]  Thus, if the United States is an operator of the Site, it is subject to CERCLA liability.

The majority concludes that the United States is not an "operator" under CERCLA.  The majority's analysis is wrong, because it misinterprets and misapplies controlling Supreme Court precedent.  Let me explain.

---

[2] Though the district court did not address this question, counsel for the United States conceded that point both in the briefing, and at oral argument.

The Supreme Court's opinion in *United States v. Bestfoods*, 524 U.S. 51 (1998) outlines what actions are required to be an "operator" under CERCLA. "[T]o operate" under CERCLA "mean[s] something more than mere mechanical activation of pumps and valves, and must be read to contemplate 'operation' as including *the exercise of direction over the facility's activities*." *Bestfoods*, 524 U.S. at 71 (emphasis added).    Thus, the *Bestfoods* Court elaborated, an "operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility." *Id.* at 66.    Under *Bestfoods*, then, a party that merely "direct[s] . . . operations specifically related to pollution" would be an "operator."    *Id.*    Or, to use the majority's definition, "operator liability . . . requires some level of direction, management, or control over the facility's polluting activities."  Maj. Op. 15.

The majority concludes that the United States cannot be held liable as an "operator" in this case, because it merely "instructed the Mine to shut down its mining operations." *Id.* Thus, the majority posits, "[t]he record does not show that the United States ever managed, directed, or conducted operations specifically related to pollution at the facility." *Id.*    The majority errs, because it attempts to draw a distinction where there is none.  To "instruct," as the United States did, literally means "[t]o give orders to; direct." *Instruct*, American Heritage Dictionary (5th ed. 2012). There can be no dispute that the United States exercised direction over the facility's activities.  Thus, there is no real distinction in this case between "instruct[ing] the mine to shut down," and exercising "some level of direction, management, or control over the facility's polluting activities." Maj. Op. at 15.

By directing the mine to cease operations and prohibiting the removal of ore waste from the facility, the United States (through the issuance of the Order) prohibited the very activity which led to the pollution at the Site; it expressly prohibited the "remov[al] of any ore or waste" from the mine. Order L–208 at 7993. The United States thus "direct[ed] the workings of . . . a facility['s] . . . operations specifically related to pollution." *Bestfoods*, 524 U.S. at 66. Accordingly, the majority's assertion that "Order L–208 included no requirements as to 'operations specifically related to pollution,'" Maj. Op. 15 (quoting *Bestfoods*, 524 U.S. at 66), is flatly wrong; shutting all operations down necessarily involved the direction of "polluting activities." The Order directed the Lava Cap Gold Mining Corporation ("LCGMC") to cease removal of any waste from the mine. Order L–208 at 7993. Shutting down all operations certainly exercises direction over the activities of the facility. Indeed, it is hard to imagine a circumstance where a party could exercise more authority over a facility's operations related to pollution than to completely shut down those operations as the United States did here, specifically forbidding the removal of toxic ore waste from the mine.

The majority argues that the United States should not be held liable, because Lava Cap Gold Mining Corporation ("LCGMC") retained authority over "existing pollution controls." Maj. Op. 16. To be sure, LCGMC may have retained some authority over safety and any leaks at the Site. But that fact does not absolve the United States from liability, because the United States still directed operations having to do with the disposal of hazardous waste. Indeed, regardless of what limited authority LCGMC retained, operator liability extends to *all* those who "direct . . . operations having to do with the leakage *or* disposal of

24      UNITED STATES V. STERLING CENTRECORP.

hazardous waste." *Bestfoods*, 524 U.S. at 66–67 (emphasis added).

Moreover, it is inconsequential that the authority of the United States was "general" or "regulatory" in nature. Maj. Op. 16. Any reliance on the nature of the United States's action in determining that it was not an "operator" of the Site is misplaced, as we have held that the capacity in which the government acts is irrelevant to determining whether it is an "operator" under CERCLA. *See United States v. Shell Oil*, 294 F.3d 1045, 1053 (9th Cir. 2002) (noting that there is no "distinction between the [government's] exercise of private . . . and regulatory powers" in determining whether the United States is liable under CERCLA (second alteration in original) (quoting *East Bay Mun. Util. Dist. v. United States Dep't of Commerce*, 142 F.3d 479, 482 (D.C. Cir. 1998))). Rather, the "relevant . . . question under CERCLA" is simply "whether [the government's] activities, however characterized, are sufficient to impose liability on the government as an owner, operator, or arranger."[3]   *Id.* (alterations in original) (quoting *FMC Corp.*, 29 F.3d at 841–42). We have thus disposed of any distinction between regulatory actions and other actions in the context of CERCLA liability.[4]   294 F.3d at 1053 (noting that we align

---

[3] "This is true even if no private party could in fact engage in those specific activities." *FMC Corp. v. United States Dep't of Commerce*, 29 F.3d 833, 840 (3d Cir. 2002) (in banc) (noting that "the government can be liable when it engages in regulatory activities extensive enough to make it an operator of a facility . . . even though no private party could engage in the regulatory activities at issue").

[4] This language from *Shell Oil* indicates that we should reexamine our approach to determining CERCLA operator liability in light of *Bestfoods*. Pre-*Bestfoods*, and in addition to the *Long Beach Unified Sch. Dist. v. Dorothy B. Godwin Cal. Living Tr.*, 32 F.3d 1364, 1367 (9th

our approach with the Third Circuit's analysis in *FMC Corp.*, 29 F.3d at 841–42 and the D.C. Circuit's analysis in *East Bay Mun. Util. Dist.*, 142 F.3d at 482). Regardless of the capacity in which the government acts, it is an operator

---

Cir. 1994) standard (which is not necessarily at odds with *Bestfoods*), we applied an incredibly expansive "authority to control" standard for CERCLA operator liability. *See Kaiser Aluminum & Chem. Corp. v. Catellus Dev. Corp*, 976 F.2d 1338, 1341 (9th Cir. 1992). While *Bestfoods* does not require hands-on participation in day-to-day operations, *Bestfoods* does make clear that an "operator" must take some action—"an operator must *manage, direct, or conduct* operations specifically related to pollution"—and not merely possess the authority to do so. 524 U.S. at 66 (emphasis added). Moreover, in light of *Shell Oil Co.*, 294 F.3d at 1053, *Kaiser*'s "authority to control" standard would subject the United States to CERCLA liability as an operator nearly any time there was a disposal of toxic substances whether it actually acted or not, merely because it had (as it almost always has in the case of environmental contamination) the "authority to" step in and control the substance or facility.

Our decision today does not turn on *Kaiser*. However, our circuit's post-*Bestfoods* restatement of *Kaiser*'s "authority to control" standard in *City of Los Angeles v. San Pedro Boat Works*, 635 F.3d 440, 451 n.9 (9th Cir. 2011) creates confusion as district courts seek to apply the correct standard for determining CERCLA "operator" liability. Particularly because we restated *Kaiser*'s standard in dicta—indeed, the issue of CERCLA operator liability was not at issue in either case, *see id.* at 443—we should make some effort to clean up these inconsistencies; any confusion resulting from them falls on our shoulders for failing to critically analyze how our circuit's pre-*Bestfoods* precedent comports with *Bestfoods* before summarily restating that case law in dicta. *See Barapind v. Enomoto*, 400 F.3d 744, 759 (9th Cir. 2005) (en banc) (Ryder, J., concurring in the judgment in part and dissenting in part) (per curiam). Therefore, we should reexamine *Kaiser*'s "authority to control" standard to the extent it is inconsistent with *Bestfoods*, and ensure that the standard we do articulate comports both with the direction we have been given by the Supreme Court in *Bestfoods* and our precedent.

26      UNITED STATES V. STERLING CENTRECORP.

so long as it "directs the workings of, manages, or conducts the affairs of a facility." *Bestfoods*, 524 U.S. at 66.

Put differently, had a private entity exerted control over the Site coextensive with that exercised by the United States through the issuance of the Order—completely shutting down mining and waste disposal operations at the Site—it would assuredly be considered an "operator" under the *Bestfoods* standard. Merely because the Order was issued by the War Production Board in furtherance of the national defense during World War II does not protect the United States from liability. As we have stated in a similar context, "placing 'a cost of war on the United States, and thus on society as a whole, [constitutes] a result which is neither untoward nor inconsistent with the Policy underlying CERCLA.'" *Cadillac Fairview/California, Inc. v. Dow Chemical Co.*, 299 F.3d 1019, 1029 (alteration in original) (quoting *FMC Corp.*, 29 F.3d at 846). Thus, the United States cannot escape that same fate merely because it operated pursuant to its general regulatory authority. *See Shell Oil*, 294 F.3d at 1053.

Finally, the majority's reliance on *PPG Industries Inc. v. United States*, 957 F.3d 395 (3d Cir. 2020) is misplaced. *See* Maj. Op. 15. In fact, that case actually supports the proposition that the United States should be held liable here. In *PPG Industries*, the polluter was forced to argue that there was some "nexus" between the government's activities and waste disposal activities at the site, because there was "no evidence that the Government specifically controlled operations related to pollution." 957 F.3d at 403. There is no such attenuated relationship in this case. Indeed, it cannot be denied that the United States "specifically controlled operations related to pollution" and thereby involved itself with the pollution-creating waste dumping. *See id.* Thus,

unlike in *PPG Industries*, the United States exercised direct control over "operations specifically related to pollution" at the Site. *Bestfoods*, 524 U.S. at 66. Under the *Bestfoods* standard, the United States is therefore subject to CERCLA liability as an "operator" of the Site.